# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

In re:

| | |
|---|---|
| JLK CONSTRUCTION, LLC,<br><br>Debtor. | Case No.: 23-50034- btf11<br>Chapter 11 |
| JLK CONSTRUCTION, LLC,<br><br>Plaintiff,<br><br>v.<br><br>GFE NY, LLC, a New York limited liability company; WHITE ROAD CAPITAL, LLC, SERIES 120785, dba GFE HOLDINGS, a Delaware limited liability company; WHITE ROAD CAPITAL, LLC, SERIES 127009 DBA GFE HOLDINGS, a Delaware limited liability company; PREMIUM MERCHANT FUNDING 18, LLC, a Delaware limited liability company; BOOST CAPITAL GROUP, LLC, a New York limited liability company,<br><br>Defendant. | Adv. Pro. No. |

## COMPLAINT FOR:
### DECLARATORY RELIEF;
### FRAUD;
### USURY;
### UNJUST ENRICHMENT;
### AVOIDANCE OF FRAUDULENT TRANSFERS;
### AVOIDANCE OF TRANSFERS;
### PRESERVATION AND RECOVERY OF TRANSFERS;
### RACKETEERING (18 U.S.C. § 1962).

1

# I.

## INTRODUCTION,

## JURISDICTION, AND VENUE

Plaintiff JLK CONSTRUCTION, LLC, a Missouri limited liability company, the debtor and debtor-in-possession in the above-entitled case (the "Debtor" or "Plaintiff") hereby respectfully alleges and states as follows:

1.      Plaintiff, a Missouri limited liability company, is the debtor and debtor-in-possession in the Bankruptcy Case, with the rights, powers, and duties of a trustee. 11 U.S.C. §§1107 and 704.

2.      At all times herein mentioned, Defendant GFE NY, LLC is a New York corporation ("GFE") which is not and was not registered to transact business in the State of Missouri, and which therefore unlawfully transacted business in the State of Missouri when it fraudulently induced a small Missouri business, the Plaintiff here, to make extortionate and fraudulent loans, in violation of MO. REV. STAT. § 347.153 (2015).

3.      At all times herein mentioned, Defendants in this adversary proceeding is WHITE ROAD CAPITAL, LLC SERIES 120785, dba GFE HOLDINGS, a Delaware limited liability company ("WHITE ROAD 1") which is not and were not registered to transact business in the State of Missouri, and which therefore unlawfully transacted business in the State of Missouri when they fraudulently induced a small Missouri business, the Plaintiff here, to make extortionate and fraudulent loan, in violation of MO. REV. STAT. § 347.153 (2015).

4.      At all times herein mentioned, Defendants in this adversary proceeding are WHITE ROAD CAPITAL, LLC SERIES 127009, dba GFE HOLDINGS, a Delaware limited liability company ("WHITE ROAD 2") which are not and were not registered to transact business in the State of Missouri, and which therefore unlawfully transacted business in the State of Missouri when they fraudulently induced a small Missouri business, the Plaintiff here, to make extortionate and fraudulent loan, in violation of MO.

GFE

REV. STAT. § 347.153 (2015). Plaintiff is further informed and believes and based thereon that GFE, WHITE ROAD 1 and WHITE ROAD 2 are the alter-ego and/or joint-venturer of the other, and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Each of GFE's, WHITE ROAD 1's and WHITE ROAD 2's alleged actions were done with the permission, consent, and ratification of each other. GFE, WHITE ROAD 1 and WHITE ROAD 2 are hereinafter collectively referred to as "GFE".

5.      At all times herein mentioned, Defendant in this adversary proceeding is PREMIUM MERCHANT FUNDING 18, LLC, a Delaware limited liability company with its principal place of business in New York ("PMF") which is not and was not registered to transact business in the State of Missouri, and which therefore unlawfully transacted business in the State of Missouri in violation of MO. REV. STAT. § 347.153 (2015), when it brokered a loans between Plaintiff to make extortionate and fraudulent loans that Defendants, and each of them, misleadingly labeled a sale of "future receipts". Plaintiff is further informed and believes and based thereon alleges that PMF solicits loans and brokers loans for other lenders who made loans to this Debtor, including, but not limited to GCM Capital, LLC , in addition to making a loan directly to Plaintiff.

5.      At all times herein mentioned, Defendant in this adversary proceeding is BOOST CAPITAL GROUP, LLC, a New York limited liability company ("BOOST") which is not and was not registered to transact business in the State of Missouri, and which therefore unlawfully transacted business in the State of Missouri in violation of MO. REV. STAT. § 347.153 (2015) when it fraudulently induced a small Missouri business, the Plaintiff here, to make extortionate and fraudulent loans that Defendants misleadingly labeled a sale of "future receipts". Plaintiff is further informed and believes and based thereon alleges that BOOST solicits loans and brokers loans for other lenders who made loans to this Debtor, including, but not limited to Alva Advance, LLC, EIN CAP, FFCG, LLC, and Fundamental Capital, LLC.

6.     Plaintiff filed a petition under Chapter 11 of Title 11 of the United States Code on February 13, 2023 (the "Petition Date"), initiating *In re JLK Construction*, LLC, Case No. 23-50034-BTF (the "Bankruptcy Case").

7.     Within all times herein mentioned, Plaintiff was insolvent as defined by the *United States Bankruptcy Code*, 11 U.S.C. § 101(32).

8.     The claims in this adversary proceeding arise in and relate to the Bankruptcy Case.

9.     The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b).

10.    This adversary proceeding is a core proceeding under, *inter alia*, 28 U.S.C. §§ 157(b)(2)(A), (E), (F) and (H) and (O).

11.    If this adversary proceeding is determined to be a non-core proceeding, Plaintiff consents to the entry of final orders and judgments by the bankruptcy judge. Plaintiff notifies each Defendant that *Fed. R. Bankr. P.* 7012(b) requires it to admit or deny whether this adversary proceeding is a core or non-core proceeding and, if non-core, to state whether each Defendant consents, or does not consent, to the entry of final orders or judgment by the bankruptcy judge.

12.    This adversary proceeding is a civil proceeding arising in and related to the Bankruptcy Case, and such case is pending before this Court. Accordingly, venue in this Court is proper under 28 U.S.C. § 1409(a).

13.    Plaintiff is unaware of the names of other potential defendants who may be responsible for the unlawful practices, acts, conduct, and occurrences alleged herein. Plaintiff will seek leave of the Court to amend this Complaint to allege the true names and capacities of these unknown defendants, and to detail the roles they played once Plaintiff ascertains their identities and/or their manner of participation in the wrongful conduct herein described.

GFE

14.     At all relevant times, as alleged more fully herein, each Defendant acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint-venturer of the other Defendant, and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Each one of Defendants' alleged actions was done with the permission and consent of each of the other Defendants.

15.     At all relevant times, as alleged more fully herein, PMF was and is a loans broker for GFE acting as its agent, servant, employee, co-conspirator, alter-ego and/or joint-venturer of the other and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Each act of said Defendants alleged herein was done with the permission and consent of each of the other Defendants.

16.     At all relevant times, as alleged more fully herein, BOOST was and is a loan broker for GFE acting as its agent, servant, employee, co-conspirator, alter-ego and/or joint-venturer of the other and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Each act of said Defendants alleged herein were done with the permission and consent of each of the other Defendants.

## II.

## FACTUAL BACKGROUND

17.     Plaintiff is informed and believes, and based thereon alleges that PMF is a consulting group and loan broker.

18.     Beginning on or about 2019, Plaintiff received telephone solicitations from PMF, offering PMF's Premium Business Financing Service and Custom Small Business Solutions, which includes credit servicing, credit card processing, bookkeeping, payroll, SEO (Search Engine Optimization), and employee retention credit program as well as

5

Merchant Cash Advances, Line of Credit, Equipment Financing, Mortgage Financing,

Term Loans, Factoring, P.O. Financing, and SBA Loans.

19.     On or about February 1, 2022 by interstate cell phone communication and

interstate e-mail communication, PMF's Premium Financing Service pitch to Plaintiff

was that:

> a.     Lenders for which it brokered transactions were legitimate business
> lenders;
>
> b.     Lenders for which it brokered transactions charged reasonable
> interest rates.
>
> c.     Loans which it brokered were based on commercially reasonable
> terms that would be repaid from daily or weekly withdrawals from
> Plaintiff's bank account; and
>
> d.     Lenders for which it brokered transactions would work with Plaintiff
> just like a bank but would be easier to work with than a bank.

20.     On or about February 14, 2022, Plaintiff and Defendant PMF executed a

one-year Consulting Agreement pursuant to which PMF contracted to provide a:

> broad array of services and solutions for small businesses. PMF advises
> merchants on reliable, safe, and innovative financing and payments
> solutions combined with *individualized* attention to provide *tailored*
> solutions that respond to the various needs of the business, including but
> not limited to Accounting, Payroll Processing, Marketing, Branding and
> more. Our all-inclusive bundle will provide Client with a thorough review
> of the various metrics of their business and provided *tailored* solutions that
> solve the business's most pressing needs.

(*Emphasis added*.) A true and correct copy of PMF's Consulting Agreement is attached

hereto as *Exhibit "1"*.

21.     Pursuant to the Consulting Agreement, Plaintiff agreed to pay a 9% flat fee

commission for PMF's services payable at the earlier of the (i) completion of any of the

services contemplated by the Consulting Agreement or (ii) the delivery of any financing.

GFE

20.     Plaintiff is informed and believes, and based thereon alleges that BOOST is a loan broker.

21.     Beginning in or about 2020, Plaintiff received interstate telephone solicitations from BOOST, offering his brokering services.

22.     BOOST's lending pitch to Plaintiff was that:

    a.     Lenders for which it brokered transactions were legitimate business lenders;

    b.     Lenders for which it brokered transactions charged reasonable interest rates.

    c.     Loans which it brokered were based on commercially reasonable terms that would be repaid from daily or weekly withdrawals from Plaintiff's bank account; and

    d.     Lenders for which it brokered transactions would work with Plaintiff just like a bank but would be easier to work with than a bank.

23.     When Defendants made the foregoing representations and offered financing to Plaintiff, Defendants, GFE, PMF, and BOOST, and each of them, were aware of the following facts:

    A.     Plaintiff was a Missouri limited liability company;

    B.     Plaintiff had no regular business operations outside of Missouri; and

    C.     Plaintiff had no contacts with New York, the stated jurisdiction, venue, and choice of law designated by the Loans Documents.

24.     PMF brokered and arranged for Plaintiff to borrow money from GFE for which Plaintiff paid PMF a commission or referral fee ("Commission Transfers")

25.     BOOST brokered and arranged for Plaintiff to borrow money from GFE for which Plaintiff paid BOOST a commission or referral fee ("Commission Transfers")

26.     Defendants made four short term loans to Plaintiff, the terms of which required daily payments designed to pay the balance over the course of between 111 to

GFE

218 business days, without disclosing that Defendants were charging an interest rate between 0.3659% daily and .9827% daily, or an imputed annual interest rate between 133% and 358%. As a result, each loan was usurious, extortionate, and unconscionable in violation of New York, Missouri, and Federal law.

27.     Plaintiff is informed and believes and based thereon alleges that at all times herein mentioned, Defendants and each of them, had actual and constructive knowledge that they were brokering or making loans without disclosing a material term, i.e., the interest rate that Defendants purported to charge Plaintiff. In fact, Plaintiff alleges that the interest rate charged by the Defendant to the Plaintiff was exorbitant, unconscionable, and criminal.

28.     The Loans Documents do not identify Plaintiff's receivables that Defendants purported to purchase by date, percentage, name, or any other identifying data that demonstrate Plaintiff's ownership of such receivables. Plaintiff made no alterations to any of Defendants' form documents

<u>The Loans</u>

10.     On or about August 2, 2021, GFE made a Loan of money to Plaintiff in the amount of $125,000.00 (the "August 2nd Loan"), for which Plaintiff was required to repay Defendant the sum of $180,000.00 ("Receivables Purchased Amount") within 139 business days. PMF brokered the loan between Plaintiff and GFE. Attached hereto as *Exhibit "2"* is a true and correct copy of the Merchant Agreement ("August 2nd Loan Documents") pursuant to which GFE made such Loan to Plaintiff. Plaintiff paid GFE $97,500.00.  Pursuant to the Weekly Advance Addendum to Merchant Agreement, attached hereto as part of Exhibit "2", The Loan was broken into 10 weekly amounts.

11.     The effective daily interest rate on the August 2nd Loan was 0.6858%, or 250.3150% annually, more than the allowable interest rate pursuant to New York, Missouri, or Federal law.

12.     On December 7, 2021, GFE made a loan of money to Plaintiff in the amount of $600,000.00 (the "December 7th Loan"), for which Plaintiff was required to repay Defendant the sum of $870,000.00 ("Receivables Purchased Amount") within 218 business days. PMF brokered the loan between Plaintiff and GFE. Attached hereto as *Exhibit "3"* is a true and correct copy of the Merchant Agreement ("December 7th Loan Documents") pursuant to which GFE made such loan to Plaintiff. Plaintiff paid GFE $ 893,994.00.

13.     The effective daily interest rate on the December 7th Loan was 0.3659%, or 133.5360% annually, more than the allowable interest rate pursuant to New York, Missouri, or Federal law

14.     On July 13, 2022, GFE made a Loan of money to Plaintiff in the amount of $277,000.00 (the "July 13th Loan"), for which Plaintiff was required to repay Defendants the sum of $387,523.00 ("Receivables Purchased Amount") within 156 weeks. PMF brokered the loan between Plaintiff and GFE. Attached hereto as *Exhibit "4"* is true and correct copy of the Merchant Agreement July 13th Loan Documents pursuant to which GFE made such loan to Plaintiff. Pursuant to the Weekly Advance Addendum to Merchant Agreement, attached hereto as part of *Exhibit "4"*, the loan was broken into 18 weekly amounts; the lender only advanced 4 of the of the 18 installments for a total of $64,331.00. On July 28, 2022, GFE withdrew $63,716.29; in total, Plaintiff paid GFE $83,207.29.

15.     The effective daily interest rate on the July 13th Loan was 0.4640%, or 169.350% annually, more than the allowable interest rate pursuant to New York, Missouri, or Federal law.

16.     On August 5, 2022, GFE made a loan of money to Plaintiff in the amount of $50,000.00 (the "August 5th Loan"), for which Plaintiff was required to repay GFE the sum of $64,950.00 ("Receivables Purchased Amount") within 111 business days. BOOST brokered the loan between Plaintiff and GFE. Attached hereto as *Exhibit "5"* is a true and

9

correct copy of the Merchant Agreement ("August 5th Loan Documents ") pursuant to which it made such loan to Plaintiff. Plaintiff paid GFE $67,421.80. The August 2nd Loan Documents, December 7th Loan Documents, July 13th Loan Documents and August 5th Loan Documents are hereinafter collectively referred to as "Loan Documents".

17.     The effective daily interest rate on the August 5th Loan was 0.7208%, or 263.10% annually, more than the allowable interest rate pursuant to New York, Missouri, or Federal law.

18.     Defendants transmitted the Loan Documents to Plaintiff through interstate email transmission for signature by DocuSign.

19.     The Loan Documents violate New York and/or Missouri law because each one fails to disclose the interest rate, which is a material term of the contract for a loan. The annual interest rate or cost of funding that Defendants charged to Plaintiff and which Plaintiff paid was more than 25%, which exceeds the maximum interest rate permitted by New York law. N.Y. PENAL LAW §190.42.

20.     Plaintiff relied upon Defendants' representations and on the basis thereof accepted the loans offered by them.

21.     Defendants intentionally failed to disclose a material term of each loan by failing to disclose the interest rate that Defendants, and each of them, purported to charge to the Plaintiff by fraudulently labeling the loans sales of "future receipts." In fact, nothing Plaintiff sold nothing. The transactions offered and executed were and are loans of money, notwithstanding the language at "Section 1.9 that "Merchant and GFE agree that the Purchase Price under this Agreement is in exchange for the Purchased amount and that such Purchase Price is not intended to be, nor shall be construed as a loan from GFE to Merchant."

22.     Defendants intentionally misled Plaintiff by placing on the first page of the Loan Documents a percentage rate of 15% that was intended to confuse, mislead, and trick Plaintiff into believing that the stated percentage was the interest rate for the loans,

GFE

when in fact, the percentage rate related to the percentage of daily receivables to be deducted from Plaintiff's bank account until the loans were repaid.

23.    Defendants knew, or had reason to know, that the loans bore an interest at a rate of more than 25% per annum.

24.    Defendants knew, or had reasons to know, that Plaintiff would pay Defendants interest at a rate more than 25% on all funds received from the loans between Plaintiff and Defendants.

25.    At the time the Defendants made the loans to Plaintiff, Defendants were transacting interstate business in Missouri through repeated and successive transactions of business with Plaintiff, beginning from the time PMF or BOOST first solicited Plaintiff's business as a broker and received commissions therefore, and, from the time that Defendants made their loans to Plaintiff thereafter withdrew the Loan Transfers and/or Commission Transfers from Plaintiff's bank account.

26.    Defendants violated Missouri law because they were not authorized to conduct business in Missouri. Defendants continued to do business in the State of Missouri and to make loans and withdraw money from Plaintiff's bank account in Missouri in violation of Missouri law.

27.    Plaintiff made the series of transfers to GFE identified in *Exhibit "6"* attached hereto on account of the August 2nd Loan ("August 2nd Loan Transfers") from Plaintiff's property in the sum of $97,500.00.

28.    Plaintiff made the series of transfers to GFE identified in *Exhibit "7"* attached hereto on account of the December 7th Loan ("December 7th Loan Transfers") from Plaintiff's property in the sum of $893,994.00.

29.    Plaintiff made the series of transfers to GFE identified in *Exhibit "8"* attached hereto on account of the July 13th Loan ("July 13th Loan Transfers") from Plaintiff's property in the sum of $83,207.29.

GFE

30.     Plaintiff made the series of transfers to GFE identified in *Exhibit "9"* attached hereto on account of the August 5th Loan ("August 5th Loan Transfers") from Plaintiff's property in the sum of $67,421.80.

31.     Plaintiff made transfers to PMF on account of the August 2nd, December 7th and July 13th Loan ("PMF Commission Transfers") from Plaintiff's property in an amount according to proof.

32.     Plaintiff made the transfer to BOOST on account of the August 5th ("BOOST Commission Transfers") from Plaintiff's property in an amount according to proof.

33.     The transactions represented in the Loan Documents were loans notwithstanding the "Reconciliation Provision," Defendants required daily payments, a security interest in all of Plaintiff's receivables and, the personal guarantee of the Plaintiff's principal. The transactions were loans because the agreements relied on the Plaintiff's creditworthiness, rather than the creditworthiness of Plaintiff's customers, who owed Plaintiff receivables.

34.     Defendants had a confidential relationship with the Plaintiff because Plaintiff relied on and trusted them with the management of Plaintiff's property when the Loan Documents dictated that the manner of Plaintiff's repayment to Defendants was a daily withdrawal of money directly from Plaintiff's designated bank account. As a result, Defendants had a fiduciary duty to Plaintiff.

35.     When Defendants made the loans to Plaintiff, Defendants knew the effective annual interest rate was more than 25% and in fact between 169.50% and 358% and that such rates were unconscionable. Defendants knowingly and intentionally engaged in loan sharking in Missouri when it made the loans in violation of New York, Missouri, and Federal Law.

36.     The transactions offered by Defendants and accepted by Plaintiff were loans of money notwithstanding that Defendants described the transaction in each of the Loan Documents as a sale of "future receipts."

37.     Defendants' Loan Documents provide for recovery of attorneys' fees and costs and Plaintiff is therefore entitled to an award of attorneys' fees and costs pursuant to Missouri law, MO. REV. STAT. § 455.075 (2022) and New York Law, N.Y. DEBT. & CRED. LAW § 278(A).

## FIRST CLAIM FOR RELIEF:

## DECLARATORY RELIEF

38.     Plaintiff alleges Paragraphs 1 through 37, inclusive, as though fully stated in full herein.

39.     Plaintiff alleges that the transactions documented by the Loan Documents were and are void and unenforceable due to Defendants' status when they made the loans and because Defendants fraudulently induced Plaintiff to execute the Loan Documents .

40.     Plaintiff alleges the transactions documented by the Loan Documents were and are *void ab intio* and unenforceable pursuant to New York law that provides that for loans found to be criminally usurious, for the interest rates of more than 25%, the loans are unenforceable. Defendants' Loans to Plaintiff were and are criminally usurious. N.Y. PENAL CODE § 190.42.

41.     Plaintiff alleges the transactions documented and reflected in the Loan Documents were loans of money under New York law. Defendants dispute this contention and alleges the transactions reflected in the Loan Documents are purchases of "future receipts", not loans.

42.     Plaintiff alleges that the transactions documented and reflected in the Loan Documents were loans of money because Defendant GFE bore the risk of non-performance because: a) although the Loan Documents contain a reconciliation provision, Defendant GFE did not permit reconciliation; b) the selection of daily payment

GFE

rates did not represent a good faith estimate of receivables; c) the Loan Documents provisions permit rejection of an automated debit without prior notice an event of default entitling Defendant GFE to immediate repayment of the full uncollected purchased amount; and d) the Loan Documents authorize Defendants GFE to collect on the personal guaranty in the event of Plaintiff's inability to pay or bankruptcy.

## <u>SECOND CLAIM FOR RELIEF</u>:

### FRAUD

43.    Plaintiff alleges Paragraphs 1 through 36, inclusive and Paragraphs 39, inclusive, through 42, inclusive, as though fully stated in full herein.

44.    Defendants fraudulently represented to Plaintiff that the interest rates chargeable for the loans were reasonable and lawful, when in fact the rates were greater than the allowed rates pursuant to New York law and Federal law, and which are exorbitant pursuant to Missouri law.

45.    Defendants knew that the Loan Documents falsely represented that the transactions were sales of future receipts and intended that Plaintiff would act in the manner reasonably contemplated by the Loan Documents drafted by the Defendants.

46.    Plaintiff reasonably relied upon these false representations and was induced to execute the Loan Documents by these fraudulent and deceitful material falsehoods and believed Defendants' statements to be true.

47.    Plaintiff was damaged by the above-described fraud in a sum of not less than $1,142,123 on account of the Loans Transfers and in a sum according to proof on account of the Commission Transfers.

48.    PMF's conduct with respect to Plaintiff was egregious and directed at Plaintiff by charging it interest rate that is more than the interest rate that is considered criminal usury and in fact, felonious usury pursuant to New York law, which was a pattern of activity directed to the public generally and Plaintiff is entitled to punitive damages in the sum of $100,000.00.

49.      Boost's conduct with respect to Plaintiff was egregious and directed at Plaintiff by charging it interest rate that is more than the interest rate that is considered criminal usury and in fact, felonious usury pursuant to New York law, which was a pattern of activity directed to the public generally and Plaintiff is entitled to punitive damages in the sum of $100,000.00.

50.      GFE's conduct with respect to Plaintiff was egregious and directed at Plaintiff by charging it interest rate that is more than the interest rate that is considered criminal usury and in fact, felonious usury pursuant to New York law, which was a pattern of activity directed to the public generally and Plaintiff is entitled to punitive damages in the sum of $3,000,000.00.

### **THIRD CLAIM FOR RELIEF:**

### **USURY**

51.      Plaintiff alleges Paragraphs 1 through 37, inclusive and Paragraphs 39 through 42, inclusive, and Paragraphs 44 through Paragraph 50, inclusive as though fully stated in full herein.

52.      Defendants knowingly, willfully, and intentionally charged interest on the sums advanced pursuant to the loans more than New York's usury limitations.

53.      Defendants charged interest rates on the loans more than the 25% usury limitations in N.Y. DEBT. & CRED. PENAL LAW § 190.42 makes it a criminal offense to charge an effective interest rate of more than 25% but less than 45%.

54.      Defendants charged interest rates on the loans of more than 45%, in addition to other fees that are usurious and extortionate themselves. N.Y. DEBT. & CRED. PENAL LAW § 190.42 provides that interest rates that exceed 45% are punishable as felony.

55.      The loans to Plaintiff are criminally usurious, compelling forfeitures of interest.

56.     The loans to Plaintiff are criminally usurious and are therefore unenforceable.

57.     Plaintiff is entitled to an award of attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF:

### UNJUST ENRICHMENT

58.     Plaintiff alleges Paragraphs 1 through 37, inclusive and Paragraphs 39 through 42, inclusive, Paragraphs 44 through Paragraph 50, Paragraphs 52 through Paragraph 57, inclusive, as though fully stated in full herein.

59.     Defendants unjustly retained benefits at Plaintiff's expense.

60.     Defendants financially benefitted at the Plaintiff's expense from the loans; equity and good conscience require restitution in the amount of at least $1,142,123, Plaintiff's payments to GFE as well as Plaintiff's payments to PMF and BOOST("Commission Transfers") in an amount according to proof, as well as by the loss of business to Plaintiff.

61.     There is a lack of remedy under the law.

## FIFTH CLAIM FOR RELIEF:

### AVOIDANCE OF FRAUDULENT TRANSFER

(11 U.S.C. § 548(a)(l)(B), MO. REV. STAT. § 428.024,

N.Y. DEBT. & CRED. LAW §§ 270-280)

62.     Plaintiff alleges Paragraphs 1 through 37 inclusive, as though fully stated in full herein.

63.     Defendants withdrew the Loan Transfers and Commission Transfers from the Plaintiff's bank accounts within two years before the date of the filing of Plaintiff's Petition.

64.     Plaintiff did not receive reasonably equivalent value for the Loan Transfers and Commission Transfers.

16

GFE

65.     At the time Plaintiff made the Loan Transfers and Commission Transfers, Plaintiff was insolvent or became insolvent because of such transfers for the following reasons:

A.     The sum of Plaintiff's debts was greater than the value all of Plaintiff's property, determined at a fair valuation;

B.     Plaintiff was engaged or was about to engage in a business or a transaction for which Plaintiff's remaining assets were unreasonably small in relation to the business or transaction; and

C.     Plaintiff intended to incur, or it believed or should have reasonably believed that it would incur, debts beyond its ability to pay as they became due thereafter.

66.     The Loan Transfers and Commission Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(l)(B) and the *Missouri Uniform Fraudulent Transfer Act*, MO. REV. STAT. § 428.024 and the *Uniform Voidable Transactions Act,* N.Y. DEBT. & CRED. LAW §§ 270-280. Plaintiff is entitled to a judgment for relief in no less than the sums on account of the Loan Transfers in the sum of $1,142,123 and in an amount according to proof on account of the Commission Transfers, and for a declaration that loans are void, in addition to attorneys' fees.

## SIXTH CLAIM FOR RELIEF:

### AVOIDANCE OF TRANSFERS

(11 U.S.C. § 544)

67.     Plaintiff alleges Paragraphs 1 through 37 inclusive, and Paragraphs 63 through 67, inclusive, as though fully stated in full herein.

68.     Defendants withdrew the Loan Transfers and Commission Transfers from the Plaintiff's bank accounts.

69.     Plaintiff did not receive reasonably equivalent value for the Loan Transfers or Commission Transfers.

GFE

70.     At the time Defendants withdrew from Plaintiff's bank account for the
Loan Transfers and Commission Transfers, Plaintiff was insolvent or became insolvent
because of such transfers for the following reasons:

A.     The sum of Plaintiff's debts was greater than the value all of
Plaintiff's property, determined at a fair valuation;

B.     Plaintiff was engaged or was about to engage in a business or a
transaction for which Plaintiff's remaining assets were unreasonably small
in relation to the business or transaction; and

C.     Plaintiff intended to incur, or it believed or reasonably should have
believed that it would incur, debts beyond its ability to pay as they became
due thereafter.

71.     The Plaintiff made the Loan Transfers and Commission Transfers at a time
when Plaintiff owed money to at least one creditor, and such creditor holds an unsecured
claim that is allowable pursuant to 11 U.S.C. § 502.

72.     The Loan Transfers and Commission Transfers are avoidable pursuant to 11
U.S.C. § 544 and the *Missouri Uniform Fraudulent Transfer Act*, MO. REV. STAT. §
428.024 as well as the *Uniform Voidable Transactions Act*, N.Y. DEBT. & CRED. Law
§§ 270-280.

## SEVENTH CLAIM FOR RELIEF

### PRESERVATION AND RECOVERY OF TRANSFERS

( 11 U.S.C. § 550)

73.     Plaintiff alleges Paragraphs 1 through 37, inclusive and Paragraphs 63
through 66 inclusive, and Paragraphs 68 through 72, inclusive, as though fully stated in
full herein.

74.     The Loan Transfers and the Commission Transfers are avoidable pursuant
to 11 U.S.C. § 544, 11 U.S.C. § 547, 11 U.S.C. § 548, the *Missouri Uniform Fraudulent*

18

*Transfer Act,* MO. REV. STAT. § 428.024 as well as the *Uniform Voidable Transactions Act*, N.Y. DEBT. & CRED. Law §§ 270-280.

75. Plaintiff moves to preserve and recover each of them as provided by 11 U.S.C. §§ 550 and 551, as more fully set forth in the Fifth and Sixth Claims for Relief.

## EIGHTH CLAIM FOR RELIEF:

## RICO

(18 U.S.C. §1961 *et. seq.*)

76. Plaintiff alleges Paragraphs 1 through 37, inclusive, Paragraphs 39 through 42, inclusive, Paragraphs 44 through 50, inclusive, Paragraphs 52 through 57, inclusive, and Paragraphs 59 through Paragraphs 61, inclusive, as though fully stated in full herein.

77. This claim against Defendants GFE, PMF and BOOST for civil liability is premised upon 18 U.S.C. § 1961*, et. seq.*, also known as the *Racketeer Influence and Corporate Organizations Act* ("RICO").

78. As alleged herein, Defendants' actions fall within the scope of this statute, pursuant to 18 U.S.C. § 892:

(a) Whoever makes any extortionate extension of credit, or conspires to do so, shall be fined under this title, or imprisoned not more than 20 years, or both.

(b) In any prosecution under this section, if it is shown that all the following factors were present in connection with the extension of credit in question, there is prima facie evidence that the extension of credit was extortionate, but this subsection is nonexclusive and in no way limits the effect or applicability of subsection (a):

(1) The repayment of the extension of credit, or the performance of any promise given in consideration thereof, would be unenforceable, through civil judicial processes against the debtor (A) in the jurisdiction within which the debtor, if a natural person, resided or (B) in every jurisdiction within which the debtor, if other than a natural person, was incorporated or qualified to do business at the time the extension of credit was made.

(2) The extension of credit was made at a rate of interest in excess of an annual rate of 45 per centum calculated according to the actuarial method of allocating payments made on a debt between principal and interest, pursuant to which a payment is applied first to the accumulated interest and the balance is applied to the unpaid principal.

(3) At the time the extension of credit was made, the debtor reasonably believed that either (A) one or more extensions of credit by the creditor had been

GFE

collected or attempted to be collected by extortionate means, or the nonrepayment thereof had been punished by extortionate means; or (B) the creditor had a reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof.

(4)     Upon the making of the extension of credit, the total of the extensions of credit by the creditor to the debtor then outstanding, including any unpaid interest or similar charges, exceeded $100.

