# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re:<br><br>JLK CONSTRUCTION, LLC,<br><br>                                Debtor. | Case No.: 23-50034-btf11<br>Chapter 11 |
| JLK CONSTRUCTION, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>GFE NY, LLC, a New York limited liability company; WHITE ROAD CAPITAL, LLC, SERIES 120785, dba GFE HOLDINGS, a Delaware limited liability company; WHITE ROAD CAPITAL, LLC, SERIES 127009 DBA GFE HOLDINGS, a Delaware limited liability company; BORIS MUSHEYEV, an individual;  PREMIUM MERCHANT FUNDING 18, LLC, a Delaware limited liability company; ABE BURGER, an individual; SAMUEL A. BRUGMAN, an individual; BOOST CAPITAL GROUP, LLC, a New York limited liability company; ZAC BENA, an individual,<br><br>    Defendants. | Adv. Pro. No. 23-04033 |

## FIRST AMENDED COMPLAINT FOR:

## DECLARATORY RELIEF; FRAUD; RACKETEERING (18 U.S.C. § 1962); AVOIDANCE OF FRAUDULENT TRANSFERS; AVOIDANCE OF TRANSFERS; AND PRESERVATION AND RECOVERY OF TRANSFERS

# I.

## INTRODUCTION,

## JURISDICTION, AND VENUE

Plaintiff JLK CONSTRUCTION, LLC, a Missouri limited liability company, the debtor and debtor-in-possession in the above-entitled case (the "Debtor" or "Plaintiff") hereby respectfully alleges and states as follows:

1.        Plaintiff, a Missouri limited liability company, is the debtor and debtor-in-possession in the Bankruptcy Case, with the rights, powers, and duties of a trustee. 11 U.S.C. §§1107 and 704.

2.        At all times herein mentioned, Defendant GFE NY, LLC is a New York corporation ("GFE") which is not and was not registered to transact business in the State of Missouri, and which therefore unlawfully transacted business in the State of Missouri when it fraudulently induced a small Missouri business, the Plaintiff here, to enter fraudulent loans, in violation of MO. REV. STAT. § 347.153 (2015).

3.        At all times herein mentioned, Defendant WHITE ROAD CAPITAL, LLC SERIES 120785, dba GFE HOLDINGS, is a Delaware limited liability company ("WHITE ROAD 1"). At all times mentioned herein, WHITE ROAD 1 was not registered to transact business in the State of Missouri, and which therefore unlawfully transacted business in the State of Missouri when they fraudulently induced a small Missouri business, the Plaintiff here, to enter fraudulent loans, in violation of MO. REV. STAT. § 347.153 (2015).

4.        At all times herein mentioned, Defendant WHITE ROAD CAPITAL, LLC

SERIES 127009, dba GFE HOLDINGS, is a Delaware limited liability company

("WHITE ROAD 2"). At all times mentioned herein, WHITE ROAD 2 was not

registered to transact business in the State of Missouri, and which therefore unlawfully

transacted business in the State of Missouri when they fraudulently induced a small

Missouri business, the Plaintiff here, to enter fraudulent loans, in violation of MO. REV.

STAT. § 347.153 (2015).

5.        Plaintiff is further informed and believes and based thereon that GFE,

WHITE ROAD 1 and WHITE ROAD 2 are the alter-ego and/or joint-venturer of the

other, and in doing the things alleged herein acted within the course and scope of such

agency, employment, alter-ego and/or in furtherance of the joint venture. Each of GFE's,

WHITE ROAD 1's and WHITE ROAD 2's alleged actions were done with the

permission, consent, and ratification of each other. GFE, WHITE ROAD 1 and WHITE

ROAD 2 are hereinafter collectively referred to as "GFE".

6.        Plaintiff is informed and believes and based thereon alleges that Defendant

BORIS MUSHEYEV, is an individual residing in the State of New York

("MUSHEYEV") and at all times mentioned the Chief Executive Officer and an agent of

GFE.

7.        At all times herein mentioned, Defendant PREMIUM MERCHANT

FUNDING 18, LLC, is a Delaware limited liability company with its principal place of

business in New York ("PMF") which is not and was not registered to transact business

in the State of Missouri, and which therefore unlawfully transacted business in the State

of Missouri in violation of MO. REV. STAT. § 347.153 (2015), when it brokered a loans

between Plaintiff to make fraudulent loans that Defendants, and each of them,

misleadingly labeled a sale of "future receipts." Plaintiff is further informed and believes

and based thereon alleges that PMF solicits loans and brokers loans for other lenders who

made loans to this Debtor, including, but not limited to GCM Capital, LLC, in addition to

making a loan directly to Plaintiff.

8.        Plaintiff is informed and believes and based thereon alleges that Defendant

ABE BURGER, is an individual residing in the State of New York ("BURGER") and the

Chief Operations Officer of PMF.

9.        Plaintiff is informed and believes and based thereon alleges that Defendant

SAMUEL A. BRUGMAN, is an individual residing in the State of Michigan

("BRUGMAN") and an agent of PMF.

10.        At all times herein mentioned, Defendant BOOST CAPITAL GROUP,

LLC, is a New York limited liability company ("BOOST"). At all times mentioned

herein, BOOST was not registered to transact business in the State of Missouri, and

which therefore unlawfully transacted business in the State of Missouri in violation of

MO. REV. STAT. § 347.153 (2015) when it fraudulently induced a small Missouri

business, the Plaintiff here, to enter fraudulent loans that Defendants misleadingly labeled

a sale of "future receipts." Plaintiff is further informed and believes and based thereon

alleges that BOOST solicits loans and brokers loans for other lenders who made loans to

this Debtor, including, but not limited to Alva Advance, LLC, EIN CAP, FFCG, LLC, and Fundamental Capital, LLC.

11.　　　At all times mentioned herein, Defendant ZAC BENA ("BENA") is an employee and agent of Defendant BOOST, and at all relevant times was, an individual, conducting business within this judicial district.

12.　　　Plaintiff filed a petition under Chapter 11 of Title 11 of the United States Code on February 13, 2023 (the "Petition Date"), initiating In re JLK Construction, LLC, Case No. 23-50034-BTF (the "Bankruptcy Case").

13.　　　The claims in this adversary proceeding arise in and relate to the Bankruptcy Case.

14.　　　The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b).

15.　　　This adversary proceeding is a core proceeding under, *inter alia*, 28 U.S.C. §§ 157(b)(2)(A), (E), (F) and (H) and (O).

16.　　　If this adversary proceeding is determined to be a non-core proceeding, Plaintiff consents to the entry of final orders and judgments by the bankruptcy judge. Plaintiff notifies each Defendant that Fed. R. Bankr. P. 7012(b) requires it to admit or deny whether this adversary proceeding is a core or non-core proceeding and, if non-core, to state whether each Defendant consents, or does not consent, to the entry of final orders or judgment by the bankruptcy judge.

17.　　　This adversary proceeding is a civil proceeding arising in and related to the

Bankruptcy Case, and such case is pending before this Court. Accordingly, venue in this Court is proper under 28 U.S.C. § 1409(a).

18.　　　　Plaintiff is unaware of the names of other potential defendants who may be responsible for the unlawful practices, acts, conduct, and occurrences alleged herein. Plaintiff will seek leave of the Court to amend this Complaint to allege the true names and capacities of these unknown defendants, and to detail the roles they played once Plaintiff ascertains their identities and/or their manner of participation in the wrongful conduct herein described.