79.     GFE and PMF are employed by or associated with the enterprise.

80.     GFE and PMF engaged in an enterprise whose activities affect interstate commerce by use of wire fraud, using telecommunications and information technology to continually make withdrawals directly from Plaintiff's bank account to collect the amounts asserted to be due pursuant to the Loan Documents .

81.     GFE and PMF agreed to and did engage in an enterprise by their conduct in the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff as detailed in the allegations above and to charge unconscionable, undisclosed, and criminally usurious interest rates to Plaintiff, to engage in loan sharking or predatory lending across state lines use of wire fraud.

82.     GFE and BOOST are employed by or associated with the enterprise.

83.     GFE and BOOST engaged in an enterprise whose activities affect interstate commerce by use of wire fraud, using telecommunications and information technology to continually make withdrawals directly from Plaintiff's bank account to collect the amounts asserted to be due pursuant to the Loan Documents .

84.     GFE and BOOST agreed to and did engage in an enterprise by their conduct in the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff as detailed in the allegations above and to charge unconscionable, undisclosed, and criminally usurious interest rates to Plaintiff, to engage in loan sharking or predatory lending across state lines use of wire fraud.

85.     Defendant PMF and/or BOOST brokered and Defendant GFE executed loans with Plaintiff, as a result of which Defendants withdrew the Loan Transfers and/or

GFE

Commission Transfers from Plaintiff's bank account from August 2021 through November 2022 as a regular means of collecting on the loans, which was an unlawful debt.

86.     Defendants engaged in a pattern of racketeering by charging criminal and felonious interest rates to Plaintiff over the entire period of time during which Defendants withdrew payments from Plaintiff's bank account. As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business and property as its business revenues have declined, it has lost millions in value, its business reputation has been severely damaged in the community, it has been rendered insolvent, and it has been forced to seek relief pursuant to Chapter 11 of the United States Bankruptcy Code and pay or will pay all of the costs associated with a Chapter 11 filing, including attorneys' fees for the prosecution of this adversary proceeding.

87.     Plaintiff requests that this Court enter a judgment against EIN CAP and NAFTALI in the amount of Plaintiff's actual damages, plus treble damages, and attorney's fee.

### **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for a judgment as follows:

On its First Claim for Relief for Declaratory Relief that:

1.     The transactions in the Loan Documents are loans of money under applicable law;

2.     Defendants were unlawfully doing business in Missouri when they made the loans;

3.     The contracts in the Loan Documents are unenforceable and/or void;

4.     Since the contracts in the Loan Documents are void and unenforceable any repayments of principal and interest made with respect to the alleged obligations therein were made for no consideration.

21

GFE

5.      The Loan Documents violate applicable law because each one fails to disclosure a material term of the loans by failing to state the interest rate(s);

6.      For recovery of principal, interest and commissions paid to Defendants by Plaintiff; and

7.      For attorneys' fees and court costs.

On Plaintiff's Second Claim for Relief for Fraud:

8.      For a judgment for fraud against Defendants;

9.      For recovery of principal and interest paid to GFE by Plaintiff because of the Loan Transfers in the sum of $1,142,123;

10.     For recovery of the Commission Transfers paid to PMF because of the Commission Transfers in a sum according to proof;

11.     For recovery of the Commission Transfers paid to BOOST because of the Commission Transfers in a sum according to proof;

12.     Punitive damages in the sum of no less than $3,000,000.00 against GFE;

13.     Punitive damages in the sum of no less than $100,000.00 against PMF;

14.     Punitive damages in the sum of no less than $100,000.00 against BOOST;

On the Third Claim for Relief for Usury:

15.     For a judgment preserving and recovering for the benefit of the estate the interest paid to Defendants on account of the loans, plus a penalty equal to be trebled the interest that Plaintiff paid Defendant on account of the loans pursuant to applicable law

16.     Declaring the loans unenforceable; and

17.     For attorneys' fees and costs

On the Fourth Claim for Relief for Unjust Enrichment:

18.     For a judgment that Defendants have unjustly retained the benefit at Plaintiff's expense;

GFE

19.     For an order of restitution in the amount of at least $1,142,123 on account of the Loan Transfers to GFE, as well as damages by the loss of business to Plaintiff, according to proof;

20.     For an order of restitution on account of the PMF Commission Transfers as well as damages by the loss of business to Plaintiff, according to proof;

21.     For an order of restitution on account of the BOOST Commission Transfer; account of the Commission Transfers, as well as damages by the loss of business to Plaintiff, according to proof;

On Plaintiff's Fifth Claim for Relief Avoidance of Fraudulent Transfers:

22.     For a judgment avoiding the Loan Transfers; and

23.     For a judgment avoiding the Commission Transfers.

On Plaintiff's Sixth Claim for Relief for Avoidance of Transfers:

24.     For a judgment avoiding the Loan Transfers; and

25.     For a judgment avoiding the Commission Transfers.

On the Seventh Claim for Relief for Preservation and Recovery of Transfers:

26.     For a judgment preserving and recovering for the benefit of the estate the avoidable transfers described in the Fifth and Sixth Claims for Relief as provided in 11 U.S.C. §§ 550 and 551.

On the Ninth Claim for Relief for RICO:

27.     For a judgment against Defendants in the amount of the Plaintiff's actual damages, and attorneys' fees and costs as provided by law for no less than $1,000,000.00, to be trebled as allowed by applicable law.

On all Claims for Relief:

28.     For such other and further relief as the Court deems just and proper.

Dated: October 24, 2023          THE FOX LAW CORPORATION, INC.

By: */s/ Steven R. Fox*
Steven R. Fox, CA State Bar No. 138808
17835 Ventura Blvd, Suite 306,
Encino, California A 91316
Tel: (818) 774-3545; Fax (818) 774-3707
Srfox@foxlaw.com

EVANS & MULLINIX, P.A.


By: /s/ Colin N. Gotham
Colin N. Gotham, KS #19538; MO#52343
7225 Renner Road, Suite 200
Shawnee, KS 66217
Tel: (913) 962-8700; Fax: (913) 962-8701
cgotham@emlawkc.com

Counsel for Debtor-in-Possession, JLK
Construction, LLC

GFE

## Index of Exhibits

| | |
|---|---|
| *Exhibit "1"* | PMF Consulting Agreement |
| *Exhibit "2"* | August 2, 2021 Loan Documents |
| *Exhibit "3"* | December 7, 2021 Loan Documents |
| *Exhibit "4"* | July 13, 2022 Loan Documents |
| *Exhibit "5"* | August 5, 2022 Loan Documents |
| *Exhibit "6"* | August 2nd Loan Transfers |
| *Exhibit "7"* | December 7th Loan Transfers |
| *Exhibit "8"* | July 13th Loan Transfers |
| *Exhibit "9"* | August 5th Loan Transfers |

GFE

Exhibit "1"

DocuSign Envelope ID:



WWW.PMFUS.COM

# Consulting

# Agreement

DocuSign Envelope ID:

# Consulting Agreement



AGREEMENT made on 02 / 14 / 20 22 , by and between                    JLK Construction, LLC                    and

its affiliated or parent or related entities located at            1214 Frederick Avenue, St. Joseph Missouri, 64501

(hereinafter referred to as the "Client"), and Premium Merchant Funding 18, LLC, located at 55 Water St. 50th Floor, New York, NY

10041 (hereinafter referred to as "PMF"). Client and PMF shall be referred to collectively as the "Parties."

In consideration of the mutual covenants and undertakings to be performed by this Agreement, the parties agree as follows:

1. Description of Services. Premium Merchant Funding's mission is to provide a broad array of services and solutions for small businesses. PMF advises merchants on reliable, safe, and innovative financing and payment solutions combined with individualized attention to provide tailored solutions that respond to the various needs of the business, including but not limited to Accounting, Payroll Processing, Marketing, Branding, and more. Our all-inclusive consulting bundles will provide Client with a thorough review of the various metrics of their business and provide tailored solutions that solve the business's most pressing needs.

2. Fees. PMF's fee will be a flat fee of $ _____9%_____ ("Fee"). Fee shall be earned upon the signing of this agreement and payable at the earlier of: (i) The completion of any of the services contemplated by this agreement or (ii) the delivery of any financing, and shall survive the termination of this Agreement. The Client agrees to pay all necessary out of pocket expense: i.e.; title, appraisal, inspection, recording and legal costs required by a prospective lender or PMF in connection with any commitment for or closing of a Financing. Fees, as set forth herein, shall be calculated without any discount or allowance for any efforts made by Client or by any other person in connection with the consummation of any Financing.

3. Term of Agreement. This agreement shall commence on the date of signing and terminate automatically upon completion by PMF of the services contemplated by this agreement or one (1) year from the date of signing, whichever is earlier.

4. Representation and Cooperation. Client authorizes PMF to communicate on Client's behalf with any party that is required in order to carry out the services contemplated by this Agreement. These communications may be made via electronic messages, phone, in person, or any other means necessary. Client authorizes PMF to make all representations on Client's behalf, except for the consummation of any financing or acceptance of an agreement in which Client is to be a party. Client agrees to cooperate with PMF and any parties introduced by PMF and use its best efforts to supply PMF and such parties with complete and accurate documents and information reasonably requested by PMF or such parties.

DocuSign Envelope ID:

CONSULTING AGREEMENT



Upon the issuance of a commitment, Client agrees to use its best efforts to "close" on the Financing that is the subject of said commitment. Without limiting the generality of the foregoing, Client agrees to supply PMF with updated and current documents and information upon request by PMF. Client further agrees not to circumvent, or attempt to circumvent, the terms of this Agreement. PMF's right to represent, negotiate, and correspond on behalf of Client shall be limited to those communications and tasks necessary to carry out the services contemplated by this agreement.

5. Indemnification; Limitation of Damages. Client agrees to indemnify and hold harmless PMF from all claims, losses, expenses, fees including attorneys' fees, costs, and judgments that may be asserted against PMF that result from the acts or omissions of Client, Client's employees or agents. In no event shall PMF be liable for damages due to loss of use, data, or profits, interruption of business or any special, incidental, indirect, exemplary, or consequential damages, arising out of or in connection with this Agreement, however caused, on any theory of liability, whether in an action for contract, strict liability, tort, or otherwise, whether or not Client has been advised of the possibility of such damages.

6. Notices. All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in the United States mail, postage prepaid, to the address first listed above. Such address may be changed from time to time by either party by providing written notice to the other in the manner set forth above.

7. Miscellaneous. (i) This Agreement contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties; (ii) It is understood by the parties that PMF is an independent contractor with respect to Client, and not an employee of Client. PMF's employees, agents, and contractors, if any, who perform services for Client under this Agreement shall also be bound by the provisions of this Agreement. (iii) This Agreement may be modified or amended if the amendment is made in writing and signed by both parties; (iv) If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited; (v) The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement; (vi) This Agreement shall be governed by the laws of the State of New York; (vii) This Agreement may be executed in any number of counterparts and via facsimile or other electronic means, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument; (viii) The provisions of this Agreement were negotiated between sophisticated parties. Accordingly, any ambiguity or issue concerning the drafting of this Agreement shall not be construed for or against PMF or Client; (ix) The person signing this Agreement certifies that he has the authority as a principal, or as an authorized agent of the Client, to sign this Agreement.

DocuSign Envelope ID



CONSULTING AGREEMENT

IN WITNESS THEREOF, the parties have executed this Agreement the day and year first above written.

PMF

SIGNATURE

Abe Burger

NAME

C.O.O.

TITLE

Client

DocuSigned by:

Jesse Kagarice
F19B915A4DB64B3...

SIGNATURE

Jesse Kagarice

NAME

Owner

TITLE



**NODAWAY** VALLEY BANK

*Statement Ending 04/29/2022*

*Page 3 of 12*

## BUSINESS BANKING-    559 (continued)

**Account Activity**

| Post Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 04/01/2022 | Beginning Balance | | | $74,994.80 |
| 04/01/2022 | XX0609 DDA POS CREDIT FARM PARTS STORE 8558141515 CA 01544637 345958 | | $412.69 | $75,407.49 |
| 04/01/2022 | Incoming Wire CROWN TITLE CORPORATION | | $556,478.57 | $631,886.06 |
| 04/01/2022 | Outgoing Wire Premium Merchant Funding 18, LLC | $450,000.00 | | $181,886.06 |
| 04/01/2022 | XX8444 CHK PURCH PIN Wal-Mart Super C ST. JOSEPH MO 05600027 2090860021 | $53.42 | | $181,832.64 |
| 04/01/2022 | XX6195 CHK PURCH SIG HOVER JOB 605594 SAN FRANCISCO CA 11372387 550265 | $75.00 | | $181,757.64 |
| 04/01/2022 | PAYMENT TO COMMERCIAL LOAN XXXXXX0167 | $3,904.01 | | $177,853.63 |
| 04/01/2022 | Incoming Domestic W/T Fee 55879913 | $7.50 | | $177,846.13 |
| 04/01/2022 | Outgoing W/T Fee 42427 | $20.00 | | $177,826.13 |
| 04/01/2022 | EINCAP 8776518110 IDNA651-8110#88 | $3,780.00 | | $174,046.13 |
| 04/01/2022 | Global Funding E U | $3,999.00 | | $170,047.13 |
| 04/01/2022 | CHECK # 3435 | $62.25 | | $169,984.88 |
| 04/01/2022 | CHECK # 3457 | $125.00 | | $169,859.88 |
| 04/01/2022 | CHECK # 3458 | $3,000.00 | | $166,859.88 |
| 04/01/2022 | CHECK # 10377 | $2,000.00 | | $164,859.88 |
| 04/04/2022 | DEPOSIT | | $7,830.00 | $172,689.88 |
| 04/04/2022 | XX8444 CHK PURCH PIN SAM'S Club ST JOSEPH MO 49200003 209221000906 | $41.19 | | $172,648.69 |
| 04/04/2022 | XX6195 CHK PURCH SIG WILLSCOT MOBILE 8882840614 MD 61992852 245195 | $241.66 | | $172,407.03 |
| 04/04/2022 | BETTER BIZ INFO SALE | $135.00 | | $172,272.03 |
| 04/04/2022 | GUSTO FEE 874649 6semjrfttn3 | $137.70 | | $172,134.33 |
| 04/04/2022 | Merry Maids #232 SIGONFILE 26T8FJ | $141.00 | | $171,993.33 |
| 04/04/2022 | FORD MOTOR CR FORDCREDIT XXXXX8871 | $1,571.70 | | $170,421.63 |
| 04/04/2022 | CHECK # 10213 | $1,500.00 | | $168,921.63 |
| 04/05/2022 | DEPOSIT | | $23,850.00 | $192,771.63 |
| 04/05/2022 | XX8444 CHK PURCH PIN USPS PO 28713405 SAINT JOSEPH MO 34050897 252767 | $18.45 | | $192,753.18 |
| 04/05/2022 | GUSTO CSD 900240 6semjrgccvh | $140.50 | | $192,612.68 |
| 04/05/2022 | GUSTO TAX 900691 6semjrgccu3 | $6,309.29 | | $186,303.39 |
| 04/05/2022 | FLEETCOR FUNDING BT0404 000000172251156 | $9,944.96 | | $176,358.43 |
| 04/05/2022 | GUSTO NET 900525 6semjrgccqo | $14,742.35 | | $161,616.08 |
| 04/06/2022 | Incoming Wire PREMIUM MERCHANT FUNDING 18, LLC | | $93,965.00 | $255,581.08 |
| 04/06/2022 | XX8444 CHK PURCH PIN SAMS CLUB #4920 ST JOSEPH MO 49200002 784182 | $183.66 | | $255,397.42 |
| 04/06/2022 | Incoming Domestic W/T Fee 55999934 | $7.50 | | $255,389.92 |
| 04/06/2022 | CHECK # 3456 | $100.00 | | $255,289.92 |
| 04/06/2022 | CHECK # 3463 | $500.00 | | $254,789.92 |
| 04/07/2022 | SETTLE TSYS/TRANSFIRST 5436845559413355 JLK CONSTRUCTION LLC SETT 4/6/2022 | | $97,073.05 | $351,862.97 |
| 04/07/2022 | XX0609 CHK PURCH PIN AMAZON.COM* 1H0VJ SEATTLE WA 00000101 1EWJ1AIV051E | $43.45 | | $351,819.52 |
| 04/07/2022 | XX0609 CHK PURCH SIG BUILDERS CHOICE SAINT JOSEPH MO 78127967 070897 | $1,293.47 | | $350,526.05 |
| 04/07/2022 | GUSTO TAX 936722 6semjrgne8g | $0.15 | | $350,525.90 |



# NODAWAY VALLEY BANK

304 North Main
Maryville MO 64468
(660) 562-3232

*Your wire request for $450,000.00 will be debited from account ending in 4559.*
*In addition, a $20.00 wire fee has been assessed.*

---

### *** WIRE DETAILS ***

---

**Wire Sequence**

**Business Code / Wire Type**
CTR-Customer Transfer
1000-Basic Funds Transfer

**Originator Information**
**Originator**
JLK CONSTRUCTION LLC

PO BOX 8820
SAINT JOSEPH MO 64508-8820
United States

**Entered Date**
04/01/2022 03:53 PM Central Time
**Effective Date**
04/01/2022
**Receiving Financial Institution**
021000089  CITIBANK NYC
**Beneficiary Information**
**Beneficiary**
Premium Merchant Funding 18, LLC

55 Water, 50th Floor
New York, NY 10041
United States

SIGNATURE X *Cynthia Kaganine*
DATE 04/01/2022

I, a customer of Nodaway Valley Bank, received these wire transfer instructions (circle one) via email, text, telephone, or in person. I understand and accept the risk of this wire transfer. Wire transfers are executed without recourse and refund requests may be denied and are beyond Nodaway Valley Bank's control.

Prepared by: *Carol S Barnett, Assist VP*

**To:** Jesse Kagarice <jesse@jlkconstruction.com>
**Cc:** Cindy Kagarice <cindy@jlkconstruction.com>
**Subject:** PMF Wire Instructions

Good morning guys!

The day is finally upon us.

Jesse, as discussed please see below for the wiring instructions for you to send the fee via wire transfer.

Premium Merchant Funding 18, LLC
55 Water, 50th floor
New York, NY 10041

Citibank.

Please let me know if you have any questions or concerns.

Best Regards,

--



**Premium Merchant Funding**

**Samuel A. Brugman | Account Manager**
Premium Merchant Funding
3000 Town Center Suite 1805 | Southfield, MI 48075
Tel: 315-257-1195

| Fax: 646-793-4993
Website | Line of Credit | Apply Now

**Confidentiality and Privilege statement Important Notice from Premium Merchant Funding:** The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify Abe Burger immediately at 212-931-6852 or by emailing mkashat@premiummerchantfunding.com and deleting it from your computer

**Please consider your environmental responsibility before printing the e-mail.**

--

**Jesse Kagarice**

| | |
|---|---|
| **From:** | Cindy Kagarice |
| **Sent:** | Friday, April 1, 2022 9:09 AM |
| **To:** | Sam Brugman |
| **Cc:** | Jesse Kagarice |
| **Subject:** | RE: PMF Wire Instructions |

Thank you Sam 

**From:** Sam Brugman <sbrugman@pmfus.com>
**Sent:** Friday, April 1, 2022 9:03 AM
**To:** Cindy Kagarice <cindy@jlkconstruction.com>
**Cc:** Jesse Kagarice <jesse@jlkconstruction.com>
**Subject:** Re: PMF Wire Instructions

Good morning Cindy!

Just to recap our conversation, our fee for everything was $450,000

Please see below for the wire instructions:

Premium Merchant Funding 18, LLC
55 Water, 50th floor
New York, NY 10041

Routing #
Account #

Citibank.

Also @Jesse I will have numbers for you on our LOC first thing on Monday, I am pushing underwriting to give us the highest dollar amount we can, and I know with you sending the wire they will have no choice but to say yes.

As always I appreciate you and your team's hard work.

Please feel free to call me if you have any questions.

Best Regards,

On Thu, Mar 31, 2022 at 9:50 AM Jesse Kagarice <jesse@jlkconstruction.com> wrote:

Got it

Get Outlook for iOS

---

**From:** Sam Brugman <sbrugman@pmfus.com>
**Sent:** Thursday, March 31, 2022 8:49:08 AM



**Samuel A. Brugman | Account Manager**

Premium Merchant Funding

3000 Town Center Suite 1805 | Southfield, MI 48075

Tel: 315-257-1195

| Fax: 646-793-4993

Website | Line of Credit | Apply Now

**Confidentiality and Privilege statement Important Notice from Premium Merchant Funding:** The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify Abe Burger immediately at 212-931-6852 or by emailing mkashat@premiummerchantfunding.com and deleting it from your computer

**Please consider your environmental responsibility before printing the e-mail.**

Exhibit "2"



## GLOBAL FUNDING EXPERTS

2701 QUEENS PLAZA NORTH, SUITE 802, LONG ISLAND CITY, NY 11101
Tel: 1-877-253-7686, Fax: 718-504-3736
Website: www.globalfundingexperts.com / Email: underwriting@globalfundingexperts.com

---

## MERCHANT AGREEMENT

Agreement dated ___08/02/2021___ between GFE NY, LLC (**"GFE"**) and the Merchant listed below (**"MERCHANT"**)
(Month) (Day) (Year)

### MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| State of Incorporation / Organization: | MO |
| Type of Business Entity: | LLC |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Mailing Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Primary Contact & Number: | JESSE LEE KAGARICE |

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant ("Merchant"), in consideration of the funds provided to Merchant by GFE as specified below ("Purchase Price"), hereby sells, assigns and transfers to GFE (making GFE the absolute owner) the Specified Percentage indicated below of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts") defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business, for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to GFE.

The Purchased Amount shall be paid to GFE by Merchant irrevocably directing and authorizing that there be only one depositing bank account, which account must be acceptable to and pre-approved by GFE (the "Account") into which Merchant and Merchant's customers shall remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each Transaction, until such time as GFE receives payment in full of the Purchased Amount. Merchant hereby authorizes GFE to ACH Debit the specified remittances from the Merchant's Account on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box and will provide GFE with all required access codes and monthly bank statements. Merchant understands that it is responsible for ensuring that the Specified Percentage to be debited by GFE remains in the Account and will be held responsible for any fees incurred by GFE resulting from a rejected ACH attempt or an event of default. (See Appendix A) GFE is not responsible for any overdrafts or rejected transactions that may result from GFE's ACH debiting the specified amounts under the terms of this agreement. GFE will debit the specified remittance amount during a business day based on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box. The Merchant shall deliver to GFE, no later than the 18th date of each month the bank statement for the Account in respect of the immediately preceding month. Within three business days of GFE's receipt of the Merchant's monthly bank statements, GFE shall reconcile the Merchant's Account by either crediting or debiting the difference from and back to the Merchant's Account so that the amount debited per month equals the Specified Percentage. If the Merchant fails to deliver the bank statement for the Account for any month, GFE shall consider that the specific remittances were equal to the Specified Percentage of the settlement amount due from each Transaction for such month. GFE may, upon Merchant's request, adjust the amount of any payment due under this Agreement at GFE's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between GFE and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

### ORIGINAL OFFER:

| | | | |
|---|---|---|---|
| Total Purchase Price: | $125,000.00 | Merchant's Average Monthly Revenue: | $409,024.90 |
| Purchased Amount of Receivables: | $180,000.00 | Specified Percentage of Monthly Revenue: | 15% |
| Total Fees*: | $8,750.00 | Specified Remittance Amount & Frequency: | $1,300.00 / Daily |
| Net Funded Amount**: | $116,250.00 | Initial Estimated # of Remittance Payments: | 139 |

\* This amount reflects the total fees Merchant will pay at funding. See Appendix A for a complete breakdown of fees.

\*\* This amount reflects the total funds Merchant will receive after all the fees and balance transfers are deducted from the Total Purchase Price. See Balance Transfer Form for a complete breakdown of the remaining RTR balances.

\*\*\* If an Early Payment Addendum has been executed by GFE and the Merchant, the promotional early termination discount referenced above shall be applicable subject to the terms and conditions set forth in the Early Payment Addendum.

The Total Purchase Price may also be paid incrementally over time, in the increments and in the Specific Remittance Amounts set forth in the Attachment A Addendum annexed hereto.

Merchant #1 Initials: 

DocuSign Envelope ID:

THE MERCHANT AGREEMENT TERMS AND CONDITIONS ATTACHED ON PAGE THREE (3) OF THIS AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT. BY SIGNING BELOW, MERCHANT HEREBY REPRESENTS AND WARRANTS THAT NOTHING CONTAINED HEREIN IS FALSE, MISLEADING, AND THAT MERCHANT HAS NOT FAILED TO DISCLOSE ANY MATERIAL INFORMATION TO OBTAIN FUNDING FROM GFE.

| MERCHANT (#1) | | Signature | *(signed)* JK |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | 816-896-6909 |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

| OWNER / GUARANTOR (#1) | | Signature | *(signed)* JK |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

GFE NY, LLC

By: _____

_____
(Company Officer)

Merchant #1 Initials: JK

-38-

Page 2 of 19

## I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to GFE with a Bank acceptable to GFE to obtain electronic fund transfer services for the Merchant's account at the Bank approved by GFE (the "Account"). Merchant shall provide GFE and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes GFE and/or its agent(s) to deduct from the Account the amounts owed to GFE for the receipts as specified herein and to pay such amounts to GFE. Merchant also hereby authorizes GFE to withdraw from the Account the Specified Percentage(s) and/or sums by GFE debiting the account. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by GFE or not. This additional authorization is not a waiver of GFE's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which GFE did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of GFE.

Merchant understands and agrees that this Agreement, including the authorizations to access Merchant's accounts (including the Account) set forth herein, as well as all other payment processing agreements entered into with respect to the Transactions irrevocably authorize the processor of such payments (the "Processor") and Operator to pay the cash attributable to the Specified Percentage of Receivables to GFE rather than to Merchant until GFE receives the cash attributable to the entire Specified Amount of Future Receivables from Processor and Operator. Merchant and Guarantor(s) authorize GFE and its agents: i) to investigate Merchant's financial status and history, and will provide to GFE any authorizations, bank or financial statements, tax returns, etc., as GFE deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. and ii) to update such information and financial and credit profiles from time to time as GFE deems appropriate. Merchant hereby authorizes all of its banks, brokers, processors and customers to provide GFE with Merchant's bank statements, brokerage statements, processing history and such other statements and information as GFE may in its sole discretion require to determine Merchant's and Guarantor's qualification or continuation in this program and for collections purposes. Merchant shall provide GFE with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from GFE.

These authorizations and instructions may be revoked only with the prior written consent of GFE. Merchant agrees that Processor and Operator may rely upon the instructions of GFE, without any independent verification, in making the cash payments above. Merchant waives any claim for damages it may have against Processor or Operator in connection with actions taken based on instructions from GFE, unless such damages were due to such Processor's or Operator's failure to follow GFE's instructions. Merchant acknowledges and agrees that (a) Processor and Operator will be acting on behalf of GFE with respect to the specified Percentage of Receivables until cash attributable to the entire Specified Amount of Future Receivables has been remitted by Processor and Operator to GFE, (b) Processor and Operator may or may not be affiliates of GFE, (c) GFE does not have any power or authority to control Processor's or Operator's actions with respect to the processing of Card transactions or remittance of cash to GFE, (d) GFE is not responsible and shall not be liable for, and Merchant agrees to hold GFE harmless for, the actions of Processor and Operator, and (e) funds representing the Specified Percentage of Receivables in the possession of Processing or Operator constitute property owned solely by GFE, and Merchant disclaims any and all interest therein. For purposes of this Agreement, the term "Operator" shall mean GFE or any person or entity designated by GFE to debit or otherwise withdraw (via the Automated Clearing House ("ACH") system, electronic checks, wires, or otherwise) any amounts from Merchant's or principal(s) accounts as authorized or permitted by this Agreement.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire "Purchased Amount" is received by GFE as per the terms of this Agreement. The termination of this Agreement shall not affect Merchant's continuing obligation and responsibility to fully satisfy all outstanding obligations that are due to GFE.

**1.3 Future Purchases.** GFE reserves the right to rescind the offer to make any purchase payments hereunder, in its sole and absolute discretion.

**1.4 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined) authorize GFE, its agents and representatives, as well as any credit reporting agency engaged by GFE, i) to investigate their financial responsibility and history, including any references given or any other statements or data obtained from or about Merchant or any of the Guarantor(s); ii) to obtain consumer and business credit reports on the Merchant and Guarantor(s); iii) to contact any current or prior bank of the Merchant in order to obtain whatever information it may require regarding any and all of Merchant's transactions with any such bank, including, but not limited to, applications, bank statements, financial statements and tax returns; and (iv) to contact personal and business references provided by the Merchant or Guarantor(s), at any time now or for so long as Merchant and/or Guarantor(s) continue to have any obligation owed to GFE as a consequence of this Merchant Agreement or for GFE's ability to determine Merchant's eligibility to enter into any future agreement with GFE. Merchant and Guarantor(s) will further provide to GFE any authorizations, bank or financial statements, tax returns, etc., as GFE deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. GFE is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Merchant and Guarantor(s) acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Guarantor(s) has been relied upon to GFE in connection with its decision to purchase the Specified Amount of Future Receivables from Merchant.

**1.5 Transactional History.** Merchant authorizes all of their banks and brokers to provide GFE with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program. Merchant hereby (i) authorizes GFE to contact any past, present or future processor of Merchant, its predecessors or affiliates, to obtain any information that GFE deems necessary or appropriate regarding any of their transactions with such processors, and (ii) authorizes and directs such processors to provide GFE with all such information in compliance with this Section. Such information may include information to verify the amount of Card receivables previously processed on behalf of Merchant, its predecessors or affiliates, and any amounts that may have been paid to, offset, held or reversed by, such processors. Without limiting the generality of the foregoing, Merchant authorizes GFE to contact any past, present or future processor of Merchant, its predecessors or affiliates, to confirm that Merchant is exclusively using the Processor accepted by GFE in accordance with this Agreement.

**1.6 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor and Operator, their respective officers, directors, affiliates, employees, agents, representatives and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable



attorney's fees) suffered or incurred by Processor or GFE under this Agreement or from GFE for monies owed to GFE from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by GFE.

**1.7 No Liability.** In no event will Processor, Operator or GFE be liable for any claims asserted by Merchant or Guarantors under any legal theory or law, including any tort or contract theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of GFE's legal fees and expenses resulting therefrom.

**1.8 Reliance on Terms.** Section 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, GFE and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.9 Sale of Receipts.** Merchant and GFE agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from GFE to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. GFE has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to GFE in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, - it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that GFE has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and GFE shall promptly refund to Merchant any interest received by GFE in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that GFE not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant is not a debtor to GFE as of the date of this Agreement. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.10 Power of Attorney.** Merchant irrevocably appoints GFE as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to GFE from Processor, or in the case of a violation by Merchant of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to GFE; and (v) to file any claims or take any action or institute any proceeding which GFE may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant, and GFE is authorized to use Merchant's funds to pay for same. In addition to any other remedies available for violation of the Merchant's Contractual Covenants, in the event that Merchant changes or permits the change of the Processor accepted by GFE or utilizes the services of an additional Processor, GFE shall have the right, without waiving any of its rights or remedies and without notice to Merchant or Principal(s), to notify the new or additional Processor of the sale of the Specified Amount of Future Receivables hereunder and to direct such new or additional Processor to make payment to GFE of all or any portion of the amounts received or held by such Processor for or on behalf of Merchant to pay any amounts GFE is entitled to receive hereunder. Merchant hereby grants GFE an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints GFE and its designees as Merchant's attorney-in-fact, to take any and all actions necessary and appropriate to direct such new or additional Processor to make payment to GFE as contemplated by this Section. Merchant further hereby grants GFE an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints GFE and its designees as Merchant's attorney-in-fact, to execute any and all documents in the Merchant's name sufficient to provide and perfect any security interest granted by Merchant to GFE hereunder, including but not limited to security interests in motor vehicles and real estate.