19.　　　　At all relevant times, as alleged more fully herein, each Defendant acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint-venturer of the other Defendant, and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Each one of Defendants' alleged actions was done with the permission and consent of each of the other Defendants.

20.　　　　At all relevant times, as alleged more fully herein, PMF was and is a loan broker for GFE acting as its agent, servant, employee, co-conspirator, alter-ego and/or joint-venturer of the other and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Each act of said Defendants alleged herein was done with the permission and consent of each of the other Defendants.

21.　　　　At all relevant times, as alleged more fully herein, BOOST was and is a

loan broker for GFE acting as its agent, servant, employee, co-conspirator, alter-ego and/or joint-venturer of the other and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Each act of said Defendants alleged herein were done with the permission and consent of each of the other Defendants.

## II.

## FACTUAL BACKGROUND

22.      Beginning on or about 2019, Plaintiff received telephone solicitations from PMF, offering PMF's Premium Business Financing Service and Custom Small Business Solutions, which includes credit servicing, credit card processing, bookkeeping, payroll, SEO (Search Engine Optimization), and employee retention credit program as well as Merchant Cash Advances, Line of Credit, Equipment Financing, Mortgage Financing, Term Loans, Factoring, P.O. Financing, and SBA Loans. PMF offers business consulting services in addition to brokering loans and making loans itself.

23.      On or about February 1, 2022 by interstate cell phone communication and interstate e-mail communication, PMF's Premium Financing Service pitch to Plaintiff was that:

a.      Lenders for which it brokered transactions were legitimate business lenders;

b.      Lenders for which it brokered transactions charged reasonable interest rates;

c.      Loans which it brokered were based on commercially reasonable terms that would be repaid from daily or weekly withdrawals from Plaintiff's bank account; and

d.      Lenders for which it brokered transactions would work with Plaintiff just like a bank but would be easier to work with than a bank.

24.      On or about February 14, 2022, Plaintiff and Defendant PMF executed a one-year Consulting Agreement pursuant to which PMF contracted to provide a:

> ... broad array of services and solutions for small businesses. PMF advises merchants on reliable, safe, and innovative financing and payments solutions combined with *individualized* attention to provide *tailored* solutions that respond to the various needs of the business, including but not limited to Accounting, Payroll Processing, Marketing, Branding and more. Our all-inclusive bundle will provide Client with a thorough review of the various metrics of their business and provided *tailored* solutions that solve the business's most pressing needs. (Emphasis added.)

A true and correct copy of PMF's Consulting Agreement is attached hereto as *Exhibit "1"* and incorporated herein as though fully set forth.

25.      Pursuant to the Consulting Agreement, Plaintiff agreed to pay a 9% flat fee commission for PMF's services payable at the earlier of the (i) completion of any of the services contemplated by the Consulting Agreement or (ii) the delivery of any financing.

26.      Plaintiff is informed and believes, and based thereon alleges that BOOST is a loan broker.

27.      Beginning in or about 2020, Plaintiff received interstate telephone solicitations from BOOST, offering brokering services.

28.      BOOST's lending pitch to Plaintiff was that:

   a.      Lenders for which it brokered transactions were legitimate business

lenders;

   b.      Lenders for which it brokered transactions charged reasonable interest

rates;

   c.      Loans which it brokered were based on commercially reasonable terms that

would be repaid from daily or weekly withdrawals from Plaintiff's bank account; and

   d.      Lenders for which it brokered transactions would work with Plaintiff just

like a bank but would be easier to work with than a bank.

29.      When Defendants made the foregoing representations and offered financing

to Plaintiff, Defendants, GFE, PMF, and BOOST, and each of them, were aware of the

following facts:

   A.      Plaintiff was a Missouri limited liability company;

   B.      Plaintiff had no regular business operations outside of Missouri; and

   C.      Plaintiff had no contacts with New York, the stated jurisdiction, venue, and

choice of law designated by the transaction documents.

30.      GFE made four short term loans to Plaintiff, more fully described below,

the terms of which required daily payments designed to pay the balance over the course

of between 111 to 218 business days, without disclosing that Defendants were charging

interest rates between 0.3659% daily and .9827% daily, or an imputed annual interest rate

between 133% and 358%. As a result, each loan was usurious and unconscionable in

violation of New York, Missouri, and Federal law.

31.          Defendants and each of them, had actual and constructive knowledge that they were brokering or making loans without disclosing the interest rate that Defendants purported to charge Plaintiff.

### THE MERCHANT CASH ADVANCE AGREEMENTS AT ISSUE

32.          On or about August 2, 2021, GFE made a Loan of money to Plaintiff in the amount of $125,000.00 (the "August 2nd Loan"), for which Plaintiff was required to repay Defendant the sum of $180,000.00 ("Receivables Purchased Amount") within 139 business days. PMF brokered the loan between Plaintiff and GFE. Attached hereto as *Exhibit "2"* is a true and correct copy of the Merchant Agreement ("August 2nd Loan Documents") pursuant to which GFE made such Loan to Plaintiff. Plaintiff paid GFE $97,500.00. Pursuant to the Weekly Advance Addendum to Merchant Agreement, attached hereto as part of *Exhibit "2."* The Loan was broken into 10 weekly amounts.

33.          The effective daily interest rate on the August 2nd Loan was 0.6858%, or 250.3150% annually, more than the allowable interest rate pursuant to New York, Missouri, or Federal law.

34.          On December 7, 2021, GFE made a loan of money to Plaintiff in the amount of $600,000.00 (the "December 7th Loan"), for which Plaintiff was required to repay Defendant the sum of $870,000.00 ("Receivables Purchased Amount") within 218 business days. PMF brokered the loan between Plaintiff and GFE. Attached hereto as *Exhibit "3"* is a true and correct copy of the Merchant Agreement ("December 7th Loan

Documents") pursuant to which GFE made such loan to Plaintiff. Plaintiff paid GFE $893,994.00.

35.        The effective daily interest rate on the December 7th Loan was 0.3659%, or 133.5360% annually, more than the allowable interest rate pursuant to New York, Missouri, or Federal law

36.        On July 13, 2022, GFE made a Loan of money to Plaintiff in the amount of $277,000.00 (the "July 13th Loan"), for which Plaintiff was required to repay Defendants the sum of $387,523.00 ("Receivables Purchased Amount") within 156 weeks. PMF brokered the loan between Plaintiff and GFE. Attached hereto as *Exhibit "4"* is true and correct copy of the Merchant Agreement July 13th Loan Documents pursuant to which GFE made such loan to Plaintiff. Pursuant to the Weekly Advance Addendum to Merchant Agreement, attached hereto as part of *Exhibit "4"*, the loan was broken into 18 weekly amounts; the lender only advanced 4 of the of the 18 installments for a total of $64,331.00. On July 28, 2022, GFE withdrew $60,716.29; in total, Plaintiff paid GFE $83,207.29.

37.        The effective daily interest rate on the July 13th Loan was 0.4640%, or 169.350% annually, more than the allowable interest rate pursuant to New York, Missouri, or Federal law.

38.        On August 5, 2022, GFE made a loan of money to Plaintiff in the amount of $50,000.00 (the "August 5th Loan"), for which Plaintiff was required to repay GFE the sum of $64,950.00 ("Receivables Purchased Amount") within 111 business days.