**1.11 Protections against Default.** The following Protections 1 through 8 may be invoked by GFE immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the GFE electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse or unacceptable to GFE; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor or an unauthorized depository account; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God), transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of GFE, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to GFE; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor or (f) Merchant enters into any agreement with any third person or entity that relates to the Receipts or any portion thereof, whether in the form of a purchase, sale, loan, pledge or the granting of any security interest in the Receipts or any portion thereof These protections are in addition to any other remedies available to GFE at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchase Amount plus all fees (including legal fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** GFE may enforce the provisions of the Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant agrees to execute affidavit(s) of Confession of Judgment in favor of GFE in the amount of Purchase Amount stated in the Agreement. Merchant also hereby authorizes GFE to execute in the name of the Merchant affidavit(s) of Confession of Judgment in favor of GFE in the amount of Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, GFE may, without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of any appropriate court based upon the affidavit(s) of judgment by

Merchant #1 Initials: JK

confession previously executed by Merchant(s) and Owner(s) and Guarantor(s).

**Protection 4.** GFE may enforce its security interest in the Collateral identified in the Security Agreement hereof.

**Protection 5.** The entire Purchase Amount and all fees (including legal fees) shall become immediately refundable and payable to GFE from Merchant.

**Protection 6.** GFE may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, under which GFE shall recover Judgment against Merchant, Merchant shall be liable for all of GFE's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. GFE reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to GFE from Merchant prior to applying such amounts to reduce the amount of any outstanding Purchase Amount.

**Protection 7.** This Agreement shall be deemed Merchants Assignment of Merchant's Lease of Merchant's business premises to GFE. Upon breach of any provision in this Agreement, GFE may exercise its rights under this Assignment of Lease without prior Notice to Merchant.

**Protection 8.** GFE may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile GFE on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to GFE.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes GFE, its agents and employees to obtain and disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that GFE obtains) and business conduct only to it employees. agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against GFE or any of its affiliates relating to any (i) investigation undertaken by or on behalf of GFE as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by GFE, including this Agreement and any other GFE documentations (collectively, "Confidential Information") are proprietary and confidential information of GFE. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of GFE to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles GFE to not only damages and legal fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.14 Publicity.** Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes GFE to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.15 D/B/A's.** Merchant hereby acknowledges and agrees that GFE may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between GFE and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**1.16 Purchase of Increments.** In the event that GFE offers to purchase additional Receipts in the "increments' stated on Attachment A of this Agreement, then GFE reserves the unilateral right to delay or rescind such offer in its sole and absolute discretion at any time.

**1.17 Sharing of Information.** Merchant hereby authorizes GFE to share information regarding Merchant's performance under this Agreement with affiliates and unaffiliated third parties.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement, and until GFE is fully paid:

**2.1 Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial Statements, copies of which have been furnished to GFE, and future statements which will be furnished hereafter at the discretion of GFE, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise GFE of any material adverse change in their financial condition, operation or ownership. Merchant hereby warrants that its Average Monthly Revenue as enumerated on page (1) of this Agreement is accurate, and that any and all cash advances or loans outstanding by Merchant have be disclosed to GFE. GFE may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to GFE within 5 business days. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance.** Merchant will maintain business-interruption insurance naming GFE as loss payee and additional insured in amounts and against risks as are satisfactory to GFE and shall provide GFE proof of such insurance upon request. Merchant shall also maintain such other insurance in such amounts and against such risks as GFE deems necessary to protect Merchant's business, and Merchant shall provide proof of such insurance to GFE upon demand.

**2.5 Electronic Check Processing Agreement.** Merchant will not change its processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without GFE's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location and Related Entities.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and GFE, nor shall Merchant change any of its places of business without prior written consent by GFE. Merchant does not and shall not conduct Merchant's business under any name other than as set forth in this agreement and shall not change its place of business. Merchant shall not change its legal name, entity type or jurisdiction of organization. In the event Merchant, any of its officers or directors or any Owner/Guarantor, during

Merchant #1 Initials: [JK]

the term of this agreement or while Merchant remains obligated under any provision of this Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due GFE under this Agreement. With respect to any such entity, GFE shall have the right to name such newly formed or existing entity as a debtor in any claim, suit, or legal proceeding.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from GFE to Merchant, execute, acknowledge and deliver to GFE and/or to any other person, firm or corporation specified by GFE, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy. As of the date of this Agreement, Merchant is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.**

**2.10 Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the Receipts or future check sales, or any portion thereof, whether in the form of a purchase, sale, a loan against, collateral against or the sale or purchase of credits against, such Receipts or future check sales, with any party other than GFE. GFE may share information regarding this Merchant Agreement with any third party in order to determine whether Merchant is in compliance with this provision.

**2.11 Unencumbered Receipts.** Merchant has, and at all times will have, good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of GFE. Without limiting the generality of the foregoing, all future Receipts purchased by GFE hereunder shall be free and clear of any and all liens (other than GFE's ownership rights therein) at the time they become Receivables. All amounts received by GFE attributable to the Specified Amount of Future Receivables purchased by GFE hereunder shall arise from bona fide sales by Merchant of its goods and services to Card holders who present their Cards as payment thereof.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.14 Good Faith, Best Efforts and Due Diligence.** Merchant and Guarantors hereby affirm that it will conduct its business in Good Faith and will expend its Best Efforts to maintain and grow its business, to ensure that GFE obtains the Purchased Amount. Furthermore, Merchant and Guarantors hereby agree, warrant and represent hereby that they will constantly perform all appropriate Due Diligence and credit checks of all of the customers' finances, cash flow, solvency, good faith, payment histories and business reputations (the "Due Diligence Requirements") as may suffice to ensure any and all products and/or services provided, sold or delivered by Merchant to said customers will be paid for by customers in full and on time, and will not result in the creation of an unpaid account. These Due Diligence Requirements must be performed prior to any sales to any customer, and repeated no less frequently than monthly for so long as any sums are due from those customers. Full documentation of all of Merchant's compliance with its Due Diligence Requirements must be maintained in Merchant's files so long as GFE has not fully collected all sums due to it. This is not a guaranty of payment by customers, but is a guaranty of full, adequate and good faith Due Diligent investigation and credit check of customers before extending credit to them and continuing no less frequently than monthly so long as sums are still due.

**2.15 Taxes.** Merchant will promptly pay all necessary taxes, including but not limited to employment, sales and use taxes.

**2.16 No Violation of Prior Agreements.** Merchant warrants that its execution and performance of this Merchant Agreement will not violate or conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Merchant is subject, including any agreement that prohibits the sale or pledge of Merchant's future receipts or the Purchased Amount.

**2.17 Opportunity for Counsel.** Merchant represents, warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Merchant Agreement, and that it has been represented by legal counsel or has had full opportunity to consult with its own legal counsel.

**2.18 Ongoing Obligations.** Merchant hereby covenants and agrees that even after it receives some or all of the Purchase Price from GFE, it will comply with GFE's ongoing requests for any documentation from Merchant for the purpose of business and identify verification and underwriting and verification (such as the merchant's driver's license, bank login, bank statements, or any other financial or business documentation). Merchant's failure to provide to GFE the requested documentation within twenty-four (24) hours shall be deemed a breach of this Agreement and GFE shall no longer be obligated to provide any further funding to Merchant. In addition, if after receipt of said documentation from Merchant, GFE discovers that Merchant made misrepresentations before receiving funding from GFE, GFE shall no longer be obligated to provide any further funding to Merchant and Merchant's misrepresentations shall be deemed a breach of this Agreement.

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Merchant; (d) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (e) Merchant shall transfer or sell all or substantially all of its assets, or issue any notice of intended bulk sale or transfer; (f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (g) Merchant shall use multiple depository accounts without the prior written consent of GFE (h) Merchant shall change its depositing account without the prior written consent of GFE; (i)

Merchant #1 Initials: _JK_

Merchant shall perform any act that reduces the value of grant; (j) the Specified Percentage of its daily Receipts is not available for ACH by GFE on any three (3) business days within any twenty (20) business day period; (k) Merchant shall default under any of the terms, covenants and conditions of any other agreement with GFE; or (l) Merchant fails to deposit its Receipts into the Account.

**3.2 Personal Guaranty.** In the event of a Default under Sections 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13, and 2.14 hereof, should GFE determine that the Purchased Amount cannot be obtained from the Merchant's business, GFE will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to GFE for all of GFE's losses and damages, in additional to all costs, fees expenses and legal fees associated with such enforcement. GFE shall not be required before exercising and enforcing its rights under this Personal Guaranty first to resort to payment against Merchant or to any other person or to any collateral.

**3.3 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4.1 hereof, GFE may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Security Agreement or Guaranty, or pursuant to any other legal or equitable right or remedy. Upon Merchant's and/or Guarantor's default hereunder, the balance of the Purchased Amount remaining due, plus any applicable fees, shall become immediately due and payable to GFE. In addition, upon an Event of Default, GFE may: i) enforce the provisions of the Security Agreement and Guaranty against each Merchant and Owner/Guarantor; ii) enforce its security interest in the Collateral and the ; iii) debit Merchant's deposit accounts wherever situated by means of ACH debit or facsimile signature on a computer generated check drawn on Merchant's bank account for all or a portion of the balance of the Purchased Amount remaining due, or GFE may instruct the Processor to forward to GFE, without any prior notice to Merchant, all or a portion of the balance of the Purchased Amount remaining due, and iv) without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of the appropriate court based upon the affidavit(s) of judgment by confession previously executed by Merchant(s) and Owner(s)/Guarantor(s). All rights, powers and remedies of GFE which may be exercised by GFE at any time after the occurrence of an Event of Default are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Costs.** Merchant shall pay to GFE all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(b) the enforcement of GFE 's remedies set forth in Section 3.3 above, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications.** Merchant is required to give GFE written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give GFE seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

# IV.MISCELLANEOUS

**4.1 Modifications: Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by GFE.

**4.2 Assignment.** *This Agreement shall be binding upon and inure to the benefit of Merchant, Principal(s), GFE and their respective successors and assigns, except that Merchant and Principal(s) shall not have the right to assign or delegate any of their rights or obligations hereunder or any interest herein without prior written consent of GFE, which consent may be withheld in GFE's sole discretion. Any such assignment or delegation without GFE's prior written consent shall be void. GFE reserves the right to assign or delegate this Agreement or any of its rights or obligations hereunder with or without prior notice to Merchant. GFE may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.*

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the merchant at the address set forth above in this agreement and to GFE at 2999 NE 191st Street, Unit 901, Miami, FL 33180 with a copy to 27-01 Queens Plaza North, Suite 802, Long Island City, NY 11101. Notices to GFE shall become effective only upon receipt by GFE. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of GFE to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, GFE and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of GFE which consent may be withheld in GFE's sole discretion. GFE reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, may, if GFE so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by GFE to transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provision in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and GFE and supersede all prior agreements and understandings relating to the subject matter hereof. Merchant and Principal(s) each acknowledge and agree that

Merchant #1 Initials: [signature]

Page 7 of 19

DocuSign Envelope 43                                                                              ... Fundings
he, she or it is not relying on any representations not specifically embodied in this Agreement.

### 4.10 JURY TRIAL WAIVER.

THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

### 4.11 Facsimile Acceptance. Merchant and Guarantor(s) hereby agree that facsimile and/or electronic signatures on this Merchant Agreement and Guaranty, or photocopies thereof, that shall be deemed acceptable and treated as originals for all purposes, and shall be admissible as evidence of the Merchant Agreement and Guaranty.

### 4.12. Right of Access. In order to ensure that Merchant is complying with the terms of this Merchant Agreement, Merchant agrees that GFE shall have the right to (i) enter, without notice, the premises of Merchant's business for the purpose of inspecting and checking Merchant's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Merchant's daily receipts to the Processor and to ensure that Merchant has not violated any other provision of this Agreement, and (ii) Merchant's shall provide access to its employees and records and all other items as requested by GFE, and (iii) have Merchant's provide information about its business operations, banking relationships, vendors, landlord and other information to allow GFE to interview any relevant parties. Furthermore, Merchant agrees to provide GFE, at all times with "Live Contemporaneous Access" to all of its bank accounts in order for GFE to evaluate Merchant's compliance with the Merchant Agreement, and for collections in the event of a default under the Merchant Agreement. "Live Contemporaneous Access" shall be defined as: Merchant, at all times and including but not limited to, providing GFE with accurate login information necessary to access all of Merchant's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens.

### 4.13. Phone Recordings and Contact. Merchant agrees that any call between GFE and Merchant, and their agents and employees may be recorded or monitored. Further, Merchant agrees that (i) it has an established business relationship with GFE, its employees and agents and that Merchant may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, emails address, or facsimile number given to GFE by the Merchant, its agents or employees, including cellular telephones.

### 4.14. Monitoring, Recording, and Solicitations.

   a. Authorization to Contact Seller by Phone. Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

   b. Authorization to Contact Seller by Other Means. Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

Merchant #1 Initials: JK                                                                        Page 8 of 19

| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
|---|---|
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

## SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant grants to GFE a security interest in and lien upon: (a) all accounts receivables, accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant, (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to GFE under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to GFE upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover GFE's entitlements under this Agreement, GFE is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of GFE's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, GFE or an affiliate of GFE. GFE is authorized to execute and file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by GFE without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, GFE has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, GFE will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from GFE written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant agrees that this is a contract of recoupment and GFE is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant agrees not to contest or object to any motion for relief from the automatic stay filed by GFE. Merchant agrees to execute and deliver to GFE such instruments and documents GFE may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. GFE is authorized to execute all such instruments and documents in Merchant's name.

In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to GFE for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due GFE under this Agreement. With respect to any such entity, GFE shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. GFE shall be held harmless by Merchant and each Owner/Guarantor and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. GFE shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of GFE's rights, including without limitation, GFE's right to collect all accounts, and to notify any payment card processor or creditor of such entity that GFE has such rights in such entity's assets. Merchant also agrees that, at the GFE's discretion, GFE may choose to amend any existing financing statement to include any such newly formed entity as debtor.

Merchant and Guarantor each acknowledge and agree that any security interest granted to GFE under any other agreement between Merchant or Guarantor and GFE (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as GFE deems necessary to perfect or maintain GFE's first priority security interest in the Collateral including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes GFE to file any financing statements deemed necessary by GFE to perfect or maintain GFE's security interest, which financing statement may contain notification that Merchant and/or Guarantor have granted a negative pledge to GFE with respect to the Collateral, and that any subsequent lien or may be tortuously interfering with GFE's rights. Merchant and Guarantor shall be liable for, and GFE may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by GFE in protecting, preserving and enforcing GFE's security interest and rights.

**Negative Pledge.** Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** GFE shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, GFE may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that GFE may enter into an agreement with Merchant's landlord giving GFE the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default, GFE may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to GFE, whether by acceleration or otherwise.

Merchant #1 Initials: [JK]

Page 9 of 19

**Personal Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to GFE, Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the Merchant Agreement in Sections thereof 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13 and 2.14, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, GFE may seek recovery from Guarantors for all of GFE's losses and damages by enforcement of GFE's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral GFE may hold pursuant to this Agreement or any other guaranty.

GFE does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) GFE's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to GFE. In addition, GFE may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to GFE; (ii) release Merchant from its obligations to GFE; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to GFE under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.**

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | *[signature]* | | |

| OWNER / GUARANTOR (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | *[signature]* | | |

A. **Origination Fee** - 4% of Purchase Price to cover Underwriting and related expenses. This expense is charged at the time of funding.

B. **ACH Program Fee** - 3% of Purchase Price ACH's are labor intensive and are not an automated process, requiring us to charge this fee to cover costs. This expense is charged at the time of funding.

C. **Miscellaneous Service Fees** - Merchant shall pay certain fees for services related to the origination and maintenance of Accounts, which fees are set forth below. Each Merchant shall receive their funding electronically to their designated bank account, and the GFE may deduct some or all of the fees from the funded amount.

    A. Rejected ACH/Blocked ACH - $5,000.00 when Merchant blocks Account from our Debit ACH, or when Merchant directs the bank to reject our debit ACH, which places them in default (per contract).

    B. Pre-Authorized Bank Change Fee - $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

    C. Wire Fee - $50.00 Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for either a Fed Wire fee or a bank ACH fee.

    D. UCC Filing, Amendment or Termination Fee - $200.00.

    E. Default Fee - $5,000.00 when Merchant defaults under the Agreement, including but not limited to diverting its Receivables from the bank account agreed upon in the "Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)" or changing its credit card processing thus terminating or diverting the agreed upon split.

    F. Account Management Fees - $45.00 upon origination, and $45.00 per month thereafter until the Purchase Amount, together with any and all unpaid outstanding other fees have been paid in full. These Management Fees will not be applied towards the reduction of the Purchase Amount.

    G. Stacking Fee - In the event that the Merchant enters into any cash advance or any loan agreement that relates to or involves the Receipts with any person or entity other than GFE during any portion of the term of this Agreement, then: i) Merchant shall pay to GFE a "Stacking" fee equal to $5,000.00 per occurrence, and ii) the specified daily remittances that Merchant is obligated to pay to GFE hereunder shall be doubled, and Merchant shall be deemed to have authorized GFE to double the amount of its ACH Debits from the Merchant's Account on a daily basis.

    H. Third Party Collections Fee – In the event that Merchant defaults under any of the terms and conditions of this Agreement, Merchant shall pay to GFE, in addition to any other fees associated with Merchant's default, a third party collections fee equal to fifteen (15%) of the outstanding balance after all fees at the time of default.

    I. NSF Fee (Standard) - $ 35.00 each until a default is declared.

    J. Non-ACH Transaction Fee - When a Merchant makes a payment other than through ACH, the Merchant is responsible for the cost of that transaction.

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |



| Merchant Name: JESSE LEE KAGARICE | |
|---|---|
| 1. Do you currently or within the last 90 days have any intentions, plans or discussions regarding closing your Business? | NO |
| 2. Do you currently or within the least 90 days have any intentions, plans or discussions to change the name or legal structure of the business? | NO |
| 3. Are you currently in, or contemplating personal bankruptcy? | NO |
| 4. Are you currently in, or contemplating business bankruptcy? | NO |
| 5. Is your business currently for sale? | NO |
| 6. Do you have any existing merchant cash advance balances? | NO |
| 7. Are you involved in any litigation proceedings or are a party to a lawsuit? | NO |
| 8. Is your business currently in default of any agreement with a creditor? | NO |
| 9. Is your business currently in forbearance agreement with a creditor? | NO |
| 10. Will selling the Future Receivables cause you to breach any agreement with a creditor? | NO |
| | |
| If you have answered YES to any of the above questions, please explain: | |
| | |
| | |
| | |
| | |

I hereby certify that the above statements are true and correct to the best of my knowledge; I authorize my landlord and credit card processor to discuss confidential account information for the purpose of satisfying the requirements of GFE NY, LLC.

Completed and attested by:

| MERCHANT (#1) | | | | |
|---|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | | |
| Title | Sole Member | Driver License No: | | |
| Signature | | | | |

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT)
## AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep this important legal document for Merchant's records.

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant authorizes GFE to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Merchant later identifies and is acceptable to GFE) (hereinafter referred to as the "Designated Checking Account") This authorization is to remain in full force and effect until GFE has received written notification from Merchant of its termination in such time and in such manner as to afford GFE and Merchant's depository bank a reasonable opportunity to act on it.

**BUSINESS PURPOSE ACCOUNT.** By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

**MISCELLANEOUS.** GFE is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Merchant's account must comply with the provisions of U.S. law.

I, (We) <u>JESSE LEE KAGARICE</u> hereby Authorize, <u>GFE NY, LLC.</u> (Hereinafter known as "GFE") to Electronically (ACH) debit the Bank Account Below, of which I am a signer:

| | | | |
|---|---|---|---|
| Bank Name: | NODAWAY VALLEY BANK | Tax ID: | |
| ABA: Routing: | | DDA: Account: | |
| For the amount of: | $1,300.00 | (Or) Percentage of each Banking Deposit: | 15% |
| On the Following Days: | MONDAY-FRIDAY | | |

This authorization is to remain in full force and effect until COMPANY has received written notification from me at least 5 banking days prior of its termination to afford COMPANY a reasonable opportunity to act on it.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | *DocuSigned by:* [signature] F198915A4D06483... | | |

Thank you for accepting an offer from GFE NY, LLC ("GFE") and we look forward to being your funding partner for as long as you need.

Please note that the way your advance is set up with GFE, GFE requires viewing access to your bank account each business day, throughout the term of this Agreement, in order that GFE may calculate and verify the amount of your daily remittance. Please be assured that we will carefully safeguard your confidential information and only essential personnel will have access to it.

GFE NY, LLC. will also require viewing access to your bank account, prior to funding, as part of the underwriting process.

Please be advised that for security purposes, GFE will request this information prior to funding. By signing below, you hereby agree that if you fail to provide the requested bank login information prior to funding, GFE shall have no obligation to provide funding. Please be further advised that if you change any of the bank login information during the term of this Agreement or at any time while you still have any outstanding obligations to GFE, you are required to immediately inform GFE of the changes made and provide GFE with the new bank login information. Please see below for the list of questions that will be by GFE as it relates to the banking information.

1. Bank Portal Website;
2. Bank Account Username;
3. Bank Account Password;
4. Security Question/Answer 1 of this Bank Account;
5. Security Question/Answer 2 of this Bank Account;
6. Security Question/Answer 3 of this Bank Account; and
7. Any other information necessary to access your Bank Account.

If you have any questions please feel free to contact our cash management department.

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

BANK DOCUMENT DISCLOSURE AFFIDAVIT

For the purpose of obtaining the Business Cash Advance evidence by the Merchant Agreement of this same date herewith (the "Business Cash Advance") from GFE NY, LLC., the undersigned Seller/Merchant hereby makes the following statement under penalty of law:

## OPTION 1 – DISCLOSURE AND AUTHORIZATION FOR ADDITIONAL ACCOUNTS:

By selecting this option, the Seller/Merchant hereby declares that in addition to the designated for ACH debit, the Seller/Merchant also has the following additional account(s) which he authorizes us to use in the event we are unable to debit from the designated account. The Seller/Merchant declares and warrents that it currently maintains no other bank account at any financial institution other than those banks and accounts referenced below.

| | |
|---|---|
| Bank Name | |
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| | |
|---|---|
| Bank Name | |
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| | |
|---|---|
| Bank Name | |
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

**OPTION 2** - By selecting this option, the merchant swears, under penalty of law, that Merchant has no accounts in any lending institution in addition to the one provided for ACH debit

**PLEASE SELECT AN OPTION AND SIGN BELOW:**

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |



DocuSign Envelope ID: ... 4D - PIER MG Merchant Funding

## ADDENDUM TO MERCHANT AGREEMENT

This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law. Any litigation relating to this Agreement must be commenced and maintained in any court located in New York State (the "Acceptable Forums"), however any action or proceeding to enforce a judgment or arbitration award may also be commenced and maintained in any other court of competent jurisdiction. The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum.

**THE PARTIES AGREE TO WAIVE TRIAL BY JURY IN ANY DISPUTE BETWEEN THEM.**

In any litigation commenced by GFE, Merchant and Guarantor will not be permitted to interpose any counterclaim. Merchant and Guarantor agree that any claim that is not asserted against GFE within 1 year of its accrual will be time barred. If GFE prevails in any litigation with Merchant and/or Guarantor, then Merchant and Guarantor must pay GFE's reasonable attorney fees, which may include a contingency fee of up to 33% of the amount claimed, expert fees, costs of suit, and prejudgment interest at a rate of 16% per annum (or the maximum rate permitted by applicable law if lower). GFE, Merchant, and Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**Merchant and Guarantor consent to service of process and legal notices made by certified mail, return receipt requested delivered by the United States Postal Service and addressed to the Contact Address set forth immediately below or on Page 1 of this Agreement, any such service will be deemed complete 5 days after dispatch.**

I have read and agreed to the Terms and Conditions set forth above:

| MERCHANT (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

Please provide a list of 3-5 professional references

| TRADE REFERENCE #1: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #2: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #3: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #4: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #5: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

## Weekly Advance Addendum to the Merchant Agreement

This Weekly Advance Addendum amends the Merchant Agreement and Security Agreement between GFE and the merchant listed below (the "Merchant") dated 08/02/2021, (the "Agreement"). All capitalized terms used in his Addendum shall have the same meaning as defined in the Agreement. Except as modified below, the terms of the Agreement remain in full force and effect.

### MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

This Weekly Advance Addendum amends the Merchant Agreement and Security Agreement between GFE and the merchant listed below (the "Merchant") dated 08/02/2021, (the "Agreement"). All capitalized terms used in his Addendum shall have the same meaning as defined in the Agreement. Except as modified below, the terms of the Agreement remain in full force and effect.

### AGREEMENT AS TO ADVANCES

1. Weekly Sale and Purchase of Merchant's Future Receipts: Merchant hereby offers to sell and GFE agrees to purchase, up to the Receipts Purchased Amount, future Receipts on a weekly basis according to the attached schedule. GFE shall have the right to terminate the purchase of any additional future Receipts as set forth in Section 2 of this Addendum.

2. GFE's Obligation to Make Future Purchases: GFE reserves the right to terminate its obligation to make the weekly purchases at its option, if upon: (i) a Event of Default has occurred, as defined in the Agreement; (ii) Merchant fails to provide to GFE a monthly Account statement, access codes to the Account, and full access to merchant's Account prior making any weekly purchase as contemplated herein; (iii) Merchant obtains any additional funding without providing prior written notice to and receiving written approval from GFE; (iv) the Specified Percentage of its weekly Receipts is not available for ACH by GFE on any three (3) business days within any twenty (20) business day period; (v) Merchant has a 20% decline in monthly deposits that is not due to regular seasonal payment fluctuations; (vi) GFE believes in its sole judgment that Merchant's business may not be able to generate future Receipts sufficient to deliver the Purchased Receipts in a timely manner, vii) the Account has a negative balance; viii) Merchant is in arrears with respect to its payment obligations under the Agreement or ix) the Merchant has failed to provide GFE with a complete account receivable report within any thirty (30) day period prior to any weekly purchase contemplated herein In the event that weekly purchases are terminated, the Merchant will remain obligated to deliver the Specified Percentage of its weekly Receipts to GFE until GFE has received the Receipts GFE purchased prior to termination, and to comply with all other provisions of this Agreement.

3. Merchant's Indebtedness When Receipts Purchased Amount Is Sold In Increments: When Merchant sells and GFE purchases the Receipts Purchased Amount, or portions thereof, in increments, the Merchant's indebtedness to GFE under the Agreement (excluding any fees and expenses then due and owing) shall at any given point in time be equal to the percentage of the total Receipts Purchase Amount that the total of all increments then paid by GFE to the Merchant bears to Total Purchase Price as set forth in the Agreement.

THE TERMS OF THIS ATTACHMENT A ARE HEREBY INCORPORATED INTO AND MADE A PART OF THE MERCHANT AGREEMENT IDENTIFIED ABOVE, AND MERCHANT HEREBY ACKNOWLEDGES THAT THE PERIODIC PURCHASE OF FUTURE RECEIPTS HEREUNDER ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE MERCHANT AGREEMENT

| MERCHANT (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

| OWNER / GUARANTOR (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

Merchant #1 Initials: _JK_                    -54-                    Page 18 of 19

| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

## GFE Weekly Distribution Grid-Special Agreement

| Increment | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Amount | $47,246.84 | $9,246.84 | $9,246.84 | $9,246.84 | $9,246.84 |
| Increment | 6 | 7 | 8 | 9 | 10 |
| Amount | $9,246.84 | $9,246.84 | $9,246.84 | $9,246.84 | $3,778.44 |

**\*Appropriate fee will be deducted from the first increment.**

**See APPENDIX A STRUCTURE for fee details.**

| MERCHANT (#1) | | Signature | | *[signed]* |
|---|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | | |
| Social Security No: | | Home or Secondary Number: | | |
| Driver License No: | | Email: | | jesse@jlkconstruction.com |

Exhibit "3"



# GLOBAL FUNDING EXPERTS

**2701 QUEENS PLAZA NORTH, SUITE 802, LONG ISLAND CITY, NY 11101**
**Tel: 1-877-253-7686, Fax: 718-504-3736**
**Website: www.globalfundingexperts.com / Email: underwriting@globalfundingexperts.com**

## MERCHANT AGREEMENT

Agreement dated ___12/07/2021___ between GFE NY, LLC ("GFE") and the Merchant listed below ("**MERCHANT**")
(Month) (Day) (Year)

### MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| State of Incorporation / Organization: | MO |
| Type of Business Entity: | LLC |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Mailing Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Primary Contact & Number: | JESSE LEE KAGARICE |

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant ("Merchant"), in consideration of the funds provided to Merchant by GFE as specified below ("Purchase Price"), hereby sells, assigns and transfers to GFE (making GFE the absolute owner) the Specified Percentage indicated below of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts") defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business, for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to GFE.