BOOST brokered the loan between Plaintiff and GFE. Attached hereto as *Exhibit "5"* is a true and correct copy of the Merchant Agreement ("August 5th Loan Documents") pursuant to which it made such loan to Plaintiff. Plaintiff paid GFE $67,421.80. The August 2nd Loan Documents, December 7th Loan Documents, July 13th Loan Documents and August 5th Loan Documents are hereinafter collectively referred to as "Loan Documents."

39.      Plaintiff made the series of transfers to GFE identified in *Exhibit "6"* attached hereto on account of the August 2nd Loan ("August 2nd Loan Transfers") from Plaintiff's property in the sum of $97,500.00.

40.      Plaintiff made the series of transfers to GFE identified in *Exhibit "7"* attached hereto on account of the December 7th Loan ("December 7th Loan Transfers") from Plaintiff's property in the sum of $893,994.00.

41.      Plaintiff made the series of transfers to GFE identified in *Exhibit "8"* attached hereto on account of the July 13th Loan ("July 13th Loan Transfers") from Plaintiff's property in the sum of $83,207.29.

42.      Plaintiff made the series of transfers to GFE identified in *Exhibit "9"* attached hereto on account of the August 5th Loan ("August 5th Loan Transfers") from Plaintiff's property in the sum of $67,421.80.

43.      Plaintiff made transfers to PMF on account of the August 2nd, December 7th and July 13th Loan ("PMF Commission Transfers") from Plaintiff's property in an amount according to proof.

44.        Plaintiff made the transfer to BOOST on account of the August 5th Loan

("BOOST Commission Transfers") from Plaintiff's property in an amount according to

proof.

## FIRST CLAIM FOR RELIEF:

## DECLARATORY RELIEF

## (AGAINST ALL DEFENDANTS)

45.        Plaintiff alleges Paragraphs 1 through 44, inclusive, as though fully stated

in full herein.

46.        Defendants, and each of them, are in the business of brokering and/or

funding predatory loans to small businesses.

47.        Beginning in or about 2019, Defendant PMF continually solicited

Plaintiff's business, offering various lending options to Plaintiff to facilitate its Plaintiff's

cash flow. In 2020, Defendant BOOST began soliciting Plaintiff, offering its brokering

services.

48.        Separately, they each pitched to Plaintiff that:

    a.    The many lenders for which they brokered transactions were legitimate

         business lenders;

    b.    The many lenders for which they brokered transactions charged reasonable

         interest rates;

    c.    The loans which they brokered were based on commercially reasonable

         terms that would be repaid from daily or weekly withdrawals from

Plaintiff's bank account; and

    d.    The many lenders for which they brokered transactions would work with Plaintiff just like a bank but would be easier to work with than a bank.

49.    When BOOST and PMF made the foregoing representations and offered financing to Plaintiff, they were aware of the following facts:

    a.    Plaintiff was a Missouri limited liability company;

    b.    Plaintiff had no regular business operations outside of Missouri; and

    c.    Plaintiff had no contacts with New York, Defendant GFE NY's place of business and state of organization, the stated jurisdiction, venue, and choice of law designated by GFE NY's Loan Documents.

50.    Defendants and each of them's only concern was and is whether GFE could collect in the event of a default, and not whether the Plaintiff, a small business, could survive.

51.    At all times mentioned, Plaintiff was interested in capital loans to help the company move forward. What Plaintiff received from GFE were Loan Documents which identified themselves as purchases of future receipts. Documents for the transactions were forwarded to Plaintiff electronically and followed by phone calls intended to speed Plaintiff's execution indicating the funds were ready to deposit in Plaintiff's account and encouraging Plaintiff's principal to execute the documents without actually reading them, thereby depriving Plaintiff of the opportunity to uncover the bait and switch from a genuine loan to a purchase of future receivables.

52.        The transactions themselves were concealed loans rather than future receipt purchases because the terms of the transactions provided GFE with the right to repayment under all circumstances, including the right to deny reconciliation requests. The Loan Documents shifted the risk of nonpayment to Plaintiff and did not bear a substantial risk of nonpayment because of provisions in the agreement.

53.        None of the Loan Documents identify Plaintiff's receivables that the GFE purported to purchase by date, percentage, name, or any other identifying data that could demonstrate Plaintiff's ownership of such receivables. Plaintiff made no alterations to any of the GFE's form documents, which are contracts of adhesion. A true purchase of future receivables would provide a means to collect from the obligors of those receivables who would actually owe the obligation. Instead, GFE simply took funds directly from Plaintiff's bank account without any consideration of whether those funds represent any receivables purchased.

54.        The Loan Documents violate New York law because each one fails to disclose the interest rate, which is a material term of the contract for a loan. The annual interest rate or cost of funding that GFE charged to Plaintiff and which Plaintiff paid was more than 25%, which exceeds the maximum interest rate permitted by New York law. N.Y. PENAL LAW §190.42.

55.        Defendants, and each of them, intentionally failed to disclose a material term of the Loans by failing to disclose the interest rate that the Defendants charged to the Plaintiff by fraudulently labeling the loan a sale of "future receipts." In fact, Plaintiff

sold nothing. The transactions offered and executed were and are loans of money, notwithstanding the language at Section 1.9 that "Merchant and [GFE] agree that the Purchase Price under this Agreement is in exchange for the Purchased amount and that such Purchase Price is not intended to be, nor shall be construed as a loan from GFE to Merchant," contained in each agreement attached as *Exhibits "2" through "4"* inclusive.

56.        The Defendants, and each of them, intentionally misled Plaintiff by placing on the first page of each Loan Document a summary table showing a percentage rate of 15% or less. This was intended to confuse, mislead, and trick Plaintiff into believing that the stated percentage was the interest rate for the Loan, when in fact, the percentage rate related to the percentage of daily receivables to be deducted from Plaintiff's bank account until the loan was repaid.

57.        Defendants, and each of them, knew or had reason to know, that the Loans bore an interest at a rate of more than 25% per annum.

58.        Defendants, and each of them, knew, or had reasons to know, that Plaintiff would pay GFE interest at a rate more than 25% on all funds received from the Loans.

59.        At the time Defendants, and each of them, made the Loans to Plaintiff, they were transacting interstate business in Missouri through repeated and successive transactions of business with Plaintiff, making loans to Plaintiff from August 2021 through August 2022 and taking repeated payments from Plaintiff's bank account beginning in August 2021 through November 2022.

60.        GFE violated Missouri law because despite that none of the Defendants

were authorized to conduct business in Missouri, each continued to do business in the State of Missouri and to make loans and withdraw money from Plaintiff's bank account in Missouri in violation of Missouri law.

61.       Plaintiff made the series of transfers to the GFE identified in *Exhibits "6"* through *"9"* which are attached for informational purposes only and are subject to amendment, and specifically incorporated herein by this reference, on account of the Loans ("Loan Transfers") from the property of Plaintiff in the sum of $1,142,123.09.

62.       Plaintiff contends that the transactions documented by the Loan Documents (hereinafter "Loans") are loans; Defendants, and each of them contend that the transactions are sales of future receivables.