The Purchased Amount shall be paid to GFE by Merchant irrevocably directing and authorizing that there be only one depositing bank account, which account must be acceptable to and pre-approved by GFE (the "Account") into which Merchant and Merchant's customers shall remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each Transaction, until such time as GFE receives payment in full of the Purchased Amount. Merchant hereby authorizes GFE to ACH Debit the specified remittances from the Merchant's Account on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box and will provide GFE with all required access codes and monthly bank statements. Merchant understands that it is responsible for ensuring that the Specified Percentage to be debited by GFE remains in the Account and will be held responsible for any fees incurred by GFE resulting from a rejected ACH attempt or an event of default. (See Appendix A) GFE is not responsible for any overdrafts or rejected transactions that may result from GFE's ACH debiting the specified amounts under the terms of this agreement. GFE will debit the specified remittance amount during a business day based on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box. The Merchant shall deliver to GFE, no later than the 18th date of each month the bank statement for the Account in respect of the immediately preceding month. Within three business days of GFE's receipt of the Merchant's monthly bank statements, GFE shall reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the Specified Percentage. If the Merchant fails to deliver the bank statement for the Account for any month, GFE shall consider that the specific remittances were equal to the Specified Percentage of the settlement amount due from each Transaction for such month. GFE may, upon Merchant's request, adjust the amount of any payment due under this Agreement at GFE's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between GFE and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

| **ORIGINAL OFFER:** | | | |
|---|---|---|---|
| Total Purchase Price: | $600,000.00 | Merchant's Average Monthly Revenue: | $1,159,953.39 |
| Purchased Amount of Receivables: | $870,000.00 | Specified Percentage of Monthly Revenue: | 15% |
| Total Fees*: | $0.00 | Specified Remittance Amount & Frequency: | $3,999.00 / Daily |
| Net Funded Amount**: | $600,000.00 | Initial Estimated # of Remittance Payments: | 218 |

**\* This amount reflects the total fees Merchant will pay at funding. See Appendix A for a complete breakdown of fees.**

**\*\* This amount reflects the total funds Merchant will receive after all the fees and balance transfers are deducted from the Total Purchase Price. See Balance Transfer Form for a complete breakdown of the remaining RTR balances.**

**\*\*\* If an Early Payment Addendum has been executed by GFE and the Merchant, the promotional early termination discount referenced above shall be applicable subject to the terms and conditions set forth in the Early Payment Addendum.**

**The Total Purchase Price may also be paid incrementally over time, in the increments and in the Specific Remittance Amounts set forth in the Attachment A Addendum annexed hereto.**

Merchant #1 Initials: _JK_

DocuSign Envelope ID: AB4F          Agent Name: JSO - Premium Merchant Funding

THE MERCHANT AGREEMENT TERMS AND CONDITIONS SET FORTH ON PAGE 2 THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT. BY SIGNING BELOW, MERCHANT HEREBY REPRESENTS AND WARRANTS THAT NOTHING CONTAINED HEREIN IS FALSE, MISLEADING, AND THAT MERCHANT HAS NOT FAILED TO DISCLOSE ANY MATERIAL INFORMATION TO OBTAIN FUNDING FROM GFE.

| MERCHANT (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | 816-896-6909 |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

| OWNER / GUARANTOR (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

GFE NY, LLC
By:

_____
                (Company Officer)

Merchant #1 Initials: JK                    -58-                    Page 2 of 19

## MERCHANT AGREEMENT TERMS AND CONDITIONS

### I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to GFE with a Bank acceptable to GFE to obtain electronic fund transfer services for the Merchant's account at the Bank approved by GFE (the "Account"). Merchant shall provide GFE and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes GFE and/or its agent(s) to deduct from the Account the amounts owed to GFE for the receipts as specified herein and to pay such amounts to GFE. Merchant also hereby authorizes GFE to withdraw from the Account the Specified Percentage(s) and/or sums by GFE debiting the account. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by GFE or not. This additional authorization is not a waiver of GFE's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which GFE did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of GFE.

Merchant understands and agrees that this Agreement, including the authorizations to access Merchant's accounts (including the Account) set forth herein, as well as all other payment processing agreements entered into with respect to the Transactions irrevocably authorize the processor of such payments (the "Processor") and Operator to pay the cash attributable to the Specified Percentage of Receivables to GFE rather than to Merchant until GFE receives the cash attributable to the entire Specified Amount of Future Receivables from Processor and Operator. Merchant and Guarantor(s) authorize GFE and its agents: i) to investigate Merchant's financial status and history, and will provide to GFE any authorizations, bank or financial statements, tax returns, etc., as GFE deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. and ii) to update such information and financial and credit profiles from time to time as GFE deems appropriate. Merchant hereby authorizes all of its banks, brokers, processors and customers to provide GFE with Merchant's bank statements, brokerage statements, processing history and such other statements and information as GFE may in its sole discretion require to determine Merchant's and Guarantor's qualification or continuation in this program and for collections purposes. Merchant shall provide GFE with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from GFE.

These authorizations and instructions may be revoked only with the prior written consent of GFE. Merchant agrees that Processor and Operator may rely upon the instructions of GFE, without any independent verification, in making the cash payments above. Merchant waives any claim for damages it may have against Processor or Operator in connection with actions taken based on instructions from GFE, unless such damages were due to such Processor's or Operator's failure to follow GFE's instructions. Merchant acknowledges and agrees that (a) Processor and Operator will be acting on behalf of GFE with respect to the specified Percentage of Receivables until cash attributable to the entire Specified Amount of Future Receivables has been remitted by Processor and Operator to GFE, (b) Processor and Operator may or may not be affiliates of GFE, (c) GFE does not have any power or authority to control Processor's or Operator's actions with respect to the processing of Card transactions or remittance of cash to GFE, (d) GFE is not responsible and shall not be liable for, and Merchant agrees to hold GFE harmless for, the actions of Processor and Operator, and (e) funds representing the Specified Percentage of Receivables in the possession of Processing or Operator constitute property owned solely by GFE, and Merchant disclaims any and all interest therein. For purposes of this Agreement, the term "Operator" shall mean GFE or any person or entity designated by GFE to debit or otherwise withdraw (via the Automated Clearing House ("ACH") system, electronic checks, wires, or otherwise) any amounts from Merchant's or principal(s) accounts as authorized or permitted by this Agreement.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire "Purchased Amount" is received by GFE as per the terms of this Agreement. The termination of this Agreement shall not affect Merchant's continuing obligation and responsibility to fully satisfy all outstanding obligations that are due to GFE.

**1.3 Future Purchases.** GFE reserves the right to rescind the offer to make any purchase payments hereunder, in its sole and absolute discretion.

**1.4 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined) authorize GFE, its agents and representatives, as well as any credit reporting agency engaged by GFE, i) to investigate their financial responsibility and history, including any references given or any other statements or data obtained from or about Merchant or any of the Guarantor(s); ii) to obtain consumer and business credit reports on the Merchant and Guarantor(s); iii) to contact any current or prior bank of the Merchant in order to obtain whatever information it may require regarding any and all of Merchant's transactions with any such bank, including, but not limited to applications, bank statements, financial statements and tax returns; and (iv) to contact personal and business references provided by the Merchant or Guarantor(s), at any time now or for so long as Merchant and/or Guarantor(s) continue to have any obligation owed to GFE as a consequence of this Merchant Agreement or for GFE's ability to determine Merchant's eligibility to enter into any future agreement with GFE. Merchant and Guarantor(s) will further provide to GFE any authorizations, bank or financial statements, tax returns, etc., as GFE deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. GFE is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Merchant and Guarantor(s) acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Guarantor(s) has been relied upon by GFE in connection with its decision to purchase the Specified Amount of Future Receivables from Merchant.

**1.5 Transactional History.** Merchant authorizes all of their banks and brokers to provide GFE with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program. Merchant herby (i) authorizes GFE to contact any past, present or future processor of Merchant, its predecessors or affiliates, to obtain any information that GFE deems necessary or appropriate regarding any of their transactions with such processors, and (ii) authorizes and directs such processors to provide GFE with all such information in compliance with this Section. Such information may include information to verify the amount of Card receivables previously processed on behalf of Merchant, its predecessors or affiliates, and any amounts that may have been paid to, offset, held or reversed by, such processors. Without limiting the generality of the foregoing, Merchant authorizes GFE to contact any past, present or future processor of Merchant, its predecessors or affiliates, to confirm that Merchant is exclusively using the Processor accepted by GFE in accordance with this Agreement.

**1.6 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor and Operator, their respective officers, directors, affiliates, employees, agents, representatives and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable

attorney's fees) suffered or incurred by Processor or Operator resulting from (a) actions taken by GFE for monies owed to GFE from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by GFE.

**1.7 No Liability.** In no event will Processor, Operator or GFE be liable for any claims asserted by Merchant or Guarantors under any legal theory or law, including any tort or contract theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of GFE's legal fees and expenses resulting therefrom.

**1.8 Reliance on Terms.** Section 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, GFE and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.9 Sale of Receipts.** Merchant and GFE agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from GFE to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. GFE has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to GFE in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, - it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that GFE has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and GFE shall promptly refund to Merchant any interest received by GFE in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that GFE not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant is not a debtor to GFE as of the date of this Agreement. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.10 Power of Attorney.** Merchant irrevocably appoints GFE as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to GFE from Processor, or in the case of a violation by Merchant of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due to or become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to GFE; and (v) to file any claims or take any action or institute any proceeding which GFE may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant, and GFE is authorized to use Merchant's funds to pay for same. In addition to any other remedies available for violation of the Merchant's Contractual Covenants, in the event that Merchant changes or permits the change of the Processor accepted by GFE or utilizes the services of an additional Processor, GFE shall have the right, without waiving any of its rights or remedies and without notice to Merchant or Principal(s), to notify the new or additional Processor of the sale of the Specified Amount of Future Receivables hereunder and to direct such new or additional Processor to make payment to GFE of all or any portion of the amounts received or held by such Processor for or on behalf of Merchant to pay any amounts GFE is entitled to receive hereunder. Merchant hereby grants GFE an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints GFE and its designees as Merchant's attorney-in-fact, to take any and all actions necessary and appropriate to direct such new or additional Processor to make payment to GFE as contemplated by this Section. Merchant further hereby grants GFE an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints GFE and its designees as Merchant's attorney-in-fact, to execute any all documents in the Merchant's name sufficient to provide and perfect any security interest granted by Merchant to GFE hereunder, including but not limited to security interests in motor vehicles and real estate.

**1.11 Protections against Default.** The following Protections 1 through 8 may be invoked by GFE immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the GFE electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse or unacceptable to GFE; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor or an unauthorized depository account; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God), transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of GFE, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to GFE; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor or (f) Merchant enters into any agreement with any third person or entity that relates to the Receipts or any portion thereof, whether in the form of a purchase, sale, loan, pledge or the granting of any security interest in the Receipts or any portion thereof These protections are in addition to any other remedies available to GFE at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchase Amount plus all fees (including legal fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** GFE may enforce the provisions of the Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant agrees to execute affidavit(s) of Confession of Judgment in favor of GFE in the amount of Purchase Amount stated in the Agreement. Merchant also hereby authorizes GFE to execute in the name of the Merchant affidavit(s) of Confession of Judgment in favor of GFE in the amount of Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, GFE may, without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of any appropriate court based upon the affidavit(s) of judgment by

confession previously executed by Merchant(s) and Owner(s)/Guarantor(s).

**Protection 4.** GFE may enforce its security interest in the Collateral identified in the Security Agreement hereof.

**Protection 5.** The entire Purchase Amount and all fees (including legal fees) shall become immediately refundable and payable to GFE from Merchant.

**Protection 6.** GFE may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, under which GFE shall recover Judgment against Merchant, Merchant shall be liable for all of GFE's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. GFE reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to GFE from Merchant prior to applying such amounts to reduce the amount of any outstanding Purchase Amount.

**Protection 7.** This Agreement shall be deemed Merchants Assignment of Merchant's Lease of Merchant's business premises to GFE. Upon breach of any provision in this Agreement, GFE may exercise its rights under this Assignment of Lease without prior Notice to Merchant.

**Protection 8.** GFE may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile GFE on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to GFE.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes GFE, its agents and employees to obtain and disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that GFE obtains) and business conduct only to it employees. agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against GFE or any of its affiliates relating to any (i) investigation undertaken by or on behalf of GFE as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by GFE, including this Agreement and any other GFE documentations (collectively, "Confidential Information") are proprietary and confidential information of GFE. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of GFE to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section; A breach hereof entitles GFE to not only damages and legal fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.14 Publicity.** Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes GFE to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.15 D/B/A's.** Merchant hereby acknowledges and agrees that GFE may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between GFE and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**1.16 Purchase of Increments.** In the event that GFE offers to purchase additional Receipts in the "increments" stated on Attachment A of this Agreement, then GFE reserves the unilateral right to delay or rescind such offer in its sole and absolute discretion at any time.

**1.17 Sharing of Information.** Merchant hereby authorizes GFE to share information regarding Merchant's performance under this Agreement with affiliates and unaffiliated third parties.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement, and until GFE is fully paid:

**2.1 Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial Statements, copies of which have been furnished to GFE, and future statements which will be furnished hereafter at the discretion of GFE, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise GFE of any material adverse change in their financial condition, operation or ownership. Merchant hereby warrants that its Average Monthly Revenue as enumerated on page (1) of this agreement is accurate, and that any and all cash advances or loans outstanding by Merchant have be disclosed to GFE. GFE may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to GFE within 5 business days. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance with and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance.** Merchant will maintain business-interruption insurance naming GFE as loss payee and additional insured in amounts and against risks as are satisfactory to GFE and shall provide GFE proof of such insurance upon request. Merchant shall also maintain such other insurance in such amounts and against such risks as GFE deems necessary to protect Merchant's business, and Merchant shall provide proof of such insurance to GFE upon demand.

**2.5 Electronic Check Processing Agreement.** Merchant will not change its processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without GFE's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location and Related Entities.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and GFE, nor shall Merchant change any of its places of business without prior written consent by GFE. Merchant does not and shall not conduct Merchant's business under any name other than as set forth in this agreement and shall not change its place of business. Merchant shall not change its legal name, entity type or jurisdiction of organization. In the event Merchant, any of its officers or directors or any Owner/Guarantor, during

the term of this agreement or while Merchant remains liable to GFE for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due GFE under this Agreement. With respect to any such entity, GFE shall have the right to name such newly formed or existing entity as a debtor in any claim, suit, or legal proceeding.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from GFE to Merchant, execute, acknowledge and deliver to GFE and/or to any other person, firm or corporation specified by GFE, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10 Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the Receipts or future check sales, or any portion thereof, whether in the form of a purchase, sale, a loan against, collateral against or the sale or purchase of credits against, such Receipts or future check sales, with any party other than GFE. GFE may share information regarding this Merchant Agreement with any third party in order to determine whether Merchant is in compliance with this provision.

**2.11 Unencumbered Receipts.** Merchant has, and at all times will have, good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of GFE. Without limiting the generality of the foregoing, all future Receipts purchased by GFE hereunder shall be free and clear of any and all liens (other than GFE's ownership rights therein) at the time they become Receivables. All amounts received by GFE attributable to the Specified Amount of Future Receivables purchased by GFE hereunder shall arise from bona fide sales by Merchant of its goods and services to Card holders who present their Cards as payment thereof.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.14 Good Faith, Best Efforts and Due Diligence.** Merchant and Guarantors hereby affirm that it will conduct its business in Good Faith and will expend its Best Efforts to maintain and grow its business, to ensure that GFE obtains the Purchased Amount. Furthermore, Merchant and Guarantors hereby agree, warrant and represent hereby that they will constantly perform all appropriate Due Diligence and credit checks of all of the customers' finances, cash flow, solvency, good faith, payment histories and business reputations (the "Due Diligence Requirements") as may suffice to ensure any and all products and/or services provided, sold or delivered by Merchant to said customers will be paid for by customers in full and on time, and will not result in the creation of an unpaid account. These Due Diligence Requirements must be performed prior to any sales to any customer, and repeated no less frequently than monthly for so long as any sums are due from those customers. Full documentation of all of Merchant's compliance with its Due Diligence Requirements must be maintained in Merchant's files so long as GFE has not fully collected all sums due to it. This is not a guaranty of payment by customers, but is a guaranty of full, adequate and good faith Due Diligent investigation and credit check of customers before extending credit to them and continuing no less frequently than monthly so long as sums are still due.

**2.15 Taxes.** Merchant will promptly pay all necessary taxes, including but not limited to employment, sales and use taxes.

**2.16 No Violation of Prior Agreements.** Merchant warrants that its execution and performance of this Merchant Agreement will not violate or conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Merchant is subject, including any agreement that prohibits the sale or pledge of Merchant's future receipts or the Purchased Amount.

**2.17 Opportunity for Counsel.** Merchant represents, warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Merchant Agreement, and that it has been represented by legal counsel or has had full opportunity to consult with its own legal counsel.

**2.18 Ongoing Obligations.** Merchant hereby covenants and agrees that even after it receives some or all of the Purchase Price from GFE, it will comply with GFE's ongoing requests for any documentation from Merchant for the purpose of business and identify verification and underwriting and verification (such as the merchant's driver's license, bank login, bank statements, or any other financial or business documentation). Merchant's failure to provide to GFE the requested documentation within twenty-four (24) hours shall be deemed a breach of this Agreement and GFE shall no longer be obligated to provide any further funding to Merchant. In addition, if after receipt of said documentation from Merchant, GFE discovers that Merchant made misrepresentations before receiving funding from GFE, GFE shall no longer be obligated to provide any further funding to Merchant and Merchant's misrepresentations shall be deemed a breach of this Agreement.

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Merchant; (d) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (e) Merchant shall transfer or sell all or substantially all of its assets, or issue any notice of intended bulk sale or transfer; (f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (g) Merchant shall use multiple depository accounts without the prior written consent of GFE (h) Merchant shall change its depositing account without the prior written consent of GFE; (i)

DocuSign Envelope ID: _____    Agent Name: ISO - Premium Merchant Funding

Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; (j) the Specified Percentage of its daily Receipts is not available for ACH by GFE on any three (3) business days within any twenty (20) business day period; (k) Merchant shall default under any of the terms, covenants and conditions of any other agreement with GFE; or (l) Merchant fails to deposit its Receipts into the Account.

**3.2 Personal Guaranty.** In the event of a Default under Sections 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13, and 2.14 hereof, should GFE determine that the Purchased Amount cannot be obtained from the Merchant's business, GFE will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to GFE for all of GFE's losses and damages, in additional to all costs, fees expenses and legal fees associated with such enforcement. GFE shall not be required before exercising and enforcing its rights under this Personal Guaranty first to resort to payment against Merchant or to any other person or to any collateral.

**3.3 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4.1 hereof, GFE may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Security Agreement or Guaranty, or pursuant to any other legal or equitable right or remedy. Upon Merchant's and/or Owner's/Guarantor's default hereunder, the balance of the Purchased Amount remaining due, plus any applicable fees, shall become immediately due and payable to GFE. In addition, upon an Event of Default, GFE may: i) enforce the provisions of the Security Agreement and Guaranty against each Merchant and Owner/Guarantor; ii) enforce its security interest in the Collateral and the ; iii) debit Merchant's deposit accounts wherever situated by means of ACH debit or facsimile signature on a computer generated check drawn on Merchant's bank account for all or a portion of the balance of the Purchased Amount remaining due, or GFE may instruct the Processor to forward to GFE, without any prior notice to Merchant, all or a portion of the balance of the Purchased Amount remaining due, and iv) without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of the appropriate court based upon the affidavit(s) of judgment by confession previously executed by Merchant(s) and Owner(s)/Guarantor(s). All rights, powers and remedies of GFE which may be exercised by GFE at any time after the occurrence of an Event of Default are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Costs.** Merchant shall pay to GFE all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(b) the enforcement of GFE 's remedies set forth in Section 3.3 above, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications.** Merchant is required to give GFE written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give GFE seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## IV.MISCELLANEOUS

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by GFE.

**4.2 Assignment.** *This Agreement shall be binding upon and inure to the benefit of Merchant, Principal(s), GFE and their respective successors and assigns, except that Merchant and Principal(s) shall not have the right to assign or delegate any of their rights or obligations hereunder or any interest herein without prior written consent of GFE, which consent may be withheld in GFE's sole discretion. Any such assignment or delegation without GFE's prior written consent shall be void.* GFE reserves the right to assign or delegate this Agreement or any of its rights or obligations hereunder with or without prior notice to Merchant. GFE may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the merchant at the address set forth above in this agreement and to GFE at 2999 NE 191st Street, Unit 901, Miami, FL 33180 with a copy to 27-01 Queens Plaza North, Suite 802, Long Island City, NY 11101. Notices to GFE shall become effective only upon receipt by GFE. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of GFE to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, GFE and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of GFE which consent may be withheld in GFE's sole discretion. GFE reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, may, if GFE so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by GFE to transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provision in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and GFE and supersede all prior agreements and understandings relating to the subject matter hereof. Merchant and Principal(s) each acknowledge and agree that

Merchant #1 Initials: [signature]

DocuSign Envelope ID:

he, she or it is not relying on any representations not specifically embodied in the GFE Funding Agreement.

**4.10 JURY TRIAL WAIVER.**

THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.11 Facsimile Acceptance.** Merchant and Guarantor(s) hereby agree that facsimile and/or electronic signatures on this Merchant Agreement and Guaranty, or photocopies thereof, that shall be deemed acceptable and treated as originals for all purposes, and shall be admissible as evidence of the Merchant Agreement and Guaranty.

**4.12. Right of Access.** In order to ensure that Merchant is complying with the terms of this Merchant Agreement, Merchant agrees that GFE shall have the right to (i) enter, without notice, the premises of Merchant's business for the purpose of inspecting and checking Merchant's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Merchant's daily receipts to the Processor and to ensure that Merchant has not violated any other provision of this Agreement, and (ii) Merchant's shall provide access to its employees and records and all other items as requested by GFE, and (iii) have Merchant's provide information about its business operations, banking relationships, vendors, landlord and other information to allow GFE to interview any relevant parties. Furthermore, Merchant agrees to provide GFE, at all times with "Live Contemporaneous Access" to all of its bank accounts in order for GFE to evaluate Merchant's compliance with the Merchant Agreement, and for collections in the event of a default under the Merchant Agreement. "Live Contemporaneous Access" shall be defined as: Merchant, at all times and including but not limited to, providing GFE with accurate login information necessary to access all of Merchant's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens.

**4.13. Phone Recordings and Contact.** Merchant agrees that any call between GFE and Merchant, and their agents and employees may be recorded or monitored. Further, Merchant agrees that (i) it has an established business relationship with GFE, its employees and agents and that Merchant may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, emails address, or facsimile number given to GFE by the Merchant, its agents or employees, including cellular telephones.

**4.14. Monitoring, Recording, and Solicitations.**

   a. Authorization to Contact Seller by Phone. Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

   b. Authorization to Contact Seller by Other Means. Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

Merchant #1 Initials: ___

| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

## SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant grants to GFE a security interest in and lien upon: (a) all accounts receivables, accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant, (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to GFE under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to GFE upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover GFE's entitlements under this Agreement, GFE is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of GFE's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, GFE or an affiliate of GFE. GFE is authorized to execute and file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by GFE without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, GFE has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, GFE will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from GFE written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant agrees that this is a contract of recoupment and GFE is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant agrees not to contest or object to any motion for relief from the automatic stay filed by GFE. Merchant agrees to execute and deliver to GFE such instruments and documents GFE may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. GFE is authorized to execute all such instruments and documents in Merchant's name.

In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to GFE for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due GFE under this Agreement. With respect to any such entity, GFE shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. GFE shall be held harmless by Merchant and each Owner/Guarantor and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. GFE shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of GFE's rights, including without limitation, GFE's right to collect all accounts, and to notify any payment card processor or creditor of such entity that GFE has such rights in such entity's assets. Merchant also agrees that, at the GFE's discretion, GFE may choose to amend any existing financing statement to include any such newly formed entity as debtor.

Merchant and Guarantor each acknowledge and agree that any security interest granted to GFE under any other agreement between Merchant or Guarantor and GFE (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as GFE deems necessary to perfect or maintain GFE's first priority security interest in the Collateral including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes GFE to file any financing statements deemed necessary by GFE to perfect or maintain GFE's security interest, which financing statement may contain notification that Merchant and/or Guarantor have granted a negative pledge to GFE with respect to the Collateral, and that any subsequent lien or may be tortuously interfering with GFE's rights. Merchant and Guarantor shall be liable for, and GFE may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by GFE in protecting, preserving and enforcing GFE's security interest and rights.

**Negative Pledge.** Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** GFE shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, GFE may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that GFE may enter into an agreement with Merchant's landlord giving GFE the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default, GFE may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to GFE, whether by acceleration or otherwise.

Merchant #1 Initials: [signature]

**Personal Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to GFE, Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the Merchant Agreement in Sections thereof 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13 and 2.14, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, GFE may seek recovery from Guarantors for all of GFE's losses and damages by enforcement of GFE's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral GFE may hold pursuant to this Agreement or any other guaranty.

GFE does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) GFE's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to GFE. In addition, GFE may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to GFE; (ii) release Merchant from its obligations to GFE; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to GFE under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.**

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

| OWNER / GUARANTOR (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

## APPENDIX A STRUCTURE:

A. **Origination Fee** - % of Purchase Price to cover Underwriting and related expenses. This expense is charged at the time of funding.

B. **ACH Program Fee** - % of Purchase Price ACH's are labor intensive and are not an automated process, requiring us to charge this fee to cover costs. This expense is charged at the time of funding.

C. **Miscellaneous Service Fees** - Merchant shall pay certain fees for services related to the origination and maintenance of Accounts, which fees are set forth below. Each Merchant shall receive their funding electronically to their designated bank account, and the GFE may deduct some or all of the fees from the funded amount.

A. Rejected ACH/Blocked ACH - $5,000.00 when Merchant blocks Account from our Debit ACH, or when Merchant directs the bank to reject our debit ACH, which places them in default (per contract).

B. Pre-Authorized Bank Change Fee - $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

C. Wire Fee - $50.00 Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for either a Fed Wire fee or a bank ACH fee.

D. UCC Filing, Amendment or Termination Fee - $200.00.

E. Default Fee - $5,000.00 when Merchant defaults under the Agreement, including but not limited to diverting its Receivables from the bank account agreed upon in the "Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)" or changing its credit card processing thus terminating or diverting the agreed upon split.

F. Account Management Fees - $45.00 upon origination, and $45.00 per month thereafter until the Purchase Amount, together with any and all unpaid outstanding other fees have been paid in full. These Management Fees will not be applied towards the reduction of the Purchase Amount.

G. Stacking Fee - In the event that the Merchant enters into any cash advance or any loan agreement that relates to or involves the Receipts with any person or entity other than GFE during any portion of the term of this Agreement, then: i) Merchant shall pay to GFE a "Stacking" fee equal to $5,000.00 per occurrence, and ii) the specified daily remittances that Merchant is obligated to pay to GFE hereunder shall be doubled, and Merchant shall be deemed to have authorized GFE to double the amount of its ACH Debits from the Merchant's Account on a daily basis.

H. Third Party Collections Fee – In the event that Merchant defaults under any of the terms and conditions of this Agreement, Merchant shall pay to GFE, in addition to any other fees associated with Merchant's default, a third party collections fee equal to fifteen (15%) of the outstanding balance after all fees at the time of default.

I. NSF Fee (Standard) - $ 35.00 each until a default is declared.

J. Non-ACH Transaction Fee - When a Merchant makes a payment other than through ACH, the Merchant is responsible for the cost of that transaction.

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

DocuSign Envelope ID:

## Merchant Verification Form

| Merchant Name: JESSE LEE KAGARICE | |
|---|---|
| 1.  Do you currently or within the last 90 days have any intentions, plans or discussions regarding closing your Business? | NO |
| 2.  Do you currently or within the least 90 days have any intentions, plans or discussions to change the name or legal structure of the business? | NO |
| 3.  Are you currently in, or contemplating personal bankruptcy? | NO |
| 4.  Are you currently in, or contemplating business bankruptcy? | NO |
| 5.  Is your business currently for sale? | NO |
| 6.  Do you have any existing merchant cash advance balances? | NO |
| 7.  Are you involved in any litigation proceedings or are a party to a lawsuit? | NO |
| 8.  Is your business currently in default of any agreement with a creditor? | NO |
| 9.  Is your business currently in forbearance agreement with a creditor? | NO |
| 10. Will selling the Future Receivables cause you to breach any agreement with a creditor? | NO |

| | |
|---|---|
| If you have answered YES to any of the above questions, please explain: | |
| | |
| | |
| | |
| | |

I hereby certify that the above statements are true and correct to the best of my knowledge; I authorize my landlord and credit card processor to discuss confidential account information for the purpose of satisfying the requirements of GFE NY, LLC.

Completed and attested by:

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT)
# AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep this important legal document for Merchant's records.

DISBURSEMENT OF ADVANCE PROCEEDS. By signing below, Merchant authorizes GFE to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Merchant later identifies and is acceptable to GFE) (hereinafter referred to as the "Designated Checking Account") This authorization is to remain in full force and effect until GFE has received written notification from Merchant of its termination in such time and in such manner as to afford GFE and Merchant's depository bank a reasonable opportunity to act on it.

BUSINESS PURPOSE ACCOUNT. By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

MISCELLANEOUS. GFE is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Merchant's account must comply with the provisions of U.S. law.

I, (We) JESSE LEE KAGARICE hereby Authorize, GFE NY, LLC. (Hereinafter known as "GFE") to Electronically (ACH) debit the Bank Account Below, of which I am a signer:

| | | | |
|---|---|---|---|
| Bank Name: | NODAWAY VALLEY BANK | Tax ID: | |
| ABA: Routing: | | DDA: Account: | |
| For the amount of: | $3,999.00 | (Or) Percentage of each Banking Deposit: | 15% |
| On the Following Days: | MONDAY-FRIDAY | | |

This authorization is to remain in full force and effect until COMPANY has received written notification from me at least 5 banking days prior of its termination to afford COMPANY a reasonable opportunity to act on it.

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

Thank you for accepting an offer from GFE NY, LLC ("GFE"). We look forward to being your funding partner for as long as you need.

Please note that the way your advance is set up with GFE, GFE requires viewing access to your bank account each business day, throughout the term of this Agreement, in order that GFE may calculate and verify the amount of your daily remittance. Please be assured that we will carefully safeguard your confidential information and only essential personnel will have access to it.

GFE NY, LLC. will also require viewing access to your bank account, prior to funding, as part of the underwriting process.

Please be advised that for security purposes, GFE will request this information prior to funding. By signing below, you hereby agree that if you fail to provide the requested bank login information prior to funding, GFE shall have no obligation to provide funding. Please be further advised that if you change any of the bank login information during the term of this Agreement or at any time while you still have any outstanding obligations to GFE, you are required to immediately inform GFE of the changes made and provide GFE with the new bank login information. Please see below for the list of questions that will be by GFE as it relates to the banking information.

1. Bank Portal Website;
2. Bank Account Username;
3. Bank Account Password;
4. Security Question/Answer 1 of this Bank Account;
5. Security Question/Answer 2 of this Bank Account;
6. Security Question/Answer 3 of this Bank Account; and
7. Any other information necessary to access your Bank Account.

If you have any questions please feel free to contact our cash management department.

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

**BANK ACCOUNT DISCLOSURE AFFIDAVIT**

For the purpose of obtaining the Business Cash Advance evidence by the Merchant Agreement of this same date herewith (the "Business Cash Advance") from GFE NY, LLC., the undersigned Seller/Merchant hereby makes the following statement under penalty of law:

## OPTION 1 – DISCLOSURE AND AUTHORIZATION FOR ADDITIONAL ACCOUNTS:

By selecting this option, the Seller/Merchant hereby declares that in addition to the designated for ACH debit, the Seller/Merchant also has the following additional account(s) which he authorizes us to use in the event we are unable to debit from the designated account. The Seller/Merchant declares and warrents that it currently maintains no other bank account at any financial institution other than those banks and accounts referenced below.

| | |
|---|---|
| Bank Name | |
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| | |
|---|---|
| Bank Name | |
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| | |
|---|---|
| Bank Name | |
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

**OPTION 2** - By selecting this option, the merchant swears, under penalty of law, that Merchant has no accounts in any lending institution in addition to the one provided for ACH debit

**PLEASE SELECT AN OPTION AND SIGN BELOW:**

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

# ADDENDUM TO MERCHANT AGREEMENT

This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law. Any litigation relating to this Agreement must be commenced and maintained in any court located in New York State (the "Acceptable Forums"), however any action or proceeding to enforce a judgment or arbitration award may also be commenced and maintained in any other court of competent jurisdiction. The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum.