63.       Despite their documents form, the transactions are, in economic reality, loans that are absolutely repayable. The true nature of the Loan Documents contain hallmarks of a loan are more fully set forth:

a.       The agreements relied on the Plaintiff's creditworthiness, rather than the creditworthiness of Plaintiff's customers, who owed Plaintiff receivables;

b.       Section 1.11 titled "Protections against Default," *see, e.g., Exhibit "1"*, includes an acceleration clause making the balance due and payable upon the event of default, thereby shifting the burden of loss to Plaintiff. ¶ 1.11 Protection 1;

c.       GFE has recourse against Plaintiff's principal based on the guaranty executed concurrently with the Loans, shifting risk of loss to Plaintiff. *See,*

*e.g., Exhibit "1"*, ¶ 1.11 <u>Protection 2</u> & ¶ 3.2 <u>Personal Guaranty</u>;

d.   GFE required Confessions of Judgment shifting risk of loss to Plaintiff which GFE is authorized to execute on behalf of Plaintiff, shifting the. *See, e.g., Exhibit "1"*, ¶ 1.11 <u>Protection 3</u>;

e.   GFE has a right of recourse against Plaintiff based on the security agreement executed concurrently with the Loans and because the Loan Documents provide that Plaintiff grants GFE a security interest, shifting risk of loss to Plaintiff. *See, e.g., Exhibit "1"*, ¶ 1.11 <u>Protection 4</u>;

f.   GFE may proceed to protect and enforce its rights and remedies by lawsuit in which Plaintiff shall be liable for all costs and attorneys' fees, shifting risk of loss to Plaintiff. *See, e.g., Exhibit "1"*, ¶ 1.11 <u>Protection 5</u> and <u>Protection 6</u>;

g.   GFE may exercise its rights under the assignment of Plaintiff's lease, shifting risk of loss to Plaintiff. *See, e.g., Exhibit "1"*, ¶ 1.11 <u>Protection 7</u>;

h.   GFE may debit Plaintiff's depository accounts wherever situated by means of ACH, shifting risk of loss to Plaintiff. *See, e.g., Exhibit "1"*, ¶ 1.11 <u>Protection 8</u>;

i.   Events of default include any violation of the agreement as outlined in Section 1.11 of *Exhibit "1"* and is funds are unavailable for transfer via ACH or any other default; *See, e.g., Exhibit "1"*, ¶ 3.1 <u>Events of Default</u>;

j.   The Loan Documents do not provide a specific reconciliation provision.

However, the second boilerplate paragraph on the first page of each agreement provides that GFE will reconcile Plaintiff's account from Plaintiff's bank statements within 3 days and issue a refund for any overpayments taken by GFE. Plaintiff provided GFE with its bank pass codes for full access to Plaintiff's bank account. GFE, however, never reconciled Plaintiff's payments nor offered to do so after the loans were processed, which shifted the risk of loss to Plaintiff; and,

k.    The selection of daily payment rates did not represent a good faith estimate of receivables.

64.    GFE's Loan Documents provide for recovery of attorneys' fees and costs and Plaintiff is therefore entitled to an award of attorneys' fees and costs pursuant to New York Law, N.Y. DEBT. & CRED. LAW § 278(A).

65.    Plaintiff seeks a declaration by the Court that the transactions which are the subject of this action are disguised loans and not a sale of future receivables.

## SECOND CLAIM FOR RELIEF:

### FRAUD

### (AGAINST ALL DEFENDANTS)

66.    Plaintiff alleges Paragraphs 1 through 44, inclusive, and Paragraphs 47 through 64, inclusive, as though fully stated in full herein.

67.    PMF is in the business of making and brokering loans to small businesses such as Plaintiff.

68.         BOOST is a loan broker. "We help trusted businesses get money for businesses funding as quickly and efficiently as possible with funding from Boost Capital Group. We can help commercial clients looking for an increase in capital through business funds by simplifying the process for approval." www.boostcapitalgroup.com.

69.         Beginning in or about 2019, BOOST through its agent, BENA, continually solicited Plaintiff's business, offering various lending options to Plaintiff to facilitate Plaintiff's cash flow.

70.         PMF, through its agent BRUGMAN, and BOOST, through its agent BENA, each pitched Plaintiff was that:

    a.         The many lenders for which they brokered transactions were legitimate business lenders;

    b.         The many lenders for which they brokered transactions charged reasonable interest rates;

    c.         The loans which they brokered were based on commercially reasonable terms that would be repaid from daily or weekly withdrawals from Plaintiff's bank account; and,

    d.         The many lenders for which it brokered transactions would work with Plaintiff just like a bank but would be easier to work with than a bank.

71.         When BRUGMAN on behalf of PMF and, BENA on behalf of BOOST made the foregoing representations and offered financing to Plaintiff, they were aware of the following facts:

a.    Plaintiff was a Missouri limited liability company;

b.    Plaintiff had no regular business operations outside of Missouri; and

c.    Plaintiff had no contacts with New York, Defendant GFE's place of business and state of organization, the stated jurisdiction, venue, and choice of law designated by the GFE's Loan Documents.

72.       Throughout the initial negotiations for credit, Plaintiff only inquired about a loan. Plaintiff is a small Missouri business operated by a single individual with limited resources, education, and experience in lending. Plaintiff was never informed prior to entering any of the agreement that there would be no interest rate because the transaction was a purchase of receivables.

73.       When Plaintiff agreed to the transaction, it believed it was obtaining a loan. When the Loan Documents were electronically transmitted to Plaintiff's principal, they were followed up with a calls from BRUGMAN of PMF or BENA of BOOST, who discouraged any review of the transaction document and focused Plaintiff to simply sign the agreement without reading the document. Plaintiff was rushed through the process with statements about funds being ready to deposit in Plaintiff's bank account for immediate use. In a text box on the signature page, a percentage rate of 15% or less was prominently displayed. There was no reason for Plaintiff to assume that referred to anything other than a legal interest rate.

74.       There had never been a meeting of the minds because neither BOOST or its agent or PMF or its agent disclosed the transaction was not as described during

negotiations and prevented Plaintiff from conducting a review of the agreement prior to execution.

75.         Notwithstanding that BENA, BOOST, BRUGMAN and PMF knew, or should have known Plaintiff's financial condition, from August 2, 2021 through August 5, 2022, PMF and BOOST brokered and GFE made four short term loans to Plaintiff, more fully described above, the terms of which required daily payments designed to pay the balance over the course of between 111 to 218 business days, without disclosing that Defendants were charging an interest rate between 0.3659% daily and .9827% daily, or an imputed annual interest rate between 133% and 358%. As a result, each loan was usurious and unconscionable in violation of New York, Missouri, and Federal law.

76.         Plaintiff is informed and believes and based thereon alleges that at all times herein mentioned, that GFE, PMF, BRUGMAN, BOOST and BENA, and each of them, had actual and constructive knowledge that each was engaging in bait and switch tactics to induce Plaintiff to enter transactions to which it did not agree. As the stated percentage rate identified on the Loan Documents' first page was understood by Plaintiff to be an interest rate, when calculated on what was actually paid to GFE the interest rate would have been significantly higher than 15% or less, approaching 358% in some instances. Plaintiff would not have agreed to such unreasonable interest rates.

77.         Had Plaintiff known the truth that the agreements purported to be sales of receivables at extremely high rates of return far in excess of any legal interest imposed by a lawful loan, it would never have entered the transactions.

78.　　　　PMF, through its agent BRUGMAN, and BOOST, through its agent

BENA, each separately and fraudulently represented to Plaintiff that the interest rate

chargeable for each loan was reasonable and lawful, when in fact they presented Loan

Documents drafted with the intent of avoiding usurious interest rates greater than the

allowed rates pursuant to New York law.