**THE PARTIES AGREE TO WAIVE TRIAL BY JURY IN ANY DISPUTE BETWEEN THEM.**

In any litigation commenced by GFE, Merchant and Guarantor will not be permitted to interpose any counterclaim. Merchant and Guarantor agree that any claim that is not asserted against GFE within 1 year of its accrual will be time barred. If GFE prevails in any litigation with Merchant and/or Guarantor, then Merchant and Guarantor must pay GFE's reasonable attorney fees, which may include a contingency fee of up to 33% of the amount claimed, expert fees, costs of suit, and prejudgment interest at a rate of 16% per annum (or the maximum rate permitted by applicable law if lower). GFE, Merchant, and Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**Merchant and Guarantor consent to service of process and legal notices made by certified mail, return receipt requested delivered by the United States Postal Service and addressed to the Contact Address set forth immediately below or on Page 1 of this Agreement, any such service will be deemed complete 5 days after dispatch.**

I have read and agreed to the Terms and Conditions set forth above:

| MERCHANT (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18500 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jtkconstruction.com |

ABM - BSO Maxim Funding

**TRADE REFERENCES**

Please provide a list of 3-5 professional references

| TRADE REFERENCE #1: |  |
|---|---|
| Name: |  |
| Phone Number: |  |
| Email Address: |  |

| TRADE REFERENCE #2: |  |
|---|---|
| Name: |  |
| Phone Number: |  |
| Email Address: |  |

| TRADE REFERENCE #3: |  |
|---|---|
| Name: |  |
| Phone Number: |  |
| Email Address: |  |

| TRADE REFERENCE #4: |  |
|---|---|
| Name: |  |
| Phone Number: |  |
| Email Address: |  |

| TRADE REFERENCE #5: |  |
|---|---|
| Name: |  |
| Phone Number: |  |
| Email Address: |  |

Merchant #1 Initials: JK

## Weekly Advance Addendum to the Merchant Agreement

This Weekly Advance Addendum amends the Merchant Agreement and Security Agreement between GFE and the merchant listed below (the "Merchant") dated 12/07/2021, (the "Agreement"). All capitalized terms used in his Addendum shall have the same meaning as defined in the Agreement. Except as modified below, the terms of the Agreement remain in full force and effect.

### MERCHANT INFORMATION

| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
|---|---|
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

This Weekly Advance Addendum amends the Merchant Agreement and Security Agreement between GFE and the merchant listed below (the "Merchant") dated 12/07/2021, (the "Agreement"). All capitalized terms used in his Addendum shall have the same meaning as defined in the Agreement. Except as modified below, the terms of the Agreement remain in full force and effect.

### AGREEMENT AS TO ADVANCES

1. <u>Weekly Sale and Purchase of Merchant's Future Receipts</u>: Merchant hereby offers to sell and GFE agrees to purchase, up to the Receipts Purchased Amount, future Receipts on a weekly basis according to the attached schedule. GFE shall have the right to terminate the purchase of any additional future Receipts as set forth in Section 2 of this Addendum.

2. <u>GFE's Obligation to Make Future Purchases</u>: GFE reserves the right to terminate its obligation to make the weekly purchases at its option, if upon: (i) a Event of Default has occurred, as defined in the Agreement; (ii) Merchant fails to provide to GFE a monthly Account statement, access codes to the Account, and full access to merchant's Account prior making any weekly purchase as contemplated herein; (iii) Merchant obtains any additional funding without providing prior written notice to and receiving written approval from GFE; (iv) the Specified Percentage of its weekly Receipts is not available for ACH by GFE on any three (3) business days within any twenty (20) business day period; (v) Merchant has a 20% decline in monthly deposits that is not due to regular seasonal payment fluctuations; (vi) GFE believes in its sole judgment that Merchant's business may not be able to generate future Receipts sufficient to deliver the Purchased Receipts in a timely manner, vii) the Account has a negative balance; viii) Merchant is in arrears with respect to its payment obligations under the Agreement or ix) the Merchant has failed to provide GFE with a complete account receivable report within any thirty (30) day period prior to any weekly purchase contemplated herein In the event that weekly purchases are terminated, the Merchant will remain obligated to deliver the Specified Percentage of its weekly Receipts to GFE until GFE has received the Receipts GFE purchased prior to termination, and to comply with all other provisions of this Agreement.

3. <u>Merchant's Indebtedness When Receipts Purchased Amount Is Sold In Increments</u>: When Merchant sells and GFE purchases the Receipts Purchased Amount, or portions thereof, in increments, the Merchant's indebtedness to GFE under the Agreement (excluding any fees and expenses then then due and owing) shall at any given point in time be equal to the percentage of the total Receipts Purchase Amount that the total of all increments then paid by GFE to the Merchant bears to Total Purchase Price as set forth in the Agreement.

THE TERMS OF THIS ATTACHMENT A ARE HEREBY INCORPORATED INTO AND MADE A PART OF THE MERCHANT AGREEMENT IDENTIFIED ABOVE, AND MERCHANT HEREBY ACKNOWLEDGES THAT THE PERIODIC PURCHASE OF FUTURE RECEIPTS HEREUNDER ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE MERCHANT AGREEMENT

| MERCHANT (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

| OWNER / GUARANTOR (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

DocuSign Envelope ID:

**MERCHANT INFORMATION**

| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
|---|---|
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

## GFE Weekly Distribution Grid-Special Agreement

| Increment | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Amount | $106,090.50 | $33,090.50 | $33,090.50 | $33,090.50 | $33,090.50 |
| Increment | 6 | 7 | 8 | 9 | 10 |
| Amount | $33,090.50 | $33,090.50 | $33,090.50 | $33,090.50 | $33,090.50 |
| Increment | 11 | 12 | 13 | 14 | 15 |
| Amount | $33,090.50 | $33,090.50 | $33,090.50 | $33,090.50 | $33,090.50 |
| Increment | 16 | | | | |
| Amount | $30,642.50 | | | | |

**\*Appropriate fee will be deducted from the first increment.**

**See APPENDIX A STRUCTURE for fee details.**

| MERCHANT (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

Merchant #1 Initials: [JK]

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: | | Status: Completed |
| Subject: Global Funding Experts (GFE) - Merchant DocuSign Contract for: JLK CONSTRUCTION, LLC. | | |
| Source Envelope: | | |
| Document Pages: 19 | Signatures: 13 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 19 | GFE Contract Team |
| AutoNav: Enabled | | 27-01 Queens Plaza North, Suite 802 |
| EnvelopeId Stamping: Enabled | | Long Island City, NY 11101 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | contracts@globalfundingexperts.com |
| | | IP Address: |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: GFE Contract Team | Location: DocuSign |
|     12/7/2021 7:21:21 PM |     contracts@globalfundingexperts.com | |

## Signer Events | Signature | Timestamp

**JESSE LEE KAGARICE**
jesse@jlkconstruction.com
President
Security Level: Email, Account Authentication
(None)

Signature Adoption: Drawn on Device
Using IP Address:
Signed using mobile

Sent: 12/7/2021 7:23:29 PM
Viewed: 12/7/2021 7:58:04 PM
Signed: 12/7/2021 8:00:53 PM

**Electronic Record and Signature Disclosure:**
    Accepted: 12/7/2021 7:58:04 PM
    ID:

## In Person Signer Events | Signature | Timestamp

## Editor Delivery Events | Status | Timestamp

## Agent Delivery Events | Status | Timestamp

## Intermediary Delivery Events | Status | Timestamp

## Certified Delivery Events | Status | Timestamp

## Carbon Copy Events | Status | Timestamp

Sam Brugman
sbrugman@pmfus.com
Security Level: Email, Account Authentication
(None)

**COPIED**

Sent: 12/7/2021 7:23:29 PM

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

Liliana
iso@globalfundingexperts.com
Security Level: Email, Account Authentication
(None)

**COPIED**

Sent: 12/7/2021 7:23:29 PM

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| GFE Contract Team<br>contracts@globalfundingexperts.com<br>GFE Contract Team<br>Global Funding Experts<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 12/7/2021 7:23:29 PM |

**Electronic Record and Signature Disclosure:**
  Not Offered via DocuSign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/7/2021 7:23:29 PM |
| Certified Delivered | Security Checked | 12/7/2021 7:58:04 PM |
| Signing Complete | Security Checked | 12/7/2021 8:00:53 PM |
| Completed | Security Checked | 12/7/2021 8:00:53 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 8/29/2019 1:03:27 PM
Parties agreed to: JESSE LEE KAGARICE

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Global Funding Experts (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Global Funding Experts:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: samin@globalfundingexperts.com

**To advise Global Funding Experts of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at samin@globalfundingexperts.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Global Funding Experts**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to samin@globalfundingexperts.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Global Funding Experts**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to samin@globalfundingexperts.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Global Funding Experts as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Global Funding Experts during the course of your relationship with Global Funding Experts.

# Exhibit "4"

DocuSign Envelope ID:



# MERCHANT CONTRACT:

# JLK CONSTRUCTION, LLC.

**I hereby certify that ISO - Premium Merchant Funding ("Agent") acted as a Merchant's agent.**

**Completed and attested by:**



| 07/13/2022 | Agent Name: ISO - Premium Merchant Funding |
|---|---|

Agent Name: ISO - Premium Merchant Funding

## GFE

**27-01 Queens Plaza North, Suite 802, Long Island City, NY 11101**
**Tel: 1-877-253-7686, Fax: 718-504-3736**
**Website: www.globalfundingexperts.com / Email: underwriting@globalfundingexperts.com**

# MERCHANT AGREEMENT

Agreement dated _____07/13/2022_____ between White Road Capital LLC, Series: 120785, D/B/A: GFE Holdings (**"White Road"**) and the Merchant listed below (**"MERCHANT"**)
              (Month) (Day) (Year)

## MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| State of Incorporation / Organization: | MO |
| Type of Business Entity: | LLC |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Mailing Address: | PO BOX 8820, Saint Joseph, MO, 64508 |
| Primary Contact & Number: | JESSE LEE KAGARICE ((816) 273-7860) |

## PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant ("Merchant"), in consideration of the funds provided to Merchant by White Road as specified below ("Purchase Price"), hereby sells, assigns and transfers to White Road (making White Road the absolute owner) the Specified Percentage indicated below of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts") defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business, for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to White Road.

The Purchased Amount shall be paid to White Road by Merchant irrevocably directing and authorizing that there be only one depositing bank account, which account must be acceptable to and pre-approved by White Road (the "Account") into which Merchant and Merchant's customers shall remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each Transaction, until such time as White Road receives payment in full of the Purchased Amount. Merchant hereby authorizes White Road to ACH Debit the specified remittances from the Merchant's Account on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box and will provide White Road with all required access codes and monthly bank statements. Merchant understands that it is responsible for ensuring that the Specified Percentage to be debited by White Road remains in the Account and will be held responsible for any fees incurred by White Road resulting from a rejected ACH attempt or an event of default. (See Appendix A) White Road is not responsible for any overdrafts or rejected transactions that may result from White Road's ACH debiting the specified amounts under the terms of this agreement. White Road will debit the specified remittance amount during a business day based on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box. The Merchant shall deliver to White Road, no later than the 18th date of each month the bank statement for the Account in respect of the immediately preceding month. Within three business days of White Road's receipt of the Merchant's monthly bank statements, White Road shall reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the Specified Percentage. If the Merchant fails to deliver the bank statement for the Account for any month, White Road shall consider that the specific remittances were equal to the Specified Percentage of the settlement amount due from each Transaction for such month. White Road may, upon Merchant's request, adjust the amount of any payment due under this Agreement at White Road's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between White Road and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

### ORIGINAL OFFER:

| | | | |
|---|---|---|---|
| Total Purchase Price: | $277,000.00 | Merchant's Average Monthly Revenue: | $435,706.03 |
| Purchased Amount of Receivables: | $387,523.00 | Specified Percentage of Monthly Revenue: | 15% |
| Total Fees*: | $0.00 | Specified Remittance Amount & Frequency: | $2,499.00 / Daily |
| Net Funded Amount**: | $277,000.00 | Initial Estimated # of Remittance Payments: | 156 |

**\* This amount reflects the total fees Merchant will pay at funding. See Appendix A for a complete breakdown of fees.**

**\*\* This amount reflects the total funds Merchant will receive after all the fees and balance transfers are deducted from the Total Purchase Price. See Balance Transfer Form for a complete breakdown of the remaining RTR balances.**

**\*\*\* If an Early Payment Addendum has been executed by White Road and the Merchant, the promotional early termination discount referenced above shall be applicable subject to the terms and conditions set forth in the Early Payment Addendum.**

**The Total Purchase Price may also be paid incrementally over time, in the increments and in the Specific Remittance Amounts set forth in the Attachment A Addendum annexed hereto.**

-83-

Merchant #1 Initials: _____

THE MERCHANT AGREEMENT ON PAGE 2, THE "SECURED AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT. BY SIGNING BELOW, MERCHANT HEREBY REPRESENTS AND WARRANTS THAT NOTHING CONTAINED HEREIN IS FALSE, MISLEADING, AND THAT MERCHANT HAS NOT FAILED TO DISCLOSE ANY MATERIAL INFORMATION TO OBTAIN FUNDING FROM White Road.

| MERCHANT (#1) | | Signature | *JESSE LEE KAGARICE* |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | 816-896-6909 |
| Social Security No: | | Home or Secondary Number: | 816-396-9097 |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

| OWNER / GUARANTOR (#1) | | Signature | *JESSE LEE KAGARICE* |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | 816-896-6909 |
| Social Security No: | | Home or Secondary Number: | 816-396-9097 |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

White Road Capital LLC, Series: 120785, D/B/A: GFE Holdings

By:

_____

(Company Officer)

Merchant #1 Initials:

**MERCHANT AGREEMENT TERMS AND CONDITIONS**

## I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to White Road with a Bank acceptable to White Road to obtain electronic fund transfer services for the Merchant's account at the Bank approved by White Road (the "Account"). Merchant shall provide White Road and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes White Road and/or its agent(s) to deduct from the Account the amounts owed to White Road for the receipts as specified herein and to pay such amounts to White Road. Merchant also hereby authorizes White Road to withdraw from the Account the Specified Percentage(s) and/or sums by White Road debiting the account. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by White Road or not. This additional authorization is not a waiver of White Road's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which White Road did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of White Road.

Merchant understands and agrees that this Agreement, including the authorizations to access Merchant`s accounts (including the Account) set forth herein, as well as all other payment processing agreements entered into with respect to the Transactions irrevocably authorize the processor of such payments (the "Processor") and Operator to pay the cash attributable to the Specified Percentage of Receivables to White Road rather than to Merchant until White Road receives the cash attributable to the entire Specified Amount of Future Receivables from Processor and Operator. Merchant and Guarantor(s) authorize White Road and its agents: i) to investigate Merchant's financial status and history, and will provide to White Road any authorizations, bank or financial statements, tax returns, etc., as White Road deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. and ii) to update such information and financial and credit profiles from time to time as White Road deems appropriate. Merchant hereby authorizes all of its banks, brokers, processors and customers to provide White Road with Merchant's bank statements, brokerage statements, processing history and such other statements and information as White Road may in its sole discretion require to determine Merchant's and Guarantor's qualification or continuation in this program and for collections purposes. Merchant shall provide White Road with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from White Road.

These authorizations and instructions may be revoked only with the prior written consent of White Road. Merchant agrees that Processor and Operator may rely upon the instructions of White Road, without any independent verification, in making the cash payments above. Merchant waives any claim for damages it may have against Processor or Operator in connection with actions taken based on instructions from White Road, unless such damages were due to such Processor`s or Operator`s failure to follow White Road`s instructions. Merchant acknowledges and agrees that (a) Processor and Operator will be acting on behalf of White Road with respect to the specified Percentage of Receivables until cash attributable to the entire Specified Amount of Future Receivables has been remitted by Processor and Operator to White Road, (b) Processor and Operator may or may not be affiliates of White Road, (c) White Road does not have any power or authority to control Processor`s or Operator`s actions with respect to the processing of Card transactions or remittance of cash to White Road, (d) White Road is not responsible and shall not be liable for, and Merchant agrees to hold White Road harmless for, the actions of Processor and Operator, and (e) funds representing the Specified Percentage of Receivables in the possession of Processing or Operator constitute property owned solely by White Road, and Merchant disclaims any and all interest therein. For purposes of this Agreement, the term "Operator" shall mean White Road or any person or entity designated by White Road to debit or otherwise withdraw (via the Automated Clearing House ("ACH") system, electronic checks, wires, or otherwise) any amounts from Merchant`s or principal(s) accounts as authorized or permitted by this Agreement.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire "Purchased Amount" is received by White Road as per the terms of this Agreement. The termination of this Agreement shall not affect Merchant's continuing obligation and responsibility to fully satisfy all outstanding obligations that are due to White Road.

**1.3 Future Purchases.** White Road reserves the right to rescind the offer to make any purchase payments hereunder, in its sole and absolute discretion.

**1.4 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined) authorize White Road, its agents and representatives, as well as any credit reporting agency engaged by White Road, i) to investigate their financial responsibility and history, including any references given or any other statements or data obtained from or about Merchant or any of the Guarantor(s); ii) to obtain consumer and business credit reports on the Merchant and Guarantor(s); iii) to contact any current or prior bank of the Merchant in order to obtain whatever information it may require regarding any and all of Merchant's transactions with any such bank, including, but not limited to applications, bank statements, financial statements and tax returns; and (iv) to contact personal and business references provided by the Merchant or Guarantor(s), at any time now or for so long as Merchant and/or Guarantor(s) continue to have any obligation owed to White Road as a consequence of this Merchant Agreement or for White Road's ability to determine Merchant's eligibility to enter into any future agreement with White Road. Merchant and Guarantor(s) will further provide to White Road any authorizations, bank or financial statements, tax returns, etc., as White Road deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. White Road is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Merchant and Guarantor(s) acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Guarantor(s) has been relied upon to White Road in connection with its decision to purchase the Specified Amount of Future Receivables from Merchant.

**1.5 Transactional History.** Merchant authorizes all of their banks and brokers to provide White Road with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program. Merchant herby (i) authorizes White Road to contact any past, present or future processor of Merchant, its predecessors or affiliates, to obtain any information that White Road deems necessary or appropriate regarding any of their transactions with such processors, and (ii) authorizes and directs such processors to provide White Road with all such information in compliance with this Section. Such information may include information to verify the amount of Card receivables previously processed on behalf of Merchant, its predecessors or affiliates, and any amounts that may have been paid to, offset, held or reversed by, such processors. Without limiting the generality of the foregoing, Merchant authorizes White Road to contact any past, present or future processor of Merchant, its predecessors or affiliates, to confirm that Merchant is exclusively using the Processor accepted by White Road in accordance with this Agreement.

Merchant #1 Initials:

**1.6 Indemnification.** ................ indemnify and hold harmless Processor and Operator, their respective officers, directors, affiliates, employees, agents, representatives and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) suffered or incurred by Processor or Operator resulting from (a) claims asserted by White Road for monies owed to White Road from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by White Road.

**1.7 No Liability.** In no event will Processor, Operator or White Road be liable for any claims asserted by Merchant or Guarantors under any legal theory or law, including any tort or contract theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of White Road's legal fees and expenses resulting therefrom.

**1.8 Reliance on Terms.** Section 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, White Road and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.9 Sale of Receipts.** Merchant and White Road agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from White Road to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. White Road has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to White Road in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, - it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that White Road has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and White Road shall promptly refund to Merchant any interest received by White Road in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that White Road not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant is not a debtor to White Road as of the date of this Agreement. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.10 Power of Attorney.** Merchant irrevocably appoints White Road as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to White Road from Processor, or in the case of a violation by Merchant of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to White Road; and (v) to file any claims or take any action or institute any proceeding which White Road may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant, and White Road is authorized to use Merchant's funds to pay for same. In addition to any other remedies available for violation of the Merchant's Contractual Covenants, in the event that Merchant changes or permits the change of the Processor accepted by White Road or utilizes the services of an additional Processor, White Road shall have the right, without waiving any of its rights or remedies and without notice to Merchant or Principal(s), to notify the new or additional Processor of the sale of the Specified Amount of Future Receivables hereunder and to direct such new or additional Processor to make payment to White Road of all or any portion of the amounts received or held by such Processor for or on behalf of Merchant to pay any amounts White Road is entitled to receive hereunder. Merchant hereby grants White Road an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints White Road and its designees as Merchant's attorney-in-fact, to take any and all actions necessary and appropriate to direct such new or additional Processor to make payment to White Road as contemplated by this Section. Merchant further hereby grants White Road an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints White Road and its designees as Merchant's attorney-in-fact, to execute any all documents in the Merchant's name sufficient to provide and perfect any security interest granted by Merchant to White Road hereunder, including but not limited to security interests in motor vehicles and real estate.

**1.11 Protections against Default.** The following Protections 1 through 8 may be invoked by White Road immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the White Road electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse or unacceptable to White Road; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor or an unauthorized depository account; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God), transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of White Road, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to White Road; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor or (f) Merchant enters into any agreement with any third person or entity that relates to the Receipts or any portion thereof, whether in the form of a purchase, sale, loan, pledge or the granting of any security interest in the Receipts or any portion thereof These protections are in addition to any other remedies available to White Road at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchase Amount plus all fees (including legal fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** White Road may enforce the provisions of the Personal Guaranty of Performance against the Guarantor(s).

Merchant #1 Initials: [signature]

**Protection 3.** Merchant [Judgment in favor of White Road in the amount of Purchase Amount stated in the Agreement. Merchant also hereby authorizes White Road to execute in the name of the Merchant affidavit(s) of Confession of Judgment in favor of White Road in the amount of Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, White Road may, without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of any appropriate court based upon the affidavit(s) of judgment by confession previously executed by Merchant(s) and Owner(s)/Guarantor(s).

**Protection 4.** White Road may enforce its security interest in the Collateral identified in the Security Agreement hereof.

**Protection 5.** The entire Purchase Amount and all fees (including legal fees) shall become immediately refundable and payable to White Road from Merchant.

**Protection 6.** White Road may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, under which White Road shall recover Judgment against Merchant, Merchant shall be liable for all of White Road's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. White Road reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to White Road from Merchant prior to applying such amounts to reduce the amount of any outstanding Purchase Amount.

**Protection 7.** This Agreement shall be deemed Merchants Assignment of Merchant's Lease of Merchant's business premises to White Road. Upon breach of any provision in this Agreement, White Road may exercise its rights under this Assignment of Lease without prior Notice to Merchant.

**Protection 8.** White Road may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile White Road on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to White Road.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes White Road, its agents and employees to obtain and disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that White Road obtains) and business conduct only to it employees. agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against White Road or any of its affiliates relating to any (i) investigation undertaken by or on behalf of White Road as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by White Road, including this Agreement and any other White Road documentations (collectively, "Confidential Information") are proprietary and confidential information of White Road. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of White Road to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles White Road to not only damages and legal fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.14 Publicity.** Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes White Road to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.15 D/B/A's.** Merchant hereby acknowledges and agrees that White Road may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between White Road and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**1.16 Purchase of Increments.** In the event that White Road offers to purchase additional Receipts in the 'increments' stated on Attachment A of this Agreement, then White Road reserves the unilateral right to delay or rescind such offer in its sole and absolute discretion at any time.

**1.17 Sharing of Information.** Merchant hereby authorizes White Road to share information regarding Merchant's performance under this Agreement with affiliates and unaffiliated third parties.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement, and until White Road is fully paid:

**2.1 Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial Statements, copies of which have been furnished to White Road, and future statements which will be furnished hereafter at the discretion of White Road, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise White Road of any material adverse change in their financial condition, operation or ownership. Merchant hereby warrants that its Average Monthly Revenue as enumerated on page (1) of this Agreement is accurate, and that any and all cash advances or loans outstanding by Merchant have be disclosed to White Road. White Road may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to White Road within 5 business days. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance.** Merchant will maintain business-interruption insurance naming White Road as loss payee and additional insured in amounts and against risks as satisfactory to White Road and shall provide White Road proof of such insurance upon request. Merchant shall also maintain such other insurance in such amounts and against such risks as White Road deems necessary to protect Merchant's business, and Merchant shall provide proof of such insurance to White Road upon demand.

-87-



Merchant #1 Initials: _____

DocuSign Envelope ID:                                                                Agent Name: ISO - Premium Merchant Funding

**2.5 Electronic Check** take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without White Road's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location and Related Entities.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and White Road, nor shall Merchant change any of its places of business without prior written consent by White Road. Merchant does not and shall not conduct Merchant's business under any name other than as set forth in this agreement and shall not change its place of business. Merchant shall not change its legal name, entity type or jurisdiction of organization. In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to White Road for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due White Road under this Agreement. With respect to any such entity, White Road shall have the right to name such newly formed or existing entity as a debtor in any claim, suit, or legal proceeding.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from White Road to Merchant, execute, acknowledge and deliver to White Road and/or to any other person, firm or corporation specified by White Road, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy. As of the date of this Agreement, Merchant is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.**

**2.10 Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the Receipts or future check sales, or any portion thereof, whether in the form of a purchase, sale, a loan against, collateral against or the sale or purchase of credits against, such Receipts or future check sales, with any party other than White Road. White Road may share information regarding this Merchant Agreement with any third party in order to determine whether Merchant is in compliance with this provision.

**2.11 Unencumbered Receipts.** Merchant has, and at all times will have, good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of White Road. Without limiting the generality of the foregoing, all future Receipts purchased by White Road hereunder shall be free and clear of any and all liens (other than White Road's ownership rights therein) at the time they become Receivables. All amounts received by White Road attributable to the Specified Amount of Future Receivables purchased by White Road hereunder shall arise from bona fide sales by Merchant of its goods and services to Card holders who present their Cards as payment thereof.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.14 Good Faith, Best Efforts and Due Diligence.** Merchant and Guarantors hereby affirm that it will conduct its business in Good Faith and will expend its Best Efforts to maintain and grow its business, to ensure that White Road obtains the Purchased Amount. Furthermore, Merchant and Guarantors hereby agree, warrant and represent hereby that they will constantly perform all appropriate Due Diligence and credit checks of all of the customers' finances, cash flow, solvency, good faith, payment histories and business reputations (the "Due Diligence Requirements") as may suffice to ensure any and all products and/or services provided, sold or delivered by Merchant to said customers will be paid for by customers in full and on time, and will not result in the creation of an unpaid account. These Due Diligence Requirements must be performed prior to any sales to any customer, and repeated no less frequently than monthly for so long as any sums are due from those customers. Full documentation of all of Merchant's compliance with its Due Diligence Requirements must be maintained in Merchant's files so long as White Road has not fully collected all sums due to it. This is not a guaranty of payment by customers, but a guaranty of full, adequate and good faith Due Diligent investigation and credit check of customers before extending credit to them and continuing no less frequently than monthly so long as sums are still due.

**2.15 Taxes.** Merchant will promptly pay all necessary taxes, including but not limited to employment, sales and use taxes.

**2.16 No Violation of Prior Agreements.** Merchant warrants that its execution and performance of this Merchant Agreement will not violate or conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Merchant is subject, including any agreement that prohibits the sale or pledge of Merchant's future receipts or the Purchased Amount.

**2.17 Opportunity for Counsel.** Merchant represents, warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Merchant Agreement, and that it has been represented by legal counsel or has had full opportunity to consult with its own legal counsel.

**2.18 Ongoing Obligations.** Merchant hereby covenants and agrees that even after it receives some or all of the Purchase Price from White Road, it will comply with White Road's ongoing requests for any documentation from Merchant for the purpose of business and identify verification and underwriting and verification (such as the merchant's driver's license, bank login, bank statements, or any other financial or business documentation). Merchant's failure to provide to White Road the requested documentation within twenty-four (24) hours shall be deemed a breach of this Agreement and White Road shall no longer be obligated to provide any further funding to Merchant. In addition, if after receipt of said documentation from Merchant, White Road discovers that Merchant made misrepresentations before receiving funding from White Road, White Road shall no longer be obligated to provide any further funding to Merchant, and Merchant's misrepresentations shall be deemed a breach of this Agreement.

88

Merchant #1 Initials:

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Merchant; (d) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (e) Merchant shall transfer or sell all or substantially all of its assets, or issue any notice of intended bulk sale or transfer; (f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (g) Merchant shall use multiple depository accounts without the prior written consent of White Road (h) Merchant shall change its depositing account without the prior written consent of White Road; (i) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; (j) the Specified Percentage of its daily Receipts is not available for ACH by White Road on any three (3) business days within any twenty (20) business day period; (k) Merchant shall default under any of the terms, covenants and conditions of any other agreement with White Road; or (l) Merchant fails to deposit its Receipts into the Account.

**3.2 Personal Guaranty.** In the event of a Default under Sections 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13, and 2.14 hereof, should White Road determine that the Purchased Amount cannot be obtained from the Merchant's business, White Road will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to White Road for all of White Road's losses and damages, in additional to all costs, fees expenses and legal fees associated with such enforcement. White Road shall not be required before exercising and enforcing its rights under this Personal Guaranty first to resort to payment against Merchant or to any other person or to any collateral.

**3.3 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4.1 hereof, White Road may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Security Agreement or Guaranty, or pursuant to any other legal or equitable right or remedy. Upon Merchant's and/or Owner's/Guarantor's default hereunder, the balance of the Purchased Amount remaining due, plus any applicable fees, shall become immediately due and payable to White Road. In addition, upon an Event of Default, White Road may: i) enforce the provisions of the Security Agreement and Guaranty against each Merchant and Owner/Guarantor; ii) enforce its security interest in the Collateral and the ; iii) adjust debits of Merchant's Account to a daily debit; iv) debit Merchant's deposit accounts wherever situated by means of ACH debit or facsimile signature on a computer generated check drawn on Merchant's bank account for all or a portion of the balance of the Purchased Amount remaining due, or White Road may instruct the Processor to forward to White Road, without any prior notice to Merchant, all or a portion of the balance of the Purchased Amount remaining due, and v) without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of the appropriate court based upon the affidavit(s) of judgment by confession previously executed by Merchant(s) and Owner(s)/Guarantor(s). All rights, powers and remedies of White Road which may be exercised by White Road at any time after the occurrence of an Event of Default are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Costs.** Merchant shall pay to White Road all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(b) the enforcement of White Road 's remedies set forth in Section 3.3 above, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications.** Merchant is required to give White Road written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give White Road seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## IV. MISCELLANEOUS

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by White Road.

**4.2 Assignment.** This Agreement shall be binding upon and inure to the benefit of Merchant, Principal(s), White Road and their respective successors and assigns, except that Merchant and Principal(s) shall not have the right to assign or delegate any of their rights or obligations hereunder or any interest herein without prior written consent of White Road, which consent may be withheld in White Road's sole discretion. Any such assignment or delegation without White Road's prior written consent shall be void. White Road reserves the right to assign or delegate this Agreement or any of its rights or obligations hereunder with or without prior notice to Merchant. White Road may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the merchant at the address set forth above in this agreement and to White Road at 2999 NE 191st Street, Unit 901, Miami, FL 33180 with a copy to 27-01 Queens Plaza North, Suite 802, Long Island City, NY 11101. Notices to White Road shall become effective only upon receipt by White Road. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of White Road to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, White Road and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of White Road which consent may be withheld in White Road's sole discretion. White Road reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, may, if White Road so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by White Road to

Merchant #1 Initials:

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provision in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and White Road and supersede all prior agreements and understandings relating to the subject matter hereof. Merchant and Principal(s) each acknowledge and agree that he, she or it is not relying on any representations not specifically embodied in this Agreement.