79.　　　　GFE, PMF, BRUGMAN, BOOST and BENA knew or should have known

that they falsely substituted terms of a sale of future receipts and employed an electronic

means to sign the agreements in such a way as to conceal the true nature of the

documents.

80.　　　　Plaintiff justifiably relied upon representations that it would be obtaining a

loan because only a loan was requested and in response to inquiry regarding interest

rates, Plaintiff was informed they were to be reasonable and lawful. Having entered a

consulting agreement with PMF in February of 2022, PMF and BRUGMAN assumed

fiduciary duties towards Plaintiff to advise on business and finance matters. See, *Exhibit

"1."* Plaintiff is justified because it was never told that there would be no interest and

why and could rely upon trusted advisers. Plaintiff was induced to execute the Loan

Documents by the Defendants, and each of them, as alleged herein without examining the

terms contained within the documents.

81.　　　　As a proximate result of the conduct by Defendants and each of them,

Plaintiff has been damaged in a sum of not less than $1,142,123 on account of the Loans

Transfers, as set forth in *Exhibits "6" through "9"*, inclusive, and in a sum according to

proof on account of the PMF and BOOST Commission Transfers.

82.	Plaintiff justifiably relied upon these false representations, because its principal sought reasonable and lawful interest and was never told there would be no interest as it was not a loan. Plaintiff was induced to execute the Loan Documents by these fraudulent and deceitful material falsehoods and concealments, believing GFE's, PMF's, BRUGMAN's, BOOST's and BENA's statements to be true.

83.	PMF's conduct with respect to Plaintiff was egregious and directed at Plaintiff by charging it interest rate that is more than the interest rate that is considered criminal usury and in fact, felonious usury pursuant to New York law, which was a pattern of activity directed to the public generally and Plaintiff is entitled to punitive damages in the sum of $100,000.00.

84.	Boost's conduct with respect to Plaintiff was egregious and directed at Plaintiff by charging it interest rate that is more than the interest rate that is considered criminal usury and in fact, felonious usury pursuant to New York law, which was a pattern of activity directed to the public generally and Plaintiff is entitled to punitive damages in the sum of $100,000.00.

85.	GFE's conduct with respect to Plaintiff was egregious and directed at Plaintiff by charging it interest rate that is more than the interest rate that is considered criminal usury and in fact, felonious usury pursuant to New York law, which was a pattern of activity directed to the public generally and Plaintiff is entitled to punitive damages in the sum of $3,000,000.00.

**THIRD CLAIM FOR RELIEF:**

**RICO**

**(AGAINST DEFENDANTS, MUSHEYEV, PMF,
BURGER, BRUGMAN, BOOST and BENA)**

86.         Plaintiff alleges Paragraphs 1 through 44, inclusive, as though fully stated

in full herein.

87.         The Merchant Cash Advance ("MCA") industry is a predatory lending

industry, a "payday lending" for businesses charging exorbitant interest rates. Predatory

lending is based on an underwriting policy based on the ability to collect, rather than the

ability of the borrower to repay without going out of business because the MCAs receive

the bulk of their revenues from the origination process rather than from the performance

of the loan.

88.         A fundamental characteristic of predatory lending is the aggressive

marketing of credit to prospective borrowers who simply cannot afford the credit on the

terms being offered. Typically, such credit is underwritten predominately on the basis of

liquidation value of the collateral, without regard to the borrower's ability to service and

repay the loan according to its terms absent resorting to that collateral.

89.         In addition to charging unlawful interest, the scheme is designed to trap

small businesses, like Plaintiff, into a never-ending spiral of debt similar to a payday

lending where the small business has to take out additional loans to a prior one.

90.         Although the Loan Documents refer to the transaction as a sale of

receivables, the transactions were, in fact, loans. The true nature of the Loan Documents

contain hallmarks of a loan are more fully set forth:

a.     The agreements relied on the Plaintiff's creditworthiness, rather than the

creditworthiness of Plaintiff's customers, who owed Plaintiff receivables;

b.     Section 1.11 titled "Protections against Default," *see, e.g., Exhibit "1"*,

includes an acceleration clause making the balance due and payable upon

the event of default, thereby shifting the burden of loss to Plaintiff. ¶ 1.11

Protection 1;

c.     GFE has recourse against Plaintiff's principal based on the guaranty

executed concurrently with the Loans, shifting risk of loss to Plaintiff. *See,

e.g., Exhibit "1"*, ¶ 1.11 Protection 2 & ¶ 3.2 Personal Guaranty;

d.     GFE required Confessions of Judgment shifting risk of loss to Plaintiff

which GFE is authorized to execute on behalf of Plaintiff, shifting the. *See,

e.g., Exhibit "1"*, ¶ 1.11 Protection 3;

e.     GFE has a right of recourse against Plaintiff based on the security

agreement executed concurrently with the Loans and because the Loan

Documents provide that Plaintiff grants GFE a security interest, shifting

risk of loss to Plaintiff. *See, e.g., Exhibit "1"*, ¶ 1.11 Protection 4;

f.     GFE may proceed to protect and enforce its rights and remedies by lawsuit

in which Plaintiff shall be liable for all costs and attorneys' fees, shifting

risk of loss to Plaintiff. *See, e.g.*, *Exhibit "1"*, ¶ 1.11 <u>Protection 5</u> and

<u>Protection 6</u>;

g.    GFE may exercise its rights under the assignment of Plaintiff's lease,

shifting risk of loss to Plaintiff. *See, e.g., Exhibit "1"*, ¶ 1.11 <u>Protection 7</u>;

h.    GFE may debit Plaintiff's depository accounts wherever situated by means

of ACH, shifting risk of loss to Plaintiff. *See, e.g., Exhibit "1"*, ¶ 1.11

<u>Protection 8</u>;

i.    Events of default include any violation of the agreement as outlined in

Section 1.11 of *Exhibit "1"* and is funds are unavailable for transfer via

ACH or any other default; *See, e.g., Exhibit "1"*, ¶ 3.1 <u>Events of Default</u>;

j.    The Loan Documents do not provide a specific reconciliation provision.

However, the second boilerplate paragraph on the first page provides that

GFE will reconcile Plaintiff's account from Plaintiff's bank statements

within 3 days and issue a refund for any overpayments taken by GFE.

Plaintiff provided GFE with its bank pass codes for full access to Plaintiff's

bank account. GFE, however, never reconciled Plaintiff's payments nor

offered to do so after the loans were processed, which shifted the risk of

loss to Plaintiff; and,

k.    The selection of daily payment rates did not represent a good faith estimate

of receivables.

91.      GFE's Loan Documents provide for recovery of attorneys' fees and costs

and Plaintiff is therefore entitled to an award of attorneys' fees and costs pursuant to New

York Law, N.Y. DEBT. & CRED. LAW § 278(A).<u>The Unlawful Activity.</u>

92.      New York places a 25% annual limit on the amount of interest that can be

charged in connection with providing a loan. N.Y. PENAL LAW §190.42.

93.      The Loan Documents are unconscionable contracts of adhesion that were

not negotiated at arm-length. Instead, each contains one-sided terms that prey upon a

small business and individual owner's desperation that conceals the fact that the

transactions, including those involving Plaintiff, are really loans.