**4.10 JURY TRIAL WAIVER.**

THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.11 Facsimile Acceptance.** Merchant and Guarantor(s) hereby agree that facsimile and/or electronic signatures on this Merchant Agreement and Guaranty, or photocopies thereof, that shall be deemed acceptable and treated as originals for all purposes, and shall be admissible as evidence of the Merchant Agreement and Guaranty.

**4.12. Right of Access.** In order to ensure that Merchant is complying with the terms of this Merchant Agreement, Merchant agrees that White Road shall have the right to (i) enter, without notice, the premises of Merchant's business for the purpose of inspecting and checking Merchant's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Merchant's daily receipts to the Processor and to ensure that Merchant has not violated any other provision of this Agreement, and (ii) Merchant's shall provide access to its employees and records and all other items as requested by White Road, and (iii) have Merchant's provide information about its business operations, banking relationships, vendors, landlord and other information to allow White Road to interview any relevant parties. Furthermore, Merchant agrees to provide White Road, at all times with "Live Contemporaneous Access" to all of its bank accounts in order for White Road to evaluate Merchant's compliance with the Merchant Agreement, and for collections in the event of a default under the Merchant Agreement. "Live Contemporaneous Access" shall be defined as: Merchant, at all times and including but not limited to, providing White Road with accurate login information necessary to access all of Merchant's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens.

**4.13. Phone Recordings and Contact.** Merchant agrees that any call between White Road and Merchant, and their agents and employees may be recorded or monitored. Further, Merchant agrees that (i) it has an established business relationship with White Road, its employees and agents and that Merchant may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, emails address, or facsimile number given to White Road by the Merchant, its agents or employees, including cellular telephones.

**4.14. Monitoring, Recording, and Solicitations.**

a. Authorization to Contact Seller by Phone. Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

b. Authorization to Contact Seller by Other Means. Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

Merchant #1 Initials: 

| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
|---|---|
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

## SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant grants to White Road a security interest in and lien upon: (a) all accounts receivables, accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant, (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to White Road under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to White Road upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover White Road's entitlements under this Agreement, White Road is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of White Road's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, White Road or an affiliate of White Road. White Road is authorized to execute and file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by White Road without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, White Road has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, White Road will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from White Road written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant agrees that this is a contract of recoupment and White Road is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant agrees not to contest or object to any motion for relief from the automatic stay filed by White Road. Merchant agrees to execute and deliver to White Road such instruments and documents White Road may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. White Road is authorized to execute all such instruments and documents in Merchant's name.

In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to White Road for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due White Road under this Agreement. With respect to any such entity, White Road shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. White Road shall be held harmless by Merchant and each Owner/Guarantor and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. White Road shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of White Road's rights, including without limitation, White Road's right to collect all accounts, and to notify any payment card processor or creditor of such entity that White Road has such rights in such entity's assets. Merchant also agrees that, at the White Road's discretion, White Road may choose to amend any existing financing statement to include any such newly formed entity as debtor.

Merchant and Guarantor each acknowledge and agree that any security interest granted to White Road under any other agreement between Merchant or Guarantor and White Road (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as White Road deems necessary to perfect or maintain White Road's first priority security interest in the Collateral including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes White Road to file any financing statements deemed necessary by White Road to perfect or maintain White Road's security interest, which financing statement may contain notification that Merchant and/or Guarantor have granted a negative pledge to White Road with respect to the Collateral, and that any subsequent lien or may be tortuously interfering with White Road's rights. Merchant and Guarantor shall be liable for, and White Road may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by White Road in protecting, preserving and enforcing White Road's security interest and rights.

**Negative Pledge.** Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** White Road shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, White Road may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that White Road may enter into an agreement with Merchant's landlord giving White Road the right to: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

Merchant #1 Initials:

**Remedies.** Upon any E          medy available at law including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to White Road, whether by acceleration or otherwise.

## GUARANTY

**Personal Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to White Road, Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the Merchant Agreement in Sections thereof 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13 and 2.14, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, White Road may seek recovery from Guarantors for all of White Road's losses and damages by enforcement of White Road's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral White Road may hold pursuant to this Agreement or any other guaranty.

White Road does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) White Road's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to White Road. In addition, White Road may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to White Road; (ii) release Merchant from its obligations to White Road; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to White Road under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.**

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | *Jesse Lee Kagarice* | | |

| OWNER / GUARANTOR (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | *Jesse Lee Kagarice* | | |

Merchant #1 Initials:

A. **Origination Fee** - 0% of Purchase Price to cover Underwriting and related expenses. This expense is charged at the time of funding.

B. **ACH Program Fee** - 0% of Purchase Price ACH's are labor intensive and are not an automated process, requiring us to charge this fee to cover costs. This expense is charged at the time of funding.

C. **Miscellaneous Service Fees** - Merchant shall pay certain fees for services related to the origination and maintenance of Accounts, which fees are set forth below. Each Merchant shall receive their funding electronically to their designated bank account, and the White Road may deduct some or all of the fees from the funded amount.

   A. Rejected ACH/Blocked ACH - $5,000.00 when Merchant blocks Account from our Debit ACH, or when Merchant directs the bank to reject our debit ACH, which places them in default (per contract).

   B. Pre-Authorized Bank Change Fee - $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

   C. Wire Fee - $50.00 Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for either a Fed Wire fee or a bank ACH fee.

   D. UCC Filing, Amendment or Termination Fee - $200.00.

   E. Default Fee - $5,000.00 when Merchant defaults under the Agreement, including but not limited to diverting its Receivables from the bank account agreed upon in the "Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)" or changing its credit card processing thus terminating or diverting the agreed upon split.

   F. Account Management Fees - $45.00 upon origination, and $45.00 per month thereafter until the Purchase Amount, together with any and all unpaid origination other fees have been paid in full. These Management Fees will not be applied towards the reduction of the Purchase Amount.

   G. Stacking Fee - In the event that the Merchant enters into any cash advance or any loan agreement that relates to or involves the Receipts with any person or entity other than White Road during any portion of the term of this Agreement, then: i) Merchant shall pay to White Road a "Stacking" fee equal to $5,000.00 per occurrence, and ii) the specified daily remittances that Merchant is obligated to pay to White Road hereunder shall be doubled, and Merchant shall be deemed to have authorized White Road to double the amount of its ACH Debits from the Merchant's Account on a daily basis.

   H. Third Party Collections Fee – In the event that Merchant defaults under any of the terms and conditions of this Agreement, Merchant shall pay to White Road, in addition to any other fees associated with Merchant's default, a third party collections fee equal to fifteen (15%) of the outstanding balance after all fees at the time of default.

   I. NSF Fee (Standard) - $ 35.00 each until a default is declared.

   J. Non-ACH Transaction Fee - When a Merchant makes a payment other than through ACH, the Merchant is responsible for the cost of that transaction.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | JESSE LEE KAGARICE | | |

Merchant #1 Initials: 

**Merchant Verification Form**

| Merchant Name: JESSE LEE KAGARICE | |
|---|---|
| 1.  Do you currently or within the last 90 days have any intentions, plans or discussions regarding closing your Business? | NO |
| 2.  Do you currently or within the least 90 days have any intentions, plans or discussions to change the name or legal structure of the business? | NO |
| 3.  Are you currently in, or contemplating personal bankruptcy? | NO |
| 4.  Are you currently in, or contemplating business bankruptcy? | NO |
| 5.  Is your business currently for sale? | NO |
| 6.  Do you have any existing merchant cash advance balances? | Yes |
| 7.  Are you involved in any litigation proceedings or are a party to a lawsuit? | NO |
| 8.  Is your business currently in default of any agreement with a creditor? | NO |
| 9.  Is your business currently in forbearance agreement with a creditor? | NO |
| 10. Will selling the Future Receivables cause you to breach any agreement with a creditor? | NO |
| | |
| If you have answered YES to any of the above questions, please explain: | |
| | |
| | |
| | |
| | |

I hereby certify that the above statements are true and correct to the best of my knowledge; I authorize my landlord and credit card processor to discuss confidential account information for the purpose of satisfying the requirements of White Road Capital LLC, Series: 120785, D/B/A: GFE Holdings.

Completed and attested by:

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | *JESSE LEE KAGARICE* | | |

Merchant #1 Initials:

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT)
## AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep this important legal document for Merchant's records.

DISBURSEMENT OF ADVANCE PROCEEDS. By signing below, Merchant authorizes White Road to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Merchant later identifies and is acceptable to White Road) (hereinafter referred to as the "Designated Checking Account") This authorization is to remain in full force and effect until White Road has received written notification from Merchant of its termination in such time and in such manner as to afford White Road and Merchant's depository bank a reasonable opportunity to act on it.

BUSINESS PURPOSE ACCOUNT. By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

MISCELLANEOUS. White Road is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Merchant's account must comply with the provisions of U.S. law.

I, (We) JESSE LEE KAGARICE hereby Authorize, White Road Capital LLC, Series: 120785, D/B/A: GFE Holdings. (Hereinafter known as "White Road") to Electronically (ACH) debit the Bank Account Below, of which I am a signer:

| | | | |
|---|---|---|---|
| Bank Name: | NODAWAY VALLEY BANK | Tax ID: | |
| ABA: Routing: | | DDA: Account: | |
| For the amount of: | $2,499.00 | (Or) Percentage of each Banking Deposit: | 15% |
| On the Following Days: | MONDAY-FRIDAY | | |

This authorization is to remain in full force and effect until COMPANY has received written notification from me at least 5 banking days prior of its termination to afford COMPANY a reasonable opportunity to act on it.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | *Jesse Lee Kagarice* | | |

Merchant #1 Initials:                                                                                                                Page 14 of 20

Thank you for accepting an offer from White Road Capital LLC, Series: 120785, D/B/A: GFE Holdings ("White Road"). We look forward to being your funding partner for as long as you need.

Please note that the way your advance is set up with White Road, White Road requires viewing access to your bank account each business day, throughout the term of this Agreement, in order that White Road may calculate and verify the amount of your daily remittance. Please be assured that we will carefully safeguard your confidential information and only essential personnel will have access to it.

White Road Capital LLC, Series: 120785, D/B/A: GFE Holdings. will also require viewing access to your bank account, prior to funding, as part of the underwriting process.

Please be advised that for security purposes, White Road will request this information prior to funding. By signing below, you hereby agree that if you fail to provide the requested bank login information prior to funding, White Road shall have no obligation to provide funding. Please be further advised that if you change any of the bank login information during the term of this Agreement or at any time while you still have any outstanding obligations to White Road, you are required to immediately inform White Road of the changes made and provide White Road with the new bank login information. Please see below for the list of questions that will be by White Road as it relates to the banking information.

1. Bank Portal Website;

2. Bank Account Username;

3. Bank Account Password;

4. Security Question/Answer 1 of this Bank Account;

5. Security Question/Answer 2 of this Bank Account;

6. Security Question/Answer 3 of this Bank Account; and

7. Any other information necessary to access your Bank Account.

If you have any questions please feel free to contact our cash management department.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | JESSE LEE KAGARICE | | |

# BANK ACCOUNT DISCLOSURE AFFIDAVIT

For the purpose of obtaining the Business Cash Advance evidence by the Merchant Agreement of this same date herewith (the "Business Cash Advance") from White Road Capital LLC, Series: 120785, D/B/A: GFE Holdings., the undersigned Seller/Merchant hereby makes the following statement under penalty of law:

## OPTION 1 – DISCLOSURE AND AUTHORIZATION FOR ADDITIONAL ACCOUNTS:

By selecting this option, the Seller/Merchant hereby declares that in addition to the designated for ACH debit, the Seller/Merchant also has the following additional account(s) which he authorizes us to use in the event we are unable to debit from the designated account. The Seller/Merchant declares and warrents that it currently maintains no other bank account at any financial institution other than those banks and accounts referenced below.

| | |
|---|---|
| Bank Name | |
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| | |
|---|---|
| Bank Name | |
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| | |
|---|---|
| Bank Name | |
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

**OPTION 2** - By selecting this option, the merchant swears, under penalty of law, that Merchant has no accounts in any lending institution in addition to the one provided for ACH debit

**PLEASE SELECT AN OPTION AND SIGN BELOW:**

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | *JESSE LEE KAGARICE* | | |

Agent Name: ISO - Premium Merchant Funding

**ADDENDUM TO MERCHANT AGREEMENT**

This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law. Any litigation relating to this Agreement must be commenced and maintained in any court located in New York State (the "Acceptable Forums"), however any action or proceeding to enforce a judgment or arbitration award may also be commenced and maintained in any other court of competent jurisdiction. The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum.

**THE PARTIES AGREE TO WAIVE TRIAL BY JURY IN ANY DISPUTE BETWEEN THEM.**

In any litigation commenced by White Road, Merchant and Guarantor will not be permitted to interpose any counterclaim. Merchant and Guarantor agree that any claim that is not asserted against White Road within 1 year of its accrual will be time barred. If White Road prevails in any litigation with Merchant and/or Guarantor, then Merchant and Guarantor must pay White Road's reasonable attorney fees, which may include a contingency fee of up to 33% of the amount claimed, expert fees, costs of suit, and prejudgment interest at a rate of 16% per annum (or the maximum rate permitted by applicable law if lower). White Road, Merchant, and Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**Merchant and Guarantor consent to service of process and legal notices made by certified mail, return receipt requested delivered by the United States Postal Service and addressed to the Contact Address set forth immediately below or on Page 1 of this Agreement, any such service will be deemed complete 5 days after dispatch.**

I have read and agreed to the Terms and Conditions set forth above:

| MERCHANT (#1) | | Signature | JESSE LEE KAGARICE |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Home Address:** | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 | **Email:** | jesse@jlkconstruction.com |

Merchant #1 Initials:

**TRADE REFERENCES**

Please provide a list of 3-5 professional references

| TRADE REFERENCE #1: | |
|---|---|
| **Name:** | |
| **Phone Number:** | |
| **Email Address:** | |

| TRADE REFERENCE #2: | |
|---|---|
| **Name:** | |
| **Phone Number:** | |
| **Email Address:** | |

| TRADE REFERENCE #3: | |
|---|---|
| **Name:** | |
| **Phone Number:** | |
| **Email Address:** | |

| TRADE REFERENCE #4: | |
|---|---|
| **Name:** | |
| **Phone Number:** | |
| **Email Address:** | |

| TRADE REFERENCE #5: | |
|---|---|
| **Name:** | |
| **Phone Number:** | |
| **Email Address:** | |

### Weekly Advance Addendum to the Merchant Agreement

This Weekly Advance Addendum amends the Merchant Agreement and Security Agreement between White Road and the merchant listed below (the "Merchant") dated 07/13/2022, (the "Agreement"). All capitalized terms used in his Addendum shall have the same meaning as defined in the Agreement. Except as modified below, the terms of the Agreement remain in full force and effect.

### MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

This Weekly Advance Addendum amends the Merchant Agreement and Security Agreement between White Road and the merchant listed below (the "Merchant") dated 07/13/2022, (the "Agreement"). All capitalized terms used in his Addendum shall have the same meaning as defined in the Agreement. Except as modified below, the terms of the Agreement remain in full force and effect.

### AGREEMENT AS TO ADVANCES

1. Weekly Sale and Purchase of Merchant's Future Receipts: Merchant hereby offers to sell and White Road agrees to purchase, up to the Receipts Purchased Amount, future Receipts on a weekly basis according to the attached schedule. White Road shall have the right to terminate the purchase of any additional future Receipts as set forth in Section 2 of this Addendum.

2. White Road's Obligation to Make Future Purchases: White Road reserves the right to terminate its obligation to make the weekly purchases at its option, if upon: (i) a Event of Default has occurred, as defined in the Agreement; (ii) Merchant fails to provide to White Road a monthly Account statement, access codes to the Account, and full access to merchant's Account prior making any weekly purchase as contemplated herein; (iii) Merchant obtains any additional funding without providing prior written notice to and receiving written approval from White Road; (iv) the Specified Percentage of its weekly Receipts is not available for ACH by White Road on any three (3) business days within any twenty (20) business day period; (v) Merchant has a 20% decline in monthly deposits that is not due to regular seasonal payment fluctuations; (vi) White Road believes in its sole judgment that Merchant's business may not be able to generate future Receipts sufficient to deliver the Purchased Receipts in a timely manner, vii) the Account has a negative balance; viii) Merchant is in arrears with respect to its payment obligations under the Agreement or ix) the Merchant has failed to provide White Road with a complete account receivable report within any thirty (30) day period prior to any weekly purchase contemplated herein In the event that weekly purchases are terminated, the Merchant will remain obligated to deliver the Specified Percentage of its weekly Receipts to White Road until White Road has received the Receipts White Road purchased prior to termination, and to comply with all other provisions of this Agreement.

3. Merchant's Indebtedness When Receipts Purchased Amount Is Sold In Increments: When Merchant sells and White Road purchases the Receipts Purchased Amount, or portions thereof, in increments, the Merchant's indebtedness to White Road under the Agreement (excluding any fees and expenses then then due and owing) shall at any given point in time be equal to the percentage of the total Receipts Purchase Amount that the total of all increments then paid by White Road to the Merchant bears to Total Purchase Price as set forth in the Agreement.

THE TERMS OF THIS ATTACHMENT A ARE HEREBY INCORPORATED INTO AND MADE A PART OF THE MERCHANT AGREEMENT IDENTIFIED ABOVE, AND MERCHANT HEREBY ACKNOWLEDGES THAT THE PERIODIC PURCHASE OF FUTURE RECEIPTS HEREUNDER ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE MERCHANT AGREEMENT

| MERCHANT (#1) | | Signature | *Jesse Lee Kagarice* |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 | Email: | jesse@jlkconstruction.com |

| OWNER / GUARANTOR (#1) | | Signature | *Jesse Lee Kagarice* |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 | Email: | jesse@jlkconstruction.com |

Merchant #1 Initials:

Page 19 of 20

| | ANT INFORMATION: | |
|---|---|---|
| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. | |
| D/B/A: | JLK CONSTRUCTION, LLC. | |
| Federal EIN: | | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 | |

## White Road Weekly Distribution Grid-Special Agreement

| Increment | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Amount | $20,241.10 | $19,546.10 | $19,546.10 | $19,546.10 | $19,546.10 |
| Increment | 6 | 7 | 8 | 9 | 10 |
| Amount | $19,546.10 | $19,546.10 | $19,546.10 | $19,546.10 | $19,546.10 |
| Increment | 11 | 12 | 13 | 14 | 15 |
| Amount | $17,171.10 | $12,221.10 | $9,821.10 | $9,821.10 | $9,821.10 |
| Increment | 16 | 17 | 18 | | |
| Amount | $7,901.10 | $7,826.10 | $6,261.30 | | |

**\*Appropriate fee will be deducted from the first increment.**

**See APPENDIX A STRUCTURE for fee details.**

| MERCHANT (#1) | | Signature | JESSE LEE KAGARICE |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 | Email: | jesse@jlkconstruction.com |

Merchant #1 Initials:

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: | | Status: Completed |
| Subject: GFE Merchant Contract for JLK CONSTRUCTION, LLC.. | | |
| Source Envelope: | | |
| Document Pages: 20 | Signatures: 14 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 19 | GFE Contract Team |
| AutoNav: Enabled | | 27-01 Queens Plaza North, Suite 802 |
| EnvelopeId Stamping: Enabled | | Long Island City, NY  11101 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | underwriting@globalfundingexperts.com |
| | | IP Address: 54.68.3.6 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: GFE Contract Team | Location: DocuSign |
| 7/13/2022 3:37:44 PM | underwriting@globalfundingexperts.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| JESSE LEE KAGARICE |  | Sent: 7/13/2022 3:37:46 PM |
| jesse@jlkconstruction.com | | Viewed: 7/13/2022 3:39:35 PM |
| President | | Signed: 7/13/2022 4:01:35 PM |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style | |
| | Using IP Address: | |

**Electronic Record and Signature Disclosure:**
   Accepted: 7/13/2022 3:39:35 PM
   ID:

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| ISO - Premium Merchant Funding | COPIED | Sent: 7/13/2022 3:37:47 PM |
| underwriting@pmfus.com | | |
| Security Level: Email, Account Authentication (None) | | |

**Electronic Record and Signature Disclosure:**
   Not Offered via DocuSign

| | | |
|---|---|---|
| Liliana V. Hernandez | COPIED | Sent: 7/13/2022 3:37:47 PM |
| iso@globalfundingexperts.com | | |
| Security Level: Email, Account Authentication (None) | | |

**Electronic Record and Signature Disclosure:**
   Not Offered via DocuSign

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Underwriting departement | **COPIED** | Sent: 7/13/2022 3:37:46 PM |
| underwriting@globalfundingexperts.com | | Resent: 7/13/2022 4:01:39 PM |
| GFE Contract Team | | |
| Global Funding Experts | | |
| Security Level: Email, Account Authentication (None) | | |

**Electronic Record and Signature Disclosure:**
   Not Offered via DocuSign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 7/13/2022 3:37:47 PM |
| Certified Delivered | Security Checked | 7/13/2022 3:39:35 PM |
| Signing Complete | Security Checked | 7/13/2022 4:01:35 PM |
| Completed | Security Checked | 7/13/2022 4:01:35 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Global Funding Experts (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Global Funding Experts:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: underwriting@globalfundingexperts.com

**To advise Global Funding Experts of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at underwriting@globalfundingexperts.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Global Funding Experts**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to underwriting@globalfundingexperts.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Global Funding Experts**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to underwriting@globalfundingexperts.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

## Required hardware and software

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

## Acknowledging your access and consent to receive and sign documents electronically

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Global Funding Experts as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Global Funding Experts during the course of your relationship with Global Funding Experts.

Exhibit "5"



# MERCHANT CONTRACT:

# JLK CONSTRUCTION, LLC.

**I hereby certify that ISO - Boost Capital Group LLC (boostcapitalgroup.com) ("Agent") acted as a Merchant's agent.**

**Completed and attested by:**



DocuSigned by:

JESSE LEE LAGARCE

C29128E7CBD4455...

08/05/2022        Agent Name: ISO - Boost Capital Group LLC (boostcapitalgroup.com)



27-01 Queens Plaza North, Suite 802, Long Island City, NY 11101
Tel: 1-877-253-7686, Fax: 718-504-3736
Website: www.globalfundingexperts.com / Email: underwriting@globalfundingexperts.com

## MERCHANT AGREEMENT

Agreement dated _____08/05/2022_____ between White Road Capital LLC, Series: 127009, D/B/A: GFE Holdings (**"White Road"**) and the Merchant listed below (**"MERCHANT"**)
     (Month) (Day) (Year)

### MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| State of Incorporation / Organization: | MO |
| Type of Business Entity: | LLC |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Mailing Address: | PO BOX 8820, Saint Joseph, MO, 64508 |
| Primary Contact & Number: | JESSE LEE KAGARICE ((816) 273-7860) |

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant ("Merchant"), in consideration of the funds provided to Merchant by White Road as specified below ("Purchase Price"), hereby sells, assigns and transfers to White Road (making White Road the absolute owner) the Specified Percentage indicated below of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts") defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business, for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to White Road.

The Purchased Amount shall be paid to White Road by Merchant irrevocably directing and authorizing that there be only one depositing bank account, which account must be acceptable to and pre-approved by White Road (the "Account") into which Merchant and Merchant's customers shall remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each Transaction, until such time as White Road receives payment in full of the Purchased Amount. Merchant hereby authorizes White Road to ACH Debit the specified remittances from the Merchant's Account on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box and will provide White Road with all required access codes and monthly bank statements. Merchant understands that it is responsible for ensuring that the Specified Percentage to be debited by White Road remains in the Account and will be held responsible for any fees incurred by White Road resulting from a rejected ACH attempt or an event of default. (See Appendix A) White Road is not responsible for any overdrafts or rejected transactions that may result from White Road's ACH debiting the specified amounts under the terms of this agreement. White Road will debit the specified remittance amount during a business day based on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box. The Merchant shall deliver to White Road, no later than the 18th date of each month the bank statement for the Account in respect of the immediately preceding month. Within three business days of White Road's receipt of the Merchant's monthly bank statements, White Road shall reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the Specified Percentage. If the Merchant fails to deliver the bank statement for the Account for any month, White Road shall consider that the specific remittances were equal to the Specified Percentage of the settlement amount due from each Transaction for such month. White Road may, upon Merchant's request, adjust the amount of any payment due under this Agreement at White Road's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between White Road and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

| ORIGINAL OFFER: | | | |
|---|---|---|---|
| Total Purchase Price: | $50,000.00 | Merchant's Average Monthly Revenue: | $433,112.22 |
| Purchased Amount of Receivables: | $64,950.00 | Specified Percentage of Monthly Revenue: | 3% |
| Total Fees*: | $5,000.00 | Specified Remittance Amount & Frequency: | $590.45 / Daily |
| Net Funded Amount**: | $45,000.00 | Initial Estimated # of Remittance Payments: | 111 |

\* This amount reflects the total fees Merchant will pay at funding. See Appendix A for a complete breakdown of fees.

\*\* This amount reflects the total funds Merchant will receive after all the fees and balance transfers are deducted from the Total Purchase Price. See Balance Transfer Form for a complete breakdown of the remaining RTR balances.

\*\*\* If an Early Payment Addendum has been executed by White Road and the Merchant, the promotional early termination discount referenced above shall be applicable subject to the terms and conditions set forth in the Early Payment Addendum.

The Total Purchase Price may also be paid incrementally over time, in the increments and in the Specific Remittance Amounts set forth in the Attachment A Addendum annexed hereto.

Merchant #1 Initials: 

Page 2 of 18

DocuSign Envelope ID:

THE MERCHANT AGREEMENT TERMS AND CONDITIONS, SET FORTH ON PAGE 2 OF THIS "MERCHANT AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT. BY SIGNING BELOW, MERCHANT HEREBY REPRESENTS AND WARRANTS THAT NOTHING CONTAINED HEREIN IS FALSE, MISLEADING, AND THAT MERCHANT HAS NOT FAILED TO DISCLOSE ANY MATERIAL INFORMATION TO OBTAIN FUNDING FROM White Road.

| MERCHANT (#1) | | Signature | JESSE LEE KAGARICE |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | 816-896-6909 |
| Social Security No: | | Home or Secondary Number: | 816-273-7860 |
| Driver License No: | | Email: | Jesse@jlkconstruction.com |

| OWNER / GUARANTOR (#1) | | Signature | JESSE LEE KAGARICE |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | 816-896-6909 |
| Social Security No: | | Home or Secondary Number: | 816-273-7860 |
| Driver License No: | | Email: | Jesse@jlkconstruction.com |

White Road Capital LLC, Series: 127009, D/B/A: GFE Holdings
By:

_____
(Company Officer)

Merchant #1 Initials:

MERCHANT AGREEMENT TERMS AND CONDITIONS

## I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to White Road with a Bank acceptable to White Road to obtain electronic fund transfer services for the Merchant's account at the Bank approved by White Road (the "Account"). Merchant shall provide White Road and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes White Road and/or its agent(s) to deduct from the Account the amounts owed to White Road for the receipts as specified herein and to pay such amounts to White Road. Merchant also hereby authorizes White Road to withdraw from the Account the Specified Percentage(s) and/or sums by White Road debiting the account. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by White Road or not. This additional authorization is not a waiver of White Road's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which White Road did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of White Road.

Merchant understands and agrees that this Agreement, including the authorizations to access Merchant's accounts (including the Account) set forth herein, as well as all other payment processing agreements entered into with respect to the Transactions irrevocably authorize the processor of such payments (the "Processor") and Operator to pay the cash attributable to the Specified Percentage of Receivables to White Road rather than to Merchant until White Road receives the cash attributable to the entire Specified Amount of Future Receivables from Processor and Operator. Merchant and Guarantor(s) authorize White Road and its agents: i) to investigate Merchant's financial status and history, and will provide to White Road any authorizations, bank or financial statements, tax returns, etc., as White Road deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. and ii) to update such information and financial and credit profiles from time to time as White Road deems appropriate. Merchant hereby authorizes all of its banks, brokers, processors and customers to provide White Road with Merchant's bank statements, brokerage statements, processing history and such other statements and information as White Road may in its sole discretion require to determine Merchant's and Guarantor's qualification or continuation in this program and for collections purposes. Merchant shall provide White Road with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from White Road.

These authorizations and instructions may be revoked only with the prior written consent of White Road. Merchant agrees that Processor and Operator may rely upon the instructions of White Road, without any independent verification, in making the cash payments above. Merchant waives any claim for damages it may have against Processor or Operator in connection with actions taken based on instructions from White Road, unless such damages were due to such Processor's or Operator's failure to follow White Road's instructions. Merchant acknowledges and agrees that (a) Processor and Operator will be acting on behalf of White Road with respect to the specified Percentage of Receivables until cash attributable to the entire Specified Amount of Future Receivables has been remitted by Processor and Operator to White Road, (b) Processor and Operator may or may not be affiliates of White Road, (c) White Road does not have any power or authority to control Processor's or Operator's actions with respect to the processing of Card transactions or remittance of cash to White Road, (d) White Road is not responsible and shall not be liable for, and Merchant agrees to hold White Road harmless for, the actions of Processor and Operator, and (e) funds representing the Specified Percentage of Receivables in the possession of Processing or Operator constitute property owned solely by White Road, and Merchant disclaims any and all interest therein. For purposes of this Agreement, the term "Operator" shall mean White Road or any person or entity designated by White Road to debit or otherwise withdraw (via the Automated Clearing House ("ACH") system, electronic checks, wires, or otherwise) any amounts from Merchant's or principal(s) accounts as authorized or permitted by this Agreement.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire "Purchased Amount" is received by White Road as per the terms of this Agreement. The termination of this Agreement shall not affect Merchant's continuing obligation and responsibility to fully satisfy all outstanding obligations that are due to White Road.

**1.3 Future Purchases.** White Road reserves the right to rescind the offer to make any purchase payments hereunder, in its sole and absolute discretion.

**1.4 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined) authorize White Road, its agents and representatives, as well as any credit reporting agency engaged by White Road, i) to investigate their financial responsibility and history, including any references given or any other statements or data obtained from or about Merchant or any of the Guarantor(s); ii) to obtain consumer and business credit reports on the Merchant and Guarantor(s); iii) to contact any current or prior bank of the Merchant in order to obtain whatever information it may require regarding any and all of Merchant's transactions with any such bank, including, but not limited to applications, bank statements, financial statements and tax returns; and (iv) to contact personal and business references provided by the Merchant or Guarantor(s), at any time now or for so long as Merchant and/or Guarantor(s) continue to have any obligation owed to White Road as a consequence of this Merchant Agreement or for White Road's ability to determine Merchant's eligibility to enter into any future agreement with White Road. Merchant and Guarantor(s) will further provide to White Road any authorizations, bank or financial statements, tax returns, etc., as White Road deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. White Road is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Merchant and Guarantor(s) acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Guarantor(s) has been relied upon to White Road in connection with its decision to purchase the Specified Amount of Future Receivables from Merchant.