94.      Among the one-sided terms, the Loan Documents (See, *Exhibits "2"*

*through "5"*, inclusive) include:

a.      a provision giving GFE the irrevocable right to withdraw money directly

from the merchant's bank accounts;

b.      a provision preventing the merchant from transferring, moving or selling

the business or any assets without GFE's permission;

c.      a one-sided attorneys' fees provision obligating the merchant, Plaintiff, to

pay GFE's attorneys' fees but not the other way around;

d.      a venue and choice-of-law provision requiring the merchant to litigate in a

foreign jurisdiction under the laws of a foreign jurisdiction;

e.      a personal guaranty, the revocation of which is an event of default;

f.      a jury waiver;

g.  a class action waiver;

h.  a collateral and security agreement providing a UCC lien over all of merchant's assets;

i.  a prohibition of obtaining financing from other sources;

j.  the maintenance of business interruption insurance;

k.  the right to direct all credit card processing payments to GFE;

l.  a power-of attorney "to take any and all action necessary to direct such new or additional credit card processor to make payment to GFE; and

m.  a power of attorney authorizing GFE "to take any action or execute any instrument or document to settle all obligations due…"

95.   The Loan Documents are also unconscionable because each contains numerous knowingly false statements. Among these knowingly false statements are that:

a.  the transaction is not a loan;

b.  the daily payment is a good faith estimate of the merchant's receivables;

c.  the fixed daily payment is for the merchant's convenience; and

d.  that the automated ACH program is labor intensive, requiring EIN to charge an exorbitant ACH Program Fee or Origination Fee.

96.   The Loan Documents are also unconscionable because they are designed to fail. Among other things, the Loan Documents are designed to result in a default in the event that the merchant's business suffers any downturn in sales by:

a.  forcing the merchant to wait until the end of the month before entitling it to invoke the reconciliation provision;

b.  preventing the merchant from obtaining other financing; and

c.  requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of merchant.

97.     The Loan Documents (*Exhibits "2" through "5"*) also contain numerous improper penalties that violate New York's strong public policy. Among these improper penalties, the Loan Documents:

a.  require the merchant to sign a confession of judgment entitling GFE to liquidated attorneys' fees based on a percentage of the amount owed rather than a good faith estimate of the attorneys' fees required to file a confession of judgment;

b.  accelerate the entire debt upon an Event of Default; and

c.  require the Plaintiff to turn over 100% of all its receivables if it misses just one fixed daily payment.

98.     The Loan Documents do not provide a specific reconciliation provision. However, the second boilerplate paragraph on the first page of each agreement provides that GFE will reconcile Plaintiff's account from Plaintiff's bank statements within 3 days, adjust the estimated daily rate up or down as indicated, and issue a refund for any overpayments taken by GFE. Plaintiff provided GFE with its bank pass codes for full

access to Plaintiff's bank account. GFE, however, never reconciled Plaintiff's payments

nor offered to do so after the loans were processed.

99.      From August 2, 2021 through August 5, 2022 PMF and BOOST brokered

and GFE made four short term loans to Plaintiff, more fully described above, the terms of

which required daily payments designed to pay the balance over the course of between

111 to 218 business days, without disclosing that Defendants were charging an interest

rate between 0.3659% daily and .9827% daily, or an imputed annual interest rate between

133% and 358%. As a result, each loan was usurious and unconscionable in violation of

New York, Missouri, and Federal law

100.      As a consequence of the scheme used by Defendants, the debt, including

such debt evidence by the Loan Documents, constitutes unlawful debt within the meaning

of 18 U.S.C. § 1962(c) and (d), 18 U.S.C. 1961(6) because (i) it violates applicable

criminal usury statues and (ii) the rates are more than twice the legal rate permitted by

New York Penal Law ¶ 190.40.

101.      The Defendants would induce small businesses like Plaintiff with promises

of loans with legal interest rates and then switch the terms to be a purchase of future

receivables. However, by taking a security interest in all of Plaintiff's assets, it is clear

that Defendants did not take ownership of any future receivables, which became

collateral for an unlawful loan.

102.      For example, in the August 2nd Loan , GFE made a Loan of money to

Plaintiff in the amount of $125,000.00, for which Plaintiff was required to repay

Defendant the sum of $180,000.00 ("Receivables Purchased Amount") within 139 business days. PMF brokered the loan between Plaintiff and GFE. Attached hereto as *Exhibit "2"* is a true and correct copy of the Merchant Agreement ("August 2nd Loan Documents") pursuant to which GFE made such Loan to Plaintiff. Plaintiff paid GFE $97,500.00. Pursuant to the Weekly Advance Addendum to Merchant Agreement, attached hereto as part of *Exhibit "2"*, the Loan was broken into 10 weekly amounts.

103.        The effective daily interest rate on the August 2nd Loan was 0.6858%, or 250.3150% annually, more than the allowable interest rate pursuant to New York, Missouri, or Federal law. Further, by domiciling their business in New York, they take advantage of New York law which only permits commercial claims of usury as a defense to collection, thus insulating Defendants and each of them from New York's usury laws' limit of 25% per year. N.Y. PENAL LAW §190.42. Each of the following three transactions contained similar or more usurious rates. See, *Exhibits "2" through "5"*.

    <u>Culpable Persons</u>.

104.        MUSHEYEV, PMF, BURGER, BRUGMAN, BOOST and BENA are persons within the meaning of 18 U.S.C. § 1961(3) and § 1982(c) in that each is either an individual, corporation, or limited liability company capable of holding a legal interest in property.

105.        At all times mentioned herein, MUSHEYEV, PMF, BURGER, BRUGMAN, BOOST and BENA, were and are persons that exists separate and distinct from the Enterprise, described below.

The Enterprise.

106.        GFE constitutes an Enterprise (the "Enterprise") within the meaning of 18

U.S.C. §§ 1961(4) and 1962(c).

107.        Plaintiff is informed and believes and based thereon alleges that

MUSHEYEV is a principal and agent of GFE and exercised authority over the Enterprise

and has authority to execute contracts on behalf of the Enterprise. During the relevant

time period, MUSHEYEV controlled the transactions within the Enterprise.

108.        MUSHEYEV, PMF, BURGER, BRUGMAN, BOOST and BENA are

associated in fact for the common purposes of collecting on an unlawful debt.

Specifically, the Defendants, and each of them, engaged in a common goal of soliciting,

funding, servicing, and collecting upon usurious loans that charge interest at more than

twice the enforceable rate under the laws of the New York.

109.        Plaintiff is informed and believes and upon such information and believe

alleges that Defendants, and each of them, have worked together for a several years and

have enjoyed the benefits of construing loans as a purchase of future receivables in order

to avoid New York State usury laws and have used GFE to pursue such unlawful goals.

110.        At all times mentioned herein, and continuing through the present, the

members of the Enterprise have had ongoing relations with each other through common

control/ownership, and/or one or more contracts or agreements relating to and for the

purpose of originating, underwriting, servicing, and collecting upon unlawful debt issued

by the Enterprise to small businesses throughout the United States.

{01022152 }        33

111.       New York law looks primarily to the intent of the parties in determining

whether a transaction is a loan. As alleged above, the major indicia of whether a

transaction is a loan or purchase of future receipts is whether the risk of loss falls on the

lender or the borrower. Here, the Loan Documents provide no risk for Defendants and

each of them. Plaintiff is informed and believes that MUSHEYEV knew or should have

known that PMF and BOOST had completed transactions with Plaintiff with other MCA

lenders when Plaintiff was requested to execute the MCA agreements which included an

anti-stacking provision, rendering Plaintiff in serious default upon execution. Defendants

and each of them never intended to suffer any loss.