**1.5 Transactional History.** Merchant authorizes all of their banks and brokers to provide White Road with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program. Merchant herby (i) authorizes White Road to contact any past, present or future processor of Merchant, its predecessors or affiliates, to obtain any information that White Road deems necessary or appropriate regarding any of their transactions with such processors, and (ii) authorizes and directs such processors to provide White Road with all such information in compliance with this Section. Such information may include information to verify the amount of Card receivables previously processed on behalf of Merchant, its predecessors or affiliates, and any amounts that may have been paid to, offset, held or reversed by, such processors. Without limiting the generality of the foregoing, Merchant authorizes White Road to contact any past, present or future processor of Merchant, its predecessors or affiliates, to confirm that Merchant is exclusively using the Processor accepted by White Road in accordance with this Agreement.



Merchant #1 Initials: _____

Page 4 of 18

**1.6 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor and Operator, their respective officers, directors, affiliates, employees, agents, representatives and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) suffered or incurred by Processor or Operator resulting from (a) claims asserted by White Road for monies owed to White Road from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by White Road.

**1.7 No Liability.** In no event will Processor, Operator or White Road be liable for any claims asserted by Merchant or Guarantors under any legal theory or law, including any tort or contract theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of White Road's legal fees and expenses resulting therefrom.

**1.8 Reliance on Terms.** Section 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, White Road and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.9 Sale of Receipts.** Merchant and White Road agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from White Road to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. White Road has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to White Road in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, - it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that White Road has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and White Road shall promptly refund to Merchant any interest received by White Road in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that White Road not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant is not a debtor to White Road as of the date of this Agreement. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.10 Power of Attorney.** Merchant irrevocably appoints White Road as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to White Road from Processor, or in the case of a violation of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to White Road; and (v) to file any claims or take any action or institute any proceeding which White Road may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant, and White Road is authorized to use Merchant's funds to pay for same. In addition to any other remedies available for violation of the Merchant's Contractual Covenants, in the event that Merchant changes or permits the change of the Processor accepted by White Road or utilizes the services of an additional Processor, White Road shall have the right, without waiving any of its rights or remedies and without notice to Merchant or Principal(s), to notify the new or additional Processor of the sale of the Specified Amount of Future Receivables hereunder and to direct such new or additional Processor to make payment to White Road of all or any portion of the amounts received or held by such Processor for or on behalf of Merchant to pay any amounts White Road is entitled to receive hereunder. Merchant hereby grants White Road an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints White Road and its designees as Merchant's attorney-in-fact, to take any and all actions necessary and appropriate to direct such new or additional Processor to make payment to White Road as contemplated by this Section. Merchant further hereby grants White Road an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints White Road and its designees as Merchant's attorney-in-fact, to execute any all documents in the Merchant's name sufficient to provide and perfect any security interest granted by Merchant to White Road hereunder, including but not limited to security interests in motor vehicles and real estate.

**1.11 Protections against Default,** The following Protections 1 through 8 may be invoked by White Road immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the White Road electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse or unacceptable to White Road; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor or an unauthorized depository account; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God), transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of White Road, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to White Road; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor or (f) Merchant enters into any agreement with any third person or entity that relates to the Receipts or any portion thereof, whether in the form of a purchase, sale, loan, pledge or the granting of any security interest in the Receipts or any portion thereof These protections are in addition to any other remedies available to White Road at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchase Amount plus all fees (including legal fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** White Road may enforce the provisions of the Personal Guaranty of Performance against the Guarantor(s).

Merchant #1 Initials: _____

**Protection 3.** Merchant agrees to execute affidavit(s) and judgment(s) stating the amount stated in the amount of Purchase Amount stated in the Agreement. Merchant also hereby authorizes White Road to execute in the name of the Merchant affidavit(s) of Confession of Judgment in favor of White Road in the amount of Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, White Road may, without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of any appropriate court based upon the affidavit(s) of judgment by confession previously executed by Merchant(s) and Owner(s)/Guarantor(s).

**Protection 4.** White Road may enforce its security interest in the Collateral identified in the Security Agreement hereof.

**Protection 5.** The entire Purchase Amount and all fees (including legal fees) shall become immediately refundable and payable to White Road from Merchant.

**Protection 6.** White Road may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, under which White Road shall recover Judgment against Merchant, Merchant shall be liable for all of White Road's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. White Road reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to White Road from Merchant prior to applying such amounts to reduce the amount of any outstanding Purchase Amount.

**Protection 7.** This Agreement shall be deemed Merchants Assignment of Merchant's Lease of Merchant's business premises to White Road. Upon breach of any provision in this Agreement, White Road may exercise its rights under this Assignment of Lease without prior Notice to Merchant.

**Protection 8.** White Road may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile White Road on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to White Road.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes White Road, its agents and employees to obtain and disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that White Road obtains) and business conduct only to it employees. agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against White Road or any of its affiliates relating to any (i) investigation undertaken by or on behalf of White Road as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by White Road, including this Agreement and any other White Road documentations (collectively, "Confidential Information") are proprietary and confidential information of White Road. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of White Road to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles White Road to not only damages and legal fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.14 Publicity.** Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes White Road to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.15 D/B/A's.** Merchant hereby acknowledges and agrees that White Road may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between White Road and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**1.16 Purchase of Increments.** In the event that White Road offers to purchase additional Receipts in the "increments' stated on Attachment A of this Agreement, then White Road reserves the unilateral right to delay or rescind such offer in its sole and absolute discretion at any time.

**1.17 Sharing of Information.** Merchant hereby authorizes White Road to share information regarding Merchant's performance under this Agreement with affiliates and unaffiliated third parties.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement, and until White Road is fully paid:

**2.1 Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial Statements, copies of which have been furnished to White Road, and future statements which will be furnished hereafter at the discretion of White Road, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise White Road of any material adverse change in their financial condition, operation or ownership. Merchant hereby warrants that its Average Monthly Revenue as enumerated on page (1) of this Agreement is accurate, and that any and all cash advances or loans outstanding by Merchant have be disclosed to White Road. White Road may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to White Road within 5 business days. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance.** Merchant will maintain business-interruption insurance naming White Road as loss payee and additional insured in amounts and against risks as are satisfactory to White Road and shall provide White Road proof of such insurance upon request. Merchant shall also maintain such other insurance in such amounts and against such risks as White Road deems necessary to protect Merchant's business, and Merchant shall provide proof of such insurance to White Road upon demand.



Merchant #1 Initials:

-113-

Page 6 of 18

**2.5 Electronic Check Processing Agreement.** Merchant will not change its Processor, each Merchant change its financial institution or bank account(s) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without White Road's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location and Related Entities.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and White Road, nor shall Merchant change any of its places of business without prior written consent by White Road. Merchant does not and shall not conduct Merchant's business under any name other than as set forth in this agreement and shall not change its place of business. Merchant shall not change its legal name, entity type or jurisdiction of organization. In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to White Road for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due White Road under this Agreement. With respect to any such entity, White Road shall have the right to name such newly formed or existing entity as a debtor in any claim, suit, or legal proceeding.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from White Road to Merchant, execute, acknowledge and deliver to White Road and/or to any other person, firm or corporation specified by White Road, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy. As of the date of this Agreement, Merchant is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.**

**2.10 Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the Receipts or future check sales, or any portion thereof, whether in the form of a purchase, sale, a loan against, collateral against or the sale or purchase of credits against, such Receipts or future check sales, with any party other than White Road. White Road may share information regarding this Merchant Agreement with any third party in order to determine whether Merchant is in compliance with this provision.

**2.11 Unencumbered Receipts.** Merchant has, and at all times will have, good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of White Road. Without limiting the generality of the foregoing, all future Receipts purchased by White Road hereunder shall be free and clear of any and all liens (other than White Road's ownership rights therein) at the time they become Receivables. All amounts received by White Road attributable to the Specified Amount of Future Receivables purchased by White Road hereunder shall arise from bona fide sales by Merchant of its goods and services to Card holders who present their Cards as payment thereof.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.14 Good Faith, Best Efforts and Due Diligence.** Merchant and Guarantors hereby affirm that it will conduct its business in Good Faith and will expend its Best Efforts to maintain and grow its business, to ensure that White Road obtains the Purchased Amount. Furthermore, Merchant and Guarantors hereby agree, warrant and represent hereby that they will constantly perform all appropriate Due Diligence and credit checks of all of the customers' finances, cash flow, solvency, good faith, payment histories and business reputations (the "Due Diligence Requirements") as may suffice to ensure any and all products and/or services provided, sold or delivered by Merchant to said customers will be paid for by customers in full and on time, and will not result in the creation of an unpaid account. These Due Diligence Requirements must be performed prior to any sales to any customer, and repeated no less frequently than monthly for so long as any sums are due from those customers. Full documentation of all of Merchant's compliance with its Due Diligence Requirements must be maintained in Merchant's files so long as White Road has not fully collected all sums due to it. This is not a guaranty of payment by customers, but is a guaranty of full, adequate and good faith Due Diligent investigation and credit check of customers before extending credit to them and continuing no less frequently than monthly so long as sums are still due.

**2.15 Taxes.** Merchant will promptly pay all necessary taxes, including but not limited to employment, sales and use taxes.

**2.16 No Violation of Prior Agreements.** Merchant warrants that its execution and performance of this Merchant Agreement will not violate or conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Merchant is subject, including any agreement that prohibits the sale or pledge of Merchant's future receipts or the Purchased Amount.

**2.17 Opportunity for Counsel.** Merchant represents, warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Merchant Agreement, and that it has been represented by legal counsel or has had full opportunity to consult with its own legal counsel.

**2.18 Ongoing Obligations.** Merchant hereby covenants and agrees that even after it receives some or all of the Purchase Price from White Road, it will comply with White Road's ongoing requests for any documentation from Merchant for the purpose of business and identify verification and underwriting and verification (such as the merchant's driver's license, bank login, bank statements, or any other financial or business documentation). Merchant's failure to provide to White Road the requested documentation within twenty-four (24) hours shall be deemed a breach of this Agreement and White Road shall no longer be obligated to provide any further funding to Merchant. In addition, if after receipt of said documentation from Merchant, White Road discovers that Merchant made misrepresentations before receiving funding from White Road, White Road shall no longer be obligated to provide any further funding to Merchant and Merchant's misrepresentations shall be deemed a breach of this Agreement.

-114-

Merchant #1 Initials: _____

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Merchant; (d) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (e) Merchant shall transfer or sell all or substantially all of its assets, or issue any notice of intended bulk sale or transfer; (f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (g) Merchant shall use multiple depository accounts without the prior written consent of White Road (h) Merchant shall change its depositing account without the prior written consent of White Road; (i) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; (j) the Specified Percentage of its daily Receipts is not available for ACH by White Road on any three (3) business days within any twenty (20) business day period; (k) Merchant shall default under any of the terms, covenants and conditions of any other agreement with White Road; or (l) Merchant fails to deposit its Receipts into the Account.

**3.2 Personal Guaranty.** In the event of a Default under Sections 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13, and 2.14 hereof, should White Road determine that the Purchased Amount cannot be obtained from the Merchant's business, White Road will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to White Road for all of White Road's losses and damages, in additional to all costs, fees expenses and legal fees associated with such enforcement. White Road shall not be required before exercising and enforcing its rights under this Personal Guaranty first to resort to payment against Merchant or to any other person or to any collateral.

**3.3 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4.1 hereof, White Road may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Security Agreement or Guaranty, or pursuant to any other legal or equitable right or remedy. Upon Merchant's and/or Owner's/Guarantor's default hereunder, the balance of the Purchased Amount remaining due, plus any applicable fees, shall become immediately due and payable to White Road. In addition, upon an Event of Default, White Road may: i) enforce the provisions of the Security Agreement and Guaranty against each Merchant and Owner/Guarantor; ii) enforce its security interest in the Collateral and the ; iii) adjust debits of Merchant's Account to a daily debit; iv) debit Merchant's deposit accounts wherever situated by means of ACH debit or facsimile signature on a computer generated check drawn on Merchant's bank account for all or a portion of the balance of the Purchased Amount remaining due, or White Road may instruct the Processor to forward to White Road, without any prior notice to Merchant, all or a portion of the balance of the Purchased Amount remaining due, and v) without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of the appropriate court based upon the affidavit(s) of judgment by confession previously executed by Merchant(s) and Owner(s)/Guarantor(s). All rights, powers and remedies of White Road which may be exercised by White Road at any time after the occurrence of an Event of Default are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Costs.** Merchant shall pay to White Road all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(b) the enforcement of White Road 's remedies set forth in Section 3.3 above, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications.** Merchant is required to give White Road written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give White Road seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## IV.MISCELLANEOUS

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by White Road.

**4.2 Assignment.** This Agreement shall be binding upon and inure to the benefit of Merchant, Principal(s), White Road and their respective successors and assigns, except that Merchant and Principal(s) shall not have the right to assign or delegate any of their rights or obligations hereunder or any interest herein without prior written consent of White Road, which consent may be withheld in White Road's sole discretion. Any such assignment or delegation without White Road's prior written consent shall be void. White Road reserves the right to assign or delegate this Agreement or any of its rights or obligations hereunder with or without prior notice to Merchant. White Road may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the merchant at the address set forth above in this agreement and to White Road at 2999 NE 191st Street, Unit 901, Miami, FL 33180 with a copy to 27-01 Queens Plaza North, Suite 802, Long Island City, NY 11101. Notices to White Road shall become effective only upon receipt by White Road. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of White Road to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, White Road and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of White Road which consent may be withheld in White Road's sole discretion. White Road reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, may, if White Road so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by White Road to

Merchant #1 Initials: [signature]                                                         Page 8 of 18

transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provision in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and White Road and supersede all prior agreements and understandings relating to the subject matter hereof. Merchant and Principal(s) each acknowledge and agree that he, she or it is not relying on any representations not specifically embodied in this Agreement.

**4.10 JURY TRIAL WAIVER.**

THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.11 Facsimile Acceptance.** Merchant and Guarantor(s) hereby agree that facsimile and/or electronic signatures on this Merchant Agreement and Guaranty, or photocopies thereof, that shall be deemed acceptable and treated as originals for all purposes, and shall be admissible as evidence of the Merchant Agreement and Guaranty.

**4.12. Right of Access.** In order to ensure that Merchant is complying with the terms of this Merchant Agreement, Merchant agrees that White Road shall have the right to (i) enter, without notice, the premises of Merchant's business for the purpose of inspecting and checking Merchant's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Merchant's daily receipts to the Processor and to ensure that Merchant has not violated any other provision of this Agreement, and (ii) Merchant's shall provide access to its employees and records and all other items as requested by White Road, and (iii) have Merchant's provide information about its business operations, banking relationships, vendors, landlord and other information to allow White Road to interview any relevant parties. Furthermore, Merchant agrees to provide White Road, at all times with "Live Contemporaneous Access" to all of its bank accounts in order for White Road to evaluate Merchant's compliance with the Merchant Agreement, and for collections in the event of a default under the Merchant Agreement. "Live Contemporaneous Access" shall be defined as: Merchant, at all times and including but not limited to, providing White Road with accurate login information necessary to access all of Merchant's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens.

**4.13. Phone Recordings and Contact.** Merchant agrees that any call between White Road and Merchant, and their agents and employees may be recorded or monitored. Further, Merchant agrees that (i) it has an established business relationship with White Road, its employees and agents and that Merchant may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, emails address, or facsimile number given to White Road by the Merchant, its agents or employees, including cellular telephones.

**4.14. Monitoring, Recording, and Solicitations.**

a. Authorization to Contact Seller by Phone. Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

b. Authorization to Contact Seller by Other Means. Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.



Merchant #1 Initials:

| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

### SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant grants to White Road a security interest in and lien upon: (a) all accounts receivables, accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant, (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to White Road under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to White Road upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover White Road's entitlements under this Agreement, White Road is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of White Road's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, White Road or an affiliate of White Road. White Road is authorized to execute and file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by White Road without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, White Road has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, White Road will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from White Road written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant agrees that this is a contract of recoupment and White Road is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant agrees not to contest or object to any motion for relief from the automatic stay filed by White Road. Merchant agrees to execute and deliver to White Road such instruments and documents White Road may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. White Road is authorized to execute all such instruments and documents in Merchant's name.

In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to White Road for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due White Road under this Agreement. With respect to any such entity, White Road shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. White Road shall be held harmless by Merchant and each Owner/Guarantor and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. White Road shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of White Road's rights, including without limitation, White Road's right to collect all accounts, and to notify any payment card processor or creditor of such entity that White Road has such rights in such entity's assets. Merchant also agrees that, at the White Road's discretion, White Road may choose to amend any existing financing statement to include any such newly formed entity as debtor.

Merchant and Guarantor each acknowledge and agree that any security interest granted to White Road under any other agreement between Merchant or Guarantor and White Road (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as White Road deems necessary to perfect or maintain White Road's first priority security interest in the Collateral including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes White Road to file any financing statements deemed necessary by White Road to perfect or maintain White Road's security interest, which financing statement may contain notification that Merchant and/or Guarantor have granted a negative pledge to White Road with respect to the Collateral, and that any subsequent lien or may be tortuously interfering with White Road's rights. Merchant and Guarantor shall be liable for, and White Road may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by White Road in protecting, preserving and enforcing White Road's security interest and rights.

**Negative Pledge.** Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** White Road shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, White Road may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that White Road may enter into an agreement with Merchant's landlord giving White Road the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

Merchant #1 Initials: _JLK_

DocuSign Envelope ID: ... (White Road Capital, LLC ... wrcmca.com)

**Remedies.** Upon any Event of Default, White Road may exercise any remedy it may have (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to White Road, whether by acceleration or otherwise.

## GUARANTY

**Personal Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to White Road, Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the Merchant Agreement in Sections thereof 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13 and 2.14, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, White Road may seek recovery from Guarantors for all of White Road's losses and damages by enforcement of White Road's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral White Road may hold pursuant to this Agreement or any other guaranty.

White Road does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) White Road's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to White Road. In addition, White Road may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to White Road; (ii) release Merchant from its obligations to White Road; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to White Road under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.**

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | JESSE LEE KAGARICE | | |

| OWNER / GUARANTOR (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | JESSE LEE KAGARICE | | |

## APPENDIX A STRUCTURE.

A. **Origination Fee** - 10.0% of Purchase Price to cover Underwriting and related expenses. This expense is charged at the time of funding.

B. **ACH Program Fee** - 0% of Purchase Price ACH's are labor intensive and are not an automated process, requiring us to charge this fee to cover costs. This expense is charged at the time of funding.

C. **Miscellaneous Service Fees** - Merchant shall pay certain fees for services related to the origination and maintenance of Accounts, which fees are set forth below. Each Merchant shall receive their funding electronically to their designated bank account, and the White Road may deduct some or all of the fees from the funded amount.

A. Rejected ACH/Blocked ACH - $5,000.00 when Merchant blocks Account from our Debit ACH, or when Merchant directs the bank to reject our debit ACH, which places them in default (per contract).

B. Pre-Authorized Bank Change Fee - $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

C. Wire Fee - $50.00 Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for either a Fed Wire fee or a bank ACH fee.

D. UCC Filing, Amendment or Termination Fee - $200.00.

E. Default Fee - $5,000.00 when Merchant defaults under the Agreement, including but not limited to diverting its Receivables from the bank account agreed upon in the "Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)" or changing its credit card processing thus terminating or diverting the agreed upon split.

F. Account Management Fees - $45.00 upon origination, and $45.00 per month thereafter until the Purchase Amount, together with any and all unpaid outstanding other fees have been paid in full. These Management Fees will not be applied towards the reduction of the Purchase Amount.

G. Stacking Fee - In the event that the Merchant enters into any cash advance or any loan agreement that relates to or involves the Receipts with any person or entity other than White Road during any portion of the term of this Agreement, then: i) Merchant shall pay to White Road a "Stacking" fee equal to $5,000.00 per occurrence, and ii) the specified daily remittances that Merchant is obligated to pay to White Road hereunder shall be doubled, and Merchant shall be deemed to have authorized White Road to double the amount of its ACH Debits from the Merchant's Account on a daily basis.

H. Third Party Collections Fee – In the event that Merchant defaults under any of the terms and conditions of this Agreement, Merchant shall pay to White Road, in addition to any other fees associated with Merchant's default, a third party collections fee equal to fifteen (15%) of the outstanding balance after all fees at the time of default.

I. NSF Fee (Standard) - $ 35.00 each until a default is declared.

J. Non-ACH Transaction Fee - When a Merchant makes a payment other than through ACH, the Merchant is responsible for the cost of that transaction.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | JESSE LEE KAGARICE | | |



Merchant #1 Initials:

DocuSign Envelope ID:

## Merchant Verification Form

| Merchant Name: JESSE LEE KAGARICE | |
|---|---|
| 1.  Do you currently or within the last 90 days have any intentions, plans or discussions regarding closing your Business? | No |
| 2.  Do you currently or within the least 90 days have any intentions, plans or discussions to change the name or legal structure of the business? | No |
| 3.  Are you currently in, or contemplating personal bankruptcy? | No |
| 4.  Are you currently in, or contemplating business bankruptcy? | No |
| 5.  Is your business currently for sale? | No |
| 6.  Do you have any existing merchant cash advance balances? | Yes |
| 7.  Are you involved in any litigation proceedings or are a party to a lawsuit? | No |
| 8.  Is your business currently in default of any agreement with a creditor? | No |
| 9.  Is your business currently in forbearance agreement with a creditor? | No |
| 10. Will selling the Future Receivables cause you to breach any agreement with a creditor? | No |

If you have answered YES to any of the above questions, please explain:

I hereby certify that the above statements are true and correct to the best of my knowledge; I authorize my landlord and credit card processor to discuss confidential account information for the purpose of satisfying the requirements of White Road Capital LLC, Series: 127009, D/B/A: GFE Holdings.

Completed and attested by:

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | JESSE LEE KAGARICE | | |



Merchant #1 Initials:

-120-

DocuSign Envelope ID: ... White Road Capital LLC (DocuSign.com)

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT)
## AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep this important legal document for Merchant's records.

DISBURSEMENT OF ADVANCE PROCEEDS. By signing below, Merchant authorizes White Road to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Merchant later identifies and is acceptable to White Road) (hereinafter referred to as the "Designated Checking Account") This authorization is to remain in full force and effect until White Road has received written notification from Merchant of its termination in such time and in such manner as to afford White Road and Merchant's depository bank a reasonable opportunity to act on it.

BUSINESS PURPOSE ACCOUNT. By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

MISCELLANEOUS. White Road is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Merchant's account must comply with the provisions of U.S. law.

I, (We) <u>JESSE LEE KAGARICE</u> hereby Authorize, <u>White Road Capital LLC, Series: 127009, D/B/A: GFE Holdings</u>. (Hereinafter known as "White Road") to Electronically (ACH) debit the Bank Account Below, of which I am a signer:

| | | | |
|---|---|---|---|
| Bank Name: | NODAWAY VALLEY BANK | Tax ID: | |
| ABA: Routing: | | DDA: Account: | |
| For the amount of: | $590.45 | (Or) Percentage of each Banking Deposit: | 3% |
| On the Following Days: | MONDAY-FRIDAY | | |

This authorization is to remain in full force and effect until COMPANY has received written notification from me at least 5 banking days prior of its termination to afford COMPANY a reasonable opportunity to act on it.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | *JESSE LEE KAGARICE* | | |

Thank you for accepting an offer from White Road Capital LLC, Series: 127009, D/B/A: GFE Holdings ("White Road"). We look forward to being your funding partner for as long as you need.

Please note that the way your advance is set up with White Road, White Road requires viewing access to your bank account each business day, throughout the term of this Agreement, in order that White Road may calculate and verify the amount of your daily remittance. Please be assured that we will carefully safeguard your confidential information and only essential personnel will have access to it.

White Road Capital LLC, Series: 127009, D/B/A: GFE Holdings. will also require viewing access to your bank account, prior to funding, as part of the underwriting process.

Please be advised that for security purposes, White Road will request this information prior to funding. By signing below, you hereby agree that if you fail to provide the requested bank login information prior to funding, White Road shall have no obligation to provide funding. Please be further advised that if you change any of the bank login information during the term of this Agreement or at any time while you still have any outstanding obligations to White Road, you are required to immediately inform White Road of the changes made and provide White Road with the new bank login information. Please see below for the list of questions that will be by White Road as it relates to the banking information.

1. Bank Portal Website;
2. Bank Account Username;
3. Bank Account Password;
4. Security Question/Answer 1 of this Bank Account;
5. Security Question/Answer 2 of this Bank Account;
6. Security Question/Answer 3 of this Bank Account; and
7. Any other information necessary to access your Bank Account.

If you have any questions please feel free to contact our cash management department.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | JESSE LEE KAGARICE | | |


Merchant #1 Initials:

Page 15 of 18

## BANK ACCOUNT DISCLOSURE AFFIDAVIT

For the purpose of obtaining the Business Cash Advance evidence by the Merchant Agreement of this same date herewith (the "Business Cash Advance") from White Road Capital LLC, Series: 127009, D/B/A: GFE Holdings., the undersigned Seller/Merchant hereby makes the following statement under penalty of law:

### OPTION 1 – DISCLOSURE AND AUTHORIZATION FOR ADDITIONAL ACCOUNTS:

By selecting this option, the Seller/Merchant hereby declares that in addition to the designated for ACH debit, the Seller/Merchant also has the following additional account(s) which he authorizes us to use in the event we are unable to debit from the designated account. The Seller/Merchant declares and warrents that it currently maintains no other bank account at any financial institution other than those banks and accounts referenced below.

| | |
|---|---|
| **Bank Name** | |
| **Name on Account** | |
| **Account Number** | |
| **Routing Number** | |
| **Fed ID number associated with this account** | |
| **Name associated with this account** | |
| **Phone number of person whose name is associated with this account** | |

| | |
|---|---|
| **Bank Name** | |
| **Name on Account** | |
| **Account Number** | |
| **Routing Number** | |
| **Fed ID number associated with this account** | |
| **Name associated with this account** | |
| **Phone number of person whose name is associated with this account** | |

| | |
|---|---|
| **Bank Name** | |
| **Name on Account** | |
| **Account Number** | |
| **Routing Number** | |
| **Fed ID number associated with this account** | |
| **Name associated with this account** | |
| **Phone number of person whose name is associated with this account** | |

**OPTION 2** - By selecting this option, the merchant swears, under penalty of law, that Merchant has no accounts in any lending institution in addition to the one provided for ACH debit

### PLEASE SELECT AN OPTION AND SIGN BELOW:

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | JESSE LEE KAGARICE | | |



Merchant #1 Initials:

## ADDENDUM TO MERCHANT AGREEMENT

This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law. Any litigation relating to this Agreement must be commenced and maintained in any court located in New York State (the "Acceptable Forums"), however any action or proceeding to enforce a judgment or arbitration award may also be commenced and maintained in any other court of competent jurisdiction. The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum.

**THE PARTIES AGREE TO WAIVE TRIAL BY JURY IN ANY DISPUTE BETWEEN THEM.**

In any litigation commenced by White Road, Merchant and Guarantor will not be permitted to interpose any counterclaim. Merchant and Guarantor agree that any claim that is not asserted against White Road within 1 year of its accrual will be time barred. If White Road prevails in any litigation with Merchant and/or Guarantor, then Merchant and Guarantor must pay White Road's reasonable attorney fees, which may include a contingency fee of up to 33% of the amount claimed, expert fees, costs of suit, and prejudgment interest at a rate of 16% per annum (or the maximum rate permitted by applicable law if lower). White Road, Merchant, and Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**Merchant and Guarantor consent to service of process and legal notices made by certified mail, return receipt requested delivered by the United States Postal Service and addressed to the Contact Address set forth immediately below or on Page 1 of this Agreement, any such service will be deemed complete 5 days after dispatch.**

I have read and agreed to the Terms and Conditions set forth above:

| MERCHANT (#1) | | Signature | JESSE LEE KAGARICE |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Home Address:** | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 | **Email:** | Jesse@jlkconstruction.com |

Merchant #1 Initials: JLK

DocuSign Envelope ID

# TRADE REFERENCES

Please provide a list of 3-5 professional references

| TRADE REFERENCE #1: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #2: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #3: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #4: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #5: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

Merchant #1 Initials:



26570.25

# JLK Construction LLC BUSINESS BANKING – 6424559 ⌄

## Transactions

🏛 Scheduled    🕐 Pending    ● Posted

| | Date ⌄ | Description ⌄ | Amount ⌄ | Balance |
|---|---|---|---|---|
| ● | Oct 07, 2022 | GFE Holdings.WR U | -590.45 | |
| ⊘ | Oct 06, 2022 | GFE Holdings.WR U | -590.45 | |
| ● | Oct 05, 2022 | GFE Holdings.WR U | -590.45 | |
| ● | Oct 04, 2022 | GFE Holdings.WR U | -590.45 | |
| ● | Oct 03, 2022 | GFE Holdings.WR U | -590.45 | |
| ● | Sep 30, 2022 | GFE Holdings.WR U | -590.45 | |
| ● | Sep 29, 2022 | GFE Holdings.WR U | -590.45 | |
| ● | Sep 28, 2022 | GFE Holdings.WR U | -590.45 | |
| ● | Sep 27, 2022 | GFE Holdings.WR U | -590.45 | |

| Date ▾ | Description ↕ | Amount ↕ | Balance |
|--------|---------------|----------|---------|
| Sep 26, 2022 | GFE Holdings.WR U | -590.45 | 10 |
| Sep 23, 2022 | GFE Holdings.WR U | -590.45 | 11 |
| Sep 22, 2022 | GFE Holdings.WR U | -590.45 | 12 |
| Sep 21, 2022 | GFE Holdings.WR U | -590.45 | 13 |
| Sep 20, 2022 | GFE Holdings.WR U | -590.45 | 14 |
| Sep 19, 2022 | GFE Holdings.WR U | -590.45 | 16 |
| Sep 16, 2022 | GFE Holdings.WR U | -590.45 | 17 |
| Sep 15, 2022 | GFE Holdings.WR U | -590.45 | 18 |
| Sep 14, 2022 | GFE Holdings.WR U | -590.45 | 19 |
| Sep 13, 2022 | GFE Holdings.WR U | -590.45 | 20 |
| Sep 12, 2022 | GFE Holdings.WR U | -590.45 | 21 |
| Sep 09, 2022 | GFE Holdings.WR U | -590.45 | 22 |
| Sep 08, 2022 | GFE Holdings.WR U | -590.45 | 23 |
| Sep 07, 2022 | GFE Holdings.WR U | -590.45 | 24 |
| Sep 06, 2022 | GFE Holdings.WR U | -590.45 | 25 |

| Date ▾ | Description ⬍ | Amount ⬍ | Balance |
|--------|---------------|----------|---------|
| Sep 06, 2022 | GFE Holdings.WR U | -590.45 | 26 |
| Sep 02, 2022 | GFE Holdings.WR U | -590.45 | 27 |
| Sep 01, 2022 | GFE Holdings.WR U | -590.45 | 28 |
| Aug 31, 2022 | GFE Holdings.WR U | -590.45 | 29 |
| Aug 30, 2022 | GFE Holdings.WR U | -590.45 | 30 |
| Aug 29, 2022 | GFE Holdings.WR U | -590.45 | 31 |
| Aug 26, 2022 | GFE Holdings.WR U | -590.45 | 32 |
| Aug 25, 2022 | GFE Holdings.WR U | -590.45 | 33 |
| Aug 24, 2022 | GFE Holdings.WR U | -590.45 | 34 |
| Aug 23, 2022 | GFE Holdings.WR U | -590.45 | 35 |
| Aug 22, 2022 | GFE Holdings.WR U | -590.45 | 36 |
| Aug 19, 2022 | GFE Holdings.WR U | -590.45 | 37 |
| Aug 18, 2022 | GFE Holdings.WR U | -590.45 | 38 |
| Aug 17, 2022 | GFE Holdings.WR U | -590.45 | 39 |
| Aug 16, 2022 | GFE Holdings.WR U | -590.45 | 40 |

| Date ▼ | Description ↕ | Amount ↕ | Balance |
|--------|---------------|----------|---------|
| Aug 15, 2022 | GFE Holdings.WR U | -590.45 | *41* |
| Aug 12, 2022 | GFE Holdings.WR U | -590.45 | *42* |
| Aug 11, 2022 | GFE Holdings.WR U | -590.45 | *43* |
| Aug 10, 2022 | GFE Holdings.WR U | -590.45 | *44* |
| Aug 09, 2022 | GFE Holdings.WR U | -590.45 | *45* |

Member FDIC. Equal Housing Lender 🏠.                © 2015-2022 Fiserv, Inc. or its affiliates.