112.       Through their operation of GFE, MUSHEYEV, PMF, BURGER,

BRUGMAN, BOOST and BENA solicited, underwrote, funded, serviced and collected

an unlawful debt incurred by a Missouri-based small business, Plaintiff here, who was

their targeted victim.

113.       As a proximate result of the conduct of Defendants, and each of them,

Plaintiff has been damaged in a sum of approximately $1,142,123 constituting the

exorbitant interest collected by the Defendants; was required to file for protection under

the U.S. Bankruptcy Code, retained and paid counsel and is entitled to treble damages,

costs and attorney fees under 18 U.S. Code § 1964.

114.       Plaintiff requests that this Court enter a judgment against Defendants and

each of them, in the amount of Plaintiff's actual damages, plus treble damages, and

attorney's fee.

## FIFTH CLAIM FOR RELIEF:

## AVOIDANCE OF FRAUDULENT TRANSFER

## (AGAINST DEFENDANT GFE)

### (11 U.S.C. § 548(a)(l)(B), MO. REV. STAT. § 428.024,

### N.Y. DEBT. & CRED. LAW §§ 270-280)

115.        Plaintiff alleges Paragraphs 1 through 44, inclusive, and Paragraphs 47

through 64, inclusive, as though fully stated in full herein.

116.        GFE made four short term loans to Plaintiff, more fully described above in

paragraphs 32 through 44, inclusive, the terms of which required daily payments

designed to pay the balance over the course of between 111 to 218 business days, without

disclosing that Defendants were charging interest rates between 0.3659% daily and

.9827% daily, or an imputed annual interest rate between 133% and 358%. As a result,

each loan was usurious and unconscionable in violation of New York, Missouri, and

Federal law. In response to the tender of a total of $1,052,000, Plaintiff was to repay a

total of $1,437,523 within a total time period between August 2, 2021, when the first loan

proceeds were tendered, to November 14, 2022 when the final payment was made on the

last loan. This amounts to a period of approximately 15 months. The payments far exceed

what would have been paid under terms that included lawful interest, as showing on

*Exhibits "6" through "9"*, inclusive.

117.        As a result, Plaintiff did not receive reasonably equivalent value for the

obligations imposed on Plaintiff by the Loan Documents.

118.     GFE withdrew the Loan Transfers and Commission Transfers from the

Plaintiff's bank accounts within two years before the date of the filing of Plaintiff's

Petition.

119.     At the time GFE withdrew the Loan Transfers from Plaintiff's bank

account, Plaintiff was insolvent or became insolvent because of such transfers for the

following reasons:

a.       At the time each loan was made, the sum of the Debtor's liabilities, as

reflected in its balance sheets, was greater than the value of all of Plaintiff's property at a

fair valuation. Attached as *Exhibit 10* are copies of Plaintiff's balance sheets at or near

the time of the loans. The balance sheets reflect that at in and around the time of each of

the loans, the value of the Debtor's assets at fair value was less than the amount of its

debts;

b.       At the times of each of the loans, the Debtor was engaged in the business

of bidding, negotiating, entering into and providing construction services and labor on

construction projects. As part of this business, the Debtor maintained M&E, vehicles, had

employees for whom there were payroll costs including taxes. At the times of each of the

loans, the Plaintiffs' remaining assets, as reflected in its balance sheets at the various

times, were unreasonably small in relation to the loans with GFE. They were

unreasonably small because the loans called for large payments are frequent intervals and

these payments disrupted the Debtor's ability to meet its other expenses; and

c.         Plaintiff, in incurring the payment obligations under these five loans from
GFE, found itself in a position where it could not pay the loans as the regular payments
came due. As a result of these loans, Plaintiff was forced to obtain other financing, and
go deeper into debt, in order to meet its obligations to GFE.

120.        The Plaintiff made the Loan Transfers at a time when Plaintiff owed money
to at least one creditor, and such creditor holds an unsecured claim that is allowable
pursuant to 11 U.S.C. § 502.

121.        The Loan Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B) and
the *Uniform Voidable Transactions Act*, N.Y. DEBT. & CRED. LAW §§ 270-280.

122.        The Loan Transfers and Commission Transfers are avoidable pursuant to
11 U.S.C. § 548(a)(l)(B) and the Missouri Uniform Fraudulent Transfer Act, MO. REV.
STAT. § 428.024 and the Uniform Voidable Transactions Act, N.Y. DEBT. & CRED.
LAW §§ 270-280.

123.        Plaintiff is entitled to a judgment for relief in no less than the sums on
account of the Loan Transfers in the sum of $1,142,123 and in an amount according to
proof on account of the Commission Transfers.

124.        Plaintiff is entitled to recover its attorney fees.

///

///

///

///

**SIXTH CLAIM FOR RELIEF:**

**AVOIDANCE OF TRANSFERS**

**(AGAINST DEFENDANT GFE)**

(11 U.S.C. § 544)

125.        Plaintiff alleges Paragraphs 1 through 44, inclusive, and Paragraphs 47
through 64, inclusive, as though fully stated in full herein.

126.        GFE made four short term loans to Plaintiff, more fully described above in
paragraphs 32 through 44, inclusive, the terms of which required daily payments
designed to pay the balance over the course of between 111 to 218 business days, without
disclosing that Defendants were charging interest rates between 0.3659% daily and
.9827% daily, or an imputed annual interest rate between 133% and 358%. As a result,
each loan was usurious and unconscionable in violation of New York, Missouri, and
Federal law. In response to the tender of a total of $1,052,000, Plaintiff was to repay a
total of $1,437.523 within a total time period between August 2, 2021, when the first loan
proceeds were tendered, to November 14, 2022 when the final payment was made on the
last loan. This amounts to a period of approximately 15 months. The payments far exceed
what would have been paid under terms that included lawful interest, as showing on
*Exhibits "6" through "9"*, inclusive.

127.        As a result, Plaintiff did not receive reasonably equivalent value for the
obligations imposed on Plaintiff by the Loan Documents.

128.        GFE withdrew the Loan Transfers and Commission Transfers from the

Plaintiff's bank accounts within two years before the date of the filing of Plaintiff's

Petition.

129.        At the time GFE withdrew the Loan Transfers from Plaintiff's bank

account, Plaintiff was insolvent or became insolvent because of such transfers for the

following reasons:

a.        At the time each loan was made, the sum of the Debtor's liabilities, as

reflected in its balance sheets, was greater than the value of all of Plaintiff's property at a

fair valuation. Attached as *Exhibit 10* are copies of Plaintiff's balance sheets at or near

the time of the loans. The balance sheets reflect that at in and around the time of each of

the loans, the value of the Debtor's assets at fair value was less than the amount of its

debts;

b.         At the times of each of the loans, the Debtor was engaged in the business

of bidding, negotiating, entering into and providing construction services and labor on

construction projects. As part of this business, the Debtor maintained M&E, vehicles, had

employees for whom there were payroll costs including taxes. At the times of each of the

loans, the Plaintiffs' remaining assets, as reflected in its balance sheets at the various

times, were unreasonably small in relation to the loans with GFE. They were

unreasonably small because the loans called for large payments are frequent intervals and

these payments disrupted the Debtor's ability to meet its other expenses; and

c.          Plaintiff, in incurring the payment obligations under these five loans from

GFE, found itself in a position where it could not pay the loans as the regular payments

came due. As a result of these loans, Plaintiff was forced to obtain other financing, and

go deeper into debt, in order to meet its obligations to GFE.