Exhibit "6"

| JLK Construction LLC | | | Annual Interest Rate | | | 250.3150% |
| Global Funding Experts 8-2-21 | | | Daily Interest Rate | | | 0.6858% |

| Date | Transaction | Payment | Interest | Principle | Balance |
|---|---|---|---|---|---|
| 8/2/2021 | Original Loan Amount | | | | 47,246.84 |
| | Loan fee deducted | | | | 8,750.00 |
| | Loan deposited | | | | 38,496.84 |
| 8/3/2021 | Payment | 1,300.00 | 264.01 | 1,035.99 | 37,460.85 |
| 8/4/2021 | Payment | 1,300.00 | 256.90 | 1,043.10 | 36,417.75 |
| 8/5/2021 | Payment | 1,300.00 | 249.75 | 1,050.25 | 35,367.50 |
| 8/6/2021 | Payment | 1,300.00 | 242.55 | 1,057.45 | 34,310.05 |
| 8/9/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 43,556.89 |
| 8/9/2021 | Payment | 1,300.00 | 298.71 | 1,001.29 | 42,555.60 |
| 8/10/2021 | Payment | 1,300.00 | 291.84 | 1,008.16 | 41,547.45 |
| 8/11/2021 | Payment | 1,300.00 | 284.93 | 1,015.07 | 40,532.38 |
| 8/12/2021 | Payment | 1,300.00 | 277.97 | 1,022.03 | 39,510.35 |
| 8/13/2021 | Payment | 1,300.00 | 270.96 | 1,029.04 | 38,481.31 |
| 8/16/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 47,728.15 |
| 8/16/2021 | Payment | 1,300.00 | 327.32 | 972.68 | 46,755.46 |
| 8/17/2021 | Payment | 1,300.00 | 320.65 | 979.35 | 45,776.11 |
| 8/18/2021 | Payment | 1,300.00 | 313.93 | 986.07 | 44,790.04 |
| 8/13/2021 | Payment | 1,300.00 | 307.17 | 992.83 | 43,797.21 |
| 8/20/2021 | Payment | 1,300.00 | 300.36 | 999.64 | 42,797.57 |
| 8/23/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 52,044.41 |
| 8/23/2021 | Payment | 1,300.00 | 356.92 | 943.08 | 51,101.32 |
| 8/24/2021 | Payment | 1,300.00 | 350.45 | 949.55 | 50,151.77 |
| 8/25/2021 | Payment | 1,300.00 | 343.94 | 956.06 | 49,195.71 |
| 8/26/2021 | Payment | 1,300.00 | 337.38 | 962.62 | 48,233.09 |
| 8/27/2021 | Payment | 1,300.00 | 330.78 | 969.22 | 47,263.87 |
| 8/30/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 56,510.71 |
| 8/30/2021 | Payment | 1,300.00 | 387.55 | 912.45 | 55,598.26 |
| 8/31/2021 | Payment | 1,300.00 | 381.29 | 918.71 | 54,679.55 |
| 9/1/2021 | Payment | 1,300.00 | 374.99 | 925.01 | 53,754.54 |
| 9/2/2021 | Payment | 1,300.00 | 368.65 | 931.35 | 52,823.19 |
| 9/3/2021 | Payment | 1,300.00 | 362.26 | 937.74 | 51,885.44 |
| 9/7/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 61,132.28 |
| 9/7/2021 | Payment | 1,300.00 | 419.24 | 880.76 | 60,251.53 |
| 9/7/2021 | Payment | 1,300.00 | 413.20 | 886.80 | 59,364.73 |
| 9/8/2021 | Payment | 1,300.00 | 407.12 | 892.88 | 58,471.85 |
| 9/9/2021 | Payment | 1,300.00 | 401.00 | 899.00 | 57,572.84 |
| 9/10/2021 | Payment | 1,300.00 | 394.83 | 905.17 | 56,667.68 |
| 9/13/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 65,914.52 |
| 9/13/2021 | Payment | 1,300.00 | 452.04 | 847.96 | 65,066.55 |
| 9/14/2021 | Payment | 1,300.00 | 446.22 | 853.78 | 64,212.78 |
| 9/15/2021 | Payment | 1,300.00 | 440.37 | 859.63 | 63,353.15 |
| 9/16/2021 | Payment | 1,300.00 | 434.47 | 865.53 | 62,487.62 |
| 9/17/2021 | Payment | 1,300.00 | 428.54 | 871.46 | 61,616.15 |
| 9/20/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 70,862.99 |
| 9/20/2021 | Payment | 1,300.00 | 485.97 | 814.03 | 70,048.97 |

| Date | Transaction | Payment | Interest | Principle | Balance |
|------|-------------|---------|----------|-----------|---------|
| 9/21/2021 | Payment | 1,300.00 | 480.39 | 819.61 | 69,229.36 |
| 9/22/2021 | Payment | 1,300.00 | 474.77 | 825.23 | 68,404.13 |
| 9/23/2021 | Payment | 1,300.00 | 469.11 | 830.89 | 67,573.24 |
| 9/24/2021 | Payment | 1,300.00 | 463.41 | 836.59 | 66,736.66 |
| 9/27/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 75,983.50 |
| 9/28/2021 | Payment | 1,300.00 | 521.09 | 778.91 | 75,204.59 |
| 9/29/2021 | Payment | 1,300.00 | 515.75 | 784.25 | 74,420.34 |
| 9/30/2021 | Payment | 1,300.00 | 510.37 | 789.63 | 73,630.71 |
| 10/1/2021 | Payment | 1,300.00 | 504.96 | 795.04 | 72,835.66 |
| 10/4/2021 | Payment | 1,300.00 | 499.50 | 800.50 | 72,035.17 |
| 10/4/2021 | Additional monies (see note) | (3,778.44) | 0.00 | (3,778.44) | 75,813.61 |
| 10/5/2021 | Payment | 1,300.00 | 519.93 | 780.07 | 75,033.53 |
| 10/6/2021 | Payment | 1,300.00 | 514.58 | 785.42 | 74,248.11 |
| 10/7/2021 | Payment | 1,300.00 | 509.19 | 790.81 | 73,457.30 |
| 10/8/2021 | Payment | 1,300.00 | 503.77 | 796.23 | 72,661.06 |
| 10/12/2021 | Payment | 1,300.00 | 498.31 | 801.69 | 71,859.37 |
| 10/12/2021 | Payment | 1,300.00 | 0.00 | 1,300.00 | 70,559.37 |
| 10/13/2021 | Payment | 1,300.00 | 483.89 | 816.11 | 69,743.26 |
| 10/14/2021 | Payment | 1,300.00 | 478.30 | 821.70 | 68,921.56 |
| 10/15/2021 | Payment | 1,300.00 | 472.66 | 827.34 | 68,094.22 |
| 10/18/2021 | Payment | 1,300.00 | 466.99 | 833.01 | 67,261.20 |
| 10/19/2021 | Payment | 1,300.00 | 0.00 | 1,300.00 | 65,961.20 |
| 10/20/2021 | Payment | 1,300.00 | 452.36 | 847.64 | 65,113.56 |
| 10/21/2021 | Payment | 1,300.00 | 446.55 | 853.45 | 64,260.11 |
| 10/22/2021 | Payment | 1,300.00 | 440.69 | 859.31 | 63,400.80 |
| 10/25/2021 | Payment | 1,300.00 | 434.80 | 865.20 | 62,535.60 |
| 10/26/2021 | Payment | 1,300.00 | 428.87 | 871.13 | 61,664.46 |
| 10/27/2021 | Payment | 1,300.00 | 422.89 | 877.11 | 60,787.35 |
| 10/28/2021 | Payment | 1,300.00 | 0.00 | 1,300.00 | 59,487.35 |
| 10/29/2021 | Payment | 1,300.00 | 407.96 | 892.04 | 58,595.32 |
| 11/1/2021 | Payment | 1,300.00 | 401.84 | 898.16 | 57,697.16 |
| 11/2/2021 | Payment | 1,300.00 | 395.68 | 904.32 | 56,792.84 |
| 11/3/2021 | Payment | 1,300.00 | 389.48 | 910.52 | 55,882.33 |
| 11/4/2021 | Payment | 1,300.00 | 383.24 | 916.76 | 54,965.56 |
| 11/5/2021 | Payment | 1,300.00 | 376.95 | 923.05 | 54,042.51 |
| 11/8/2021 | Payment | 1,300.00 | 370.62 | 929.38 | 53,113.13 |
| 11/9/2021 | Payment | 1,300.00 | 0.00 | 1,300.00 | 51,813.13 |
| 11/10/2021 | Payment | 1,300.00 | 355.33 | 944.67 | 50,868.47 |
| 11/12/2021 | Payment | 1,300.00 | 348.85 | 951.15 | 49,917.32 |
| 11/12/2021 | Payment | 1,300.00 | 342.33 | 957.67 | 48,959.65 |
| 11/15/2021 | Payment | 1,300.00 | 335.76 | 964.24 | 47,995.41 |
| 11/16/2021 | Payment | 1,300.00 | 329.15 | 970.85 | 47,024.56 |

| | Totals - Net of Additional monies | 97,500.00 | 11,510.96 | 229,726.28 | |

Exhibit "7"

| JLK Construction LLC | | | Annual Interest Rate | | 133.5360% |
| Global Funding Experts 12-7-21 | | | Daily Interest Rate | | 0.3659% |

| Date | Transaction | Payment | Interest | Principle | Balance |
|------|-------------|---------|----------|-----------|---------|
| 12/8/2021 | Original Loan Amount | | | | 106,090.50 |
| | Loan fee deducted | | | | 0.00 |
| | Loan deposited | | | | 106,090.50 |
| 12/9/2021 | Payment | 3,999.00 | 388.13 | 3,610.87 | 102,479.63 |
| 12/10/2021 | Payment | 3,999.00 | 374.92 | 3,624.08 | 98,855.56 |
| 12/13/2021 | Payment | 3,999.00 | 361.67 | 3,637.33 | 95,218.22 |
| 12/14/2021 | Payment | 3,999.00 | 348.36 | 3,650.64 | 91,567.58 |
| 12/15/2021 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 124,658.08 |
| 12/15/2021 | Payment | 3,999.00 | 456.06 | 3,542.94 | 121,115.15 |
| 12/16/2021 | Payment | 3,999.00 | 443.10 | 3,555.90 | 117,559.25 |
| 12/17/2021 | Payment | 3,999.00 | 430.09 | 3,568.91 | 113,990.34 |
| 12/20/2021 | Payment | 3,999.00 | 417.04 | 3,581.96 | 110,408.38 |
| 12/21/2021 | Payment | 3,999.00 | 403.93 | 3,595.07 | 106,813.31 |
| 12/22/2021 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 139,903.81 |
| 12/22/2021 | Payment | 3,999.00 | 511.84 | 3,487.16 | 136,416.65 |
| 12/23/2021 | Payment | 3,999.00 | 499.08 | 3,499.92 | 132,916.73 |
| 12/24/2021 | Payment | 3,999.00 | 486.28 | 3,512.72 | 129,404.01 |
| 12/27/2021 | Payment | 3,999.00 | 473.43 | 3,525.57 | 125,878.44 |
| 12/28/2021 | Payment | 3,999.00 | 460.53 | 3,538.47 | 122,339.97 |
| 12/29/2021 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 155,430.47 |
| 12/29/2021 | Payment | 3,999.00 | 568.65 | 3,430.35 | 152,000.11 |
| 12/30/2021 | Payment | 3,999.00 | 556.10 | 3,442.90 | 148,557.21 |
| 12/31/2021 | Payment | 3,999.00 | 543.50 | 3,455.50 | 145,101.71 |
| 1/3/2022 | Payment | 3,999.00 | 530.86 | 3,468.14 | 141,633.56 |
| 1/4/2022 | Payment | 3,999.00 | 518.17 | 3,480.83 | 138,152.73 |
| 1/5/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 171,243.23 |
| 1/5/2022 | Payment | 3,999.00 | 626.50 | 3,372.50 | 167,870.73 |
| 1/6/2022 | Payment | 3,999.00 | 614.16 | 3,384.84 | 164,485.89 |
| 1/7/2022 | Payment | 3,999.00 | 601.78 | 3,397.22 | 161,088.66 |
| 1/10/2022 | Payment | 3,999.00 | 589.35 | 3,409.65 | 157,679.01 |
| 1/11/2022 | Payment | 3,999.00 | 576.87 | 3,422.13 | 154,256.88 |
| 1/12/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 187,347.38 |
| 1/12/2022 | Payment | 3,999.00 | 685.41 | 3,313.59 | 184,033.80 |
| 1/13/2022 | Payment | 3,999.00 | 673.29 | 3,325.71 | 180,708.09 |
| 1/14/2022 | Payment | 3,999.00 | 661.12 | 3,337.88 | 177,370.21 |
| 1/18/2022 | Payment | 3,999.00 | 648.91 | 3,350.09 | 174,020.12 |
| 1/18/2022 | Payment | 3,999.00 | 636.66 | 3,362.34 | 170,657.78 |
| 1/19/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 203,748.28 |
| 1/19/2022 | Payment | 3,999.00 | 745.42 | 3,253.58 | 200,494.70 |
| 1/20/2022 | Payment | 3,999.00 | 733.51 | 3,265.49 | 197,229.21 |
| 1/21/2022 | Payment | 3,999.00 | 721.57 | 3,277.43 | 193,951.78 |
| 1/24/2022 | Payment | 3,999.00 | 709.58 | 3,289.42 | 190,662.36 |
| 1/25/2022 | Payment | 3,999.00 | 697.54 | 3,301.46 | 187,360.90 |
| 1/26/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 220,451.40 |
| 1/26/2022 | Payment | 3,999.00 | 806.53 | 3,192.47 | 217,258.92 |

| Date | Transaction | Payment | Interest | Principle | Balance |
|------|-------------|---------|----------|-----------|---------|
| 1/27/2022 | Payment | 3,999.00 | 794.85 | 3,204.15 | 214,054.77 |
| 1/28/2022 | Payment | 3,999.00 | 783.12 | 3,215.88 | 210,838.89 |
| 1/31/2022 | Payment | 3,999.00 | 771.36 | 3,227.64 | 207,611.25 |
| 2/1/2022 | Payment | 3,999.00 | 759.55 | 3,239.45 | 204,371.80 |
| 2/2/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 237,462.30 |
| 2/2/2022 | Payment | 3,999.00 | 868.76 | 3,130.24 | 234,332.06 |
| 2/3/2022 | Payment | 3,999.00 | 857.31 | 3,141.69 | 231,190.37 |
| 2/4/2022 | Payment | 3,999.00 | 845.81 | 3,153.19 | 228,037.19 |
| 2/7/2022 | Payment | 3,999.00 | 834.28 | 3,164.72 | 224,872.47 |
| 2/8/2022 | Payment | 3,999.00 | 822.70 | 3,176.30 | 221,696.17 |
| 2/9/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 254,786.67 |
| 2/9/2022 | Payment | 3,999.00 | 932.14 | 3,066.86 | 251,719.81 |
| 2/10/2022 | Payment | 3,999.00 | 920.92 | 3,078.08 | 248,641.73 |
| 2/11/2022 | Payment | 3,999.00 | 909.66 | 3,089.34 | 245,552.39 |
| 2/14/2022 | Payment | 3,999.00 | 898.36 | 3,100.64 | 242,451.75 |
| 2/15/2022 | Payment | 3,999.00 | 887.01 | 3,111.99 | 239,339.76 |
| 2/16/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 272,430.26 |
| 2/16/2022 | Payment | 3,999.00 | 996.69 | 3,002.31 | 269,427.96 |
| 2/17/2022 | Payment | 3,999.00 | 985.71 | 3,013.29 | 266,414.66 |
| 2/18/2022 | Payment | 3,999.00 | 974.68 | 3,024.32 | 263,390.35 |
| 2/22/2022 | Payment | 3,999.00 | 963.62 | 3,035.38 | 260,354.97 |
| 2/22/2022 | Payment | 3,999.00 | 952.51 | 3,046.49 | 257,308.48 |
| 2/23/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 290,398.98 |
| 2/23/2022 | Payment | 3,999.00 | 1,062.43 | 2,936.57 | 287,462.41 |
| 2/24/2022 | Payment | 3,999.00 | 1,051.69 | 2,947.31 | 284,515.10 |
| 2/25/2022 | Payment | 3,999.00 | 1,040.90 | 2,958.10 | 281,557.00 |
| 2/28/2022 | Payment | 3,999.00 | 1,030.08 | 2,968.92 | 278,588.08 |
| 3/1/2022 | Payment | 3,999.00 | 1,019.22 | 2,979.78 | 275,608.30 |
| 3/2/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 308,698.80 |
| 3/2/2022 | Payment | 3,999.00 | 1,129.38 | 2,869.62 | 305,829.19 |
| 3/3/2022 | Payment | 3,999.00 | 1,118.88 | 2,880.12 | 302,949.07 |
| 3/4/2022 | Payment | 3,999.00 | 1,108.35 | 2,890.65 | 300,058.41 |
| 3/7/2022 | Payment | 3,999.00 | 1,097.77 | 2,901.23 | 297,157.18 |
| 3/8/2022 | Payment | 3,999.00 | 1,087.16 | 2,911.84 | 294,245.34 |
| 3/9/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 327,335.84 |
| 3/9/2022 | Payment | 3,999.00 | 1,197.56 | 2,801.44 | 324,534.40 |
| 3/10/2022 | Payment | 3,999.00 | 1,187.32 | 2,811.68 | 321,722.72 |
| 3/11/2022 | Payment | 3,999.00 | 1,177.03 | 2,821.97 | 318,900.75 |
| 3/14/2022 | Payment | 3,999.00 | 1,166.70 | 2,832.30 | 316,068.45 |
| 3/15/2022 | Payment | 3,999.00 | 1,156.34 | 2,842.66 | 313,225.80 |
| 3/16/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 346,316.30 |
| 3/16/2022 | Payment | 3,999.00 | 1,267.01 | 2,731.99 | 343,584.30 |
| 3/17/2022 | Payment | 3,999.00 | 1,257.01 | 2,741.99 | 340,842.31 |
| 3/18/2022 | Payment | 3,999.00 | 1,246.98 | 2,752.02 | 338,090.29 |
| 3/21/2022 | Payment | 3,999.00 | 1,236.91 | 2,762.09 | 335,328.20 |
| 3/22/2022 | Payment | 3,999.00 | 1,226.81 | 2,772.19 | 332,556.01 |
| 3/23/2022 | Additional monies (see note) | (30,642.50) | 0.00 | (30,642.50) | 363,198.51 |

| Date | Transaction | Payment | Interest | Principle | Balance |
|---|---|---|---|---|---|
| 3/23/2022 | Payment | 3,999.00 | 1,328.77 | 2,670.23 | 360,528.28 |
| 3/24/2022 | Payment | 3,999.00 | 1,319.00 | 2,680.00 | 357,848.28 |
| 3/25/2022 | Payment | 3,999.00 | 1,309.20 | 2,689.80 | 355,158.47 |
| 3/28/2022 | Payment | 3,999.00 | 1,299.35 | 2,699.65 | 352,458.83 |
| 3/29/2022 | Payment | 3,999.00 | 1,289.48 | 2,709.52 | 349,749.30 |
| 3/30/2022 | Payment | 3,999.00 | 1,279.57 | 2,719.43 | 347,029.87 |
| 3/31/2022 | Payment | 566,076.00 | 1,269.62 | 564,806.38 | (217,776.52) |
| 3/31/2022 | Payment | 3,999.00 | 0.00 | 3,999.00 | (221,775.52) |
| 4/1/2022 | Payment | 3,999.00 | 0.00 | 3,999.00 | (225,774.52) |
| 4/11/2022 | Refund | (27,993.00) | 0.00 | (27,993.00) | (197,781.52) |
| | Totals - Net of Additional monies | 893,994.00 | 41,381.82 | 797,781.52 | |

Exhibit "8"

JLK Construction LLC                                          Annual Interest Rate              169.3500%
Global Funding Experts - 7/13/22                              Daily Interest Rate                 0.4640%

| Date | Transaction | Payment | Interest | Principle | Balance |
|---|---|---|---|---|---|
| 7/14/2022 | Original Loan Amount | | | | 20,241.10 |
| | Loan fee deducted | | | | 0.00 |
| | Loan deposited | | | | 20,241.10 |
| 7/18/2022 | Payment | 2,499.00 | 375.65 | 2,123.35 | 18,117.75 |
| 7/19/2022 | Payment | 2,499.00 | 336.25 | 2,162.75 | 15,955.00 |
| 7/20/2022 | Payment | 2,499.00 | 296.11 | 2,202.89 | 13,752.11 |
| 7/21/2022 | Additional monies - see note | (19,546.10) | 0.00 | (19,546.10) | 33,298.21 |
| 7/21/2022 | Payment | 2,499.00 | 617.98 | 1,881.02 | 31,417.18 |
| 7/22/2022 | Payment | 2,499.00 | 583.07 | 1,915.93 | 29,501.25 |
| 7/25/2022 | Payment | 2,499.00 | 547.51 | 1,951.49 | 27,549.76 |
| 7/26/2022 | Payment | 2,499.00 | 511.29 | 1,987.71 | 25,562.06 |
| 7/27/2022 | Payment | 2,499.00 | 474.40 | 2,024.60 | 23,537.46 |
| 7/28/2022 | Additional monies - see note | (19,546.10) | 0.00 | (19,546.10) | 43,083.56 |
| 7/28/2022 | Payment | 2,499.00 | 799.58 | 1,699.42 | 41,384.14 |
| 7/28/2022 | Payment | 60,716.29 | 768.04 | 59,948.25 | (18,564.10) |
| 8/4/2022 | Additional monies - see note | (4,998.00) | (344.53) | (4,653.47) | (13,910.63) |
| | Totals - Net of Additional monies | 83,207.29 | 4,965.36 | 78,241.93 | |

Note: Additional Monies - The loan was broken into 18 amounts made on a weekly basis.  The lender only advances 4 of the 18 scheduled amounts for a total of $64,331.20.

On July 28, 2022, the lender withdrew the final payment of $60,716.29 to pay off the loan. The lender then on August 4, 2022, sent additional funds in the amount of $4,998.00. The amount withdrawn less the final additional funds provided resulted in the lender receiving $13,910.63 in money in excess of the amounts loaned

Exhibit "9"

| JLK Construction LLC | | | Annual Interest Rate | | 263.1000% |
| Global Funding Experts - 8/5/22 | | | Daily Interest Rate | | 0.7208% |

| Date | Transaction | Payment | Interest | Principle | Balance |
|---|---|---|---|---|---|
| 8/9/2022 | Original Loan Amount | | | | 50,000.00 |
| | Loan fee deducted | | | | 5,000.00 |
| | Loan deposited | | | | 45,000.00 |
| 8/9/2022 | Payment | 590.45 | 324.37 | 266.08 | 44,733.92 |
| 8/10/2022 | Payment | 590.45 | 322.45 | 268.00 | 44,465.92 |
| 8/11/2022 | Payment | 590.45 | 320.52 | 269.93 | 44,195.99 |
| 8/12/2022 | Payment | 590.45 | 318.57 | 271.88 | 43,924.12 |
| 8/15/2022 | Payment | 590.45 | 316.61 | 273.84 | 43,650.28 |
| 8/16/2022 | Payment | 590.45 | 314.64 | 275.81 | 43,374.47 |
| 8/17/2022 | Payment | 590.45 | 312.65 | 277.80 | 43,096.67 |
| 8/18/2022 | Payment | 590.45 | 310.65 | 279.80 | 42,816.87 |
| 8/19/2022 | Payment | 590.45 | 308.63 | 281.82 | 42,535.06 |
| 8/22/2022 | Payment | 590.45 | 306.60 | 283.85 | 42,251.21 |
| 8/23/2022 | Payment | 590.45 | 304.56 | 285.89 | 41,965.32 |
| 8/24/2022 | Payment | 590.45 | 302.50 | 287.95 | 41,677.36 |
| 8/25/2022 | Payment | 590.45 | 300.42 | 290.03 | 41,387.33 |
| 8/26/2022 | Payment | 590.45 | 298.33 | 292.12 | 41,095.21 |
| 8/29/2022 | Payment | 590.45 | 296.22 | 294.23 | 40,800.98 |
| 8/30/2022 | Payment | 590.45 | 294.10 | 296.35 | 40,504.64 |
| 8/31/2022 | Payment | 590.45 | 291.97 | 298.48 | 40,206.15 |
| 9/1/2022 | Payment | 590.45 | 289.81 | 300.64 | 39,905.52 |
| 9/2/2022 | Payment | 590.45 | 287.65 | 302.80 | 39,602.71 |
| 9/6/2022 | Payment | 590.45 | 285.47 | 304.98 | 39,297.73 |
| 9/6/2022 | Payment | 590.45 | 283.27 | 307.18 | 38,990.55 |
| 9/7/2022 | Payment | 590.45 | 281.05 | 309.40 | 38,681.15 |
| 9/8/2022 | Payment | 590.45 | 278.82 | 311.63 | 38,369.52 |
| 9/9/2022 | Payment | 590.45 | 276.58 | 313.87 | 38,055.65 |
| 9/12/2022 | Payment | 590.45 | 274.31 | 316.14 | 37,739.51 |
| 9/13/2022 | Payment | 590.45 | 272.03 | 318.42 | 37,421.09 |
| 9/14/2022 | Payment | 590.45 | 269.74 | 320.71 | 37,100.38 |
| 9/15/2022 | Payment | 590.45 | 267.43 | 323.02 | 36,777.36 |
| 9/16/2022 | Payment | 590.45 | 265.10 | 325.35 | 36,452.01 |
| 9/19/2022 | Payment | 590.45 | 262.75 | 327.70 | 36,124.32 |
| 9/20/2022 | Payment | 590.45 | 260.39 | 330.06 | 35,794.26 |
| 9/21/2022 | Payment | 590.45 | 258.01 | 332.44 | 35,461.82 |
| 9/22/2022 | Payment | 590.45 | 255.62 | 334.83 | 35,126.99 |
| 9/23/2022 | Payment | 590.45 | 253.20 | 337.25 | 34,789.74 |
| 9/26/2022 | Payment | 590.45 | 250.77 | 339.68 | 34,450.06 |
| 9/27/2022 | Payment | 590.45 | 248.32 | 342.13 | 34,107.94 |
| 9/28/2022 | Payment | 590.45 | 245.86 | 344.59 | 33,763.34 |
| 9/29/2022 | Payment | 590.45 | 243.37 | 347.08 | 33,416.27 |
| 9/30/2022 | Payment | 590.45 | 240.87 | 349.58 | 33,066.69 |
| 10/3/2022 | Payment | 590.45 | 238.35 | 352.10 | 32,714.59 |
| 10/4/2022 | Payment | 590.45 | 235.81 | 354.64 | 32,359.95 |

| Date | Transaction | Payment | Interest | Principle | Balance |
|---|---|---|---|---|---|
| 10/5/2022 | Payment | 590.45 | 233.26 | 357.19 | 32,002.76 |
| 10/6/2022 | Payment | 590.45 | 230.68 | 359.77 | 31,642.99 |
| 10/7/2022 | Payment | 590.45 | 228.09 | 362.36 | 31,280.63 |
| 10/11/2022 | Payment | 590.45 | 225.48 | 364.97 | 30,915.66 |
| 10/11/2022 | Payment | 590.45 | 222.85 | 367.60 | 30,548.06 |
| 10/12/2022 | Payment | 590.45 | 220.20 | 370.25 | 30,177.81 |
| 10/13/2022 | Payment | 590.45 | 217.53 | 372.92 | 29,804.88 |
| 10/14/2022 | Payment | 590.45 | 214.84 | 375.61 | 29,429.27 |
| 10/17/2022 | Payment | 590.45 | 212.13 | 378.32 | 29,050.96 |
| 10/18/2022 | Payment | 590.45 | 209.41 | 381.04 | 28,669.91 |
| 10/19/2022 | Payment | 590.45 | 206.66 | 383.79 | 28,286.12 |
| 10/20/2022 | Payment | 590.45 | 203.89 | 386.56 | 27,899.56 |
| 10/21/2022 | Payment | 590.45 | 201.11 | 389.34 | 27,510.22 |
| 10/24/2022 | Payment | 590.45 | 198.30 | 392.15 | 27,118.07 |
| 10/25/2022 | Payment | 590.45 | 195.47 | 394.98 | 26,723.09 |
| 10/26/2022 | Payment | 590.45 | 192.63 | 397.82 | 26,325.27 |
| 10/27/2022 | Payment | 590.45 | 189.76 | 400.69 | 25,924.58 |
| 10/28/2022 | Payment | 590.45 | 186.87 | 403.58 | 25,521.00 |
| 10/31/2022 | Payment | 590.45 | 183.96 | 406.49 | 25,114.51 |
| 11/1/2022 | Payment | 590.45 | 181.03 | 409.42 | 24,705.09 |
| 11/2/2022 | Payment | 590.45 | 178.08 | 412.37 | 24,292.72 |
| 11/3/2022 | Payment | 590.45 | 175.11 | 415.34 | 23,877.38 |
| 11/4/2022 | Payment | 590.45 | 172.11 | 418.34 | 23,459.04 |
| 11/7/2022 | Payment | 590.45 | 169.10 | 421.35 | 23,037.69 |
| 11/8/2022 | Payment | 590.45 | 166.06 | 424.39 | 22,613.30 |
| 11/9/2022 | Payment | 590.45 | 163.00 | 427.45 | 22,185.85 |
| 11/10/2022 | Payment | 590.45 | 159.92 | 430.53 | 21,755.32 |
| 11/14/2022 | Payment | 590.45 | 156.82 | 433.63 | 21,321.69 |
| 11/14/2022 | Payment | 590.45 | 153.69 | 436.76 | 20,884.93 |
| 11/14/2022 | Payment | 26,090.30 | 0.00 | 26,090.30 | (5,205.37) |
| | Totals | 67,421.80 | 17,216.43 | 50,205.37 | |