130.        The Plaintiff made the Loan Transfers at a time when Plaintiff owed money

to at least one creditor, and such creditor holds an unsecured claim that is allowable

pursuant to 11 U.S.C. § 502.

131.        The Loan Transfers and Commission Transfers are avoidable pursuant to

11 U.S.C. § 544 and the Missouri Uniform Fraudulent Transfer Act, MO. REV. STAT. §

428.024 as well as the Uniform Voidable Transactions Act, N.Y. DEBT. & CRED. Law

§§ 270-280.

## SEVENTH CLAIM FOR RELIEF

## PRESERVATION AND RECOVERY OF TRANSFERS

## (AGAINST DEFENDANT GFE)

( 11 U.S.C. § 550)

132.        Plaintiff alleges Paragraphs 1 through 44, inclusive, and Paragraphs 47

through 64, inclusive, as though fully stated in full herein.

133.        GFE made four short term loans to Plaintiff, more fully described above in

paragraphs 32 through 44, inclusive, the terms of which required daily payments

designed to pay the balance over the course of between 111 to 218 business days, without

disclosing that Defendants were charging interest rates between 0.3659% daily and

.9827% daily, or an imputed annual interest rate between 133% and 358%. As a result, each loan was usurious and unconscionable in violation of New York, Missouri, and Federal law. In response to the tender of a total of $1,052,000, Plaintiff was to repay a total of $1,437.523 within a total time period between August 2, 2021, when the first loan proceeds were tendered, to November 14, 2022 when the final payment was made on the last loan. This amounts to a period of approximately 15 months. The payments far exceed what would have been paid under terms that included lawful interest, as showing on *Exhibits "6" through "9"*, inclusive.

134.        At the time GFE withdrew the Loan Transfers from Plaintiff's bank account, Plaintiff was insolvent or became insolvent because of such transfers for the following reasons:

a.        At the time each loan was made, the sum of the Debtor's liabilities, as reflected in its balance sheets, was greater than the value of all of Plaintiff's property at a fair valuation. Attached as *Exhibit 10* are copies of Plaintiff's balance sheets at or near the time of the loans. The balance sheets reflect that at in and around the time of each of the loans, the value of the Debtor's assets at fair value was less than the amount of its debts;

b.         At the times of each of the loans, the Debtor was engaged in the business of bidding, negotiating, entering into and providing construction services and labor on construction projects. As part of this business, the Debtor maintained M&E, vehicles, had employees for whom there were payroll costs including taxes. At the times of each of the

loans, the Plaintiffs' remaining assets, as reflected in its balance sheets at the various times, were unreasonably small in relation to the loans with GFE. They were unreasonably small because the loans called for large payments are frequent intervals and these payments disrupted the Debtor's ability to meet its other expenses; and

c.        Plaintiff, in incurring the payment obligations under these five loans from GFE, found itself in a position where it could not pay the loans as the regular payments came due. As a result of these loans, Plaintiff was forced to obtain other financing, and go deeper into debt, in order to meet its obligations to GFE.

135.        Plaintiff is informed and believes and based thereon alleges that PMF is the initial transferee of the Loan Transfers, or the entity for whose benefit the said Loan Transfers were made or is the immediate or mediate transferee of the initial transferee receiving such Loan Transfers.

136.        Pursuant to 11 U.S.C. § 550, the Plaintiff is entitled to recover the Loan Transfers, together with interest thereon.

137.        The Plaintiff is entitled to an order and judgment under 11 U.S.C. §§ 544, 547 and 548 as well as 11 U.S.C. §§ 550 and 551 that the Loan Transfers are avoidable and recoverable and preserved for the benefit of the Plaintiff's estate.

138.        The Loan Transfers in the sum of $1,142,123 are avoidable pursuant to 11 U.S.C. § 548(a)(l)(B), MO. REV. STAT. § 428.024, NY DEBT. & CRED. LAW §§ 270-280.

139.        Plaintiff moves to preserve and recover each transfer as provided by 11

U.S.C. §§ 550 and 551.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for a judgment as follows:

On its First Claim for Relief for Declaratory Relief:

1.        For a judicial declaration that the transactions in the Loan Documents are

loans of money under applicable law;

On Plaintiff's Second Claim for Relief for Fraud:

2.        For a judgment for Plaintiff and against Defendants in the sum of

$1,142,123;

3.        For recovery of the Commission Transfers paid to PMF because of the

Commission Transfers in a sum according to proof;

4.        For recovery of the Commission Transfers paid to BOOST because of the

Commission Transfers in a sum according to proof;

5.        Punitive damages in the sum of no less than $3,000,000.00 against GFE;

6.        Punitive damages in the sum of no less than $100,000.00 against PMF;

7.        Punitive damages in the sum of no less than $100,000.00 against BOOST;

On the Third Claim for Relief for RICO:

8.        For a judgment against Defendants in the amount of the Plaintiff's actual

damages, and attorneys' fees and costs as provided by law for no less than $1,000,000.00,

to be trebled as allowed by applicable law;

On the Fourth Claim for Relief Avoidance of Fraudulent Transfers:

     9.     For a judgment avoiding the Loan Transfers; and

     10.     For a judgment avoiding the Commission Transfers;

On Plaintiff's Fifth Claim for Relief for Avoidance of Transfers:

     11.     For a judgment avoiding the Loan Transfers; and

     12.     For a judgment avoiding the Commission Transfers;

On the Sixth Claim for Relief for Preservation and Recovery of Transfers:

     13.     For a judgment preserving and recovering for the benefit of the estate the avoidable transfers described in the Fourth and Fifth Claims for Relief as provided in 11 U.S.C. §§ 550 and 551;

On all Claims for Relief:

     14.     For costs incurred herein;

     15.     For attorney fees according to proof; and,

     16.     For such other and further relief as the Court deems just and proper.

Dated: July 9, 2024          THE FOX LAW CORPORATION, INC.


          By: /s/ Steven R. Fox
          Steven R. Fox, CA State Bar No. 138808
          17835 Ventura Blvd, Suite 306,
          Encino, California A 91316
          Tel: (818) 774-3545; Fax (818) 774-3707
          Srfox@foxlaw.com

EVANS & MULLINIX, P.A.


By: /s/ Colin N. Gotham
Colin N. Gotham, KS #19538; MO#52343
7225 Renner Road, Suite 200
Shawnee, KS 66217
Tel: (913) 962-8700; Fax: (913) 962-8701
cgotham@emlawkc.com

Counsel for Debtor-in-Possession, JLK
Construction, LLC

**Index of Exhibits**

| | |
|---|---|
| *Exhibit "1"* | PMF Consulting Agreement |
| *Exhibit "2"* | August 2, 2021 Loan Documents |
| *Exhibit "3"* | December 7, 2021 Loan Documents |
| *Exhibit "4"* | July 13, 2022 Loan Documents |
| *Exhibit "5"* | August 5, 2022 Loan Documents |
| *Exhibit "6"* | August 2nd Loan Transfers |
| *Exhibit "7"* | December 7th Loan Transfers |
| *Exhibit "8"* | July 13th Loan Transfers |
| *Exhibit "9"* | August 5th Loan Transfers |
| *Exhibit "10"* | Plaintiff's Balance Sheets for 2020, 2021 2022 |