# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re:<br><br>JLK CONSTRUCTION, LLC,<br><br>               Debtor. | Case No.: 23-50034-btf11<br>Chapter 11 |
| JLK CONSTRUCTION, LLC,<br><br>          Plaintiff,<br><br>v.<br><br>GFE NY, LLC, a New York limited liability company; WHITE ROAD CAPITAL, LLC, SERIES 120785, dba GFE HOLDINGS, a Delaware limited liability company; WHITE ROAD CAPITAL, LLC, SERIES 127009 DBA GFE HOLDINGS, a Delaware limited liability company; PREMIUM MERCHANT FUNDING 18, LLC, a Delaware limited liability company; ABE BURGER, an individual; SAMUEL A. BRUGMAN, an individual; BOOST CAPITAL GROUP, LLC, a New York limited liability company; ZAC BENA, an individual,<br><br>         Defendants. | Adv. Pro. No. 23-4033-BTF |

## SECOND AMENDED COMPLAINT FOR:

**DECLARATORY RELIEF; FRAUD; RACKETEERING (18 U.S.C. § 1962); AVOIDANCE OF FRAUDULENT TRANSFERS; AVOIDANCE OF TRANSFERS; AND PRESERVATION AND RECOVERY OF TRANSFERS**

1

# I.

## INTRODUCTION,
## JURISDICTION, AND VENUE

Plaintiff JLK CONSTRUCTION, LLC, a Missouri limited liability company, the

debtor and debtor-in-possession in the above-entitled case (the "Debtor" or "Plaintiff")

hereby respectfully alleges and states as follows:

1.      Plaintiff, a Missouri limited liability company, is the debtor and

debtor-in-possession in the Bankruptcy Case, with the rights, powers, and duties of a

trustee. 11 U.S.C. §§1107 and 704.

2.      At all times herein mentioned, Defendant GFE NY, LLC is a New York

corporation ("GFE") which is not and was not registered to transact business in the State

of Missouri, and which therefore unlawfully transacted business in the State of Missouri

when it fraudulently induced a small Missouri business, the Plaintiff here, to enter

fraudulent loans, in violation of MO. REV. STAT. § 347.153 (2015).

3.      At all times herein mentioned, Defendant WHITE ROAD CAPITAL, LLC

SERIES 120785, dba GFE HOLDINGS, is a Delaware limited liability company

("WHITE ROAD 1").  At all times mentioned herein, WHITE ROAD 1 was not

registered to transact business in the State of Missouri, and which therefore unlawfully

transacted business in the State of Missouri when they fraudulently induced a small

Missouri business, the Plaintiff here, to enter fraudulent loans, in violation of MO. REV.

STAT. § 347.153 (2015).

4.      At all times herein mentioned, Defendant WHITE ROAD CAPITAL, LLC

SERIES 127009, dba GFE HOLDINGS, is a Delaware limited liability company

("WHITE ROAD 2").  At all times mentioned herein, WHITE ROAD 2 was not

registered to transact business in the State of Missouri, and which therefore unlawfully

transacted business in the State of Missouri when they fraudulently induced a small

Missouri business, the Plaintiff here, to enter fraudulent loans, in violation of MO. REV.

STAT. § 347.153 (2015)

5.      At all times herein mentioned, Defendant PREMIUM MERCHANT

FUNDING 18, LLC, is a Delaware limited liability company with its principal place of

business in New York ("PMF") which is not and was not registered to transact business in

the State of Missouri, and which therefore unlawfully transacted business in the State of

Missouri in violation of MO. REV. STAT. § 347.153 (2015), when it brokered a loans

between Plaintiff to make fraudulent loans that Defendants, and each of them,

misleadingly labeled a sale of "future receipts."  Plaintiff is further informed and believes

and based thereon alleges that PMF solicits loans and brokers loans for other lenders who

made loans to this Debtor, including, but not limited to GCM Capital, LLC, in addition to

making a loan directly to Plaintiff.

6.      Plaintiff is informed and believes and based thereon alleges that Defendant

ABE BURGER, is an individual residing in the State of New York ("BURGER") and the

Chief Operations Officer of PMF.

7.      Plaintiff is informed and believes and based thereon alleges that Defendant

SAMUEL A. BRUGMAN, is an individual residing in the State of Michigan

("BRUGMAN") and an agent of PMF.

8.      At all times herein mentioned, Defendant BOOST CAPITAL GROUP,

LLC, is a New York limited liability company ("BOOST").  At all times mentioned

herein, BOOST was not registered to transact business in the State of Missouri, and

which therefore unlawfully transacted business in the State of Missouri in violation of

MO. REV. STAT. § 347.153 (2015) when it fraudulently induced a small Missouri

business, the Plaintiff here, to enter fraudulent loans that Defendants misleadingly labeled

a sale of "future receipts."  Plaintiff is further informed and believes and based thereon

alleges that BOOST solicits loans and brokers loans for other lenders who made loans to

this Debtor, including, but not limited to Alva Advance, LLC, EIN CAP, FFCG, LLC,

and Fundamental Capital, LLC.

9.      At all times mentioned herein, Defendant ZAC BENA  ("BENA") is an

employee and agent of Defendant BOOST, and at all relevant times was, an individual,

conducting business within this judicial district.

10.     Plaintiff filed a petition under Chapter 11 of Title 11 of the United States

Code on February 13, 2023 (the "Petition Date"), initiating In re JLK Construction, LLC,

Case No. 23-50034-BTF (the "Bankruptcy Case").

11.     The claims in this adversary proceeding arise in and relate to the

Bankruptcy Case.

12.     The Bankruptcy Court has jurisdiction over this adversary proceeding

pursuant to 28 U.S.C. §§ 157 and 1334(b).

13.     This adversary proceeding is a core proceeding under, *inter alia*, 28 U.S.C. §§ 157(b)(2)(A), (E), (F) and (H) and (O).

14.     If this adversary proceeding is determined to be a non-core proceeding, Plaintiff consents to the entry of final orders and judgments by the bankruptcy judge. Plaintiff notifies each Defendant that Fed. R. Bankr. P. 7012(b) requires it to admit or deny whether this adversary proceeding is a core or non-core proceeding and, if non-core, to state whether each Defendant consents, or does not consent, to the entry of final orders or judgment by the bankruptcy judge.

15.     This adversary proceeding is a civil proceeding arising in and related to the Bankruptcy Case, and such case is pending before this Court. Accordingly, venue in this Court is proper under 28 U.S.C. § 1409(a).

16.     Defendants GFE, WHITE ROAD 1 and WHITE ROAD 2 utilized an almost identical Merchant Agreement in each of the four loans.  Each agreement contains the GFE logo at the top of the agreement.  They all utilize the same telephone numbers, URL and Email address.  Both WHITE ROAD 1 and WHITE ROAD 2 are each doing business as GFE Holdings, as provided in the July 13 Loan and August 5 Loan.  Because of the apparent relationship between these entities, when an allegation is common to each of these lenders, they will be referred to as the "LENDERS."

17.     Plaintiff is unaware of the names of other potential defendants who may be responsible for the unlawful practices, acts, conduct, and occurrences alleged herein.

5

Plaintiff will seek leave of the Court to amend this Complaint to allege the true names and

capacities of these unknown defendants, and to detail the roles they played once Plaintiff

ascertains their identities and/or their manner of participation in the wrongful conduct

herein described.

18.    At all relevant times, as alleged more fully herein, each Defendant acted as

an agent, servant, employee, co-conspirator, alter-ego and/or joint-venturer of the other

Defendant, and in doing the things alleged herein acted within the course and scope of

such agency, employment, alter-ego and/or in furtherance of the joint venture. Each one

of Defendants' alleged actions was done with the permission and consent of each of the

other Defendants.

19.    At all relevant times, as alleged more fully herein, PMF was and is a loan

broker for the LENDERS acting as its agent, servant, employee, co-conspirator, alter-ego

and/or joint-venturer of the other and in doing the things alleged herein acted within the

course and scope of such agency, employment, alter-ego and/or in furtherance of the joint

venture. Each act of said Defendants alleged herein was done with the permission and

consent of each of the other Defendants.

20.    At all relevant times, as alleged more fully herein, BOOST was and is a

loan broker for the LENDERS acting as its agent, servant, employee, co-conspirator,

alter-ego and/or joint-venturer of the other and in doing the things alleged herein acted

within the course and scope of such agency, employment, alter-ego and/or in furtherance

of the joint venture. Each act of said Defendants alleged herein were done with the

permission and consent of each of the other Defendants.

## II.

## FACTUAL BACKGROUND

21.     Beginning on or about 2019, Plaintiff received telephone solicitations from PMF, offering PMF's Premium Business Financing Service and Custom Small Business Solutions, which includes credit servicing, credit card processing, bookkeeping, payroll, SEO (Search Engine Optimization), and employee retention credit program as well as Merchant Cash Advances, Line of Credit, Equipment Financing, Mortgage Financing, Term Loans, Factoring, P.O. Financing, and SBA Loans.  PMF offers business consulting services in addition to brokering loans and making loans itself.

22.     On or about February 1, 2022 by interstate cell phone communication and interstate e-mail communication, PMF's Premium Financing Service pitch to Plaintiff was that:

a.      Lenders for which it brokered transactions were legitimate business lenders;

b.      Lenders for which it brokered transactions charged reasonable interest rates;

c.      Loans which it brokered were based on commercially reasonable terms that would be repaid from daily or weekly withdrawals from Plaintiff's bank account; and

d.      Lenders for which it brokered transactions would work with Plaintiff just like a bank but would be easier to work with than a bank.

23.     On or about February 14, 2022, Plaintiff and Defendant PMF executed a one-year Consulting Agreement pursuant to which PMF contracted to provide a:

7

... broad array of services and solutions for small businesses. PMF advises
merchants on reliable, safe, and innovative financing and payments
solutions combined with *individualized* attention to provide *tailored*
solutions that respond to the various needs of the business, including but not
limited to Accounting, Payroll Processing, Marketing, Branding and more.
Our all-inclusive bundle will provide Client with a thorough review of the
various metrics of their business and provided *tailored* solutions that solve
the business's most pressing needs. (Emphasis added.)

A true and correct copy of PMF's Consulting Agreement is attached hereto as *Exhibit*

*"1"* and incorporated herein as though fully set forth.

24.     Pursuant to the Consulting Agreement, Plaintiff agreed to pay a 9% flat fee

commission for PMF's services payable at the earlier of the (i) completion of any of the

services contemplated by the Consulting Agreement or (ii) the delivery of any financing.

25.     Plaintiff is informed and believes, and based thereon alleges that BOOST is

a loan broker.

26.     Beginning in or about 2020, Plaintiff received interstate telephone

solicitations from BOOST, offering brokering services.

27.     BOOST's lending pitch to Plaintiff was that:

a.      Lenders for which it brokered transactions were legitimate business lenders;

b.      Lenders for which it brokered transactions charged reasonable interest rates;

c.      Loans which it brokered were based on commercially reasonable terms that

would be repaid from daily or weekly withdrawals from Plaintiff's bank account; and

d.      Lenders for which it brokered transactions would work with Plaintiff just

like a bank but would be easier to work with than a bank.

8

28.     When Defendants made the foregoing representations and offered financing to Plaintiff, Defendants LENDERS, PMF, and BOOST, and each of them, were aware of the following facts:

A.     Plaintiff was a Missouri limited liability company;

B.     Plaintiff had no regular business operations outside of Missouri; and

C.     Plaintiff had no contacts with New York, the stated jurisdiction, venue, and choice of law designated by the transaction documents.

29.     GFE made two short term loans and WHITE ROAD 1 and WHITE ROAD 2 each made one loan to Plaintiff, more fully described below, the terms of which required daily payments designed to pay the balance over the course of between 111 to 218 business days, without disclosing that Defendants were charging interest rates between 0.3659% daily and .9827% daily, or an imputed annual interest rate between 133% and 358%. As a result, each loan was usurious and unconscionable in violation of New York, Missouri, and Federal law.

30.     Defendants and each of them, had actual and constructive knowledge that they were brokering or making loans without disclosing the interest rate that Defendants purported to charge Plaintiff.

**THE MERCHANT CASH ADVANCE AGREEMENTS AT ISSUE**

31.     On or about August 2, 2021, GFE made a loan of money to Plaintiff in the amount of $125,000.00 (the "August 2nd Loan"), for which Plaintiff was required to repay Defendant the sum of $180,000.00 ("Receivables Purchased Amount") within 139

business days. PMF brokered the loan between Plaintiff and GFE. Attached hereto as

*Exhibit "2"* is a true and correct copy of the Merchant Agreement ("August 2nd Loan

Documents") pursuant to which GFE made such loan to Plaintiff. Plaintiff paid GFE

$97,500.00.  Pursuant to the Weekly Advance Addendum to Merchant Agreement,

attached hereto as part of *Exhibit "2."*  The loan was broken into 10 weekly amounts.

32.     The effective daily interest rate on the August 2nd Loan was 0.6858%, or

250.3150% annually, more than the allowable interest rate pursuant to New York,

Missouri, or Federal law.

33.     On December 7, 2021, GFE made a loan of money to Plaintiff in the

amount of $600,000.00 (the "December 7th Loan"), for which Plaintiff was required to

repay Defendant the sum of $870,000.00 ("Receivables Purchased Amount") within 218

business days. PMF brokered the loan between Plaintiff and GFE. Attached hereto as

*Exhibit "3"* is a true and correct copy of the Merchant Agreement ("December 7th Loan

Documents") pursuant to which GFE made such loan to Plaintiff. Plaintiff paid GFE

$893,994.00.

34.     The effective daily interest rate on the December 7th Loan was 0.3659%, or

133.5360% annually, more than the allowable interest rate pursuant to New York,

Missouri, or Federal law.

35.     On July 13, 2022, WHITE ROAD 1 made a loan of money to Plaintiff in

the amount of $277,000.00 (the "July 13th Loan"), for which Plaintiff was required to

repay Defendants the sum of $387,523.00 ("Receivables Purchased Amount") within 156

weeks. PMF brokered the loan between Plaintiff and GFE. Attached hereto as *Exhibit "4"* is true and correct copy of the Merchant Agreement July 13th Loan Documents pursuant to which WHITE ROAD 1 made such loan to Plaintiff. Pursuant to the Weekly Advance Addendum to Merchant Agreement, attached hereto as part of *Exhibit "4"*, the loan was broken into 18 weekly amounts; the lender only advanced 4 of the of the 18 installments for a total of $64,331.00. On July 28, 2022, WHITE ROAD 1 withdrew $60,716.29; in total, Plaintiff paid WHITE ROAD 1 the sum of $83,207.29.

36.     The effective daily interest rate on the July 13th Loan was 0.4640%, or 169.350% annually, more than the allowable interest rate pursuant to New York, Missouri, or Federal law.

37.     On August 5, 2022, WHITE ROAD 2 doing business as GFE Holdings made a loan of money to Plaintiff in the amount of $50,000.00 (the "August 5th Loan"), for which Plaintiff was required to repay WHITE ROAD 2 doing business as GFE Holdings the sum of $64,950.00 ("Receivables Purchased Amount") within 111 business days. BOOST brokered the loan between Plaintiff and WHITE ROAD 2 doing business as GFE Holdings. Attached hereto as *Exhibit "5"* is a true and correct copy of the Merchant Agreement ("August 5th Loan Documents") pursuant to which it made such loan to Plaintiff. Plaintiff paid WHITE ROAD 2 doing business as GFE Holdings $67,421.80. The August 2nd Loan Documents, December 7th Loan Documents, July 13th Loan Documents and August 5th Loan Documents are hereinafter collectively referred to as "Loan Documents."

11

38.     Plaintiff made the series of transfers to GFE identified in *Exhibit "6"* attached hereto on account of the August 2nd Loan ("August 2nd Loan Transfers") from Plaintiff's property in the sum of $97,500.00.

39.     Plaintiff made the series of transfers to GFE identified in *Exhibit "7"* attached hereto on account of the December 7th Loan ("December 7th Loan Transfers") from Plaintiff's property in the sum of $893,994.00.

40.     Plaintiff made the series of transfers to WHITE ROAD 1 doing business as GFE Holdings identified in *Exhibit "8"* attached hereto on account of the July 13th Loan ("July 13th Loan Transfers") from Plaintiff's property in the sum of $83,207.29.

41.     Plaintiff made the series of transfers to WHITE ROAD 2 doing business as GFE Holdings identified in *Exhibit "9"* attached hereto on account of the August 5th Loan ("August 5th Loan Transfers") from Plaintiff's property in the sum of $67,421.80.

42.     Plaintiff made transfers to PMF on account of the August 2nd, December 7th and July 13th Loan ("PMF Commission Transfers") from Plaintiff's property in an amount according to proof.

43.     Plaintiff made the transfer to BOOST on account of the August 5th Loan ("BOOST Commission Transfers") from Plaintiff's property in an amount according to proof.

///

///

///

## FIRST CLAIM FOR RELIEF:

## DECLARATORY RELIEF
## (AGAINST ALL DEFENDANTS)

44.     Plaintiff alleges Paragraphs 1 through 43, inclusive, as though fully stated
in full herein.

45.     Defendants, and each of them, are in the business of brokering and/or
funding predatory loans to small businesses.

46.     Beginning in or about 2019, Defendant PMF continually solicited Plaintiff's
business, offering various lending options to Plaintiff to facilitate its Plaintiff's cash flow.
In 2020, Defendant BOOST began soliciting Plaintiff, offering its brokering services.

47.     Separately, they each pitched to Plaintiff that:

a.   The many lenders for which they brokered transactions were legitimate
business lenders;

b.   The many lenders for which they brokered transactions charged reasonable
interest rates;

c.   The loans which they brokered were based on commercially reasonable
terms that would be repaid from daily or weekly withdrawals from Plaintiff's bank
account; and

d.   The many lenders for which they brokered transactions would work with
Plaintiff just like a bank but would be easier to work with than a bank.

48.     When BOOST and PMF made the foregoing representations and offered

13

financing to Plaintiff, they were aware of the following facts:

      a.  Plaintiff was a Missouri limited liability company;

      b.  Plaintiff had no regular business operations outside of Missouri; and

      c.  Plaintiff had no contacts with New York, the LENDERS' place of business and state of organization, the stated jurisdiction, venue, and choice of law designated by the Loan Documents attached as *Exhibits "2," "3," "4 " and "5."*

49.    Defendants and each of them's only concern was and is whether they could collect in the event of a default, and not whether the Plaintiff, a small business, could survive.

50.    At all times mentioned, Plaintiff was interested in capital loans to help the company move forward.  What Plaintiff received from the LENDERS were Loan Documents which identified themselves as purchases of future receipts.  Documents for the transactions were forwarded to Plaintiff electronically and followed by phone calls intended to speed Plaintiff's execution by indicating the funds were ready to deposit in Plaintiff's account and encouraging Plaintiff's principal to execute the documents without actually reading them.  This deprived Plaintiff of the opportunity to uncover the bait and switch from a genuine loan to a purchase of future receivables.

51.    The transactions themselves were concealed loans rather than future receipt purchases because the terms of the transactions provided the LENDERS with the right to repayment under all circumstances, including the right to deny reconciliation requests. The Loan Documents shifted the risk of nonpayment to Plaintiff and did not bear a

substantial risk of nonpayment because of provisions in the agreement.

52.     None of the Loan Documents identify Plaintiff's receivables that the
LENDERS purported to purchase by date, percentage, name, or any other identifying data
that could demonstrate Plaintiff's ownership of such receivables. Plaintiff made no
alterations to any of the LENDERS' form documents, which are contracts of adhesion.  A
true purchase of future receivables would provide a means to collect from the obligors of
those receivables who would actually owe the obligation.  Instead, the LENDERS simply
took funds directly from Plaintiff's bank account without any consideration of whether
those funds represent any receivables purchased.

53.     The Loan Documents violate New York law because each one fails to
disclose the interest rate, which is a material term of the contract for a loan. The annual
interest rate or cost of funding that the LENDERS charged to Plaintiff and which Plaintiff
paid was more than 25%, which exceeds the maximum interest rate permitted by New
York law. N.Y. Penal Law §190.42.

54.     Defendants, and each of them, intentionally failed to disclose a material
term of the loans by failing to disclose the interest rate that the Defendants charged to the
Plaintiff by fraudulently labeling the loan a sale of "future receipts." In fact, Plaintiff sold
nothing. The transactions offered and executed were and are loans of money,
notwithstanding the language at Section 1.9 that "Merchant and [the LENDERS] agree
that the Purchase Price under this Agreement is in exchange for the Purchased amount
and that such Purchase Price is not intended to be, nor shall be construed as a loan from

[the LENDERS] to Merchant," contained in each agreement attached as *Exhibits "2" through "4"* inclusive.

55.    The LENDERS intentionally misled Plaintiff by placing on the first page of each Loan Document a summary table showing a percentage rate of 15% or less.  This was intended to confuse, mislead, and trick Plaintiff into believing that the stated percentage was the interest rate for the loan, when in fact, the percentage rate related to the percentage of daily receivables to be deducted from Plaintiff's bank account until the loan was repaid.

56.    The LENDERS, knew or had reason to know, that the loans bore an interest at a rate of more than 25% per annum.

57.    The LENDERS, knew, or had reasons to know, that Plaintiff would pay them interest at a rate more than 25% on all funds received from the loans.

58.    At the time the LENDERS made the loans to Plaintiff, they were transacting interstate business in Missouri through repeated and successive transactions of business with Plaintiff, making loans to Plaintiff from August 2021 through August 2022 and taking repeated payments from Plaintiff's bank account beginning in August 2021 through November 2022.

59.    The LENDERS violated Missouri law because despite that none of the Defendants were authorized to conduct business in Missouri, each continued to do business in the State of Missouri and to make loans and withdraw money from Plaintiff's bank account in Missouri in violation of Missouri law.

60.     Plaintiff made the series of transfers to the the LENDERS identified in *Exhibits "6"* through *"9"* which are attached for informational purposes only and are subject to amendment, and specifically incorporated herein by this reference, on account of the loans from the property of Plaintiff in the sum of $1,142,123.09 ("Loan Transfers").

61.     Plaintiff contends that the transactions documented by the Loan Documents are loans; Defendants, and each of them contend that the transactions are sales of future receivables.

62.     Despite their documents form, the transactions are, in economic reality, loans that are absolutely repayable. The true nature of the Loan Documents contain hallmarks of a loan are more fully set forth:

a.     The agreements relied on the Plaintiff's creditworthiness, rather than the creditworthiness of Plaintiff's customers, who owed Plaintiff receivables;

b.     Section 1.11 titled "Protections against Default," *see, e.g., Exhibit "1"*, includes an acceleration clause making the balance due and payable upon the event of default, thereby shifting the burden of loss to Plaintiff. ¶ 1.11 Protection 1;

c.     The LENDERS have recourse against Plaintiff's principal based on the guaranty executed concurrently with the loans, shifting risk of loss to Plaintiff. *See, e.g., Exhibit "1"*, ¶ 1.11 Protection 2 & ¶ 3.2 Personal Guaranty;

17

d.      The LENDERS required Confessions of Judgment shifting risk of loss to

Plaintiff which the LENDERS are authorized to execute on behalf of

Plaintiff, shifting the. *See, e.g., Exhibit "1", ¶* 1.11 <u>Protection 3</u>;

e.      The LENDERS has a right of recourse against Plaintiff based on the

security agreement executed concurrently with the loans and because the

Loan Documents provide that Plaintiff grants the LENDERS a security

interest, shifting risk of loss to Plaintiff. *See, e.g., Exhibit "1", ¶* 1.11

<u>Protection 4</u>;

f.      The LENDERS may proceed to protect and enforce its rights and remedies

by lawsuit in which Plaintiff shall be liable for all costs and attorneys' fees,

shifting risk of loss to Plaintiff. *See, e.g*., *Exhibit "1", ¶* 1.11 <u>Protection 5</u>

and <u>Protection 6</u>;

g.      The LENDERS may exercise its rights under the assignment of Plaintiff's

lease, shifting risk of loss to Plaintiff. *See, e.g., Exhibit "1", ¶* 1.11

<u>Protection 7</u>;

h.      The LENDERS may debit Plaintiff's depository accounts wherever situated

by means of ACH, shifting risk of loss to Plaintiff. *See, e.g., Exhibit "1", ¶*

1.11 <u>Protection 8</u>;

i.      Events of default include any violation of the agreement as outlined in

Section 1.11 of *Exhibit "1"* and is funds are unavailable for transfer via

ACH or any other default; *See, e.g., Exhibit "1", ¶* 3.1 <u>Events of Default</u>;

18

j.      The Loan Documents do not provide a specific reconciliation provision. However, the second boilerplate paragraph on the first page of each agreement provides that the LENDERS will reconcile Plaintiff's account from Plaintiff's bank statements within 3 days and issue a refund for any overpayments taken by the LENDERS.  Plaintiff provided the LENDERS with its bank pass codes for full access to Plaintiff's bank account.  The LENDERS, however, never reconciled Plaintiff's payments nor offered to do so after the loans were processed, which shifted the risk of loss to Plaintiff; and,

k.      The selection of daily payment rates did not represent a good faith estimate of receivables.

63.     The LENDERS' Loan Documents provide for recovery of attorneys' fees and costs and Plaintiff is therefore entitled to an award of attorneys' fees and costs pursuant to New York Law, N.Y. DEBT. & CRED. LAW § 278(A).

64.     Plaintiff seeks a declaration by the Court that the transactions which are the subject of this action are disguised loans and not a sale of future receivables.

## SECOND CLAIM FOR RELIEF:

### FRAUD
### (AGAINST PMF, BRUGMAN, BOOST and BENA)

65.     Plaintiff alleges Paragraphs 1 through 43, inclusive, and Paragraphs 45 through 64, inclusive, as though fully stated in full herein.

66.    PMF is in the business of making and brokering loans to small businesses such as Plaintiff.

67.    BOOST is a loan broker. "We help trusted businesses get money for businesses funding as quickly and efficiently as possible with funding from Boost Capital Group. We can help commercial clients looking for an increase in capital through business funds by simplifying the process for approval." (www.boostcapitalgroup.com.)

68.    Beginning in or about 2019, BOOST through its agent, BENA, continually solicited Plaintiff's business, offering various lending options to Plaintiff to facilitate Plaintiff's cash flow.

69.    PMF, through its agent BRUGMAN, and BOOST, through its agent BENA, each pitched Plaintiff was that:

a.    The many lenders for which they brokered transactions were legitimate business lenders;

b.    The many lenders for which they brokered transactions charged reasonable interest rates;

c.    The loans which they brokered were based on commercially reasonable terms that would be repaid from daily or weekly withdrawals from Plaintiff's bank account; and,

d.    The many lenders for which it brokered transactions would work with Plaintiff just like a bank but would be easier to work with than a bank.

70.    When BRUGMAN on behalf of PMF and, BENA on behalf of BOOST

made the foregoing representations and offered financing to Plaintiff, they were aware of

the following facts:

    a.     Plaintiff was a Missouri limited liability company;

    b.     Plaintiff had no regular business operations outside of Missouri; and

    c.     Plaintiff had no contacts with New York, Defendant the LENDERS' place

           of business and state of organization, the stated jurisdiction, venue, and

           choice of law designated by the the LENDERS' Loan Documents.

71.    Throughout the initial negotiations for credit, Plaintiff only inquired about a

loan.  Plaintiff is a small Missouri business operated by a single individual with limited

resources, education, and experience in lending.  Plaintiff was never informed prior to

entering any of the agreement that there would be no interest rate because the transaction

was a purchase of receivables.

72.    When Plaintiff agreed to the transaction, it believed it was obtaining a loan.

When the Loan Documents were electronically transmitted to Plaintiff's principal, they

were followed up with a calls from BRUGMAN of PMF or BENA of BOOST, who

discouraged any review of the transaction document and focused Plaintiff to simply sign

the agreement without reading the document.  Plaintiff was rushed through the process

with statements about funds being ready to deposit in Plaintiff's bank account for

immediate use.  In a text box on the signature page, a percentage rate of 15% or less was

prominently displayed.  There was no reason for Plaintiff to assume that referred to

anything other than a legal interest rate.

73.    There had never been a meeting of the minds because neither BOOST or its agent or PMF or its agent disclosed the transaction was not as described during negotiations and prevented Plaintiff from conducting a review of the agreement prior to execution.

74.    Notwithstanding that BENA, BOOST, BRUGMAN and PMF knew, or should have known Plaintiff's financial condition, from August 2, 2021 through August 5, 2022, PMF and BOOST brokered and the LENDERS made four short term loans to Plaintiff, more fully described above, the terms of which required daily payments designed to pay the balance over the course of between 111 to 218 business days, without disclosing that Defendants were charging an interest rate between 0.3659% daily and .9827% daily, or an imputed annual interest rate between 133% and 358%. As a result, each loan was usurious and unconscionable in violation of New York, Missouri, and Federal law.

75.    Plaintiff is informed and believes and based thereon alleges that at all times herein mentioned, that the LENDERS, PMF, BRUGMAN, BOOST and BENA, and each of them, had actual and constructive knowledge that each was engaging in bait and switch tactics to induce Plaintiff to enter transactions to which it did not agree.  As the stated percentage rate identified on the Loan Documents' first page was understood by Plaintiff to be an interest rate, when calculated on what was actually paid to the LENDERS the interest rate would have been significantly higher than 15% or less, approaching 358% in some instances.  Plaintiff would not have agreed to such unreasonable interest rates.

76.     Had Plaintiff known the truth that the agreements purported to be sales of receivables at extremely high rates of return far in excess of any legal interest imposed by a lawful loan, it would never have entered the transactions.

77.     PMF, through its agent BRUGMAN, and BOOST, through its agent BENA, each separately and fraudulently represented to Plaintiff that the interest rate chargeable for each loan was reasonable and lawful, when in fact they presented Loan Documents drafted with the intent of avoiding usurious interest rates greater than the allowed rates pursuant to New York law.

78.     The LENDERS, PMF, BRUGMAN, BOOST and BENA knew or should have known that they falsely substituted terms of a sale of future receipts and employed an electronic means to sign the agreements in such a way as to conceal the true nature of the documents.

79.     Plaintiff justifiably relied upon representations that it would be obtaining a loan because only a loan was requested and in response to inquiry regarding interest rates, Plaintiff was informed they were to be reasonable and lawful.  Having entered a consulting agreement with PMF in February of 2022, PMF and BRUGMAN assumed fiduciary duties towards Plaintiff to advise on business and finance matters.  See, *Exhibit "1."*  Plaintiff is justified because it was never told that there would be no interest and why and could rely upon trusted advisers.  Plaintiff was induced to execute the Loan Documents by the Defendants, and each of them, as alleged herein without examining the terms contained within the documents.  In so doing, Defendants and each of them aided

23

and abetted each other to accomplish the task of deflecting Plaintiff from knowing the true nature of the agreements to enable the LENDERS to collect usurious interest.

80.     As a proximate result of the conduct by Defendants and each of them, Plaintiff has been damaged in a sum of not less than $1,142,123 on account of the Loans Transfers, as set forth in *Exhibits "6" through "9"*, inclusive, and in a sum according to proof on account of the PMF and BOOST Commission Transfers.

81.     Plaintiff justifiably relied upon these false representations, because its principal sought reasonable and lawful interest and was never told there would be no interest as it was not a loan.  Plaintiff was induced to execute the Loan Documents by these fraudulent and deceitful material falsehoods and concealments, believing the LENDERS',  PMF's, BRUGMAN's, BOOST's and BENA's statements to be true.

82.     PMF's conduct with respect to Plaintiff was egregious and directed at Plaintiff by charging it interest rate that is more than the interest rate that is considered criminal usury and in fact, felonious usury pursuant to New York law, which was a pattern of activity directed to the public generally and Plaintiff is entitled to punitive damages in the sum of $100,000.00.

83.     Boost's conduct with respect to Plaintiff was egregious and directed at Plaintiff by charging it interest rate that is more than the interest rate that is considered criminal usury and in fact, felonious usury pursuant to New York law, which was a pattern of activity directed to the public generally and Plaintiff is entitled to punitive damages in the sum of $100,000.00.

84.     The LENDERS' conduct with respect to Plaintiff was egregious and

directed at Plaintiff by charging it interest rate that is more than the interest rate that is

considered criminal usury and in fact, felonious usury pursuant to New York law, which

was a pattern of activity directed to the public generally and Plaintiff is entitled to

punitive damages in the sum of $3,000,000.00.

### THIRD CLAIM FOR RELIEF:

### RACKETEERING - (18 U.S.C. § 1961, et. seq.)
### (AGAINST GFE, WHITE ROAD 1, WHITE ROAD 2, PMF, BURGER, BRUGMAN, BOOST and BENA)

85.     Plaintiff alleges  Paragraphs 1 through 43, inclusive, Paragraphs 45 through

64, inclusive, and Paragraphs 66 through 81, inclusive, as though fully stated in full

herein.

86.     The Merchant Cash Advance ("MCA") industry is a predatory lending

industry charging exorbitant interest rates. Predatory lending is based based on the ability

to collect, rather than the ability of the borrower to repay without going out of business.

The MCAs receive the much of their revenues from the origination process rather than

from the performance of the loan.

87.     A fundamental characteristic of predatory lending is the aggressive

marketing of credit to prospective borrowers who simply cannot afford the credit on the

terms being offered. Typically, such credit is underwritten predominately on the basis of

liquidation value of the collateral, without regard to the borrower's ability to service and

repay the loan according to its terms absent resorting to that collateral.

88.    In addition to charging unlawful interest, the scheme is designed to trap

small businesses, like Plaintiff, into a never-ending spiral of debt similar to a payday

lending where the small business has to take out additional loans to a prior one.

89.    Although the Loan Documents refer to the transaction as a sale of

receivables, the transactions were, in fact, loans.  The true nature of the Loan Documents

contain hallmarks of a loan are more fully set forth:

a.    The agreements relied on the Plaintiff's creditworthiness, rather than the

creditworthiness of Plaintiff's customers, who owed Plaintiff receivables;

b.    Section 1.11 titled "Protections against Default," *see, e.g., Exhibit "1"*,

includes an acceleration clause making the balance due and payable upon

the event of default, thereby shifting the burden of loss to Plaintiff. ¶ 1.11

Protection 1;

c.    The LENDERS have recourse against Plaintiff's principal based on the

guaranty executed concurrently with the loans, shifting risk of loss to

Plaintiff. *See, e.g., Exhibit "1",* ¶ 1.11 Protection 2 & ¶ 3.2 Personal

Guaranty;

d.    The LENDERS required Confessions of Judgment shifting risk of loss to

Plaintiff which The LENDERS are authorized to execute on behalf of

Plaintiff, shifting the. *See, e.g., Exhibit "1",* ¶ 1.11 Protection 3;

e.    The LENDERS have a right of recourse against Plaintiff based on the

security agreement executed concurrently with the loans and because the

Loan Documents provide that Plaintiff grants the LENDERS a security

interest, shifting risk of loss to Plaintiff. *See, e.g., Exhibit "1"*, ¶ 1.11

Protection 4;

f. The LENDERS may proceed to protect and enforce its rights and remedies

by lawsuit in which Plaintiff shall be liable for all costs and attorneys' fees,

shifting risk of loss to Plaintiff. *See, e.g.*, *Exhibit "1",* ¶ 1.11 Protection 5

and Protection 6;

g. The LENDERS may exercise its rights under the assignment of Plaintiff's

lease, shifting risk of loss to Plaintiff. *See, e.g., Exhibit "1",* ¶ 1.11

Protection 7;

h. The LENDERS may debit Plaintiff's depository accounts wherever situated

by means of ACH, shifting risk of loss to Plaintiff. *See, e.g., Exhibit "1",* ¶

1.11 Protection 8;

i. Events of default include any violation of the agreement as outlined in

Section 1.11 of *Exhibit "1"* and is funds are unavailable for transfer via

ACH or any other default; *See, e.g., Exhibit "1",* ¶ 3.1 Events of Default;

j. The Loan Documents do not provide a specific reconciliation provision.

However, the second boilerplate paragraph on the first page provides that

the LENDERS will reconcile Plaintiff's account from Plaintiff's bank

statements within 3 days and issue a refund for any overpayments taken by

GFE. Plaintiff provided the LENDERS with its bank pass codes for full

27

access to Plaintiff's bank account.  The LENDERS, however, never reconciled Plaintiff's payments nor offered to do so after the loans were processed, which shifted the risk of loss to Plaintiff; and,

k.    The selection of daily payment rates did not represent a good faith estimate of receivables.

90.    The LENDERS' Loan Documents provide for recovery of attorneys' fees and costs and Plaintiff is therefore entitled to an award of attorneys' fees and costs pursuant to New York Law, N.Y. DEBT. & CRED. LAW § 278(A).

The Unlawful Activity.

91.    New York places a 25% annual limit on the amount of interest that can be charged in connection with providing a loan.  N.Y. PENAL LAW §190.42.

92.    From August 2, 2021 through August 5, 2022 PMF and BOOST brokered and the LENDERS made four short term loans to Plaintiff, more fully described above, the terms of which required daily payments designed to pay the balance over the course of between 111 to 218 business days, without disclosing that Defendants were charging an interest rate between 0.3659% daily and .9827% daily, or an imputed annual interest rate between 133% and 358%. As a result, each loan was usurious and unconscionable in violation of New York, Missouri, and Federal law.

93.    For example, in the August 2nd Loan, GFE made a loan of money to Plaintiff in the amount of $125,000.00, for which Plaintiff was required to repay Defendant the sum of $180,000.00 ("Receivables Purchased Amount") within 139

business days. PMF brokered the loan between Plaintiff and GFE. Attached hereto as

*Exhibit "2"* is a true and correct copy of the Merchant Agreement ("August 2nd Loan

Documents") pursuant to which GFE made such loan to Plaintiff. Plaintiff paid GFE

$97,500.00.  Pursuant to the Weekly Advance Addendum to Merchant Agreement,

attached hereto as part of *Exhibit "2"*, the loan was broken into 10 weekly amounts.

94.     The effective daily interest rate on the August 2nd Loan was 0.6858%, or

250.3150% annually, more than the allowable interest rate pursuant to New York,

Missouri, or Federal law.  Further, by domiciling their business in New York, they take

advantage of New York law which only permits commercial claims of usury as a defense

to collection, thus insulating Defendants and each of them from New York's usury laws'

limit of 25% per year.  N.Y. PENAL LAW §190.42.  Each of the following three

transactions contained similar or more usurious rates.  See, *Exhibits "2" through "5"*.

95.     As a consequence of the scheme used by LENDERS, PMF, BURGER,

BRUGMAN, BOOST and BENA, the debt, including such debt evidence by the Loan

Documents, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d),

18 U.S.C. 1961(6) because (i) it violates applicable criminal usury statues and (ii) the

rates are more than twice the legal rate permitted by New York Penal Law ¶ 190.40.

96.     The Loan Documents are unconscionable contracts of adhesion that were

not negotiated at arm-length. Instead, each contains one-sided terms that prey upon a

small business and individual owner's desperation that conceals the fact that the

transactions, including those involving Plaintiff, are really loans.

97.     Among the one-sided terms, the Loan Documents (See, *Exhibits "2"*

*through "5"*, inclusive) include:

a.      a provision giving the LENDERS the irrevocable right to withdraw money

        directly from the merchant's bank accounts;

b.      a provision preventing the merchant from transferring,  moving or selling

        the business or any assets without the LENDERS' permission;

c.      a one-sided attorneys' fees provision obligating the merchant, Plaintiff, to

        pay the LENDERS' attorneys' fees but not the other way around;

d.      a venue and choice-of-law provision requiring the merchant to litigate in a

        foreign jurisdiction under the laws of a foreign jurisdiction;

e.      a personal guaranty, the revocation of which is an event of default;

f.      a jury waiver;

g.      a class action waiver;

h.      a collateral and security agreement providing a UCC lien over all of

        merchant's assets;

i.      a prohibition of obtaining financing from other sources;

j.      the maintenance of business interruption insurance;

k.      the right to direct all credit card processing payments to the LENDERS;

l.      a power-of attorney "to take any and all action necessary to direct such new

        or additional credit card processor to make payment to the LENDERS; and

m.      a power of attorney authorizing the LENDERS "to take any action or

execute any instrument or document to settle all obligations due…"

98. The Loan Documents are also unconscionable because each contains numerous knowingly false statements. Among these knowingly false statements are that:

a. the transaction is not a loan;

b. the daily payment is a good faith estimate of the merchant's receivables;

c. the fixed daily payment is for the merchant's convenience; and

d. that the automated ACH program is labor intensive, requiring EIN to charge an exorbitant ACH Program Fee or Origination Fee.

99. The Loan Documents are also unconscionable because they are designed to fail. Among other things, the Loan Documents are designed to result in a default in the event that the merchant's business suffers any downturn in sales by:

a. forcing the merchant to wait until the end of the month before entitling it to invoke the reconciliation provision;

b. preventing the merchant from obtaining other financing; and

c. requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of merchant.

100. The Loan Documents (*Exhibits "2" through "5"*) also contain numerous improper penalties that violate New York's strong public policy. Among these improper penalties, the Loan Documents:

a. require the merchant to sign a confession of judgment entitling GFE to

liquidated attorneys' fees based on a percentage of the amount owed rather

than a good faith estimate of the attorneys' fees required to file a confession

of judgment;

b.      accelerate the entire debt upon an Event of Default; and

c.      require the Plaintiff to turn over 100% of all its receivables if it misses just

one fixed daily payment.

101.    The Loan Documents do not provide a specific reconciliation provision.

However, the second boilerplate paragraph on the first page of each agreement provides

that the LENDERS will reconcile Plaintiff's account from Plaintiff's bank statements

within 3 days, adjust the estimated daily rate up or down as indicated, and issue a refund

for any overpayments taken by the LENDERS.  Plaintiff provided the LENDERS with its

bank pass codes for full access to Plaintiff's bank account.  The LENDERS, however,

never reconciled Plaintiff's payments nor offered to do so after the loans were

processed.The Defendants would induce small businesses like Plaintiff with promises of

loans with legal interest rates and then switch the terms to be a purchase of future

receivables.  However, by taking a security interest in all of Plaintiff's assets, it is clear

that the LENDERS did not take ownership of any future receivables, which became

collateral for an unlawful loan.

Culpable Persons.

102.    The LENDERS, PMF, BURGER, BRUGMAN, BOOST and BENA are

persons within the meaning of 18 U.S.C. § 1961(3) and § 1982(c) in that each is either an

32

individual, corporation, or limited liability company capable of holding a legal interest in property.

103.   At all times mentioned herein, the LENDERS, PMF, BURGER, BRUGMAN, BOOST and BENA, were and are persons that exists separate and distinct from the Enterprise, described below.

104.   The LENDERS, PMF, BURGER,  BRUGMAN, BOOST and BENA devised the usurious scheme above to ensure collection of unlawful debts from which they received unknown portions thereof.

The Enterprise.

105.   G.F.E. Holdings, LLC ("GFE Holdings") constitutes an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  Defendants White Road Capital LLC, Series 127009 and White Road Capital LLC, Series 120785, both successors to GFE NY, LLC are both doing business as GFE Holdings. Notwithstanding, the Delaware secretary of state identifies two similar entities, GFE Holdings LLC and G.F.E. Holdings LLC.

106.   GFE Holdings, an entity of unknown form, was created to manage and provide legitimate lending services to businesses, such as Plaintiff.  GFE Holdings was usurped by the LENDERS, PMF, BURGER,  BRUGMAN, BOOST and BENA for their nefarious purposes and exercised authority over the Enterprise.

107.   The LENDERS, PMF, BURGER,  BRUGMAN, BOOST and BENA are associated in fact for the common purposes of collecting on an unlawful debt.

Specifically, the Defendants, and each of them, engaged in a common goal of soliciting,

funding, servicing, and collecting upon usurious loans that charge interest at more than

twice the enforceable rate under the laws of the New York.  Defendants, and each of

them, devised a payment scheme that required Plaintiff to provide access to its bank

accounts where the LENDERS caused daily payments to be withdrawn.

108.   Defendants, and each of them, have worked together for a several years and

have enjoyed the benefits of construing loans as a purchase of future receivables in order

to avoid New York State usury laws and have used GFE Holdings to pursue such

unlawful goals.

109.   At all times mentioned herein, and continuing through the present, the

members of the Culpable Persons have had ongoing relations with each other for the

purpose of originating, underwriting, servicing, and collecting upon unlawful debts using

the Enterprise for collection.

110.   New York law looks primarily to the intent of the parties in determining

whether a transaction is a loan.  As alleged above, the major indicia of whether a

transaction is a loan or purchase of future receipts is whether the risk of loss falls on the

lender or the borrower.  Here, the Loan Documents provide no risk for the LENDERS.

Plaintiff is informed and believes that Defendants, and each of them, knew or should have

known that PMF and BOOST had completed transactions with Plaintiff with other MCA

lenders when Plaintiff was requested to execute the MCA agreements which included an

anti-stacking provision, rendering Plaintiff in serious default upon execution.  Defendants

34

and each of them never intended to suffer any loss.

111.    As a proximate result of the conduct of Defendants, and each of them,

Plaintiff has been damaged in a sum of approximately $1,142,123 constituting the

exorbitant interest collected by the LENDERS; was required to file for protection under

the U.S. Bankruptcy Code, retained and paid counsel and is entitled to treble damages,

costs and attorney fees under 18 U.S. Code § 1964.

112.    Plaintiff requests that this Court enter a judgment against Defendants and

each of them, in the amount of Plaintiff's actual damages, plus treble damages, and

attorney's fee.

### FIFTH CLAIM FOR RELIEF:

### AVOIDANCE OF FRAUDULENT TRANSFER
### (11 U.S.C. § 548(a)(l)(B), MO. REV. STAT. § 428.024,
### N.Y. DEBT. & CRED. LAW §§ 270-280)
### (AGAINST ALL DEFENDANTS)

113.    Plaintiff alleges  Paragraphs 1 through 43, inclusive, Paragraphs 45 through

64, inclusive, Paragraphs 66 through 81, inclusive, and Paragraphs 86 through 111 as

though fully stated in full herein.

114.    The LENDERS made four short term loans to Plaintiff, more fully

described above in paragraphs 31 through 43, inclusive, the terms of which required daily

payments designed to pay the balance over the course of between 111 to 218 business

days, without disclosing that Defendants were charging interest rates between 0.3659%

daily and .9827% daily, or an imputed annual interest rate between 133% and 358%. As a

result, each loan was usurious and unconscionable in violation of New York, Missouri, and Federal law.  In response to the tender of a total of $1,052,000, Plaintiff was to repay a total of $1,437,523 within a total time period between August 2, 2021, when the first loan proceeds were tendered, to November 14, 2022 when the final payment was made on the last loan.  This amounts to a period of approximately 15 months.  The payments far exceed what would have been paid under terms that included lawful interest, as showing on *Exhibits "6" through "9"*, inclusive.

115.    As a result, Plaintiff did not receive reasonably equivalent value for the obligations imposed on Plaintiff by the Loan Documents.

116.    The LENDERS withdrew the Loan Transfers and Commission Transfers from the Plaintiff's bank accounts within two years before the date of the filing of Plaintiff's Petition.

117.    At the time the LENDERS withdrew the Loan Transfers from Plaintiff's bank account, Plaintiff was insolvent or became insolvent because of such transfers for the following reasons:

a.        At the time each loan was made, the sum of the Debtor's liabilities, as reflected in its balance sheets, was greater than the value of all of Plaintiff's property at a fair valuation.  Attached as *Exhibit 10*  are copies of Plaintiff's balance sheets at or near the time of the loans.  The balance sheets reflect that at in and around the time of each of the loans, the value of the Debtor's assets at fair value was less than the amount of its debts;

b.      At the times of each of the loans, the Debtor was engaged in the business of bidding, negotiating, entering into and providing construction services and labor on construction projects. As part of this business, the Debtor maintained M&E, vehicles, had employees for whom there were payroll costs including taxes.  At the times of each of the loans, the Plaintiffs' remaining assets, as reflected in its balance sheets at the various times, were unreasonably small in relation to the loans with the LENDERS.  They were unreasonably small because the loans called for large payments are frequent intervals and these payments disrupted the Debtor's ability to meet its other expenses; and

c.      Plaintiff, in incurring the payment obligations under these four loans from the LENDERS, found itself in a position where it could not pay the loans as the regular payments came due. As a result of these loans, Plaintiff was forced to obtain other financing, and go deeper into debt, in order to meet its obligations to the LENDERS.

118.    The Plaintiff made the Loan Transfers at a time when Plaintiff owed money to at least one creditor, and such creditor holds an unsecured claim that is allowable pursuant to 11 U.S.C. § 502.

119.    The Loan Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B) and the *Uniform Voidable Transactions Act*, N.Y. DEBT. & CRED. LAW §§ 270-280.

120.    The Loan Transfers and Commission Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(l)(B) and the Missouri Uniform Fraudulent Transfer Act, MO. REV. STAT. § 428.024 and the Uniform Voidable Transactions Act, N.Y. DEBT. & CRED. LAW §§ 270-280.

121.    Plaintiff is entitled to a judgment for relief in no less than the sums on account of the Loan Transfers in the sum of $1,142,123 and in an amount according to proof on account of the Commission Transfers.

122.    Plaintiff is entitled to recover its attorney fees.

## SIXTH CLAIM FOR RELIEF:

### AVOIDANCE OF TRANSFERS - (11 U.S.C. § 544)
### (AGAINST ALL DEFENDANTS)

123.    Plaintiff alleges  Paragraphs 1 through 43, inclusive, Paragraphs 45 through 64, inclusive, Paragraphs 66 through 81, inclusive, and Paragraphs 86 through 111 as though fully stated in full herein.

124.    The LENDERS made four short term loans to Plaintiff, more fully described above in paragraphs 31 through 43, inclusive, the terms of which required daily payments designed to pay the balance over the course of between 111 to 218 business days, without disclosing that Defendants were charging interest rates between 0.3659% daily and .9827% daily, or an imputed annual interest rate between 133% and 358%. As a result, each loan was usurious and unconscionable in violation of New York, Missouri, and Federal law.  In response to the tender of a total of $1,052,000, Plaintiff was to repay a total of $1,437.523 within a total time period between August 2, 2021, when the first loan proceeds were tendered, to November 14, 2022 when the final payment was made on the last loan.  This amounts to a period of approximately 15 months.  The payments far exceed what would have been paid under terms that included lawful interest, as showing

on *Exhibits "6" through "9"*, inclusive.

125. As a result, Plaintiff did not receive reasonably equivalent value for the obligations imposed on Plaintiff by the Loan Documents.

126. The LENDERS withdrew the Loan Transfers and Commission Transfers from the Plaintiff's bank accounts within two years before the date of the filing of Plaintiff's Petition.

127. At the time the LENDERS withdrew the Loan Transfers from Plaintiff's bank account, Plaintiff was insolvent or became insolvent because of such transfers for the following reasons:

a. At the time each loan was made, the sum of the Debtor's liabilities, as reflected in its balance sheets, was greater than the value of all of Plaintiff's property at a fair valuation. Attached as *Exhibit 10* are copies of Plaintiff's balance sheets at or near the time of the loans. The balance sheets reflect that at in and around the time of each of the loans, the value of the Debtor's assets at fair value was less than the amount of its debts;

b. At the times of each of the loans, the Debtor was engaged in the business of bidding, negotiating, entering into and providing construction services and labor on construction projects. As part of this business, the Debtor maintained M&E, vehicles, had employees for whom there were payroll costs including taxes. At the times of each of the loans, the Plaintiffs' remaining assets, as reflected in its balance sheets at the various times, were unreasonably small in relation to the loans with the LENDERS. They were

39

unreasonably small because the loans called for large payments are frequent intervals and these payments disrupted the Debtor's ability to meet its other expenses; and

c.        Plaintiff, in incurring the payment obligations under these four loans from the LENDERS, found itself in a position where it could not pay the loans as the regular payments came due. As a result of these loans, Plaintiff was forced to obtain other financing, and go deeper into debt, in order to meet its obligations to the LENDERS.

128.    The Plaintiff made the Loan Transfers at a time when Plaintiff owed money to at least one creditor, and such creditor holds an unsecured claim that is allowable pursuant to 11 U.S.C. § 502.

129.    The Loan Transfers and Commission Transfers are avoidable pursuant to 11 U.S.C. § 544 and the Missouri Uniform Fraudulent Transfer Act, MO. REV. STAT. § 428.024 as well as the Uniform Voidable Transactions Act, N.Y. DEBT. & CRED. Law §§ 270-280.

## SEVENTH CLAIM FOR RELIEF

### PRESERVATION AND RECOVERY OF TRANSFERS
### ( 11 U.S.C. § 550)
### (AGAINST ALL DEFENDANTS)

130.    Plaintiff alleges  Paragraphs 1 through 43, inclusive, Paragraphs 45 through 64, inclusive, Paragraphs 66 through 81, inclusive, and Paragraphs 86 through 111 as though fully stated in full herein.

131.    The LENDERS made four short term loans to Plaintiff, more fully described above in paragraphs 31 through 43, inclusive, the terms of which required daily

payments designed to pay the balance over the course of between 111 to 218 business days, without disclosing that Defendants were charging interest rates between 0.3659% daily and .9827% daily, or an imputed annual interest rate between 133% and 358%. As a result, each loan was usurious and unconscionable in violation of New York, Missouri, and Federal law.  In response to the tender of a total of $1,052,000, Plaintiff was to repay a total of $1,437.523 within a total time period between August 2, 2021, when the first loan proceeds were tendered, to November 14, 2022 when the final payment was made on the last loan.  This amounts to a period of approximately 15 months.  The payments far exceed what would have been paid under terms that included lawful interest, as showing on *Exhibits "6" through "9"*, inclusive.

132.    At the time the LENDERS withdrew the Loan Transfers from Plaintiff's bank account, Plaintiff was insolvent or became insolvent because of such transfers for the following reasons:

a.      At the time each loan was made, the sum of the Debtor's liabilities, as reflected in its balance sheets, was greater than the value of all of Plaintiff's property at a fair valuation.  Attached as *Exhibit 10*  are copies of Plaintiff's balance sheets at or near the time of the loans.  The balance sheets reflect that at in and around the time of each of the loans, the value of the Debtor's assets at fair value was less than the amount of its debts;

b.      At the times of each of the loans, the Debtor was engaged in the business of bidding, negotiating, entering into and providing construction services and labor on

construction projects. As part of this business, the Debtor maintained M&E, vehicles, had

employees for whom there were payroll costs including taxes.  At the times of each of the

loans, the Plaintiffs' remaining assets, as reflected in its balance sheets at the various

times, were unreasonably small in relation to the loans with the LENDERS.  They were

unreasonably small because the loans called for large payments are frequent intervals and

these payments disrupted the Debtor's ability to meet its other expenses; and

     c.     Plaintiff, in incurring the payment obligations under these four loans from

the LENDERS, found itself in a position where it could not pay the loans as the regular

payments came due.  As a result of these loans, Plaintiff was forced to obtain other

financing, and go deeper into debt, in order to meet its obligations to the LENDERS.

133.    Plaintiff is informed and believes and based thereon alleges that the

LENDERS are the initial transferee of the Loan Transfers, or the entity for whose benefit

the said Loan Transfers were made or is the immediate or mediate transferee of the initial

transferee receiving such Loan Transfers.

134.    Pursuant to 11 U.S.C. § 550, the Plaintiff is entitled to recover the Loan

Transfers, together with interest thereon.

135.    The Plaintiff is entitled to an order and judgment under 11 U.S.C. §§ 544,

547 and 548 as well as 11 U.S.C. §§ 550 and 551 that the Loan Transfers are avoidable

and recoverable and preserved for the benefit of the Plaintiff's estate.

136.    The Loan Transfers in the sum of $1,142,123 are avoidable pursuant to 11

U.S.C. § 548(a)(l)(B), MO. REV. STAT. § 428.024, NY DEBT. & CRED. LAW §§

270-280.

137.    Plaintiff moves to preserve and recover each transfer as provided by 11

U.S.C. §§ 550 and 551.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for a judgment as follows:

On its First Claim for Relief for Declaratory Relief:

1.    For a judicial declaration that the transactions in the Loan Documents are

loans of money under applicable law;

On Plaintiff's Second Claim for Relief for Fraud:

2.    For a judgment for Plaintiff and against the LENDERS in the sum of

$1,142,123;

3.    For recovery of the Commission Transfers paid to PMF because of the

Commission Transfers in a sum according to proof;

4.    For recovery of the Commission Transfers paid to BOOST because of the

Commission Transfers in a sum according to proof;

5.    Punitive damages in the sum of no less than $3,000,000.00 against the

LENDERS;

6.    Punitive damages in the sum of no less than $100,000.00 against PMF;

7.    Punitive damages in the sum of no less than $100,000.00 against BOOST;

On the Third Claim for Relief for RICO:

8.    For a judgment against Defendants and each of them in the amount of the

43

Plaintiff's actual damages, and attorneys' fees and costs as provided by law for no less

than $1,000,000.00, to be trebled as allowed by applicable law;

On the Fourth Claim for Relief Avoidance of Fraudulent Transfers:

     9.     For a judgment avoiding the Loan Transfers; and

     10.     For a judgment avoiding the Commission Transfers;

On Plaintiff's Fifth Claim for Relief for Avoidance of Transfers:

     11.     For a judgment avoiding the Loan Transfers; and

     12.     For a judgment avoiding the Commission Transfers;

On the Sixth Claim for Relief for Preservation and Recovery of Transfers:

     13.     For a judgment preserving and recovering for the benefit of the estate the

avoidable transfers described in the Fourth and Fifth Claims for Relief as provided in 11

U.S.C. §§ 550 and 551;

On all Claims for Relief:

     14.     For costs incurred herein;

     15.     For attorney fees according to proof; and,

     16.     For such other and further relief as the Court deems just and proper.

Dated: April   , 2025          THE FOX LAW CORPORATION, INC.


By: */s/ Steven R. Fox*
Steven R. Fox, CA State Bar No. 138808
17835 Ventura Blvd, Suite 306,
Encino, California A 91316
Tel: (818) 774-3545; Fax (818) 774-3707

Srfox@foxlaw.com


EVANS & MULLINIX, P.A.


By: */s/ Colin N. Gotham*
Colin N. Gotham, KS #19538; MO#52343
7225 Renner Road, Suite 200
Shawnee, KS 66217
Tel: (913) 962-8700; Fax: (913) 962-8701
cgotham@emlawkc.com

Counsel for Debtor-in-Possession, JLK
Construction, LLC

## Index of Exhibits

| | |
|---|---|
| *Exhibit "1"* | PMF Consulting Agreement |
| *Exhibit "2"* | August 2, 2021 Loan Documents |
| *Exhibit "3"* | December 7, 2021 Loan Documents |
| *Exhibit "4"* | July 13, 2022 Loan Documents |
| *Exhibit "5"* | August 5, 2022 Loan Documents |
| *Exhibit "6"* | August 2nd Loan Transfers |
| *Exhibit "7"* | December 7th Loan Transfers |
| *Exhibit "8"* | July 13th Loan Transfers |
| *Exhibit "9"* | August 5th Loan Transfers |
| *Exhibit "10"* | Plaintiff's Balance Sheets for 2020, 2021 2022 |

Exhibit "1"

DocuSign Envelope ID:



WWW.PMFUS.COM

# Consulting

# Agreement

DocuSign Envelope ID:

# Consulting Agreement



AGREEMENT made on  02 / 14 / 20 22  , by and between                          JLK Construction, LLC                          and

its affiliated or parent or related entities located at        1214 Frederick Avenue, St. Joseph Missouri, 64501

(hereinafter referred to as the "Client"), and Premium Merchant Funding 18, LLC, located at 55 Water St. 50th Floor, New York, NY

10041 (hereinafter referred to as "PMF"). Client and PMF shall be referred to collectively as the "Parties."

In consideration of the mutual covenants and undertakings to be performed by this Agreement, the parties agree as follows:

**1** Description of Services. Premium Merchant Funding's mission is to provide a broad array of services and solutions for small businesses. PMF advises merchants on reliable, safe, and innovative financing and payment solutions combined with individualized attention to provide tailored solutions that respond to the various needs of the business, including but not limited to Accounting, Payroll Processing, Marketing, Branding, and more. Our all-inclusive consulting bundles will provide Client with a thorough review of the various metrics of their business and provide tailored solutions that solve the business's most pressing needs.

**2** Fees. PMF's fee will be a flat fee of $ _____ 9% _____ ("Fee"). Fee shall be earned upon the signing of this agreement and payable at the earlier of: (i) The completion of any of the services contemplated by this agreement or (ii) the delivery of any financing, and shall survive the termination of this Agreement. The Client agrees to pay all necessary out of pocket expense: i.e.; title, appraisal, inspection, recording and legal costs required by a prospective lender or PMF in connection with any commitment for or closing of a Financing. Fees, as set forth herein, shall be calculated without any discount or allowance for any efforts made by Client or by any other person in connection with the consummation of any Financing.

**3** Term of Agreement. This agreement shall commence on the date of signing and terminate automatically upon completion by PMF of the services contemplated by this agreement or one (1) year from the date of signing, whichever is earlier.

**4** Representation and Cooperation. Client authorizes PMF to communicate on Client's behalf with any party that is required in order to carry out the services contemplated by this Agreement. These communications may be made via electronic messages, phone, in person, or any other means necessary. Client authorizes PMF to make all representations on Client's behalf, except for the consummation of any financing or acceptance of an agreement in which Client is to be a party. Client agrees to cooperate with PMF and any parties introduced by PMF and use its best efforts to supply PMF and such parties with complete and accurate documents and information reasonably requested by PMF or such parties.

DocuSign Envelope ID:

CONSULTING AGREEMENT



Upon the issuance of a commitment, Client agrees to use its best efforts to "close" on the Financing that is the subject of said commitment. Without limiting the generality of the foregoing, Client agrees to supply PMF with updated and current documents and information upon request by PMF. Client further agrees not to circumvent, or attempt to circumvent, the terms of this Agreement. PMF's right to represent, negotiate, and correspond on behalf of Client shall be limited to those communications and tasks necessary to carry out the services contemplated by this agreement.

5. Indemnification; Limitation of Damages. Client agrees to indemnify and hold harmless PMF from all claims, losses, expenses, fees including attorneys' fees, costs, and judgments that may be asserted against PMF that result from the acts or omissions of Client, Client's employees or agents. In no event shall PMF be liable for damages due to loss of use, data, or profits, interruption of business or any special, incidental, indirect, exemplary, or consequential damages, arising out of or in connection with this Agreement, however caused, on any theory of liability, whether in an action for contract, strict liability, tort, or otherwise, whether or not Client has been advised of the possibility of such damages.

6. Notices. All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in the United States mail, postage prepaid, to the address first listed above. Such address may be changed from time to time by either party by providing written notice to the other in the manner set forth above.

7. Miscellaneous. (i) This Agreement contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties; (ii) It is understood by the parties that PMF is an independent contractor with respect to Client, and not an employee of Client. PMF's employees, agents, and contractors, if any, who perform services for Client under this Agreement shall also be bound by the provisions of this Agreement. (iii) This Agreement may be modified or amended if the amendment is made in writing and signed by both parties; (iv) If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited; (v) The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement; (vi) This Agreement shall be governed by the laws of the State of New York; (vii) This Agreement may be executed in any number of counterparts and via facsimile or other electronic means, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument; (viii) The provisions of this Agreement were negotiated between sophisticated parties. Accordingly, any ambiguity or issue concerning the drafting of this Agreement shall not be construed for or against PMF or Client; (ix) The person signing this Agreement certifies that he has the authority as a principal, or as an authorized agent of the Client, to sign this Agreement.

DocuSign Envelope ID

CONSULTING AGREEMENT



IN WITNESS THEREOF, the parties have executed this Agreement the day and year first above written.

PMF

_____
SIGNATURE

Abe Burger
NAME

C.O.O.
TITLE

Client

_____
SIGNATURE

Jesse Kagarice
NAME

Owner
TITLE



# NODAWAY VALLEY BANK

## BUSINESS BANKING-          559 (continued)

### Account Activity

| Post Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 04/01/2022 | **Beginning Balance** | | | $74,994.80 |
| 04/01/2022 | XX0609 DDA POS CREDIT FARM PARTS STORE 8558141515 CA 01544637 345958 | | $412.69 | $75,407.49 |
| 04/01/2022 | Incoming Wire CROWN TITLE CORPORATION | | $556,478.57 | $631,886.06 |
| 04/01/2022 | Outgoing Wire Premium Merchant Funding 18, LLC | $450,000.00 | | $181,886.06 |
| 04/01/2022 | XX8444 CHK PURCH PIN Wal-Mart Super C ST. JOSEPH MO 05600027 2090860021 | $53.42 | | $181,832.64 |
| 04/01/2022 | XX6195 CHK PURCH SIG HOVER JOB 605594 SAN FRANCISCO CA 11372387 550265 | $75.00 | | $181,757.64 |
| 04/01/2022 | PAYMENT TO COMMERCIAL LOAN XXXXXX0167 | $3,904.01 | | $177,853.63 |
| 04/01/2022 | Incoming Domestic W/T Fee 55879913 | | $7.50 | $177,846.13 |
| 04/01/2022 | Outgoing W/T Fee 42427 | $20.00 | | $177,826.13 |
| 04/01/2022 | EINCAP 8776518110 IDNA651-8110#88 | $3,780.00 | | $174,046.13 |
| 04/01/2022 | Global Funding E U | $3,999.00 | | $170,047.13 |
| 04/01/2022 | CHECK # 3435 | $62.25 | | $169,984.88 |
| 04/01/2022 | CHECK # 3457 | $125.00 | | $169,859.88 |
| 04/01/2022 | CHECK # 3458 | $3,000.00 | | $166,859.88 |
| 04/01/2022 | CHECK # 10377 | $2,000.00 | | $164,859.88 |
| 04/04/2022 | DEPOSIT | | $7,830.00 | $172,689.88 |
| 04/04/2022 | XX8444 CHK PURCH PIN SAM'S Club ST JOSEPH MO 49200003 209221000906 | $41.19 | | $172,648.69 |
| 04/04/2022 | XX6195 CHK PURCH SIG WILLSCOT MOBILE 8882840614 MD 61992852 245195 | $241.66 | | $172,407.03 |
| 04/04/2022 | BETTER BIZ INFO SALE | $135.00 | | $172,272.03 |
| 04/04/2022 | GUSTO FEE 874649 6semjrfttn3 | $137.70 | | $172,134.33 |
| 04/04/2022 | Merry Maids #232 SIGONFILE 26T8FJ | $141.00 | | $171,993.33 |
| 04/04/2022 | FORD MOTOR CR FORDCREDIT XXXXX8871 | $1,571.70 | | $170,421.63 |
| 04/04/2022 | CHECK # 10213 | $1,500.00 | | $168,921.63 |
| 04/05/2022 | DEPOSIT | | $23,850.00 | $192,771.63 |
| 04/05/2022 | XX8444 CHK PURCH PIN USPS PO 28713405 SAINT JOSEPH MO 34050897 252767 | $18.45 | | $192,753.18 |
| 04/05/2022 | GUSTO CSD 900240 6semjrgccvh | $140.50 | | $192,612.68 |
| 04/05/2022 | GUSTO TAX 900691 6semjrgccu3 | $6,309.29 | | $186,303.39 |
| 04/05/2022 | FLEETCOR FUNDING BT0404 000000172251156 | $9,944.96 | | $176,358.43 |
| 04/05/2022 | GUSTO NET 900525 6semjrgccqo | $14,742.35 | | $161,616.08 |
| 04/06/2022 | Incoming Wire PREMIUM MERCHANT FUNDING 18, LLC | | $93,965.00 | $255,581.08 |
| 04/06/2022 | XX8444 CHK PURCH PIN SAMS CLUB #4920 ST JOSEPH MO 49200002 784182 | $183.66 | | $255,397.42 |
| 04/06/2022 | Incoming Domestic W/T Fee 55999934 | | $7.50 | $255,389.92 |
| 04/06/2022 | CHECK # 3456 | $100.00 | | $255,289.92 |
| 04/06/2022 | CHECK # 3463 | $500.00 | | $254,789.92 |
| 04/07/2022 | SETTLE TSYS/TRANSFIRST 5436845559413355 JLK CONSTRUCTION LLC SETT 4/6/2022 | | $97,073.05 | $351,862.97 |
| 04/07/2022 | XX0609 CHK PURCH PIN AMAZON.COM* 1H0VJ SEATTLE WA 00000101 1EWJ1AIV051E | $43.45 | | $351,819.52 |
| 04/07/2022 | XX0609 CHK PURCH SIG BUILDERS CHOICE SAINT JOSEPH MO 78127967 070897 | $1,293.47 | | $350,526.05 |
| 04/07/2022 | GUSTO TAX 936722 6semjrgne8g | $0.15 | | $350,525.90 |



## NODAWAY VALLEY BANK

304 North Main
Maryville MO 64468
(660) 562-3232

*Your wire request for $450,000.00 will be debited from account ending in 4559.*
*In addition, a $20.00 wire fee has been assessed.*

---

### *** WIRE DETAILS ***

---

**Wire Sequence**

**Business Code / Wire Type**
CTR-Customer Transfer
1000-Basic Funds Transfer

**Originator Information**
**Originator**
JLK CONSTRUCTION LLC

PO BOX 8820
SAINT JOSEPH MO 64508-8820
United States

**Entered Date**
04/01/2022 03:53 PM Central Time
**Effective Date**
04/01/2022
**Receiving Financial Institution**
021000089  CITIBANK NYC
**Beneficiary Information**
**Beneficiary**
Premium Merchant Funding 18, LLC

55 Water, 50th Floor
New York, NY 10041
United States

SIGNATURE X *Cynthia Kagarine*
DATE 04/01/2022

I, a customer of Nodaway Valley Bank, received these wire transfer instructions (circle one) via email, text, telephone, or in person. I understand and accept the risk of this wire transfer. Wire transfers are executed without recourse and refund requests may be denied and are beyond Nodaway Valley Bank's control.

Prepared by: *Carols Barnett. Assit VP*

**To:** Jesse Kagarice <jesse@jlkconstruction.com>
**Cc:** Cindy Kagarice <cindy@jlkconstruction.com>
**Subject:** PMF Wire Instructions

Good morning guys!

The day is finally upon us.

Jesse, as discussed please see below for the wiring instructions for you to send the fee via wire transfer.

Premium Merchant Funding 18, LLC
55 Water, 50th floor
New York, NY 10041

Citibank.

Please let me know if you have any questions or concerns.

Best Regards,

--



**Premium Merchant Funding**
**Samuel A. Brugman | Account Manager**
Premium Merchant Funding
3000 Town Center Suite 1805 | Southfield, MI 48075
Tel: 315-257-1195

| Fax: 646-793-4993
Website | Line of Credit | Apply Now

**Confidentiality and Privilege statement Important Notice from Premium Merchant Funding:** The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify Abe Burger immediately at 212-931-6852 or by emailing mkashat@premiummerchantfunding.com and deleting it from your computer

**Please consider your environmental responsibility before printing the e-mail.**

--

**Jesse Kagarice**

| | |
|---|---|
| **From:** | Cindy Kagarice |
| **Sent:** | Friday, April 1, 2022 9:09 AM |
| **To:** | Sam Brugman |
| **Cc:** | Jesse Kagarice |
| **Subject:** | RE: PMF Wire Instructions |

Thank you Sam 😊

**From:** Sam Brugman <sbrugman@pmfus.com>
**Sent:** Friday, April 1, 2022 9:03 AM
**To:** Cindy Kagarice <cindy@jlkconstruction.com>
**Cc:** Jesse Kagarice <jesse@jlkconstruction.com>
**Subject:** Re: PMF Wire Instructions

Good morning Cindy!

Just to recap our conversation, our fee for everything was $450,000

Please see below for the wire instructions:

Premium Merchant Funding 18, LLC
55 Water, 50th floor
New York, NY 10041

Routing #
Account #

Citibank.

Also @Jesse I will have numbers for you on our LOC first thing on Monday, I am pushing underwriting to give us the highest dollar amount we can, and I know with you sending the wire they will have no choice but to say yes.

As always I appreciate you and your team's hard work.

Please feel free to call me if you have any questions.

Best Regards,

On Thu, Mar 31, 2022 at 9:50 AM Jesse Kagarice <jesse@jlkconstruction.com> wrote:

> Got it
>
> Get Outlook for iOS

---

**From:** Sam Brugman <sbrugman@pmfus.com>
**Sent:** Thursday, March 31, 2022 8:49:08 AM



**Premium Merchant Funding**

**Samuel A. Brugman | Account Manager**
Premium Merchant Funding
3000 Town Center Suite 1805 | Southfield, MI 48075
Tel: 315-257-1195

| Fax: 646-793-4993
Website | Line of Credit | Apply Now

**Confidentiality and Privilege statement Important Notice from Premium Merchant Funding:** The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify Abe Burger immediately at 212-931-6852 or by emailing mkashat@premiummerchantfunding.com and deleting it from your computer

**Please consider your environmental responsibility before printing the e-mail.**

Exhibit "2"



# GLOBAL FUNDING EXPERTS

2701 QUEENS PLAZA NORTH, SUITE 802, LONG ISLAND CITY, NY 11101
Tel: 1-877-253-7686, Fax: 718-504-3736
Website: www.globalfundingexperts.com / Email: underwriting@globalfundingexperts.com

## MERCHANT AGREEMENT

Agreement dated ___08/02/2021___ between GFE NY, LLC (**"GFE"**) and the Merchant listed below (**"MERCHANT"**)
(Month) (Day) (Year)

### MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| State of Incorporation / Organization: | MO |
| Type of Business Entity: | LLC |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Mailing Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Primary Contact & Number: | JESSE LEE KAGARICE |

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant ("Merchant"), in consideration of the funds provided to Merchant by GFE as specified below ("Purchase Price"), hereby sells, assigns and transfers to GFE (making GFE the absolute owner) the Specified Percentage indicated below of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts") defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business, for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to GFE.

The Purchased Amount shall be paid to GFE by Merchant irrevocably directing and authorizing that there be only one depositing bank account, which account must be acceptable to and pre-approved by GFE (the "Account") into which Merchant and Merchant's customers shall remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each Transaction, until such time as GFE receives payment in full of the Purchased Amount. Merchant hereby authorizes GFE to ACH Debit the specified remittances from the Merchant's Account on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box and will provide GFE with all required access codes and monthly bank statements. Merchant understands that it is responsible for ensuring that the Specified Percentage to be debited by GFE remains in the Account and will be held responsible for any fees incurred by GFE resulting from a rejected ACH attempt or an event of default. (See Appendix A) GFE is not responsible for any overdrafts or rejected transactions that may result from GFE's ACH debiting the specified amounts under the terms of this agreement. GFE will debit the specified remittance amount during a business day based on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box. The Merchant shall deliver to GFE, no later than the 18th date of each month the bank statement for the Account in respect of the immediately preceding month. Within three business days of GFE's receipt of the Merchant's monthly bank statements, GFE shall reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the Specified Percentage. If the Merchant fails to deliver the bank statement for the Account for any month, GFE shall consider that the specific remittances were equal to the Specified Percentage of the settlement amount due from each Transaction for such month. GFE may, upon Merchant's request, adjust the amount of any payment due under this Agreement at GFE's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between GFE and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

### ORIGINAL OFFER:

| | | | |
|---|---|---|---|
| Total Purchase Price: | $125,000.00 | Merchant's Average Monthly Revenue: | $409,024.90 |
| Purchased Amount of Receivables: | $180,000.00 | Specified Percentage of Monthly Revenue: | 15% |
| Total Fees*: | $8,750.00 | Specified Remittance Amount & Frequency: | $1,300.00 / Daily |
| Net Funded Amount**: | $116,250.00 | Initial Estimated # of Remittance Payments: | 139 |

\* This amount reflects the total fees Merchant will pay at funding. See Appendix A for a complete breakdown of fees.

\*\* This amount reflects the total funds Merchant will receive after all the fees and balance transfers are deducted from the Total Purchase Price. See Balance Transfer Form for a complete breakdown of the remaining RTR balances.

\*\*\* If an Early Payment Addendum has been executed by GFE and the Merchant, the promotional early termination discount referenced above shall be applicable subject to the terms and conditions set forth in the Early Payment Addendum.

The Total Purchase Price may also be paid incrementally over time, in the increments and in the Specific Remittance Amounts set forth in the Attachment A Addendum annexed hereto.

Merchant #1 Initials: JK

THE MERCHANT AGREEMENT TERMS AND CONDITIONS SET FORTH ON PAGES 5-13 OF 19 (THE "AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT. BY SIGNING BELOW, MERCHANT HEREBY REPRESENTS AND WARRANTS THAT NOTHING CONTAINED HEREIN IS FALSE, MISLEADING, AND THAT MERCHANT HAS NOT FAILED TO DISCLOSE ANY MATERIAL INFORMATION TO OBTAIN FUNDING FROM GFE.

| MERCHANT (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | 816-896-6909 |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

| OWNER / GUARANTOR (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

GFE NY, LLC

By: _____

        (Company Officer)

## I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to GFE with a Bank acceptable to GFE to obtain electronic fund transfer services for the Merchant's account at the Bank approved by GFE (the "Account"). Merchant shall provide GFE and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes GFE and/or its agent(s) to deduct from the Account the amounts owed to GFE for the receipts as specified herein and to pay such amounts to GFE. Merchant also hereby authorizes GFE to withdraw from the Account the Specified Percentage(s) and/or sums by GFE debiting the account. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by GFE or not. This additional authorization is not a waiver of GFE's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which GFE did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of GFE.

Merchant understands and agrees that this Agreement, including the authorizations to access Merchant's accounts (including the Account) set forth herein, as well as all other payment processing agreements entered into with respect to the Transactions irrevocably authorize the processor of such payments (the "Processor") and Operator to pay the cash attributable to the Specified Percentage of Receivables to GFE rather than to Merchant until GFE receives the cash attributable to the entire Specified Amount of Future Receivables from Processor and Operator. Merchant and Guarantor(s) authorize GFE and its agents: i) to investigate Merchant's financial status and history, and will provide to GFE any authorizations, bank or financial statements, tax returns, etc., as GFE deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. and ii) to update such information and financial and credit profiles from time to time as GFE deems appropriate. Merchant hereby authorizes all of its banks, brokers, processors and customers to provide GFE with Merchant's bank statements, brokerage statements, processing history and such other statements and information as GFE may in its sole discretion require to determine Merchant's and Guarantor's qualification or continuation in this program and for collections purposes. Merchant shall provide GFE with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from GFE.

These authorizations and instructions may be revoked only with the prior written consent of GFE. Merchant agrees that Processor and Operator may rely upon the instructions of GFE, without any independent verification, in making the cash payments above. Merchant waives any claim for damages it may have against Processor or Operator in connection with actions taken based on instructions from GFE, unless such damages were due to such Processor's or Operator's failure to follow GFE's instructions. Merchant acknowledges and agrees that (a) Processor and Operator will be acting on behalf of GFE with respect to the specified Percentage of Receivables until cash attributable to the entire Specified Amount of Future Receivables has been remitted by Processor and Operator to GFE, (b) Processor and Operator may or may not be affiliates of GFE, (c) GFE does not have any power or authority to control Processor's or Operator's actions with respect to the processing of Card transactions or remittance of cash to GFE, (d) GFE is not responsible and shall not be liable for, and Merchant agrees to hold GFE harmless for, the actions of Processor and Operator, and (e) funds representing the Specified Percentage of Receivables in the possession of Processing or Operator constitute property owned solely by GFE, and Merchant disclaims any and all interest therein. For purposes of this Agreement, the term "Operator" shall mean GFE or any person or entity designated by GFE to debit or otherwise withdraw (via the Automated Clearing House ("ACH") system, electronic checks, wires, or otherwise) any amounts from Merchant's or principal(s) accounts as authorized or permitted by this Agreement.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire "Purchased Amount" is received by GFE as per the terms of this Agreement. The termination of this Agreement shall not affect Merchant's continuing obligation and responsibility to fully satisfy all outstanding obligations that are due to GFE.

**1.3 Future Purchases.** GFE reserves the right to rescind the offer to make any purchase payments hereunder, in its sole and absolute discretion.

**1.4 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined) authorize GFE, its agents and representatives, as well as any credit reporting agency engaged by GFE, i) to investigate their financial responsibility and history, including any references given or any other statements or data obtained from or about Merchant or any of the Guarantor(s); ii) to obtain consumer and business credit reports on the Merchant and Guarantor(s); iii) to contact any current or prior bank of the Merchant in order to obtain whatever information it may require regarding any and all of Merchant's transactions with any such bank, including, but not limited to applications, bank statements, financial statements and tax returns; and (iv) to contact personal and business references provided by the Merchant or Guarantor(s), at any time now or for so long as Merchant and/or Guarantor(s) continue to have any obligation owed to GFE as a consequence of this Merchant Agreement or for GFE's ability to determine Merchant's eligibility to enter into any future agreement with GFE. Merchant and Guarantor(s) will further provide to GFE any authorizations, bank or financial statements, tax returns, etc., as GFE deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. GFE is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Merchant and Guarantor(s) acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Guarantor(s) has been relied upon to GFE in connection with its decision to purchase the Specified Amount of Future Receivables from Merchant.

**1.5 Transactional History.** Merchant authorizes all of their banks and brokers to provide GFE with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program. Merchant herby (i) authorizes GFE to contact any past, present or future processor of Merchant, its predecessors or affiliates, to obtain any information that GFE deems necessary or appropriate regarding any of their transactions with such processors, and (ii) authorizes and directs such processors to provide GFE with all such information in compliance with this Section. Such information may include information to verify the amount of Card receivables previously processed on behalf of Merchant, its predecessors or affiliates, and any amounts that may have been paid to, offset, held or reversed by, such processors. Without limiting the generality of the foregoing, Merchant authorizes GFE to contact any past, present or future processor of Merchant, its predecessors or affiliates, to confirm that Merchant is exclusively using the Processor accepted by GFE in accordance with this Agreement.

**1.6 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor and Operator, their respective officers, directors, affiliates, employees, agents, representatives and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable

Merchant #1 Initials: _____

attorney's fees) suffered or incurred by Processor or Operator from any claims from GFE for monies owed to GFE from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by GFE.

**1.7 No Liability.** In no event will Processor, Operator or GFE be liable for any claims asserted by Merchant or Guarantors under any legal theory or law, including any tort or contract theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of GFE's legal fees and expenses resulting therefrom.

**1.8 Reliance on Terms.** Section 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, GFE and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.9 Sale of Receipts.** Merchant and GFE agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from GFE to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. GFE has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to GFE in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, - it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that GFE has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and GFE shall promptly refund to Merchant any interest received by GFE in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that GFE not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant is not a debtor to GFE as of the date of this Agreement. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.10 Power of Attorney.** Merchant irrevocably appoints GFE as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to GFE from Processor, or in the case of a violation by Merchant of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to GFE; and (v) to file any claims or take any action or institute any proceeding which GFE may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant, and GFE is authorized to use Merchant's funds to pay for same. In addition to any other remedies available for violation of the Merchant's Contractual Covenants, in the event that Merchant changes or permits the change of the Processor accepted by GFE or utilizes the services of an additional Processor, GFE shall have the right, without waiving any of its rights or remedies and without notice to Merchant or Principal(s), to notify the new or additional Processor of the sale of the Specified Amount of Future Receivables hereunder and to direct such new or additional Processor to make payment to GFE of all or any portion of the amounts received or held by such Processor for or on behalf of Merchant to pay any amounts GFE is entitled to receive hereunder. Merchant hereby grants GFE an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints GFE and its designees as Merchant's attorney-in-fact, to take any and all actions necessary and appropriate to direct such new or additional Processor to make payment to GFE as contemplated by this Section. Merchant further hereby grants GFE an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints GFE and its designees as Merchant's attorney-in-fact, to execute any and all documents in the Merchant's name sufficient to provide and perfect any security interest granted by Merchant to GFE hereunder, including but not limited to security interests in motor vehicles and real estate.

**1.11 Protections against Default.** The following Protections 1 through 8 may be invoked by GFE immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the GFE electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse or unacceptable to GFE; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor or an unauthorized depository account; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God), transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of GFE, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to GFE; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor or (f) Merchant enters into any agreement with any third person or entity that relates to the Receipts or any portion thereof, whether in the form of a purchase, sale, loan, pledge or the granting of any security interest in the Receipts or any portion thereof These protections are in addition to any other remedies available to GFE at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchase Amount plus all fees (including legal fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** GFE may enforce the provisions of the Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant agrees to execute affidavit(s) of Confession of Judgment in favor of GFE in the amount of Purchase Amount stated in the Agreement. Merchant also hereby authorizes GFE to execute in the name of the Merchant affidavit(s) of Confession of Judgment in favor of GFE in the amount of Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, GFE may, without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of any appropriate court based upon the affidavit(s) of judgment by

DocuSign Envelope...

confession previously executed by Merchant(s) and Owner/Guarantor(s).

**Protection 4.** GFE may enforce its security interest in the Collateral identified in the Security Agreement hereof.

**Protection 5.** The entire Purchase Amount and all fees (including legal fees) shall become immediately refundable and payable to GFE from Merchant.

**Protection 6.** GFE may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, under which GFE shall recover Judgment against Merchant, Merchant shall be liable for all of GFE's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. GFE reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to GFE from Merchant prior to applying such amounts to reduce the amount of any outstanding Purchase Amount.

**Protection 7.** This Agreement shall be deemed Merchants Assignment of Merchant's Lease of Merchant's business premises to GFE. Upon breach of any provision in this Agreement, GFE may exercise its rights under this Assignment of Lease without prior Notice to Merchant.

**Protection 8.** GFE may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile GFE on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to GFE.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes GFE, its agents and employees to obtain and disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that GFE obtains) and business conduct only to it employees. agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against GFE or any of its affiliates relating to any (i) investigation undertaken by or on behalf of GFE as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by GFE, including this Agreement and any other GFE documentations (collectively, "Confidential Information") are proprietary and confidential information of GFE. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of GFE to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles GFE to not only damages and legal fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.14 Publicity.** Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes GFE to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.15 D/B/A's.** Merchant hereby acknowledges and agrees that GFE may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between GFE and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**1.16 Purchase of Increments.** In the event that GFE offers to purchase additional Receipts in the "increments' stated on Attachment A of this Agreement, then GFE reserves the unilateral right to delay or rescind such offer in its sole and absolute discretion at any time.

**1.17 Sharing of Information.** Merchant hereby authorizes GFE to share information regarding Merchant's performance under this Agreement with affiliates and unaffiliated third parties.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement, and until GFE is fully paid:

**2.1 Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial Statements, copies of which have been furnished to GFE, and future statements which will be furnished hereafter at the discretion of GFE, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise GFE of any material adverse change in their financial condition, operation or ownership. Merchant hereby warrants that its Average Monthly Revenue as enumerated on page (1) of this Agreement is accurate, and that any and all cash advances or loans outstanding by Merchant have be disclosed to GFE. GFE may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to GFE within 5 business days. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance.** Merchant will maintain business-interruption insurance naming GFE as loss payee and additional insured in amounts and against risks as are satisfactory to GFE and shall provide GFE proof of such insurance upon request. Merchant shall also maintain such other insurance in such amounts and against such risks as GFE deems necessary to protect Merchant's business, and Merchant shall provide proof of such insurance to GFE upon demand.

**2.5 Electronic Check Processing Agreement.** Merchant will not change its processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without GFE's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location and Related Entities.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and GFE, nor shall Merchant change any of its places of business without prior written consent by GFE. Merchant does not and shall not conduct Merchant's business under any name other than as set forth in this agreement and shall not change its place of business. Merchant shall not change its legal name, entity type or jurisdiction of organization. In the event Merchant, any of its officers or directors or any Owner/Guarantor, during

the term of this agreement or while Merchant remains associated with any other party to this Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due GFE under this Agreement. With respect to any such entity, GFE shall have the right to name such newly formed or existing entity as a debtor in any claim, suit, or legal proceeding.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from GFE to Merchant, execute, acknowledge and deliver to GFE and/or to any other person, firm or corporation specified by GFE, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy. As of the date of this Agreement, Merchant is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.**

**2.10 Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the Receipts or future check sales, or any portion thereof, whether in the form of a purchase, sale, a loan against, collateral against or the sale or purchase of credits against, such Receipts or future check sales, with any party other than GFE. GFE may share information regarding this Merchant Agreement with any third party in order to determine whether Merchant is in compliance with this provision.

**2.11 Unencumbered Receipts.** Merchant has, and at all times will have, good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of GFE. Without limiting the generality of the foregoing, all future Receipts purchased by GFE hereunder shall be free and clear of any and all liens (other than GFE's ownership rights therein) at the time they become Receivables. All amounts received by GFE attributable to the Specified Amount of Future Receivables purchased by GFE hereunder shall arise from bona fide sales by Merchant of its goods and services to Card holders who present their Cards as payment thereof.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.14 Good Faith, Best Efforts and Due Diligence.** Merchant and Guarantors hereby affirm that it will conduct its business in Good Faith and will expend its Best Efforts to maintain and grow its business, to ensure that GFE obtains the Purchased Amount. Furthermore, Merchant and Guarantors hereby agree, warrant and represent hereby that they will constantly perform all appropriate Due Diligence and credit checks of all of the customers' finances, cash flow, solvency, good faith, payment histories and business reputations (the "Due Diligence Requirements") as may suffice to ensure any and all products and/or services provided, sold or delivered by Merchant to said customers will be paid for by customers in full and on time, and will not result in the creation of an unpaid account. These Due Diligence Requirements must be performed prior to any sales to any customer, and repeated no less frequently than monthly for so long as any sums are due from those customers. Full documentation of all of Merchant's compliance with its Due Diligence Requirements must be maintained in Merchant's files so long as GFE has not fully collected all sums due to it. This is not a guaranty of payment by customers, but is a guaranty of full, adequate and good faith Due Diligent investigation and credit check of customers before extending credit to them and continuing no less frequently than monthly so long as sums are still due.

**2.15 Taxes.** Merchant will promptly pay all necessary taxes, including but not limited to employment, sales and use taxes.

**2.16 No Violation of Prior Agreements.** Merchant warrants that its execution and performance of this Merchant Agreement will not violate or conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Merchant is subject, including any agreement that prohibits the sale or pledge of Merchant's future receipts or the Purchased Amount.

**2.17 Opportunity for Counsel.** Merchant represents, warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Merchant Agreement, and that it has been represented by legal counsel or has had full opportunity to consult with its own legal counsel.

**2.18 Ongoing Obligations.** Merchant hereby covenants and agrees that even after it receives some or all of the Purchase Price from GFE, it will comply with GFE's ongoing requests for any documentation from Merchant for the purpose of business and identify verification and underwriting and verification (such as the merchant's driver's license, bank login, bank statements, or any other financial or business documentation). Merchant's failure to provide to GFE the requested documentation within twenty-four (24) hours shall be deemed a breach of this Agreement and GFE shall no longer be obligated to provide any further funding to Merchant. In addition, if after receipt of said documentation from Merchant, GFE discovers that Merchant made misrepresentations before receiving funding from GFE, GFE shall no longer be obligated to provide any further funding to Merchant and Merchant's misrepresentations shall be deemed a breach of this Agreement.

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Merchant; (d) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (e) Merchant shall transfer or sell all or substantially all of its assets, or issue any notice of intended bulk sale or transfer; (f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (g) Merchant shall use multiple depository accounts without the prior written consent of GFE (h) Merchant shall change its depositing account without the prior written consent of GFE; (i)

Merchant shall perform any act that reduces the value of any collateral grant hereunder; (j) the Specified Percentage of its daily Receipts is not available for ACH by GFE on any three (3) business days within any twenty (20) business day period; (k) Merchant shall default under any of the terms, covenants and conditions of any other agreement with GFE; or (l) Merchant fails to deposit its Receipts into the Account.

**3.2 Personal Guaranty.** In the event of a Default under Sections 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13, and 2.14 hereof, should GFE determine that the Purchased Amount cannot be obtained from the Merchant's business, GFE will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to GFE for all of GFE's losses and damages, in additional to all costs, fees expenses and legal fees associated with such enforcement. GFE shall not be required before exercising and enforcing its rights under this Personal Guaranty first to resort to payment against Merchant or to any other person or to any collateral.

**3.3 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4.1 hereof, GFE may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Security Agreement or Guaranty, or pursuant to any other legal or equitable right or remedy. Upon Merchant's and/or Owner's/Guarantor's default hereunder, the balance of the Purchased Amount remaining due, plus any applicable fees, shall become immediately due and payable to GFE. In addition, upon an Event of Default, GFE may: i) enforce the provisions of the Security Agreement and Guaranty against each Merchant and Owner/Guarantor; ii) enforce its security interest in the Collateral and the ; iii) debit Merchant's deposit accounts wherever situated by means of ACH debit or facsimile signature on a computer generated check drawn on Merchant's bank account for all or a portion of the balance of the Purchased Amount remaining due, or GFE may instruct the Processor to forward to GFE, without any prior notice to Merchant, all or a portion of the balance of the Purchased Amount remaining due, and iv) without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of the appropriate court based upon the affidavit(s) of judgment by confession previously executed by Merchant(s) and Owner(s)/Guarantor(s). All rights, powers and remedies of GFE which may be exercised by GFE at any time after the occurrence of an Event of Default are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Costs.** Merchant shall pay to GFE all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and (b) the enforcement of GFE 's remedies set forth in Section 3.3 above, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications.** Merchant is required to give GFE written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give GFE seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

# IV.MISCELLANEOUS

**4.1 Modifications: Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by GFE.

**4.2 Assignment.** This Agreement shall be binding upon and inure to the benefit of Merchant, Principal(s), GFE and their respective successors and assigns, except that Merchant and Principal(s) shall not have the right to assign or delegate any of their rights or obligations hereunder or any interest herein without prior written consent of GFE, which consent may be withheld in GFE's sole discretion. Any such assignment or delegation without GFE's prior written consent shall be void. GFE reserves the right to assign or delegate this Agreement or any of its rights or obligations hereunder with or without prior notice to Merchant. GFE may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the merchant at the address set forth above in this agreement and to GFE at 2999 NE 191st Street, Unit 901, Miami, FL 33180 with a copy to 27-01 Queens Plaza North, Suite 802, Long Island City, NY 11101. Notices to GFE shall become effective only upon receipt by GFE. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of GFE to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, GFE and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of GFE which consent may be withheld in GFE's sole discretion. GFE reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, may, if GFE so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by GFE to transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provision in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and GFE and supersede all prior agreements and understandings relating to the subject matter hereof. Merchant and Principal(s) each acknowledge and agree that

Merchant #1 Initials: __JK__

DocuSign Envelope ID:

he, she or it is not relying on any representations not specifically embodied in the agreement for funding

### 4.10 JURY TRIAL WAIVER.

THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.11 Facsimile Acceptance.** Merchant and Guarantor(s) hereby agree that facsimile and/or electronic signatures on this Merchant Agreement and Guaranty, or photocopies thereof, that shall be deemed acceptable and treated as originals for all purposes, and shall be admissible as evidence of the Merchant Agreement and Guaranty.

**4.12. Right of Access.** In order to ensure that Merchant is complying with the terms of this Merchant Agreement, Merchant agrees that GFE shall have the right to (i) enter, without notice, the premises of Merchant's business for the purpose of inspecting and checking Merchant's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Merchant's daily receipts to the Processor and to ensure that Merchant has not violated any other provision of this Agreement, and (ii) Merchant's shall provide access to its employees and records and all other items as requested by GFE, and (iii) have Merchant's provide information about its business operations, banking relationships, vendors, landlord and other information to allow GFE to interview any relevant parties. Furthermore, Merchant agrees to provide GFE, at all times with "Live Contemporaneous Access" to all of its bank accounts in order for GFE to evaluate Merchant's compliance with the Merchant Agreement, and for collections in the event of a default under the Merchant Agreement. "Live Contemporaneous Access" shall be defined as: Merchant, at all times and including but not limited to, providing GFE with accurate login information necessary to access all of Merchant's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens.

**4.13. Phone Recordings and Contact.** Merchant agrees that any call between GFE and Merchant, and their agents and employees may be recorded or monitored. Further, Merchant agrees that (i) it has an established business relationship with GFE, its employees and agents and that Merchant may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, emails address, or facsimile number given to GFE by the Merchant, its agents or employees, including cellular telephones.

**4.14. Monitoring, Recording, and Solicitations.**

a. Authorization to Contact Seller by Phone. Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

b. Authorization to Contact Seller by Other Means. Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
|---|---|
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

## SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant grants to GFE a security interest in and lien upon: (a) all accounts receivables, accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant, (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to GFE under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to GFE upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover GFE's entitlements under this Agreement, GFE is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of GFE's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, GFE or an affiliate of GFE. GFE is authorized to execute and file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by GFE without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, GFE has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, GFE will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from GFE written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant agrees that this is a contract of recoupment and GFE is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant agrees not to contest or object to any motion for relief from the automatic stay filed by GFE. Merchant agrees to execute and deliver to GFE such instruments and documents GFE may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. GFE is authorized to execute all such instruments and documents in Merchant's name.

In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to GFE for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due GFE under this Agreement. With respect to any such entity, GFE shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. GFE shall be held harmless by Merchant and each Owner/Guarantor and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. GFE shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of GFE's rights, including without limitation, GFE's right to collect all accounts, and to notify any payment card processor or creditor of such entity that GFE has such rights in such entity's assets. Merchant also agrees that, at the GFE's discretion, GFE may choose to amend any existing financing statement to include any such newly formed entity as debtor.

Merchant and Guarantor each acknowledge and agree that any security interest granted to GFE under any other agreement between Merchant or Guarantor and GFE (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as GFE deems necessary to perfect or maintain GFE's first priority security interest in the Collateral including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes GFE to file any financing statements deemed necessary by GFE to perfect or maintain GFE's security interest, which financing statement may contain notification that Merchant and/or Guarantor have granted a negative pledge to GFE with respect to the Collateral, and that any subsequent lien or may be tortuously interfering with GFE's rights. Merchant and Guarantor shall be liable for, and GFE may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by GFE in protecting, preserving and enforcing GFE's security interest and rights.

**Negative Pledge.** Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** GFE shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, GFE may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that GFE may enter into an agreement with Merchant's landlord giving GFE the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default, GFE may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to GFE, whether by acceleration or otherwise.

Merchant #1 Initials: JK

**Personal Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to GFE, Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the Merchant Agreement in Sections thereof 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13 and 2.14, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, GFE may seek recovery from Guarantors for all of GFE's losses and damages by enforcement of GFE's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral GFE may hold pursuant to this Agreement or any other guaranty.

GFE does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) GFE's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to GFE. In addition, GFE may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to GFE; (ii) release Merchant from its obligations to GFE; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to GFE under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.**

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | *GK* | | |

| OWNER / GUARANTOR (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | *GK* | | |

A. **Origination Fee** - 4% of Purchase Price to cover Underwriting and related expenses. This expense is charged at the time of funding.

B. **ACH Program Fee** - 3% of Purchase Price ACH's are labor intensive and are not an automated process, requiring us to charge this fee to cover costs. This expense is charged at the time of funding.

C. **Miscellaneous Service Fees** - Merchant shall pay certain fees for services related to the origination and maintenance of Accounts, which fees are set forth below. Each Merchant shall receive their funding electronically to their designated bank account, and the GFE may deduct some or all of the fees from the funded amount.

A. Rejected ACH/Blocked ACH - $5,000.00 when Merchant blocks Account from our Debit ACH, or when Merchant directs the bank to reject our debit ACH, which places them in default (per contract).

B. Pre-Authorized Bank Change Fee - $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

C. Wire Fee - $50.00 Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for either a Fed Wire fee or a bank ACH fee.

D. UCC Filing, Amendment or Termination Fee - $200.00.

E. Default Fee - $5,000.00 when Merchant defaults under the Agreement, including but not limited to diverting its Receivables from the bank account agreed upon in the "Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)" or changing its credit card processing thus terminating or diverting the agreed upon split.

F. Account Management Fees - $45.00 upon origination, and $45.00 per month thereafter until the Purchase Amount, together with any and all unpaid outstanding other fees have been paid in full. These Management Fees will not be applied towards the reduction of the Purchase Amount.

G. Stacking Fee - In the event that the Merchant enters into any cash advance or any loan agreement that relates to or involves the Receipts with any person or entity other than GFE during any portion of the term of this Agreement, then: i) Merchant shall pay to GFE a "Stacking" fee equal to $5,000.00 per occurrence, and ii) the specified daily remittances that Merchant is obligated to pay to GFE hereunder shall be doubled, and Merchant shall be deemed to have authorized GFE to double the amount of its ACH Debits from the Merchant's Account on a daily basis.

H. Third Party Collections Fee – In the event that Merchant defaults under any of the terms and conditions of this Agreement, Merchant shall pay to GFE, in addition to any other fees associated with Merchant's default, a third party collections fee equal to fifteen (15%) of the outstanding balance after all fees at the time of default.

I. NSF Fee (Standard) - $ 35.00 each until a default is declared.

J. Non-ACH Transaction Fee - When a Merchant makes a payment other than through ACH, the Merchant is responsible for the cost of that transaction.

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

**Merchant Verification Form**

| Merchant Name: JESSE LEE KAGARICE | |
|---|---|
| 1.  Do you currently or within the last 90 days have any intentions, plans or discussions regarding closing your Business? | NO |
| 2.  Do you currently or within the least 90 days have any intentions, plans or discussions to change the name or legal structure of the business? | NO |
| 3.  Are you currently in, or contemplating personal bankruptcy? | NO |
| 4.  Are you currently in, or contemplating business bankruptcy? | NO |
| 5.  Is your business currently for sale? | NO |
| 6.  Do you have any existing merchant cash advance balances? | NO |
| 7.  Are you involved in any litigation proceedings or are a party to a lawsuit? | NO |
| 8.  Is your business currently in default of any agreement with a creditor? | NO |
| 9.  Is your business currently in forbearance agreement with a creditor? | NO |
| 10. Will selling the Future Receivables cause you to breach any agreement with a creditor? | NO |
| | |
| If you have answered YES to any of the above questions, please explain: | |
| | |
| | |
| | |
| | |

I hereby certify that the above statements are true and correct to the best of my knowledge; I authorize my landlord and credit card processor to discuss confidential account information for the purpose of satisfying the requirements of GFE NY, LLC.

Completed and attested by:

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT)
## AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep this important legal document for Merchant's records.

DISBURSEMENT OF ADVANCE PROCEEDS. By signing below, Merchant authorizes GFE to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Merchant later identifies and is acceptable to GFE) (hereinafter referred to as the "Designated Checking Account") This authorization is to remain in full force and effect until GFE has received written notification from Merchant of its termination in such time and in such manner as to afford GFE and Merchant's depository bank a reasonable opportunity to act on it.

BUSINESS PURPOSE ACCOUNT. By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

MISCELLANEOUS. GFE is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Merchant's account must comply with the provisions of U.S. law.

I, (We) JESSE LEE KAGARICE hereby Authorize, GFE NY, LLC. (Hereinafter known as "GFE") to Electronically (ACH) debit the Bank Account Below, of which I am a signer:

| | | | |
|---|---|---|---|
| Bank Name: | NODAWAY VALLEY BANK | Tax ID: | |
| ABA: Routing: | | DDA: Account: | |
| For the amount of: | $1,300.00 | (Or) Percentage of each Banking Deposit: | 15% |
| On the Following Days: | MONDAY-FRIDAY | | |

This authorization is to remain in full force and effect until COMPANY has received written notification from me at least 5 banking days prior of its termination to afford COMPANY a reasonable opportunity to act on it.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | | | |

Thank you for accepting an offer from GFE NY, LLC ("GFE"). We look forward to being your funding partner for as long as you need.

Please note that the way your advance is set up with GFE, GFE requires viewing access to your bank account each business day, throughout the term of this Agreement, in order that GFE may calculate and verify the amount of your daily remittance. Please be assured that we will carefully safeguard your confidential information and only essential personnel will have access to it.

GFE NY, LLC. will also require viewing access to your bank account, prior to funding, as part of the underwriting process.

Please be advised that for security purposes, GFE will request this information prior to funding. By signing below, you hereby agree that if you fail to provide the requested bank login information prior to funding, GFE shall have no obligation to provide funding. Please be further advised that if you change any of the bank login information during the term of this Agreement or at any time while you still have any outstanding obligations to GFE, you are required to immediately inform GFE of the changes made and provide GFE with the new bank login information. Please see below for the list of questions that will be by GFE as it relates to the banking information.

1. Bank Portal Website;
2. Bank Account Username;
3. Bank Account Password;
4. Security Question/Answer 1 of this Bank Account;
5. Security Question/Answer 2 of this Bank Account;
6. Security Question/Answer 3 of this Bank Account; and
7. Any other information necessary to access your Bank Account.

If you have any questions please feel free to contact our cash management department.

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

For the purpose of obtaining the Business Cash Advance evidence by the Merchant Agreement of this same date herewith (the "Business Cash Advance") from GFE NY, LLC., the undersigned Seller/Merchant hereby makes the following statement under penalty of law:

## OPTION 1 – DISCLOSURE AND AUTHORIZATION FOR ADDITIONAL ACCOUNTS:

By selecting this option, the Seller/Merchant hereby declares that in addition to the designated for ACH debit, the Seller/Merchant also has the following additional account(s) which he authorizes us to use in the event we are unable to debit from the designated account. The Seller/Merchant declares and warrents that it currently maintains no other bank account at any financial institution other than those banks and accounts referenced below.

| Bank Name | |
|---|---|
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| Bank Name | |
|---|---|
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| Bank Name | |
|---|---|
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

**OPTION 2** - By selecting this option, the merchant swears, under penalty of law, that Merchant has no accounts in any lending institution in addition to the one provided for ACH debit

**PLEASE SELECT AN OPTION AND SIGN BELOW:**

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law. Any litigation relating to this Agreement must be commenced and maintained in any court located in New York State (the "Acceptable Forums"), however any action or proceeding to enforce a judgment or arbitration award may also be commenced and maintained in any other court of competent jurisdiction. The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum.

**THE PARTIES AGREE TO WAIVE TRIAL BY JURY IN ANY DISPUTE BETWEEN THEM.**

In any litigation commenced by GFE, Merchant and Guarantor will not be permitted to interpose any counterclaim. Merchant and Guarantor agree that any claim that is not asserted against GFE within 1 year of its accrual will be time barred. If GFE prevails in any litigation with Merchant and/or Guarantor, then Merchant and Guarantor must pay GFE's reasonable attorney fees, which may include a contingency fee of up to 33% of the amount claimed, expert fees, costs of suit, and prejudgment interest at a rate of 16% per annum (or the maximum rate permitted by applicable law if lower). GFE, Merchant, and Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**Merchant and Guarantor consent to service of process and legal notices made by certified mail, return receipt requested delivered by the United States Postal Service and addressed to the Contact Address set forth immediately below or on Page 1 of this Agreement, any such service will be deemed complete 5 days after dispatch.**

I have read and agreed to the Terms and Conditions set forth above:

| MERCHANT (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

Please provide a list of 3-5 professional references

| TRADE REFERENCE #1: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #2: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #3: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #4: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #5: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

## Weekly Advance Addendum to the Merchant Agreement

This Weekly Advance Addendum amends the Merchant Agreement and Security Agreement between GFE and the merchant listed below (the "Merchant") dated 08/02/2021, (the "Agreement"). All capitalized terms used in his Addendum shall have the same meaning as defined in the Agreement. Except as modified below, the terms of the Agreement remain in full force and effect.

### MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

This Weekly Advance Addendum amends the Merchant Agreement and Security Agreement between GFE and the merchant listed below (the "Merchant") dated 08/02/2021, (the "Agreement"). All capitalized terms used in his Addendum shall have the same meaning as defined in the Agreement. Except as modified below, the terms of the Agreement remain in full force and effect.

### AGREEMENT AS TO ADVANCES

1. Weekly Sale and Purchase of Merchant's Future Receipts: Merchant hereby offers to sell and GFE agrees to purchase, up to the Receipts Purchased Amount, future Receipts on a weekly basis according to the attached schedule. GFE shall have the right to terminate the purchase of any additional future Receipts as set forth in Section 2 of this Addendum.

2. GFE's Obligation to Make Future Purchases: GFE reserves the right to terminate its obligation to make the weekly purchases at its option, if upon: (i) a Event of Default has occurred, as defined in the Agreement; (ii) Merchant fails to provide to GFE a monthly Account statement, access codes to the Account, and full access to merchant's Account prior making any weekly purchase as contemplated herein; (iii) Merchant obtains any additional funding without providing prior written notice to and receiving written approval from GFE; (iv) the Specified Percentage of its weekly Receipts is not available for ACH by GFE on any three (3) business days within any twenty (20) business day period; (v) Merchant has a 20% decline in monthly deposits that is not due to regular seasonal payment fluctuations; (vi) GFE believes in its sole judgment that Merchant's business may not be able to generate future Receipts sufficient to deliver the Purchased Receipts in a timely manner, vii) the Account has a negative balance; viii) Merchant is in arrears with respect to its payment obligations under the Agreement or ix) the Merchant has failed to provide GFE with a complete account receivable report within any thirty (30) day period prior to any weekly purchase contemplated herein In the event that weekly purchases are terminated, the Merchant will remain obligated to deliver the Specified Percentage of its weekly Receipts to GFE until GFE has received the Receipts GFE purchased prior to termination, and to comply with all other provisions of this Agreement.

3. Merchant's Indebtedness When Receipts Purchased Amount Is Sold In Increments: When Merchant sells and GFE purchases the Receipts Purchased Amount, or portions thereof, in increments, the Merchant's indebtedness to GFE under the Agreement (excluding any fees and payments then due and owing) shall at any given point in time be equal to the percentage of the total Receipts Purchase Amount that the total of all increments then paid by GFE to the Merchant bears to Total Purchase Price as set forth in the Agreement.

THE TERMS OF THIS ATTACHMENT A ARE HEREBY INCORPORATED INTO AND MADE A PART OF THE MERCHANT AGREEMENT IDENTIFIED ABOVE, AND MERCHANT HEREBY ACKNOWLEDGES THAT THE PERIODIC PURCHASE OF FUTURE RECEIPTS HEREUNDER ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE MERCHANT AGREEMENT

| MERCHANT (#1) | | Signature | | |
|---|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 | |
| Title | Sole Member | Cell Phone Number: | | |
| Social Security No: | | Home or Secondary Number: | | |
| Driver License No: | | Email: | jesse@jlkconstruction.com | |

| OWNER / GUARANTOR (#1) | | Signature | | |
|---|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 | |
| Title | Sole Member | Cell Phone Number: | | |
| Social Security No: | | Home or Secondary Number: | | |
| Driver License No: | | Email: | jesse@jlkconstruction.com | |

Merchant #1 Initials: _JK_

| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
|---|---|
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

## GFE Weekly Distribution Grid-Special Agreement

| Increment | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Amount | $47,246.84 | $9,246.84 | $9,246.84 | $9,246.84 | $9,246.84 |
| Increment | 6 | 7 | 8 | 9 | 10 |
| Amount | $9,246.84 | $9,246.84 | $9,246.84 | $9,246.84 | $3,778.44 |

## *Appropriate fee will be deducted from the first increment.

## See APPENDIX A STRUCTURE for fee details.

| MERCHANT (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

Exhibit "3"



# GLOBAL FUNDING EXPERTS

**2701 QUEENS PLAZA NORTH, SUITE 802, LONG ISLAND CITY, NY 11101**
**Tel: 1-877-253-7686, Fax: 718-504-3736**
**Website: www.globalfundingexperts.com / Email: underwriting@globalfundingexperts.com**

## MERCHANT AGREEMENT

Agreement dated _____12/07/2021_____ between GFE NY, LLC ("GFE") and the Merchant listed below ("MERCHANT")
(Month) (Day) (Year)

### MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| State of Incorporation / Organization: | MO |
| Type of Business Entity: | LLC |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Mailing Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Primary Contact & Number: | JESSE LEE KAGARICE |

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant ("Merchant"), in consideration of the funds provided to Merchant by GFE as specified below ("Purchase Price"), hereby sells, assigns and transfers to GFE (making GFE the absolute owner) the Specified Percentage indicated below of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts") defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business, for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to GFE.

The Purchased Amount shall be paid to GFE by Merchant irrevocably directing and authorizing that there be only one depositing bank account, which account must be acceptable to and pre-approved by GFE (the "Account") into which Merchant and Merchant's customers shall remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each Transaction, until such time as GFE receives payment in full of the Purchased Amount. Merchant hereby authorizes GFE to ACH Debit the specified remittances from the Merchant's Account on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box and will provide GFE with all required access codes and monthly bank statements. Merchant understands that it is responsible for ensuring that the Specified Percentage to be debited by GFE remains in the Account and will be held responsible for any fees incurred by GFE resulting from a rejected ACH attempt or an event of default. (See Appendix A) GFE is not responsible for any overdrafts or rejected transactions that may result from GFE's ACH debiting the specified amounts under the terms of this agreement. GFE will debit the specified remittance amount during a business day based on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box. The Merchant shall deliver to GFE, no later than the 18th date of each month the bank statement for the Account in respect of the immediately preceding month. Within three business days of GFE's receipt of the Merchant's monthly bank statements, GFE shall reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the Specified Percentage. If the Merchant fails to deliver the bank statement for the Account for any month, GFE shall consider that the specific remittances were equal to the Specified Percentage of the settlement amount due from each Transaction for such month. GFE may, upon Merchant's request, adjust the amount of any payment due under this Agreement at GFE's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between GFE and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

### ORIGINAL OFFER:

| | | | |
|---|---|---|---|
| Total Purchase Price: | $600,000.00 | Merchant's Average Monthly Revenue: | $1,159,953.39 |
| Purchased Amount of Receivables: | $870,000.00 | Specified Percentage of Monthly Revenue: | 15% |
| Total Fees*: | $0.00 | Specified Remittance Amount & Frequency: | $3,999.00 / Daily |
| Net Funded Amount**: | $600,000.00 | Initial Estimated # of Remittance Payments: | 218 |

\* This amount reflects the total fees Merchant will pay at funding. See Appendix A for a complete breakdown of fees.

\*\* This amount reflects the total funds Merchant will receive after all the fees and balance transfers are deducted from the Total Purchase Price. See Balance Transfer Form for a complete breakdown of the remaining RTR balances.

\*\*\* If an Early Payment Addendum has been executed by GFE and the Merchant, the promotional early termination discount referenced above shall be applicable subject to the terms and conditions set forth in the Early Payment Addendum.

The Total Purchase Price may also be paid incrementally over time, in the increments and in the Specific Remittance Amounts set forth in the Attachment A Addendum annexed hereto.

Merchant #1 Initials: _JK_                                                                                        Page 1 of 19

THE MERCHANT AGREEMENT TERMS AND CONDITIONS, THE SECTION PARAGRAPH "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT. BY SIGNING BELOW, MERCHANT HEREBY REPRESENTS AND WARRANTS THAT NOTHING CONTAINED HEREIN IS FALSE, MISLEADING, AND THAT MERCHANT HAS NOT FAILED TO DISCLOSE ANY MATERIAL INFORMATION TO OBTAIN FUNDING FROM GFE.

| MERCHANT (#1) | | Signature | *DocuSigned by:* |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | 816-896-6909 |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

| OWNER / GUARANTOR (#1) | | Signature | *DocuSigned by:* |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

GFE NY, LLC
By:

_____
(Company Officer)

## MERCHANT AGREEMENT TERMS AND CONDITIONS

# I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to GFE with a Bank acceptable to GFE to obtain electronic fund transfer services for the Merchant's account at the Bank approved by GFE (the "Account"). Merchant shall provide GFE and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes GFE and/or its agent(s) to deduct from the Account the amounts owed to GFE for the receipts as specified herein and to pay such amounts to GFE. Merchant also hereby authorizes GFE to withdraw from the Account the Specified Percentage(s) and/or sums by GFE debiting the account. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by GFE or not. This additional authorization is not a waiver of GFE's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which GFE did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of GFE.

Merchant understands and agrees that this Agreement, including the authorizations to access Merchant's accounts (including the Account) set forth herein, as well as all other payment processing agreements entered into with respect to the Transactions irrevocably authorize the processor of such payments (the "Processor") and Operator to pay the cash attributable to the Specified Percentage of Receivables to GFE rather than to Merchant until GFE receives the cash attributable to the entire Specified Amount of Future Receivables from Processor and Operator. Merchant and Guarantor(s) authorize GFE and its agents: i) to investigate Merchant's financial status and history, and will provide to GFE any authorizations, bank or financial statements, tax returns, etc., as GFE deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. and ii) to update such information and financial and credit profiles from time to time as GFE deems appropriate. Merchant hereby authorizes all of its banks, brokers, processors and customers to provide GFE with Merchant's bank statements, brokerage statements, processing history and such other statements and information as GFE may in its sole discretion require to determine Merchant's and Guarantor's qualification or continuation in this program and for collections purposes. Merchant shall provide GFE with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from GFE.

These authorizations and instructions may be revoked only with the prior written consent of GFE. Merchant agrees that Processor and Operator may rely upon the instructions of GFE, without any independent verification, in making the cash payments above. Merchant waives any claim for damages it may have against Processor or Operator in connection with actions taken based on instructions from GFE, unless such damages were due to such Processor's or Operator's failure to follow GFE's instructions. Merchant acknowledges and agrees that (a) Processor and Operator will be acting on behalf of GFE with respect to the specified Percentage of Receivables until cash attributable to the entire Specified Amount of Future Receivables has been remitted by Processor and Operator to GFE, (b) Processor and Operator may or may not be affiliates of GFE, (c) GFE does not have any power or authority to control Processor's or Operator's actions with respect to the processing of Card transactions or remittance of cash to GFE, (d) GFE is not responsible and shall not be liable for, and Merchant agrees to hold GFE harmless for, the actions of Processor and Operator, and (e) funds representing the Specified Percentage of Receivables in the possession of Processing or Operator constitute property owned solely by GFE, and Merchant disclaims any and all interest therein. For purposes of this Agreement, the term "Operator" shall mean GFE or any person or entity designated by GFE to debit or otherwise withdraw (via the Automated Clearing House ("ACH") system, electronic checks, wires, or otherwise) any amounts from Merchant's or principal(s) accounts as authorized or permitted by this Agreement.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire "Purchased Amount" is received by GFE as per the terms of this Agreement. The termination of this Agreement shall not affect Merchant's continuing obligation and responsibility to fully satisfy all outstanding obligations that are due to GFE.

**1.3 Future Purchases.** GFE reserves the right to rescind the offer to make any purchase payments hereunder, in its sole and absolute discretion.

**1.4 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined) authorize GFE, its agents and representatives, as well as any credit reporting agency engaged by GFE, i) to investigate their financial responsibility and history, including any references given or any other statements or data obtained from or about Merchant or any of the Guarantor(s); ii) to obtain consumer and business credit reports on the Merchant and Guarantor(s); iii) to contact any current or prior bank of the Merchant in order to obtain whatever information it may require regarding any and all of Merchant's transactions with any such bank, including, but not limited to applications, bank statements, financial statements and tax returns; and (iv) to contact personal and business references provided by the Merchant or Guarantor(s), at any time now or for so long as Merchant and/or Guarantor(s) continue to have any obligation owed to GFE as a consequence of this Merchant Agreement or for GFE's ability to determine Merchant's eligibility to enter into any future agreement with GFE. Merchant and Guarantor(s) will further provide to GFE any authorizations, bank or financial statements, tax returns, etc., as GFE deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. GFE is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Merchant and Guarantor(s) acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Guarantor(s) has been relied upon to GFE in connection with its decision to purchase the Specified Amount of Future Receivables from Merchant.

**1.5 Transactional History.** Merchant authorizes all of their banks and brokers to provide GFE with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program. Merchant herby (i) authorizes GFE to contact any past, present or future processor of Merchant, its predecessors or affiliates, to obtain any information that GFE deems necessary or appropriate regarding any of their transactions with such processors, and (ii) authorizes and directs such processors to provide GFE with all such information in compliance with this Section. Such information may include information to verify the amount of Card receivables previously processed on behalf of Merchant, its predecessors or affiliates, and any amounts that may have been paid to, offset, held or reversed by, such processors. Without limiting the generality of the foregoing, Merchant authorizes GFE to contact any past, present or future processor of Merchant, its predecessors or affiliates, to confirm that Merchant is exclusively using the Processor accepted by GFE in accordance with this Agreement.

**1.6 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor and Operator, their respective officers, directors, affiliates, employees, agents, representatives and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable

attorney's fees) suffered or incurred by Processor or Operator resulting from (a) claims asserted by GFE for monies owed to GFE from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by GFE.

**1.7 No Liability.** In no event will Processor, Operator or GFE be liable for any claims asserted by Merchant or Guarantors under any legal theory or law, including any tort or contract theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of GFE's legal fees and expenses resulting therefrom.

**1.8 Reliance on Terms.** Section 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, GFE and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.9 Sale of Receipts.** Merchant and GFE agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from GFE to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. GFE has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to GFE in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, - it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that GFE has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and GFE shall promptly refund to Merchant any interest received by GFE in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that GFE not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant is not a debtor to GFE as of the date of this Agreement. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.10 Power of Attorney.** Merchant irrevocably appoints GFE as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to GFE from Processor, or in the case of a violation by Merchant of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to GFE; and (v) to file any claims or take any action or institute any proceeding which GFE may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant, and GFE is authorized to use Merchant's funds to pay for same. In addition to any other remedies available for violation of the Merchant's Contractual Covenants, in the event that Merchant changes or permits the change of the Processor accepted by GFE or utilizes the services of an additional Processor, GFE shall have the right, without waiving any of its rights or remedies and without notice to Merchant or Principal(s), to notify the new or additional Processor of the sale of the Specified Amount of Future Receivables hereunder and to direct such new or additional Processor to make payment to GFE of all or any portion of the amounts received or held by such Processor for or on behalf of Merchant to pay any amounts GFE is entitled to receive hereunder. Merchant hereby grants GFE an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints GFE and its designees as Merchant's attorney-in-fact, to take any and all actions necessary and appropriate to direct such new or additional Processor to make payment to GFE as contemplated by this Section. Merchant further hereby grants GFE an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints GFE and its designees as Merchant's attorney-in-fact, to execute any all documents in the Merchant's name sufficient to provide and perfect any security interest granted by Merchant to GFE hereunder, including but not limited to security interests in motor vehicles and real estate.

**1.11 Protections against Default.** The following Protections 1 through 8 may be invoked by GFE immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the GFE electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse or unacceptable to GFE; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's checks or deposit transactions to another processor or an unauthorized depository account; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God), transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of GFE, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to GFE; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor or (f) Merchant enters into any agreement with any third person or entity that relates to the Receipts or any portion thereof, whether in the form of a purchase, sale, loan, pledge or the granting of any security interest in the Receipts or any portion thereof These protections are in addition to any other remedies available to GFE at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchase Amount plus all fees (including legal fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** GFE may enforce the provisions of the Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant agrees to execute affidavit(s) of Confession of Judgment in favor of GFE in the amount of Purchase Amount stated in the Agreement. Merchant also hereby authorizes GFE to execute in the name of the Merchant affidavit(s) of Confession of Judgment in favor of GFE in the amount of Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, GFE may, without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of any appropriate court based upon the affidavit(s) of judgment by

confession previously executed by Merchant(s) and Owner(s)/Guarantor(s).

**Protection 4.** GFE may enforce its security interest in the Collateral identified in the Security Agreement hereof.

**Protection 5.** The entire Purchase Amount and all fees (including legal fees) shall become immediately refundable and payable to GFE from Merchant.

**Protection 6.** GFE may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, under which GFE shall recover Judgment against Merchant, Merchant shall be liable for all of GFE's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. GFE reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to GFE from Merchant prior to applying such amounts to reduce the amount of any outstanding Purchase Amount.

**Protection 7.** This Agreement shall be deemed Merchants Assignment of Merchant's Lease of Merchant's business premises to GFE. Upon breach of any provision in this Agreement, GFE may exercise its rights under this Assignment of Lease without prior Notice to Merchant.

**Protection 8.** GFE may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile GFE on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to GFE.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes GFE, its agents and employees to obtain and disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that GFE obtains) and business conduct only to it employees. agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against GFE or any of its affiliates relating to any (i) investigation undertaken by or on behalf of GFE as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by GFE, including this Agreement and any other GFE documentations (collectively, "Confidential Information") are proprietary and confidential information of GFE. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of GFE to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles GFE to not only damages and legal fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.14 Publicity.** Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes GFE to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.15 D/B/A's.** Merchant hereby acknowledges and agrees that GFE may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between GFE and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**1.16 Purchase of Increments.** In the event that GFE offers to purchase additional Receipts in the "increments' stated on Attachment A of this Agreement, then GFE reserves the unilateral right to delay or rescind such offer in its sole and absolute discretion at any time.

**1.17 Sharing of Information.** Merchant hereby authorizes GFE to share information regarding Merchant's performance under this Agreement with affiliates and unaffiliated third parties.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement, and until GFE is fully paid:

**2.1 Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial Statements, copies of which have been furnished to GFE, and future statements which will be furnished hereafter at the discretion of GFE, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise GFE of any material adverse change in their financial condition, operation or ownership. Merchant hereby warrants that its Average Monthly Revenue as enumerated on page (1) of this Agreement is accurate, and that any and all cash advances or loans outstanding by Merchant have be disclosed to GFE. GFE may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to GFE within 5 business days. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance.** Merchant will maintain business-interruption insurance naming GFE as loss payee and additional insured in amounts and against risks as are satisfactory to GFE and shall provide GFE proof of such insurance upon request. Merchant shall also maintain such other insurance in such amounts and against such risks as GFE deems necessary to protect Merchant's business, and Merchant shall provide proof of such insurance to GFE upon demand.

**2.5 Electronic Check Processing Agreement.** Merchant will not change its processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without GFE's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location and Related Entities.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and GFE, nor shall Merchant change any of its places of business without prior written consent by GFE. Merchant does not and shall not conduct Merchant's business under any name other than as set forth in this agreement and shall not change its place of business. Merchant shall not change its legal name, entity type or jurisdiction of organization. In the event Merchant, any of its officers or directors or any Owner/Guarantor, during

the term of this agreement or while Merchant remains indebted to GFE or any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due GFE under this Agreement. With respect to any such entity, GFE shall have the right to name such newly formed or existing entity as a debtor in any claim, suit, or legal proceeding.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from GFE to Merchant, execute, acknowledge and deliver to GFE and/or to any other person, firm or corporation specified by GFE, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy. As of the date of this Agreement, Merchant is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.**

**2.10 Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the Receipts or future check sales, or any portion thereof, whether in the form of a purchase, sale, a loan against, collateral against or the sale or purchase of credits against, such Receipts or future check sales, with any party other than GFE. GFE may share information regarding this Merchant Agreement with any third party in order to determine whether Merchant is in compliance with this provision.

**2.11 Unencumbered Receipts.** Merchant has, and at all times will have, good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of GFE. Without limiting the generality of the foregoing, all future Receipts purchased by GFE hereunder shall be free and clear of any and all liens (other than GFE's ownership rights therein) at the time they become Receivables. All amounts received by GFE attributable to the Specified Amount of Future Receivables purchased by GFE hereunder shall arise from bona fide sales by Merchant of its goods and services to Card holders who present their Cards as payment thereof.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.14 Good Faith, Best Efforts and Due Diligence.** Merchant and Guarantors hereby affirm that it will conduct its business in Good Faith and will expend its Best Efforts to maintain and grow its business, to ensure that GFE obtains the Purchased Amount. Furthermore, Merchant and Guarantors hereby agree, warrant and represent hereby that they will constantly perform all appropriate Due Diligence and credit checks of all of the customers' finances, cash flow, solvency, good faith, payment histories and business reputations (the "Due Diligence Requirements") as may suffice to ensure any and all products and/or services provided, sold or delivered by Merchant to said customers will be paid for by customers in full and on time, and will not result in the creation of an unpaid account. These Due Diligence Requirements must be performed prior to any sales to any customer, and repeated no less frequently than monthly for so long as any sums are due from those customers. Full documentation of all of Merchant's compliance with its Due Diligence Requirements must be maintained in Merchant's files so long as GFE has not fully collected all sums due to it. This is not a guaranty of payment by customers, but is a guaranty of full, adequate and good faith Due Diligent investigation and credit check of customers before extending credit to them and continuing no less frequently than monthly so long as sums are still due.

**2.15 Taxes.** Merchant will promptly pay all necessary taxes, including but not limited to employment, sales and use taxes.

**2.16 No Violation of Prior Agreements.** Merchant warrants that its execution and performance of this Merchant Agreement will not violate or conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Merchant is subject, including any agreement that prohibits the sale or pledge of Merchant's future receipts or the Purchased Amount.

**2.17 Opportunity for Counsel.** Merchant represents, warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Merchant Agreement, and that it has been represented by legal counsel or has had full opportunity to consult with its own legal counsel.

**2.18 Ongoing Obligations.** Merchant hereby covenants and agrees that even after it receives some or all of the Purchase Price from GFE, it will comply with GFE's ongoing requests for any documentation from Merchant for the purpose of business and identify verification and underwriting and verification (such as the merchant's driver's license, bank login, bank statements, or any other financial or business documentation). Merchant's failure to provide to GFE the requested documentation within twenty-four (24) hours shall be deemed a breach of this Agreement and GFE shall no longer be obligated to provide any further funding to Merchant. In addition, if after receipt of said documentation from Merchant, GFE discovers that Merchant made misrepresentations before receiving funding from GFE, GFE shall no longer be obligated to provide any further funding to Merchant and Merchant's misrepresentations shall be deemed a breach of this Agreement.

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Merchant; (d) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (e) Merchant shall transfer or sell all or substantially all of its assets, or issue any notice of intended bulk sale or transfer; (f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (g) Merchant shall use multiple depository accounts without the prior written consent of GFE (h) Merchant shall change its depositing account without the prior written consent of GFE; (i)

Merchant #1 Initials: _JK_

Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; (j) the Specified Percentage of its daily Receipts is not available for ACH by GFE on any three (3) business days within any twenty (20) business day period; (k) Merchant shall default under any of the terms, covenants and conditions of any other agreement with GFE; or (l) Merchant fails to deposit its Receipts into the Account.

**3.2 Personal Guaranty.** In the event of a Default under Sections 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13, and 2.14 hereof, should GFE determine that the Purchased Amount cannot be obtained from the Merchant's business, GFE will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to GFE for all of GFE's losses and damages, in additional to all costs, fees expenses and legal fees associated with such enforcement. GFE shall not be required before exercising and enforcing its rights under this Personal Guaranty first to resort to payment against Merchant or to any other person or to any collateral.

**3.3 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4.1 hereof, GFE may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Security Agreement or Guaranty, or pursuant to any other legal or equitable right or remedy. Upon Merchant's and/or Owner's/Guarantor's default hereunder, the balance of the Purchased Amount remaining due, plus any applicable fees, shall become immediately due and payable to GFE. In addition, upon an Event of Default, GFE may: i) enforce the provisions of the Security Agreement and Guaranty against each Merchant and Owner/Guarantor; ii) enforce its security interest in the Collateral and the ; iii) debit Merchant's deposit accounts wherever situated by means of ACH debit or facsimile signature on a computer generated check drawn on Merchant's bank account for all or a portion of the balance of the Purchased Amount remaining due, or GFE may instruct the Processor to forward to GFE, without any prior notice to Merchant, all or a portion of the balance of the Purchased Amount remaining due, and iv) without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of the appropriate court based upon the affidavit(s) of judgment by confession previously executed by Merchant(s) and Owner(s)/Guarantor(s). All rights, powers and remedies of GFE which may be exercised by GFE at any time after the occurrence of an Event of Default are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Costs.** Merchant shall pay to GFE all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(b) the enforcement of GFE 's remedies set forth in Section 3.3 above, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications.** Merchant is required to give GFE written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give GFE seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

# IV.MISCELLANEOUS

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by GFE.

**4.2 Assignment.** This Agreement shall be binding upon and inure to the benefit of Merchant, Principal(s), GFE and their respective successors and assigns, except that Merchant and Principal(s) shall not have the right to assign or delegate any of their rights or obligations hereunder or any interest herein without prior written consent of GFE, which consent may be withheld in GFE's sole discretion. Any such assignment or delegation without GFE's prior written consent shall be void. GFE reserves the right to assign or delegate this Agreement or any of its rights or obligations hereunder with or without prior notice to Merchant. GFE may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the merchant at the address set forth above in this agreement and to GFE at 2999 NE 191st Street, Unit 901, Miami, FL 33180 with a copy to 27-01 Queens Plaza North, Suite 802, Long Island City, NY 11101. Notices to GFE shall become effective only upon receipt by GFE. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of GFE to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, GFE and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of GFE which consent may be withheld in GFE's sole discretion. GFE reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, may, if GFE so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by GFE to transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provision in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and GFE and supersede all prior agreements and understandings relating to the subject matter hereof. Merchant and Principal(s) each acknowledge and agree that

he, she or it is not relying on any representations not specifically embodied in this agreement.

### 4.10 JURY TRIAL WAIVER.

THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

### 4.11 Facsimile Acceptance.
Merchant and Guarantor(s) hereby agree that facsimile and/or electronic signatures on this Merchant Agreement and Guaranty, or photocopies thereof, that shall be deemed acceptable and treated as originals for all purposes, and shall be admissible as evidence of the Merchant Agreement and Guaranty.

### 4.12. Right of Access.
In order to ensure that Merchant is complying with the terms of this Merchant Agreement, Merchant agrees that GFE shall have the right to (i) enter, without notice, the premises of Merchant's business for the purpose of inspecting and checking Merchant's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Merchant's daily receipts to the Processor and to ensure that Merchant has not violated any other provision of this Agreement, and (ii) Merchant's shall provide access to its employees and records and all other items as requested by GFE, and (iii) have Merchant's provide information about its business operations, banking relationships, vendors, landlord and other information to allow GFE to interview any relevant parties. Furthermore, Merchant agrees to provide GFE, at all times with "Live Contemporaneous Access" to all of its bank accounts in order for GFE to evaluate Merchant's compliance with the Merchant Agreement, and for collections in the event of a default under the Merchant Agreement. "Live Contemporaneous Access" shall be defined as: Merchant, at all times and including but not limited to, providing GFE with accurate login information necessary to access all of Merchant's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens.

### 4.13. Phone Recordings and Contact.
Merchant agrees that any call between GFE and Merchant, and their agents and employees may be recorded or monitored. Further, Merchant agrees that (i) it has an established business relationship with GFE, its employees and agents and that Merchant may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, emails address, or facsimile number given to GFE by the Merchant, its agents or employees, including cellular telephones.

### 4.14. Monitoring, Recording, and Solicitations.
a. Authorization to Contact Seller by Phone. Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

b. Authorization to Contact Seller by Other Means. Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
|---|---|
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

## SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant grants to GFE a security interest in and lien upon: (a) all accounts receivables, accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant, (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to GFE under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to GFE upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover GFE's entitlements under this Agreement, GFE is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of GFE's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, GFE or an affiliate of GFE. GFE is authorized to execute and file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by GFE without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, GFE has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, GFE will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from GFE written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant agrees that this is a contract of recoupment and GFE is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant agrees not to contest or object to any motion for relief from the automatic stay filed by GFE. Merchant agrees to execute and deliver to GFE such instruments and documents GFE may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. GFE is authorized to execute all such instruments and documents in Merchant's name.

In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to GFE for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due GFE under this Agreement. With respect to any such entity, GFE shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC Financing Statement and to have it filed with any and all appropriate UCC filing offices. GFE shall be held harmless by Merchant and each Owner/Guarantor and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. GFE shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of GFE's rights, including without limitation, GFE's right to collect all accounts, and to notify any payment card processor or creditor of such entity that GFE has such rights in such entity's assets. Merchant also agrees that, at the GFE's discretion, GFE may choose to amend any existing financing statement to include any such newly formed entity as debtor.

Merchant and Guarantor each acknowledge and agree that any security interest granted to GFE under any other agreement between Merchant or Guarantor and GFE (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as GFE deems necessary to perfect or maintain GFE's first priority security interest in the Collateral including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes GFE to file any financing statements deemed necessary by GFE to perfect or maintain GFE's security interest, which financing statement may contain notification that Merchant and/or Guarantor have granted a negative pledge to GFE with respect to the Collateral, and that any subsequent lien or may be tortuously interfering with GFE's rights. Merchant and Guarantor shall be liable for, and GFE may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by GFE in protecting, preserving and enforcing GFE's security interest and rights.

**Negative Pledge.** Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** GFE shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, GFE may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that GFE may enter into an agreement with Merchant's landlord giving GFE the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default, GFE may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to GFE, whether by acceleration or otherwise.

**Personal Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to GFE, Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the Merchant Agreement in Sections thereof 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13 and 2.14, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, GFE may seek recovery from Guarantors for all of GFE's losses and damages by enforcement of GFE's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral GFE may hold pursuant to this Agreement or any other guaranty.

GFE does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) GFE's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to GFE. In addition, GFE may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to GFE; (ii) release Merchant from its obligations to GFE; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to GFE under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.**

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | *[signature]* | | |

| OWNER / GUARANTOR (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | *[signature]* | | |

## APPENDIX A STRUCTURE.

A. **Origination Fee** - % of Purchase Price to cover Underwriting and related expenses. This expense is charged at the time of funding.

B. **ACH Program Fee** - % of Purchase Price ACH's are labor intensive and are not an automated process, requiring us to charge this fee to cover costs. This expense is charged at the time of funding.

C. **Miscellaneous Service Fees** - Merchant shall pay certain fees for services related to the origination and maintenance of Accounts, which fees are set forth below. Each Merchant shall receive their funding electronically to their designated bank account, and the GFE may deduct some or all of the fees from the funded amount.

A. Rejected ACH/Blocked ACH - $5,000.00 when Merchant blocks Account from our Debit ACH, or when Merchant directs the bank to reject our debit ACH, which places them in default (per contract).

B. Pre-Authorized Bank Change Fee - $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

C. Wire Fee - $50.00 Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for either a Fed Wire fee or a bank ACH fee.

D. UCC Filing, Amendment or Termination Fee - $200.00.

E. Default Fee - $5,000.00 when Merchant defaults under the Agreement, including but not limited to diverting its Receivables from the bank account agreed upon in the "Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)" or changing its credit card processing thus terminating or diverting the agreed upon split.

F. Account Management Fees - $45.00 upon origination, and $45.00 per month thereafter until the Purchase Amount, together with any and all unpaid outstanding other fees have been paid in full. These Management Fees will not be applied towards the reduction of the Purchase Amount.

G. Stacking Fee - In the event that the Merchant enters into any cash advance or any loan agreement that relates to or involves the Receipts with any person or entity other than GFE during any portion of the term of this Agreement, then: i) Merchant shall pay to GFE a "Stacking" fee equal to $5,000.00 per occurrence, and ii) the specified daily remittances that Merchant is obligated to pay to GFE hereunder shall be doubled, and Merchant shall be deemed to have authorized GFE to double the amount of its ACH Debits from the Merchant's Account on a daily basis.

H. Third Party Collections Fee – In the event that Merchant defaults under any of the terms and conditions of this Agreement, Merchant shall pay to GFE, in addition to any other fees associated with Merchant's default, a third party collections fee equal to fifteen (15%) of the outstanding balance after all fees at the time of default.

I. NSF Fee (Standard) - $ 35.00 each until a default is declared.

J. Non-ACH Transaction Fee - When a Merchant makes a payment other than through ACH, the Merchant is responsible for the cost of that transaction.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | | | |

Merchant Verification Form

| Merchant Name: JESSE LEE KAGARICE | |
|---|---|
| 1.  Do you currently or within the last 90 days have any intentions, plans or discussions regarding closing your Business? | NO |
| 2.  Do you currently or within the least 90 days have any intentions, plans or discussions to change the name or legal structure of the business? | NO |
| 3.  *Are you currently in, or contemplating personal bankruptcy?* | NO |
| 4.  Are you currently in, or contemplating business bankruptcy? | NO |
| 5.  Is your business currently for sale? | NO |
| 6.  Do you have any existing merchant cash advance balances? | NO |
| 7.  Are you involved in any litigation proceedings or are a party to a lawsuit? | NO |
| 8.  Is your business currently in default of any agreement with a creditor? | NO |
| 9.  Is your business currently in forbearance agreement with a creditor? | NO |
| 10. Will selling the Future Receivables cause you to breach any agreement with a creditor? | NO |

If you have answered YES to any of the above questions, please explain:

I hereby certify that the above statements are true and correct to the best of my knowledge; I authorize my landlord and credit card processor to discuss confidential account information for the purpose of satisfying the requirements of GFE NY, LLC.

Completed and attested by:

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT)
## AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep this important legal document for Merchant's records.

DISBURSEMENT OF ADVANCE PROCEEDS. By signing below, Merchant authorizes GFE to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Merchant later identifies and is acceptable to GFE) (hereinafter referred to as the "Designated Checking Account") This authorization is to remain in full force and effect until GFE has received written notification from Merchant of its termination in such time and in such manner as to afford GFE and Merchant's depository bank a reasonable opportunity to act on it.

BUSINESS PURPOSE ACCOUNT. By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

MISCELLANEOUS. GFE is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Merchant's account must comply with the provisions of U.S. law.

I, (We) JESSE LEE KAGARICE hereby Authorize, GFE NY, LLC. (Hereinafter known as "GFE") to Electronically (ACH) debit the Bank Account Below, of which I am a signer:

| | | | |
|---|---|---|---|
| Bank Name: | NODAWAY VALLEY BANK | Tax ID: | |
| ABA: Routing: | | DDA: Account: | |
| For the amount of: | $3,999.00 | (Or) Percentage of each Banking Deposit: | 15% |
| On the Following Days: | MONDAY-FRIDAY | | |

This authorization is to remain in full force and effect until COMPANY has received written notification from me at least 5 banking days prior to its termination to afford COMPANY a reasonable opportunity to act on it.

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

Thank you for accepting an offer from GFE NY, LLC ("GFE"). We look forward to being your funding partner for as long as you need.

Please note that the way your advance is set up with GFE, GFE requires viewing access to your bank account each business day, throughout the term of this Agreement, in order that GFE may calculate and verify the amount of your daily remittance. Please be assured that we will carefully safeguard your confidential information and only essential personnel will have access to it.

GFE NY, LLC. will also require viewing access to your bank account, prior to funding, as part of the underwriting process.

Please be advised that for security purposes, GFE will request this information prior to funding. By signing below, you hereby agree that if you fail to provide the requested bank login information prior to funding, GFE shall have no obligation to provide funding. Please be further advised that if you change any of the bank login information during the term of this Agreement or at any time while you still have any outstanding obligations to GFE, you are required to immediately inform GFE of the changes made and provide GFE with the new bank login information. Please see below for the list of questions that will be by GFE as it relates to the banking information.

1. Bank Portal Website;
2. Bank Account Username;
3. Bank Account Password;
4. Security Question/Answer 1 of this Bank Account;
5. Security Question/Answer 2 of this Bank Account;
6. Security Question/Answer 3 of this Bank Account; and
7. Any other information necessary to access your Bank Account.

If you have any questions please feel free to contact our cash management department.

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

**BANK ACCOUNT DISCLOSURE AFFIDAVIT**

For the purpose of obtaining the Business Cash Advance evidence by the Merchant Agreement of this same date herewith (the "Business Cash Advance") from GFE NY, LLC., the undersigned Seller/Merchant hereby makes the following statement under penalty of law:

**OPTION 1 – DISCLOSURE AND AUTHORIZATION FOR ADDITIONAL ACCOUNTS:**

By selecting this option, the Seller/Merchant hereby declares that in addition to the designated for ACH debit, the Seller/Merchant also has the following additional account(s) which he authorizes us to use in the event we are unable to debit from the designated account. The Seller/Merchant declares and warrents that it currently maintains no other bank account at any financial institution other than those banks and accounts referenced below.

| | |
|---|---|
| Bank Name | |
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| | |
|---|---|
| Bank Name | |
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| | |
|---|---|
| Bank Name | |
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

**OPTION 2** - By selecting this option, the merchant swears, under penalty of law, that Merchant has no accounts in any lending institution in addition to the one provided for ACH debit

**PLEASE SELECT AN OPTION AND SIGN BELOW:**

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | | | |

## ADDENDUM TO MERCHANT AGREEMENT

This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law. Any litigation relating to this Agreement must be commenced and maintained in any court located in New York State (the "Acceptable Forums"), however any action or proceeding to enforce a judgment or arbitration award may also be commenced and maintained in any other court of competent jurisdiction. The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum.

**THE PARTIES AGREE TO WAIVE TRIAL BY JURY IN ANY DISPUTE BETWEEN THEM.**

In any litigation commenced by GFE, Merchant and Guarantor will not be permitted to interpose any counterclaim. Merchant and Guarantor agree that any claim that is not asserted against GFE within 1 year of its accrual will be time barred. If GFE prevails in any litigation with Merchant and/or Guarantor, then Merchant and Guarantor must pay GFE's reasonable attorney fees, which may include a contingency fee of up to 33% of the amount claimed, expert fees, costs of suit, and prejudgment interest at a rate of 16% per annum (or the maximum rate permitted by applicable law if lower). GFE, Merchant, and Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**Merchant and Guarantor consent to service of process and legal notices made by certified mail, return receipt requested delivered by the United States Postal Service and addressed to the Contact Address set forth immediately below or on Page 1 of this Agreement, any such service will be deemed complete 5 days after dispatch.**

I have read and agreed to the Terms and Conditions set forth above:

| MERCHANT (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

**TRADE REFERENCES**

Please provide a list of 3-5 professional references

| **TRADE REFERENCE #1:** | |
|---|---|
| **Name:** | |
| **Phone Number:** | |
| **Email Address:** | |

| **TRADE REFERENCE #2:** | |
|---|---|
| **Name:** | |
| **Phone Number:** | |
| **Email Address:** | |

| **TRADE REFERENCE #3:** | |
|---|---|
| **Name:** | |
| **Phone Number:** | |
| **Email Address:** | |

| **TRADE REFERENCE #4:** | |
|---|---|
| **Name:** | |
| **Phone Number:** | |
| **Email Address:** | |

| **TRADE REFERENCE #5:** | |
|---|---|
| **Name:** | |
| **Phone Number:** | |
| **Email Address:** | |

## Weekly Advance Addendum to the Merchant Agreement

This Weekly Advance Addendum amends the Merchant Agreement and Security Agreement between GFE and the merchant listed below (the "Merchant") dated 12/07/2021, (the "Agreement"). All capitalized terms used in his Addendum shall have the same meaning as defined in the Agreement. Except as modified below, the terms of the Agreement remain in full force and effect.

### MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

This Weekly Advance Addendum amends the Merchant Agreement and Security Agreement between GFE and the merchant listed below (the "Merchant") dated 12/07/2021, (the "Agreement"). All capitalized terms used in his Addendum shall have the same meaning as defined in the Agreement. Except as modified below, the terms of the Agreement remain in full force and effect.

### AGREEMENT AS TO ADVANCES

1. <u>Weekly Sale and Purchase of Merchant's Future Receipts</u>: Merchant hereby offers to sell and GFE agrees to purchase, up to the Receipts Purchased Amount, future Receipts on a weekly basis according to the attached schedule. GFE shall have the right to terminate the purchase of any additional future Receipts as set forth in Section 2 of this Addendum.

2. <u>GFE's Obligation to Make Future Purchases</u>: GFE reserves the right to terminate its obligation to make the weekly purchases at its option, if upon: (i) a Event of Default has occurred, as defined in the Agreement; (ii) Merchant fails to provide to GFE a monthly Account statement, access codes to the Account, and full access to merchant's Account prior making any weekly purchase as contemplated herein; (iii) Merchant obtains any additional funding without providing prior written notice to and receiving written approval from GFE; (iv) the Specified Percentage of its weekly Receipts is not available for ACH by GFE on any three (3) business days within any twenty (20) business day period; (v) Merchant has a 20% decline in monthly deposits that is not due to regular seasonal payment fluctuations; (vi) GFE believes in its sole judgment that Merchant's business may not be able to generate future Receipts sufficient to deliver the Purchased Receipts in a timely manner, vii) the Account has a negative balance; viii) Merchant is in arrears with respect to its payment obligations under the Agreement or ix) the Merchant has failed to provide GFE with a complete account receivable report within any thirty (30) day period prior to any weekly purchase contemplated herein In the event that weekly purchases are terminated, the Merchant will remain obligated to deliver the Specified Percentage of its weekly Receipts to GFE until GFE has received the Receipts GFE purchased prior to termination, and to comply with all other provisions of this Agreement.

3. <u>Merchant's Indebtedness When Receipts Purchased Amount Is Sold In Increments</u>: When Merchant sells and GFE purchases the Receipts Purchased Amount, or portions thereof, in increments, the Merchant's indebtedness to GFE under the Agreement (excluding any fees and expenses then then due and owing) shall at any given point in time be equal to the percentage of the total Receipts Purchase Amount that the total of all increments then paid by GFE to the Merchant bears to Total Purchase Price as set forth in the Agreement.

THE TERMS OF THIS ATTACHMENT A ARE HEREBY INCORPORATED INTO AND MADE A PART OF THE MERCHANT AGREEMENT IDENTIFIED ABOVE, AND MERCHANT HEREBY ACKNOWLEDGES THAT THE PERIODIC PURCHASE OF FUTURE RECEIPTS HEREUNDER ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE MERCHANT AGREEMENT

| MERCHANT (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

| OWNER / GUARANTOR (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

**MERCHANT INFORMATION**

| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
|---|---|
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

## GFE Weekly Distribution Grid-Special Agreement

| Increment | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Amount | $106,090.50 | $33,090.50 | $33,090.50 | $33,090.50 | $33,090.50 |
| Increment | 6 | 7 | 8 | 9 | 10 |
| Amount | $33,090.50 | $33,090.50 | $33,090.50 | $33,090.50 | $33,090.50 |
| Increment | 11 | 12 | 13 | 14 | 15 |
| Amount | $33,090.50 | $33,090.50 | $33,090.50 | $33,090.50 | $33,090.50 |
| Increment | 16 | | | | |
| Amount | $30,642.50 | | | | |

## *Appropriate fee will be deducted from the first increment.

## See APPENDIX A STRUCTURE for fee details.

| MERCHANT (#1) | | Signature | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | |
| Social Security No: | | Home or Secondary Number: | |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: | | Status: Completed |
| Subject: Global Funding Experts (GFE) - Merchant DocuSign Contract for: JLK CONSTRUCTION, LLC. | | |
| Source Envelope: | | |
| Document Pages: 19 | Signatures: 13 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 19 | GFE Contract Team |
| AutoNav: Enabled | | 27-01 Queens Plaza North, Suite 802 |
| EnvelopeId Stamping: Enabled | | Long Island City, NY  11101 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | contracts@globalfundingexperts.com |
| | | IP Address: |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: GFE Contract Team | Location: DocuSign |
| 12/7/2021 7:21:21 PM | contracts@globalfundingexperts.com | |

## Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| JESSE LEE KAGARICE | *DocuSigned by:* | Sent: 12/7/2021 7:23:29 PM |
| jesse@jlkconstruction.com | —F19991S44D84403... | Viewed: 12/7/2021 7:58:04 PM |
| President | | Signed: 12/7/2021 8:00:53 PM |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Drawn on Device | |
| | Using IP Address: | |
| | Signed using mobile | |

Electronic Record and Signature Disclosure:
   Accepted: 12/7/2021 7:58:04 PM
   ID: ·

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

## Carbon Copy Events

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Sam Brugman | COPIED | Sent: 12/7/2021 7:23:29 PM |
| sbrugman@pmfus.com | | |
| Security Level: Email, Account Authentication (None) | | |
| Electronic Record and Signature Disclosure: Not Offered via DocuSign | | |
| Liliana | COPIED | Sent: 12/7/2021 7:23:29 PM |
| iso@globalfundingexperts.com | | |
| Security Level: Email, Account Authentication (None) | | |
| Electronic Record and Signature Disclosure: Not Offered via DocuSign | | |

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| GFE Contract Team<br>contracts@globalfundingexperts.com<br>GFE Contract Team<br>Global Funding Experts<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 12/7/2021 7:23:29 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/7/2021 7:23:29 PM |
| Certified Delivered | Security Checked | 12/7/2021 7:58:04 PM |
| Signing Complete | Security Checked | 12/7/2021 8:00:53 PM |
| Completed | Security Checked | 12/7/2021 8:00:53 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 8/2/2018 1:03:27 PM
Parties agreed to: JESSE LEE KAGARICE

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Global Funding Experts (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Global Funding Experts:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: samin@globalfundingexperts.com

**To advise Global Funding Experts of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at samin@globalfundingexperts.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Global Funding Experts**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to samin@globalfundingexperts.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Global Funding Experts**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to samin@globalfundingexperts.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Global Funding Experts as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Global Funding Experts during the course of your relationship with Global Funding Experts.

Exhibit "4"



# MERCHANT CONTRACT:

# JLK CONSTRUCTION, LLC.

**I hereby certify that ISO - Premium Merchant Funding ("Agent") acted as a Merchant's agent.**

**Completed and attested by:**



DocuSigned by:

JESSE LEE LAGARCE

F19B915A4DB64B3...

07/13/2022    Agent Name: ISO - Premium Merchant Funding

# GFE

**27-01 Queens Plaza North, Suite 802, Long Island City, NY 11101**
**Tel: 1-877-253-7686, Fax: 718-504-3736**
**Website: www.globalfundingexperts.com / Email: underwriting@globalfundingexperts.com**

---

## MERCHANT AGREEMENT

Agreement dated _____07/13/2022_____ between White Road Capital LLC, Series: 120785, D/B/A: GFE Holdings (**"White Road"**) and the Merchant listed below (**"MERCHANT"**)
                (Month) (Day) (Year)

### MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| State of Incorporation / Organization: | MO |
| Type of Business Entity: | LLC |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Mailing Address: | PO BOX 8820, Saint Joseph, MO, 64508 |
| Primary Contact & Number: | JESSE LEE KAGARICE ((816) 273-7860) |

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant ("Merchant"), in consideration of the funds provided to Merchant by White Road as specified below ("Purchase Price"), hereby sells, assigns and transfers to White Road (making White Road the absolute owner) the Specified Percentage indicated below of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts") defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business, for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to White Road.

The Purchased Amount shall be paid to White Road by Merchant irrevocably directing and authorizing that there be only one depositing bank account, which account must be acceptable to and pre-approved by White Road (the "Account") into which Merchant and Merchant's customers shall remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each Transaction, until such time as White Road receives payment in full of the Purchased Amount. Merchant hereby authorizes White Road to ACH Debit the specified remittances from the Merchant's Account on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box and will provide White Road with all required access codes and monthly bank statements. Merchant understands that it is responsible for ensuring that the Specified Percentage to be debited by White Road remains in the Account and will be held responsible for any fees incurred by White Road resulting from a rejected ACH attempt or an event of default. (See Appendix A) White Road is not responsible for any overdrafts or rejected transactions that may result from White Road's ACH debiting the specified amounts under the terms of this agreement. White Road will debit the specified remittance amount during a business day based on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box. The Merchant shall deliver to White Road, no later than the 18th date of each month the bank statement for the Account in respect of the immediately preceding month. Within three business days of White Road's receipt of the Merchant's monthly bank statements, White Road shall reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the Specified Percentage. If the Merchant fails to deliver the bank statement for the Account for any month, White Road shall consider that the specific remittances were equal to the Specified Percentage of the settlement amount due from each Transaction for such month. White Road may, upon Merchant's request, adjust the amount of any payment due under this Agreement at White Road's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between White Road and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

| ORIGINAL OFFER: | | | |
|---|---|---|---|
| Total Purchase Price: | $277,000.00 | Merchant's Average Monthly Revenue: | $435,706.03 |
| Purchased Amount of Receivables: | $387,523.00 | Specified Percentage of Monthly Revenue: | 15% |
| Total Fees*: | $0.00 | Specified Remittance Amount & Frequency: | $2,499.00 / Daily |
| Net Funded Amount**: | $277,000.00 | Initial Estimated # of Remittance Payments: | 156 |

**\* This amount reflects the total fees Merchant will pay at funding. See Appendix A for a complete breakdown of fees.**

**\*\* This amount reflects the total funds Merchant will receive after all the fees and balance transfers are deducted from the Total Purchase Price. See Balance Transfer Form for a complete breakdown of the remaining RTR balances.**

**\*\*\* If an Early Payment Addendum has been executed by White Road and the Merchant, the promotional early termination discount referenced above shall be applicable subject to the terms and conditions set forth in the Early Payment Addendum.**

**The Total Purchase Price may also be paid incrementally over time, in the increments and in the Specific Remittance Amounts set forth in the Attachment A Addendum annexed hereto.**

Merchant #1 Initials: _____

THE MERCHANT AGREEMENT, ON PAGE 2, THE SECURITY AGREEMENT AND GUARANTY, AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT. BY SIGNING BELOW, MERCHANT HEREBY REPRESENTS AND WARRANTS THAT NOTHING CONTAINED HEREIN IS FALSE, MISLEADING, AND THAT MERCHANT HAS NOT FAILED TO DISCLOSE ANY MATERIAL INFORMATION TO OBTAIN FUNDING FROM White Road.

| MERCHANT (#1) | | Signature | JESSE LEE KAGARICE |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | 816-896-6909 |
| Social Security No: | | Home or Secondary Number: | 816-396-9097 |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

| OWNER / GUARANTOR (#1) | | Signature | JESSE LEE KAGARICE |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | 816-896-6909 |
| Social Security No: | | Home or Secondary Number: | 816-396-9097 |
| Driver License No: | | Email: | jesse@jlkconstruction.com |

White Road Capital LLC, Series: 120785, D/B/A: GFE Holdings
By:

_____
(Company Officer)

## I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to White Road with a Bank acceptable to White Road to obtain electronic fund transfer services for the Merchant's account at the Bank approved by White Road (the "Account"). Merchant shall provide White Road and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes White Road and/or its agent(s) to deduct from the Account the amounts owed to White Road for the receipts as specified herein and to pay such amounts to White Road. Merchant also hereby authorizes White Road to withdraw from the Account the Specified Percentage(s) and/or sums by White Road debiting the account. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by White Road or not. This additional authorization is not a waiver of White Road's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which White Road did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of White Road.

Merchant understands and agrees that this Agreement, including the authorizations to access Merchant`s accounts (including the Account) set forth herein, as well as all other payment processing agreements entered into with respect to the Transactions irrevocably authorize the processor of such payments (the "Processor") and Operator to pay the cash attributable to the Specified Percentage of Receivables to White Road rather than to Merchant until White Road receives the cash attributable to the entire Specified Amount of Future Receivables from Processor and Operator. Merchant and Guarantor(s) authorize White Road and its agents: i) to investigate Merchant's financial status and history, and will provide to White Road any authorizations, bank or financial statements, tax returns, etc., as White Road deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. and ii) to update such information and financial and credit profiles from time to time as White Road deems appropriate. Merchant hereby authorizes all of its banks, brokers, processors and customers to provide White Road with Merchant's bank statements, brokerage statements, processing history and such other statements and information as White Road may in its sole discretion require to determine Merchant's and Guarantor's qualification or continuation in this program and for collections purposes. Merchant shall provide White Road with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from White Road.

These authorizations and instructions may be revoked only with the prior written consent of White Road. Merchant agrees that Processor and Operator may rely upon the instructions of White Road, without any independent verification, in making the cash payments above. Merchant waives any claim for damages it may have against Processor or Operator in connection with actions taken based on instructions from White Road, unless such damages were due to such Processor`s or Operator`s failure to follow White Road`s instructions. Merchant acknowledges and agrees that (a) Processor and Operator will be acting on behalf of White Road with respect to the specified Percentage of Receivables until cash attributable to the entire Specified Amount of Future Receivables has been remitted by Processor and Operator to White Road, (b) Processor and Operator may or may not be affiliates of White Road, (c) White Road does not have any power or authority to control Processor`s or Operator`s actions with respect to the processing of Card transactions or remittance of cash to White Road, (d) White Road is not responsible and shall not be liable for, and Merchant agrees to hold White Road harmless for, the actions of Processor and Operator, and (e) funds representing the Specified Percentage of Receivables in the possession of Processing or Operator constitute property owned solely by White Road, and Merchant disclaims any and all interest therein. For purposes of this Agreement, the term "Operator" shall mean White Road or any person or entity designated by White Road to debit or otherwise withdraw (via the Automated Clearing House ("ACH") system, electronic checks, wires, or otherwise) any amounts from Merchant`s or principal(s) accounts as authorized or permitted by this Agreement.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire "Purchased Amount" is received by White Road as per the terms of this Agreement. The termination of this Agreement shall not affect Merchant's continuing obligation and responsibility to fully satisfy all outstanding obligations that are due to White Road.

**1.3 Future Purchases.** White Road reserves the right to rescind the offer to make any purchase payments hereunder, in its sole and absolute discretion.

**1.4 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined) authorize White Road, its agents and representatives, as well as any credit reporting agency engaged by White Road, i) to investigate their financial responsibility and history, including any references given or any other statements or data obtained from or about Merchant or any of the Guarantor(s); ii) to obtain consumer and business credit reports on the Merchant and Guarantor(s); iii) to contact any current or prior bank of the Merchant in order to obtain whatever information it may require regarding any and all of Merchant's transactions with any such bank, including, but not limited to applications, bank statements, financial statements and tax returns; and (iv) to contact personal and business references provided by the Merchant or Guarantor(s), at any time now or for so long as Merchant and/or Guarantor(s) continue to have any obligation owed to White Road as a consequence of this Merchant Agreement or for White Road's ability to determine Merchant's eligibility to enter into any future agreement with White Road. Merchant and Guarantor(s) will further provide to White Road any authorizations, bank or financial statements, tax returns, etc., as White Road deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. White Road is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Merchant and Guarantor(s) acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Guarantor(s) has been relied upon to White Road in connection with its decision to purchase the Specified Amount of Future Receivables from Merchant.

**1.5 Transactional History.** Merchant authorizes all of their banks and brokers to provide White Road with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program. Merchant herby (i) authorizes White Road to contact any past, present or future processor of Merchant, its predecessors or affiliates, to obtain any information that White Road deems necessary or appropriate regarding any of their transactions with such processors, and (ii) authorizes and directs such processors to provide White Road with all such information in compliance with this Section. Such information may include information to verify the amount of Card receivables previously processed on behalf of Merchant, its predecessors or affiliates, and any amounts that may have been paid to, offset, held or reversed by, such processors. Without limiting the generality of the foregoing, Merchant authorizes White Road to contact any past, present or future processor of Merchant, its predecessors or affiliates, to confirm that Merchant is exclusively using the Processor accepted by White Road in accordance with this Agreement.

**1.6 Indemnification.** indemnify and hold harmless Processor and Operator, their respective officers, directors, affiliates, employees, agents, representatives and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) suffered or incurred by Processor or Operator resulting from (a) claims asserted by White Road for monies owed to White Road from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by White Road.

**1.7 No Liability.** In no event will Processor, Operator or White Road be liable for any claims asserted by Merchant or Guarantors under any legal theory or law, including any tort or contract theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of White Road's legal fees and expenses resulting therefrom.

**1.8 Reliance on Terms.** Section 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, White Road and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.9 Sale of Receipts.** Merchant and White Road agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from White Road to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. White Road has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to White Road in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, - it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that White Road has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and White Road shall promptly refund to Merchant any interest received by White Road in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that White Road not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant is not a debtor to White Road as of the date of this Agreement. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.10 Power of Attorney.** Merchant irrevocably appoints White Road as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to White Road from Processor, or in the case of a violation by Merchant of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to White Road; and (v) to file any claims or take any action or institute any proceeding which White Road may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant, and White Road is authorized to use Merchant's funds to pay for same. In addition to any other remedies available for violation of the Merchant's Contractual Covenants, in the event that Merchant changes or permits the change of the Processor accepted by White Road or utilizes the services of an additional Processor, White Road shall have the right, without waiving any of its rights or remedies and without notice to Merchant or Principal(s), to notify the new or additional Processor of the sale of the Specified Amount of Future Receivables hereunder and to direct such new or additional Processor to make payment to White Road of all or any portion of the amounts received or held by such Processor for or on behalf of Merchant to pay any amounts White Road is entitled to receive hereunder. Merchant hereby grants White Road an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints White Road and its designees as Merchant's attorney-in-fact, to take any and all actions necessary and appropriate to direct such new or additional Processor to make payment to White Road as contemplated by this Section. Merchant further hereby grants White Road an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints White Road and its designees as Merchant's attorney-in-fact, to execute any all documents in the Merchant's name sufficient to provide and perfect any security interest granted by Merchant to White Road hereunder, including but not limited to security interests in motor vehicles and real estate.

**1.11 Protections against Default.** The following Protections 1 through 8 may be invoked by White Road immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the White Road electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse or unacceptable to White Road; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor or an unauthorized depository account; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God), transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of White Road, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to White Road; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor or (f) Merchant enters into any agreement with any third person or entity that relates to the Receipts or any portion thereof, whether in the form of a purchase, sale, loan, pledge or the granting of any security interest in the Receipts or any portion thereof These protections are in addition to any other remedies available to White Road at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchase Amount plus all fees (including legal fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** White Road may enforce the provisions of the Personal Guaranty of Performance against the Guarantor(s).

Merchant #1 Initials:

**Protection 3.** Merchant Agreement. Merchant also hereby authorizes White Road to execute in the name of the Merchant affidavit(s) of Confession of Judgment in favor of White Road in the amount of Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, White Road may, without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of any appropriate court based upon the affidavit(s) of judgment by confession previously executed by Merchant(s) and Owner(s)/Guarantor(s).

**Protection 4.** White Road may enforce its security interest in the Collateral identified in the Security Agreement hereof.

**Protection 5.** The entire Purchase Amount and all fees (including legal fees) shall become immediately refundable and payable to White Road from Merchant.

**Protection 6.** White Road may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, under which White Road shall recover Judgment against Merchant, Merchant shall be liable for all of White Road's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. White Road reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to White Road from Merchant prior to applying such amounts to reduce the amount of any outstanding Purchase Amount.

**Protection 7.** This Agreement shall be deemed Merchants Assignment of Merchant's Lease of Merchant's business premises to White Road. Upon breach of any provision in this Agreement, White Road may exercise its rights under this Assignment of Lease without prior Notice to Merchant.

**Protection 8.** White Road may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile White Road on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to White Road.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes White Road, its agents and employees to obtain and disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that White Road obtains) and business conduct only to it employees. agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against White Road or any of its affiliates relating to any (i) investigation undertaken by or on behalf of White Road as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by White Road, including this Agreement and any other White Road documentations (collectively, "Confidential Information") are proprietary and confidential information of White Road. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of White Road to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles White Road to not only damages and legal fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.14 Publicity.** Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes White Road to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.15 D/B/A's.** Merchant hereby acknowledges and agrees that White Road may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between White Road and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**1.16 Purchase of Increments.** In the event that White Road offers to purchase additional Receipts in the "increments' stated on Attachment A of this Agreement, then White Road reserves the unilateral right to delay or rescind such offer in its sole and absolute discretion at any time.

**1.17 Sharing of Information.** Merchant hereby authorizes White Road to share information regarding Merchant's performance under this Agreement with affiliates and unaffiliated third parties.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement, and until White Road is fully paid:

**2.1 Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial Statements, copies of which have been furnished to White Road, and future statements which will be furnished hereafter at the discretion of White Road, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise White Road of any material adverse change in their financial condition, operation or ownership. Merchant hereby warrants that its Average Monthly Revenue as enumerated on page (1) of this Agreement is accurate, and that any and all cash advances or loans outstanding by Merchant have to be disclosed to White Road. White Road may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to White Road within 5 business days. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance.** Merchant will maintain business-interruption insurance naming White Road as loss payee and additional insured in amounts and against risks as are satisfactory to White Road and shall provide White Road proof of such insurance upon request. Merchant shall also maintain such other insurance in such amounts and against such risks as White Road deems necessary to protect Merchant's business, and Merchant shall provide proof of such insurance to White Road upon demand.

Merchant #1 Initials:

DocuSign Envelope ID:
Case 23-04033-btf    Doc 80    Filed 04/18/25    Entered 04/18/25 18:39:31    Desc Main
Document    Page 109 of 172

Agent Name: ISO - Premium Merchant Funding

**2.5 Electronic Check** take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, change its financial institution or bank account(s) or without White Road's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location and Related Entities.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and White Road, nor shall Merchant change any of its places of business without prior written consent by White Road. Merchant does not and shall not conduct Merchant's business under any name other than as set forth in this agreement and shall not change its place of business. Merchant shall not change its legal name, entity type or jurisdiction of organization. In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to White Road for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due White Road under this Agreement. With respect to any such entity, White Road shall have the right to name such newly formed or existing entity as a debtor in any claim, suit, or legal proceeding.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from White Road to Merchant, execute, acknowledge and deliver to White Road and/or to any other person, firm or corporation specified by White Road, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy. As of the date of this Agreement, Merchant is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.**

**2.10 Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the Receipts or future check sales, or any portion thereof, whether in the form of a purchase, sale, a loan against, collateral against or the sale or purchase of credits against, such Receipts or future check sales, with any party other than White Road. White Road may share information regarding this Merchant Agreement with any third party in order to determine whether Merchant is in compliance with this provision.

**2.11 Unencumbered Receipts.** Merchant has, and at all times will have, good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of White Road. Without limiting the generality of the foregoing, all future Receipts purchased by White Road hereunder shall be free and clear of any and all liens (other than White Road's ownership rights therein) at the time they become Receivables. All amounts received by White Road attributable to the Specified Amount of Future Receivables purchased by White Road hereunder shall arise from bona fide sales by Merchant of its goods and services to Card holders who present their Cards as payment thereof.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.14 Good Faith, Best Efforts and Due Diligence.** Merchant and Guarantors hereby affirm that it will conduct its business in Good Faith and will expend its Best Efforts to maintain and grow its business, to ensure that White Road obtains the Purchased Amount. Furthermore, Merchant and Guarantors hereby agree, warrant and represent hereby that they will constantly perform all appropriate Due Diligence and credit checks of all of the customers' finances, cash flow, solvency, good faith, payment histories and business reputations (the "Due Diligence Requirements") as may suffice to ensure any and all products and/or services provided, sold or delivered by Merchant to said customers will be paid for by customers in full and on time, and will not result in the creation of an unpaid account. These Due Diligence Requirements must be performed prior to any sales to any customer, and repeated no less frequently than monthly for so long as any sums are due from those customers. Full documentation of all of Merchant's compliance with its Due Diligence Requirements must be maintained in Merchant's files so long as White Road has not fully collected all sums due to it. This is not a guaranty of payment by customers, but is a guaranty of full, adequate and good faith Due Diligent investigation and credit check of customers before extending credit to them and continuing no less frequently than monthly so long as sums are still due.

**2.15 Taxes.** Merchant will promptly pay all necessary taxes, including but not limited to employment, sales and use taxes.

**2.16 No Violation of Prior Agreements.** Merchant warrants that its execution and performance of this Merchant Agreement will not violate or conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Merchant is subject, including any agreement that prohibits the sale or pledge of Merchant's future receipts or the Purchased Amount.

**2.17 Opportunity for Counsel.** Merchant represents, warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Merchant Agreement, and that it has been represented by legal counsel or has had full opportunity to consult with its own legal counsel.

**2.18 Ongoing Obligations.** Merchant hereby covenants and agrees that even after it receives some or all of the Purchase Price from White Road, it will comply with White Road's ongoing requests for any documentation from Merchant for the purpose of business and identify verification and underwriting and verification (such as the merchant's driver's license, bank login, bank statements, or any other financial or business documentation). Merchant's failure to provide to White Road the requested documentation within twenty-four (24) hours shall be deemed a breach of this Agreement and White Road shall no longer be obligated to provide any further funding to Merchant. In addition, if after receipt of said documentation from Merchant, White Road discovers that Merchant made misrepresentations before receiving funding from White Road, White Road shall no longer be obligated to provide any further funding to M[...]nd Merchant's misrepresentations shall be deemed a breach of this Agreement.

Merchant #1 Initials: _____

DocuSign Envelope ID:

Case 23-04033-btf    Doc 80    Filed 04/18/25    Entered 04/18/25 18:39:31    Desc Main
Agent Name: ISO - Premium Merchant Funding
Document    Page 110 of 172

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Merchant; (d) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (e) Merchant shall transfer or sell all or substantially all of its assets, or issue any notice of intended bulk sale or transfer; (f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (g) Merchant shall use multiple depository accounts without the prior written consent of White Road (h) Merchant shall change its depositing account without the prior written consent of White Road; (i) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; (j) the Specified Percentage of its daily Receipts is not available for ACH by White Road on any three (3) business days within any twenty (20) business day period; (k) Merchant shall default under any of the terms, covenants and conditions of any other agreement with White Road; or (l) Merchant fails to deposit its Receipts into the Account.

**3.2 Personal Guaranty.** In the event of a Default under Sections 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13, and 2.14 hereof, should White Road determine that the Purchased Amount cannot be obtained from the Merchant's business, White Road will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to White Road for all of White Road's losses and damages, in additional to all costs, fees expenses and legal fees associated with such enforcement. White Road shall not be required before exercising and enforcing its rights under this Personal Guaranty first to resort to payment against Merchant or to any other person or to any collateral.

**3.3 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4.1 hereof, White Road may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Security Agreement or Guaranty, or pursuant to any other legal or equitable right or remedy. Upon Merchant's and/or Owner's/Guarantor's default hereunder, the balance of the Purchased Amount remaining due, plus any applicable fees, shall become immediately due and payable to White Road. In addition, upon an Event of Default, White Road may: i) enforce the provisions of the Security Agreement and Guaranty against each Merchant and Owner/Guarantor; ii) enforce its security interest in the Collateral and the ; iii) adjust debits of Merchant's Account to a daily debit; iv) debit Merchant's deposit accounts wherever situated by means of ACH debit or facsimile signature on a computer generated check drawn on Merchant's bank account for all or a portion of the balance of the Purchased Amount remaining due, or White Road may instruct the Processor to forward to White Road, without any prior notice to Merchant, all or a portion of the balance of the Purchased Amount remaining due, and v) without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of the appropriate court based upon the affidavit(s) of judgment by confession previously executed by Merchant(s) and Owner(s)/Guarantor(s). All rights, powers and remedies of White Road which may be exercised by White Road at any time after the occurrence of an Event of Default are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Costs.** Merchant shall pay to White Road all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(b) the enforcement of White Road 's remedies set forth in Section 3.3 above, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications.** Merchant is required to give White Road written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give White Road seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## IV. MISCELLANEOUS

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by White Road.

**4.2 Assignment.** This Agreement shall be binding upon and inure to the benefit of Merchant, Principal(s), White Road and their respective successors and assigns, except that Merchant and Principal(s) shall not have the right to assign or delegate any of their rights or obligations hereunder or any interest herein without prior written consent of White Road, which consent may be withheld in White Road's sole discretion. Any such assignment or delegation without White Road's prior written consent shall be void. White Road reserves the right to assign or delegate this Agreement or any of its rights or obligations hereunder with or without prior notice to Merchant. White Road may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the merchant at the address set forth above in this agreement and to White Road at 2999 NE 191st Street, Unit 901, Miami, FL 33180 with a copy to 27-01 Queens Plaza North, Suite 802, Long Island City, NY 11101. Notices to White Road shall become effective only upon receipt by White Road. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of White Road to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, White Road and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of White Road which consent may be withheld in White Road's sole discretion. White Road reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, may, if White Road so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should st[...]ding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by White Road to

transfer such proceed1

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provision in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and White Road and supersede all prior agreements and understandings relating to the subject matter hereof. Merchant and Principal(s) each acknowledge and agree that he, she or it is not relying on any representations not specifically embodied in this Agreement.

**4.10 JURY TRIAL WAIVER.**

THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.11 Facsimile Acceptance.** Merchant and Guarantor(s) hereby agree that facsimile and/or electronic signatures on this Merchant Agreement and Guaranty, or photocopies thereof, that shall be deemed acceptable and treated as originals for all purposes, and shall be admissible as evidence of the Merchant Agreement and Guaranty.

**4.12. Right of Access.** In order to ensure that Merchant is complying with the terms of this Merchant Agreement, Merchant agrees that White Road shall have the right to (i) enter, without notice, the premises of Merchant's business for the purpose of inspecting and checking Merchant's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Merchant's daily receipts to the Processor and to ensure that Merchant has not violated any other provision of this Agreement, and (ii) Merchant's shall provide access to its employees and records and all other items as requested by White Road, and (iii) have Merchant's provide information about its business operations, banking relationships, vendors, landlord and other information to allow White Road to interview any relevant parties. Furthermore, Merchant agrees to provide White Road, at all times with "Live Contemporaneous Access" to all of its bank accounts in order for White Road to evaluate Merchant's compliance with the Merchant Agreement, and for collections in the event of a default under the Merchant Agreement. "Live Contemporaneous Access" shall be defined as: Merchant, at all times and including but not limited to, providing White Road with accurate login information necessary to access all of Merchant's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens.

**4.13. Phone Recordings and Contact.** Merchant agrees that any call between White Road and Merchant, and their agents and employees may be recorded or monitored. Further, Merchant agrees that (i) it has an established business relationship with White Road, its employees and agents and that Merchant may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, emails address, or facsimile number given to White Road by the Merchant, its agents or employees, including cellular telephones.

**4.14. Monitoring, Recording, and Solicitations.**

a. Authorization to Contact Seller by Phone. Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

b. Authorization to Contact Seller by Other Means. Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

Merchant #1 Initials: _____

| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

**SECURITY AGREEMENT**

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant grants to White Road a security interest in and lien upon: (a) all accounts receivables, accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant, (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to White Road under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to White Road upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover White Road's entitlements under this Agreement, White Road is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of White Road's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, White Road or an affiliate of White Road. White Road is authorized to execute and file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by White Road without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, White Road has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, White Road will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from White Road written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant agrees that this is a contract of recoupment and White Road is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant agrees not to contest or object to any motion for relief from the automatic stay filed by White Road. Merchant agrees to execute and deliver to White Road such instruments and documents White Road may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. White Road is authorized to execute all such instruments and documents in Merchant's name.

In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to White Road for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due White Road under this Agreement. With respect to any such entity, White Road shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. White Road shall be held harmless by Merchant and each Owner/Guarantor and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. White Road shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of White Road's rights, including without limitation, White Road's right to collect all accounts, and to notify any payment card processor or creditor of such entity that White Road has such rights in such entity's assets. Merchant also agrees that, at the White Road's discretion, White Road may choose to amend any existing financing statement to include any such newly formed entity as debtor.

Merchant and Guarantor each acknowledge and agree that any security interest granted to White Road under any other agreement between Merchant or Guarantor and White Road (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as White Road deems necessary to perfect or maintain White Road's first priority security interest in the Collateral including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes White Road to file any financing statements deemed necessary by White Road to perfect or maintain White Road's security interest, which financing statement may contain notification that Merchant and/or Guarantor have granted a negative pledge to White Road with respect to the Collateral, and that any subsequent lien or may be tortuously interfering with White Road's rights. Merchant and Guarantor shall be liable for, and White Road may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by White Road in protecting, preserving and enforcing White Road's security interest and rights.

**Negative Pledge.** Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** White Road shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, White Road may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that White Road may enter into an agreement with Merchant's landlord giving White Road the right to: (a) enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

Merchant #1 Initials:

**Remedies.** Upon any E      medn available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to White Road, whether by acceleration or otherwise.

**GUARANTY**

**Personal Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to White Road, Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the Merchant Agreement in Sections thereof 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13 and 2.14, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, White Road may seek recovery from Guarantors for all of White Road's losses and damages by enforcement of White Road's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral White Road may hold pursuant to this Agreement or any other guaranty.

White Road does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) White Road's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to White Road. In addition, White Road may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to White Road; (ii) release Merchant from its obligations to White Road; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to White Road under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.**

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | *Jesse Lee Kagarice* | | |

| OWNER / GUARANTOR (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | *Jesse Lee Kagarice* | | |

A. **Origination Fee** - 0% of Purchase Price to cover Underwriting and related expenses. This expense is charged at the time of funding.

B. **ACH Program Fee** - 0% of Purchase Price ACH's are labor intensive and are not an automated process, requiring us to charge this fee to cover costs. This expense is charged at the time of funding.

C. **Miscellaneous Service Fees** - Merchant shall pay certain fees for services related to the origination and maintenance of Accounts, which fees are set forth below. Each Merchant shall receive their funding electronically to their designated bank account, and the White Road may deduct some or all of the fees from the funded amount.

A. Rejected ACH/Blocked ACH - $5,000.00 when Merchant blocks Account from our Debit ACH, or when Merchant directs the bank to reject our debit ACH, which places them in default (per contract).

B. Pre-Authorized Bank Change Fee - $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

C. Wire Fee - $50.00 Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for either a Fed Wire fee or a bank ACH fee.

D. UCC Filing, Amendment or Termination Fee - $200.00.

E. Default Fee - $5,000.00 when Merchant defaults under the Agreement, including but not limited to diverting its Receivables from the bank account agreed upon in the "Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)" or changing its credit card processing thus terminating or diverting the agreed upon split.

F. Account Management Fees - $45.00 upon origination, and $45.00 per month thereafter until the Purchase Amount, together with any and all unpaid outstanding other fees have been paid in full. These Management Fees will not be applied towards the reduction of the Purchase Amount.

G. Stacking Fee - In the event that the Merchant enters into any cash advance or any loan agreement that relates to or involves the Receipts with any person or entity other than White Road during any portion of the term of this Agreement, then: i) Merchant shall pay to White Road a "Stacking" fee equal to $5,000.00 per occurrence, and ii) the specified daily remittances that Merchant is obligated to pay to White Road hereunder shall be doubled, and Merchant shall be deemed to have authorized White Road to double the amount of its ACH Debits from the Merchant's Account on a daily basis.

H. Third Party Collections Fee – In the event that Merchant defaults under any of the terms and conditions of this Agreement, Merchant shall pay to White Road, in addition to any other fees associated with Merchant's default, a third party collections fee equal to fifteen (15%) of the outstanding balance after all fees at the time of default.

I. NSF Fee (Standard) - $ 35.00 each until a default is declared.

J. Non-ACH Transaction Fee - When a Merchant makes a payment other than through ACH, the Merchant is responsible for the cost of that transaction.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | *JESSE LEE KAGARICE* | | |

| Merchant Name: JESSE LEE KAGARICE | |
|---|---|
| 1.  Do you currently or within the last 90 days have any intentions, plans or discussions regarding closing your Business? | NO |
| 2.  Do you currently or within the least 90 days have any intentions, plans or discussions to change the name or legal structure of the business? | NO |
| 3.  Are you currently in, or contemplating personal bankruptcy? | NO |
| 4.  Are you currently in, or contemplating business bankruptcy? | NO |
| 5.  Is your business currently for sale? | NO |
| 6.  Do you have any existing merchant cash advance balances? | Yes |
| 7.  Are you involved in any litigation proceedings or are a party to a lawsuit? | NO |
| 8.  Is your business currently in default of any agreement with a creditor? | NO |
| 9.  Is your business currently in forbearance agreement with a creditor? | NO |
| 10. Will selling the Future Receivables cause you to breach any agreement with a creditor? | NO |

If you have answered YES to any of the above questions, please explain:

I hereby certify that the above statements are true and correct to the best of my knowledge; I authorize my landlord and credit card processor to discuss confidential account information for the purpose of satisfying the requirements of White Road Capital LLC, Series: 120785, D/B/A: GFE Holdings.

Completed and attested by:

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | JESSE LEE KAGARICE | | |

Merchant #1 Initials:

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT)
# AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep this important legal document for Merchant's records.

DISBURSEMENT OF ADVANCE PROCEEDS. By signing below, Merchant authorizes White Road to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Merchant later identifies and is acceptable to White Road) (hereinafter referred to as the "Designated Checking Account") This authorization is to remain in full force and effect until White Road has received written notification from Merchant of its termination in such time and in such manner as to afford White Road and Merchant's depository bank a reasonable opportunity to act on it.

BUSINESS PURPOSE ACCOUNT. By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

MISCELLANEOUS. White Road is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Merchant's account must comply with the provisions of U.S. law.

I, (We) JESSE LEE KAGARICE hereby Authorize, White Road Capital LLC, Series: 120785, D/B/A: GFE Holdings. (Hereinafter known as "White Road") to Electronically (ACH) debit the Bank Account Below, of which I am a signer:

| | | | |
|---|---|---|---|
| Bank Name: | NODAWAY VALLEY BANK | Tax ID: | |
| ABA: Routing: | | DDA: Account: | |
| For the amount of: | $2,499.00 | (Or) Percentage of each Banking Deposit: | 15% |
| On the Following Days: | MONDAY-FRIDAY | | |

This authorization is to remain in full force and effect until COMPANY has received written notification from me at least 5 banking days prior of its termination to afford COMPANY a reasonable opportunity to act on it.

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | *Jesse Lee Kagarice* | | |

Merchant #1 Initials: *JLK*

Thank you for accepting an offer from White Road Capital LLC, Series: 120785, D/B/A: GFE Holdings ("White Road"). We look forward to being your funding partner for as long as you need.

Please note that the way your advance is set up with White Road, White Road requires viewing access to your bank account each business day, throughout the term of this Agreement, in order that White Road may calculate and verify the amount of your daily remittance. Please be assured that we will carefully safeguard your confidential information and only essential personnel will have access to it.

White Road Capital LLC, Series: 120785, D/B/A: GFE Holdings. will also require viewing access to your bank account, prior to funding, as part of the underwriting process.

Please be advised that for security purposes, White Road will request this information prior to funding. By signing below, you hereby agree that if you fail to provide the requested bank login information prior to funding, White Road shall have no obligation to provide funding. Please be further advised that if you change any of the bank login information during the term of this Agreement or at any time while you still have any outstanding obligations to White Road, you are required to immediately inform White Road of the changes made and provide White Road with the new bank login information. Please see below for the list of questions that will be by White Road as it relates to the banking information.

1. Bank Portal Website;
2. Bank Account Username;
3. Bank Account Password;
4. Security Question/Answer 1 of this Bank Account;
5. Security Question/Answer 2 of this Bank Account;
6. Security Question/Answer 3 of this Bank Account; and
7. Any other information necessary to access your Bank Account.

If you have any questions please feel free to contact our cash management department.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | *JESSE LEE KAGARICE* | | |

DocuSign Envelope ID:

Case 23-04033-btf    Doc 80    Filed 04/18/25    Entered 04/18/25 18:39:31    Desc Main
BANK ACCOUNT DISCLOSURE AFFIDAVIT
Document    Page 118 of 172

Agent Name: ISO - Premium Merchant Funding

For the purpose of obtaining the Business Cash Advance evidence by the Merchant Agreement of this same date herewith (the "Business Cash Advance") from White Road Capital LLC, Series: 120785, D/B/A: GFE Holdings., the undersigned Seller/Merchant hereby makes the following statement under penalty of law:

## OPTION 1 – DISCLOSURE AND AUTHORIZATION FOR ADDITIONAL ACCOUNTS:

By selecting this option, the Seller/Merchant hereby declares that in addition to the designated for ACH debit, the Seller/Merchant also has the following additional account(s) which he authorizes us to use in the event we are unable to debit from the designated account. The Seller/Merchant declares and warrents that it currently maintains no other bank account at any financial institution other than those banks and accounts referenced below.

| | |
|---|---|
| Bank Name | |
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| | |
|---|---|
| Bank Name | |
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| | |
|---|---|
| Bank Name | |
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

**OPTION 2** - By selecting this option, the merchant swears, under penalty of law, that Merchant has no accounts in any lending institution in addition to the one provided for ACH debit

**PLEASE SELECT AN OPTION AND SIGN BELOW:**

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | *JESSE LEE KAGARICE* | | |

Merchant #1 Initials: _____

DocuSign Envelope ID:

Agent Name: ISO - Premium Merchant Funding

**ADDENDUM TO MERCHANT AGREEMENT**

This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law. Any litigation relating to this Agreement must be commenced and maintained in any court located in New York State (the "Acceptable Forums"), however any action or proceeding to enforce a judgment or arbitration award may also be commenced and maintained in any other court of competent jurisdiction. The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum.

**THE PARTIES AGREE TO WAIVE TRIAL BY JURY IN ANY DISPUTE BETWEEN THEM.**

In any litigation commenced by White Road, Merchant and Guarantor will not be permitted to interpose any counterclaim. Merchant and Guarantor agree that any claim that is not asserted against White Road within 1 year of its accrual will be time barred. If White Road prevails in any litigation with Merchant and/or Guarantor, then Merchant and Guarantor must pay White Road's reasonable attorney fees, which may include a contingency fee of up to 33% of the amount claimed, expert fees, costs of suit, and prejudgment interest at a rate of 16% per annum (or the maximum rate permitted by applicable law if lower). White Road, Merchant, and Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**Merchant and Guarantor consent to service of process and legal notices made by certified mail, return receipt requested delivered by the United States Postal Service and addressed to the Contact Address set forth immediately below or on Page 1 of this Agreement, any such service will be deemed complete 5 days after dispatch.**

I have read and agreed to the Terms and Conditions set forth above:

| MERCHANT (#1) | | Signature | *JESSE LEE KAGARICE* |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title: | Sole Member | Driver License No: | |
| Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 | Email: | jesse@jlkconstruction.com |

Merchant #1 Initials: _JLK_

DocuSign Envelope ID:

# TRADE REFERENCES

Please provide a list of 3-5 professional references

| TRADE REFERENCE #1: | |
|---|---|
| **Name:** | |
| **Phone Number:** | |
| **Email Address:** | |

| TRADE REFERENCE #2: | |
|---|---|
| **Name:** | |
| **Phone Number:** | |
| **Email Address:** | |

| TRADE REFERENCE #3: | |
|---|---|
| **Name:** | |
| **Phone Number:** | |
| **Email Address:** | |

| TRADE REFERENCE #4: | |
|---|---|
| **Name:** | |
| **Phone Number:** | |
| **Email Address:** | |

| TRADE REFERENCE #5: | |
|---|---|
| **Name:** | |
| **Phone Number:** | |
| **Email Address:** | |

Merchant #1 Initials:

DocuSign Envelope ID:

Agent Name: ISO - Premium Merchant Funding

Attachment A

### Weekly Advance Addendum to the Merchant Agreement

This Weekly Advance Addendum amends the Merchant Agreement and Security Agreement between White Road and the merchant listed below (the "Merchant") dated 07/13/2022, (the "Agreement"). All capitalized terms used in his Addendum shall have the same meaning as defined in the Agreement. Except as modified below, the terms of the Agreement remain in full force and effect.

### MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

This Weekly Advance Addendum amends the Merchant Agreement and Security Agreement between White Road and the merchant listed below (the "Merchant") dated 07/13/2022, (the "Agreement"). All capitalized terms used in his Addendum shall have the same meaning as defined in the Agreement. Except as modified below, the terms of the Agreement remain in full force and effect.

### AGREEMENT AS TO ADVANCES

1. Weekly Sale and Purchase of Merchant's Future Receipts: Merchant hereby offers to sell and White Road agrees to purchase, up to the Receipts Purchased Amount, future Receipts on a weekly basis according to the attached schedule. White Road shall have the right to terminate the purchase of any additional future Receipts as set forth in Section 2 of this Addendum.

2. White Road's Obligation to Make Future Purchases: White Road reserves the right to terminate its obligation to make the weekly purchases at its option, if upon: (i) a Event of Default has occurred, as defined in the Agreement; (ii) Merchant fails to provide to White Road a monthly Account statement, access codes to the Account, and full access to merchant's Account prior making any weekly purchase as contemplated herein; (iii) Merchant obtains any additional funding without providing prior written notice to and receiving written approval from White Road; (iv) the Specified Percentage of its weekly Receipts is not available for ACH by White Road on any three (3) business days within any twenty (20) business day period; (v) Merchant has a 20% decline in monthly deposits that is not due to regular seasonal payment fluctuations; (vi) White Road believes in its sole judgment that Merchant's business may not be able to generate future Receipts sufficient to deliver the Purchased Receipts in a timely manner, vii) the Account has a negative balance; viii) Merchant is in arrears with respect to its payment obligations under the Agreement or ix) the Merchant has failed to provide White Road with a complete account receivable report within any thirty (30) day period prior to any weekly purchase contemplated herein In the event that weekly purchases are terminated, the Merchant will remain obligated to deliver the Specified Percentage of its weekly Receipts to White Road until White Road has received the Receipts White Road purchased prior to termination, and to comply with all other provisions of this Agreement.

3. Merchant's Indebtedness When Receipts Purchased Amount Is Sold In Increments: When Merchant sells and White Road purchases the Receipts Purchased Amount, or portions thereof, in increments, the Merchant's indebtedness to White Road under the Agreement (excluding any fees and expenses then then due and owing) shall at any given point in time be equal to the percentage of the total Receipts Purchase Amount that the total of all increments then paid by White Road to the Merchant bears to Total Purchase Price as set forth in the Agreement.

THE TERMS OF THIS ATTACHMENT A ARE HEREBY INCORPORATED INTO AND MADE A PART OF THE MERCHANT AGREEMENT IDENTIFIED ABOVE, AND MERCHANT HEREBY ACKNOWLEDGES THAT THE PERIODIC PURCHASE OF FUTURE RECEIPTS HEREUNDER ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE MERCHANT AGREEMENT

| MERCHANT (#1) | | Signature | *Jesse Lee Kagarice* | |
|---|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | | |
| Title | Sole Member | Driver License No: | | |
| Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 | Email: | jesse@jlkconstruction.com | |

| OWNER / GUARANTOR (#1) | | Signature | *Jesse Lee Kagarice* | |
|---|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | | |
| Title | Sole Member | Driver License No: | | |
| Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 | Email: | jesse@jlkconstruction.com | |

Merchant #1 Initials:

| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
|---|---|
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

## White Road Weekly Distribution Grid-Special Agreement

| Increment | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Amount | $20,241.10 | $19,546.10 | $19,546.10 | $19,546.10 | $19,546.10 |
| Increment | 6 | 7 | 8 | 9 | 10 |
| Amount | $19,546.10 | $19,546.10 | $19,546.10 | $19,546.10 | $19,546.10 |
| Increment | 11 | 12 | 13 | 14 | 15 |
| Amount | $17,171.10 | $12,221.10 | $9,821.10 | $9,821.10 | $9,821.10 |
| Increment | 16 | 17 | 18 | | |
| Amount | $7,901.10 | $7,826.10 | $6,261.30 | | |

**\*Appropriate fee will be deducted from the first increment.**

**See APPENDIX A STRUCTURE for fee details.**

| MERCHANT (#1) | | Signature | JESSE LEE KAGARICE |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 | Email: | jesse@jlkconstruction.com |

DocuSign

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: | | Status: Completed |
| Subject: GFE Merchant Contract for JLK CONSTRUCTION, LLC.. | | |
| Source Envelope: | | |
| Document Pages: 20 | Signatures: 14 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 19 | GFE Contract Team |
| AutoNav: Enabled | | 27-01 Queens Plaza North, Suite 802 |
| EnvelopeId Stamping: Enabled | | Long Island City, NY  11101 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | underwriting@globalfundingexperts.com |
| | | IP Address: 54.68.3.6 |

### Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: GFE Contract Team | Location: DocuSign |
| 7/13/2022 3:37:44 PM | underwriting@globalfundingexperts.com | |

### Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| JESSE LEE KAGARICE | DocuSigned by: *JESSE LEE KAGARICE* F19B915A4DB64B3... | Sent: 7/13/2022 3:37:46 PM |
| jesse@jlkconstruction.com | | Viewed: 7/13/2022 3:39:35 PM |
| President | | Signed: 7/13/2022 4:01:35 PM |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style | |
| | Using IP Address: | |

**Electronic Record and Signature Disclosure:**
   Accepted: 7/13/2022 3:39:35 PM
   ID:

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| ISO - Premium Merchant Funding | COPIED | Sent: 7/13/2022 3:37:47 PM |
| underwriting@pmfus.com | | |
| Security Level: Email, Account Authentication (None) | | |

**Electronic Record and Signature Disclosure:**
   Not Offered via DocuSign

| | | |
|---|---|---|
| Liliana V. Hernandez | COPIED | Sent: 7/13/2022 3:37:47 PM |
| iso@globalfundingexperts.com | | |
| Security Level: Email, Account Authentication (None) | | |

**Electronic Record and Signature Disclosure:**
   Not Offered via DocuSign

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Underwriting departement<br>underwriting@globalfundingexperts.com<br>GFE Contract Team<br>Global Funding Experts<br>Security Level: Email, Account Authentication<br>(None) | COPIED | Sent: 7/13/2022 3:37:46 PM<br>Resent: 7/13/2022 4:01:39 PM |

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 7/13/2022 3:37:47 PM |
| Certified Delivered | Security Checked | 7/13/2022 3:39:35 PM |
| Signing Complete | Security Checked | 7/13/2022 4:01:35 PM |
| Completed | Security Checked | 7/13/2022 4:01:35 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Global Funding Experts (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Global Funding Experts:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: underwriting@globalfundingexperts.com

**To advise Global Funding Experts of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at underwriting@globalfundingexperts.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Global Funding Experts**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to underwriting@globalfundingexperts.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Global Funding Experts**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to underwriting@globalfundingexperts.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.


**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Global Funding Experts as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Global Funding Experts during the course of your relationship with Global Funding Experts.

Exhibit "5"

DocuSign Envelope ID:



# MERCHANT CONTRACT:

# JLK CONSTRUCTION, LLC.

**I hereby certify that ISO - Boost Capital Group LLC (boostcapitalgroup.com) ("Agent") acted as a Merchant's agent.**

Completed and attested by:



DocuSigned by:

JESSE LEE LAGARCE

C29128E7CBD4455...

08/05/2022        Agent Name: ISO - Boost Capital Group LLC (boostcapitalgroup.com)



27-01 Queens Plaza North, Suite 802, Long Island City, NY 11101
Tel: 1-877-253-7686, Fax: 718-504-3736
Website: www.globalfundingexperts.com / Email: underwriting@globalfundingexperts.com

## MERCHANT AGREEMENT

Agreement dated _____08/05/2022_____ between White Road Capital LLC, Series: 127009, D/B/A: GFE Holdings (**"White Road"**) and the Merchant listed below (**"MERCHANT"**)
(Month) (Day) (Year)

### MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| State of Incorporation / Organization: | MO |
| Type of Business Entity: | LLC |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Mailing Address: | PO BOX 8820, Saint Joseph, MO, 64508 |
| Primary Contact & Number: | JESSE LEE KAGARICE ((816) 273-7860) |

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant ("Merchant"), in consideration of the funds provided to Merchant by White Road as specified below ("Purchase Price"), hereby sells, assigns and transfers to White Road (making White Road the absolute owner) the Specified Percentage indicated below of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts") defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business, for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to White Road.

The Purchased Amount shall be paid to White Road by Merchant irrevocably directing and authorizing that there be only one depositing bank account, which account must be acceptable to and pre-approved by White Road (the "Account") into which Merchant and Merchant's customers shall remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each Transaction, until such time as White Road receives payment in full of the Purchased Amount. Merchant hereby authorizes White Road to ACH Debit the specified remittances from the Merchant's Account on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box and will provide White Road with all required access codes and monthly bank statements. Merchant understands that it is responsible for ensuring that the Specified Percentage to be debited by White Road remains in the Account and will be held responsible for any fees incurred by White Road resulting from a rejected ACH attempt or an event of default. (See Appendix A) White Road is not responsible for any overdrafts or rejected transactions that may result from White Road's ACH debiting the specified amounts under the terms of this agreement. White Road will debit the specified remittance amount during a business day based on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box. The Merchant shall deliver to White Road, no later than the 18th date of each month the bank statement for the Account in respect of the immediately preceding month. Within three business days of White Road's receipt of the Merchant's monthly bank statements, White Road shall reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the Specified Percentage. If the Merchant fails to deliver the bank statement for the Account for any month, White Road shall consider that the specific remittances were equal to the Specified Percentage of the settlement amount due from each Transaction for such month. White Road may, upon Merchant's request, adjust the amount of any payment due under this Agreement at White Road's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between White Road and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

| **ORIGINAL OFFER:** | | | |
|---|---|---|---|
| Total Purchase Price: | $50,000.00 | Merchant's Average Monthly Revenue: | $433,112.22 |
| Purchased Amount of Receivables: | $64,950.00 | Specified Percentage of Monthly Revenue: | 3% |
| Total Fees*: | $5,000.00 | Specified Remittance Amount & Frequency: | $590.45 / Daily |
| Net Funded Amount**: | $45,000.00 | Initial Estimated # of Remittance Payments: | 111 |

\* This amount reflects the total fees Merchant will pay at funding. See Appendix A for a complete breakdown of fees.

\*\* This amount reflects the total funds Merchant will receive after all the fees and balance transfers are deducted from the Total Purchase Price. See Balance Transfer Form for a complete breakdown of the remaining RTR balances.

\*\*\* If an Early Payment Addendum has been executed by White Road and the Merchant, the promotional early termination discount referenced above shall be applicable subject to the terms and conditions set forth in the Early Payment Addendum.

The Total Purchase Price may also be paid incrementally over time, in the increments and in the Specific Remittance Amounts set forth in the Attachment A Addendum annexed hereto.

Merchant #1 Initials: ⎰DS⎱ JLK

Page 2 of 18

DocuSign Envelope ID:

THE MERCHANT AGREEMENT TERMS AND CONDITIONS SET FORTH ON PAGES 1-3 OF THE "MERCHANT AGREEMENT AND GUARANTY" AND THE
"ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT. BY SIGNING
BELOW, MERCHANT HEREBY REPRESENTS AND WARRANTS THAT NOTHING CONTAINED HEREIN IS FALSE, MISLEADING, AND THAT MERCHANT
HAS NOT FAILED TO DISCLOSE ANY MATERIAL INFORMATION TO OBTAIN FUNDING FROM White Road.

| MERCHANT (#1) | | Signature | *JESSE LEE KAGARICE* |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | 816-896-6909 |
| Social Security No: | | Home or Secondary Number: | 816-273-7860 |
| Driver License No: | | Email: | Jesse@jlkconstruction.com |

| OWNER / GUARANTOR (#1) | | Signature | *JESSE LEE KAGARICE* |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Home Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |
| Title | Sole Member | Cell Phone Number: | 816-896-6909 |
| Social Security No: | | Home or Secondary Number: | 816-273-7860 |
| Driver License No: | | Email: | Jesse@jlkconstruction.com |

White Road Capital LLC, Series: 127009, D/B/A: GFE Holdings
By:

_____
(Company Officer)

**MERCHANT AGREEMENT TERMS AND CONDITIONS**

## I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to White Road with a Bank acceptable to White Road to obtain electronic fund transfer services for the Merchant's account at the Bank approved by White Road (the "Account"). Merchant shall provide White Road and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes White Road and/or its agent(s) to deduct from the Account the amounts owed to White Road for the receipts as specified herein and to pay such amounts to White Road. Merchant also hereby authorizes White Road to withdraw from the Account the Specified Percentage(s) and/or sums by White Road debiting the account. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by White Road or not. This additional authorization is not a waiver of White Road's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which White Road did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of White Road.

Merchant understands and agrees that this Agreement, including the authorizations to access Merchant's accounts (including the Account) set forth herein, as well as all other payment processing agreements entered into with respect to the Transactions irrevocably authorize the processor of such payments (the "Processor") and Operator to pay the cash attributable to the Specified Percentage of Receivables to White Road rather than to Merchant until White Road receives the cash attributable to the entire Specified Amount of Future Receivables from Processor and Operator. Merchant and Guarantor(s) authorize White Road and its agents: i) to investigate Merchant's financial status and history, and will provide to White Road any authorizations, bank or financial statements, tax returns, etc., as White Road deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. and ii) to update such information and financial and credit profiles from time to time as White Road deems appropriate. Merchant hereby authorizes all of its banks, brokers, processors and customers to provide White Road with Merchant's bank statements, brokerage statements, processing history and such other statements and information as White Road may in its sole discretion require to determine Merchant's and Guarantor's qualification or continuation in this program and for collections purposes. Merchant shall provide White Road with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from White Road.

These authorizations and instructions may be revoked only with the prior written consent of White Road. Merchant agrees that Processor and Operator may rely upon the instructions of White Road, without any independent verification, in making the cash payments above. Merchant waives any claim for damages it may have against Processor or Operator in connection with actions taken based on instructions from White Road, unless such damages were due to such Processor's or Operator's failure to follow White Road's instructions. Merchant acknowledges and agrees that (a) Processor and Operator will be acting on behalf of White Road with respect to the specified Percentage of Receivables until cash attributable to the entire Specified Amount of Future Receivables has been remitted by Processor and Operator to White Road, (b) Processor and Operator may or may not be affiliates of White Road, (c) White Road does not have any power or authority to control Processor's or Operator's actions with respect to the processing of Card transactions or remittance of cash to White Road, (d) White Road is not responsible and shall not be liable for, and Merchant agrees to hold White Road harmless for, the actions of Processor and Operator, and (e) funds representing the Specified Percentage of Receivables in the possession of Processing or Operator constitute property owned solely by White Road, and Merchant disclaims any and all interest therein. For purposes of this Agreement, the term "Operator" shall mean White Road or any person or entity designated by White Road to debit or otherwise withdraw (via the Automated Clearing House ("ACH") system, electronic checks, wires, or otherwise) any amounts from Merchant's or principal(s) accounts as authorized or permitted by this Agreement.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire "Purchased Amount" is received by White Road as per the terms of this Agreement. The termination of this Agreement shall not affect Merchant's continuing obligation and responsibility to fully satisfy all outstanding obligations that are due to White Road.

**1.3 Future Purchases.** White Road reserves the right to rescind the offer to make any purchase payments hereunder, in its sole and absolute discretion.

**1.4 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined) authorize White Road, its agents and representatives, as well as any credit reporting agency engaged by White Road, i) to investigate their financial responsibility and history, including any references given or any other statements or data obtained from or about Merchant or any of the Guarantor(s); ii) to obtain consumer and business credit reports on the Merchant and Guarantor(s); iii) to contact any current or prior bank of the Merchant in order to obtain whatever information it may require regarding any and all of Merchant's transactions with any such bank, including, but not limited to applications, bank statements, financial statements and tax returns; and (iv) to contact personal and business references provided by the Merchant or Guarantor(s), at any time now or for so long as Merchant and/or Guarantor(s) continue to have any obligation owed to White Road as a consequence of this Merchant Agreement or for White Road's ability to determine Merchant's eligibility to enter into any future agreement with White Road. Merchant and Guarantor(s) will further provide to White Road any authorizations, bank or financial statements, tax returns, etc., as White Road deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. White Road is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Merchant and Guarantor(s) acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Guarantor(s) has been relied upon to White Road in connection with its decision to purchase the Specified Amount of Future Receivables from Merchant.

**1.5 Transactional History.** Merchant authorizes all of their banks and brokers to provide White Road with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program. Merchant herby (i) authorizes White Road to contact any past, present or future processor of Merchant, its predecessors or affiliates, to obtain any information that White Road deems necessary or appropriate regarding any of their transactions with such processors, and (ii) authorizes and directs such processors to provide White Road with all such information in compliance with this Section. Such information may include information to verify the amount of Card receivables previously processed on behalf of Merchant, its predecessors or affiliates, and any amounts that may have been paid to, offset, held or reversed by, such processors. Without limiting the generality of the foregoing, Merchant authorizes White Road to contact any past, present or future processor of Merchant, its predecessors or affiliates, to confirm that Merchant is exclusively using the Processor accepted by White Road in accordance with this Agreement.

Merchant #1 Initials: _____

DocuSign Envelope ID: ... (White Road Capital, LLC (DBA Capital com))

**1.6 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor and Operator, their respective officers, directors, affiliates, employees, agents, representatives and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) suffered or incurred by Processor or Operator resulting from (a) claims asserted by White Road for monies owed to White Road from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by White Road.

**1.7 No Liability.** In no event will Processor, Operator or White Road be liable for any claims asserted by Merchant or Guarantors under any legal theory or law, including any tort or contract theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of White Road's legal fees and expenses resulting therefrom.

**1.8 Reliance on Terms.** Section 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, White Road and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.9 Sale of Receipts.** Merchant and White Road agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from White Road to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. White Road has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to White Road in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, - it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that White Road has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and White Road shall promptly refund to Merchant any interest received by White Road in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that White Road not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant is not a debtor to White Road as of the date of this Agreement. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.10 Power of Attorney.** Merchant irrevocably appoints White Road as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to White Road from Processor, or in the case of a violation by Merchant of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to White Road; and (v) to file any claims or take any action or institute any proceeding which White Road may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant, and White Road is authorized to use Merchant's funds to pay for same. In addition to any other remedies available for violation of the Merchant's Contractual Covenants, in the event that Merchant changes or permits the change of the Processor accepted by White Road or utilizes the services of an additional Processor, White Road shall have the right, without waiving any of its rights or remedies and without notice to Merchant or Principal(s), to notify the new or additional Processor of the sale of the Specified Amount of Future Receivables hereunder and to direct such new or additional Processor to make payment to White Road of all or any portion of the amounts received or held by such Processor for or on behalf of Merchant to pay any amounts White Road is entitled to receive hereunder. Merchant hereby grants White Road an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints White Road and its designees as Merchant's attorney-in-fact, to take any and all actions necessary and appropriate to direct such new or additional Processor to make payment to White Road as contemplated by this Section. Merchant further hereby grants White Road an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints White Road and its designees as Merchant's attorney-in-fact, to execute any all documents in the Merchant's name sufficient to provide and perfect any security interest granted by Merchant to White Road hereunder, including but not limited to security interests in motor vehicles and real estate.

**1.11 Protections against Default.** The following Protections 1 through 8 may be invoked by White Road immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the White Road electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse or unacceptable to White Road; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor or an unauthorized depository account; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God), transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of White Road, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to White Road; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor or (f) Merchant enters into any agreement with any third person or entity that relates to the Receipts or any portion thereof, whether in the form of a purchase, sale, loan, pledge or the granting of any security interest in the Receipts or any portion thereof These protections are in addition to any other remedies available to White Road at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchase Amount plus all fees (including legal fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** White Road may enforce the provisions of the Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant agrees to execute affidavit(s) confessing judgment in favor of White Road in the amount of Purchase Amount stated in the Agreement. Merchant also hereby authorizes White Road to execute in the name of the Merchant affidavit(s) of Confession of Judgment in favor of White Road in the amount of Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, White Road may, without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of any appropriate court based upon the affidavit(s) of judgment by confession previously executed by Merchant(s) and Owner(s)/Guarantor(s).

**Protection 4.** White Road may enforce its security interest in the Collateral identified in the Security Agreement hereof.

*Protection 5.* The entire Purchase Amount and all fees (including legal fees) shall become immediately refundable and payable to White Road from Merchant.

**Protection 6.** White Road may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, under which White Road shall recover Judgment against Merchant, Merchant shall be liable for all of White Road's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. White Road reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to White Road from Merchant prior to applying such amounts to reduce the amount of any outstanding Purchase Amount.

**Protection 7.** This Agreement shall be deemed Merchants Assignment of Merchant's Lease of Merchant's business premises to White Road. Upon breach of any provision in this Agreement, White Road may exercise its rights under this Assignment of Lease without prior Notice to Merchant.

**Protection 8.** White Road may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile White Road on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to White Road.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes White Road, its agents and employees to obtain and disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that White Road obtains) and business conduct only to it employees. agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against White Road or any of its affiliates relating to any (i) investigation undertaken by or on behalf of White Road as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by White Road, including this Agreement and any other White Road documentations (collectively, "Confidential Information") are proprietary and confidential information of White Road. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of White Road to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles White Road to not only damages and legal fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.14 Publicity.** Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes White Road to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.15 D/B/A's.** Merchant hereby acknowledges and agrees that White Road may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between White Road and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**1.16 Purchase of Increments.** In the event that White Road offers to purchase additional Receipts in the "increments' stated on Attachment A of this Agreement, then White Road reserves the unilateral right to delay or rescind such offer in its sole and absolute discretion at any time.

**1.17 Sharing of Information.** Merchant hereby authorizes White Road to share information regarding Merchant's performance under this Agreement with affiliates and unaffiliated third parties.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement, and until White Road is fully paid:

**2.1 Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial Statements, copies of which have been furnished to White Road, and future statements which will be furnished hereafter at the discretion of White Road, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise White Road of any material adverse change in their financial condition, operation or ownership. Merchant hereby warrants that its Average Monthly Revenue as enumerated on page (1) of this Agreement is accurate, and that any and all cash advances or loans outstanding by Merchant have be disclosed to White Road. White Road may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to White Road within 5 business days. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance.** Merchant will maintain business-interruption insurance naming White Road as loss payee and additional insured in amounts and against risks as are satisfactory to White Road and shall provide White Road proof of such insurance upon request. Merchant shall also maintain such other insurance in such amounts and against such risks as White Road deems necessary to protect Merchant's business, and Merchant shall provide proof of such insurance to White Road upon demand.



Merchant #1 Initials:

**2.5 Electronic Check Processing Agreement.** Merchant will not change its processor, and will not change its financial institution or bank account(s) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without White Road's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location and Related Entities.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and White Road, nor shall Merchant change any of its places of business without prior written consent by White Road. Merchant does not and shall not conduct Merchant's business under any name other than as set forth in this agreement and shall not change its place of business. Merchant shall not change its legal name, entity type or jurisdiction of organization. In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to White Road for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due White Road under this Agreement. With respect to any such entity, White Road shall have the right to name such newly formed or existing entity as a debtor in any claim, suit, or legal proceeding.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from White Road to Merchant, execute, acknowledge and deliver to White Road and/or to any other person, firm or corporation specified by White Road, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10 Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the Receipts or future check sales, or any portion thereof, whether in the form of a purchase, sale, a loan against, collateral against or the sale or purchase of credits against, such Receipts or future check sales, with any party other than White Road. White Road may share information regarding this Merchant Agreement with any third party in order to determine whether Merchant is in compliance with this provision.

**2.11 Unencumbered Receipts.** Merchant has, and at all times will have, good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of White Road. Without limiting the generality of the foregoing, all future Receipts purchased by White Road hereunder shall be free and clear of any and all liens (other than White Road's ownership rights therein) at the time they become Receivables. All amounts received by White Road attributable to the Specified Amount of Future Receivables purchased by White Road hereunder shall arise from bona fide sales by Merchant of its goods and services to Card holders who present their Cards as payment thereof.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.14 Good Faith, Best Efforts and Due Diligence.** Merchant and Guarantors hereby affirm that it will conduct its business in Good Faith and will expend its Best Efforts to maintain and grow its business, to ensure that White Road obtains the Purchased Amount. Furthermore, Merchant and Guarantors hereby agree, warrant and represent hereby that they will constantly perform all appropriate Due Diligence and credit checks of all of the customers' finances, cash flow, solvency, good faith, payment histories and business reputations (the "Due Diligence Requirements") as may suffice to ensure any and all products and/or services provided, sold or delivered by Merchant to said customers will be paid for by customers in full and on time, and will not result in the creation of an unpaid account. These Due Diligence Requirements must be performed prior to any sales to any customer, and repeated no less frequently than monthly for so long as any sums are due from those customers. Full documentation of all of Merchant's compliance with its Due Diligence Requirements must be maintained in Merchant's files so long as White Road has not fully collected all sums due to it. This is not a guaranty of payment by customers, but is a guaranty of full, adequate and good faith Due Diligent investigation and credit check of customers before extending credit to them and continuing no less frequently than monthly so long as sums are still due.

**2.15 Taxes.** Merchant will promptly pay all necessary taxes, including but not limited to employment, sales and use taxes.

**2.16 No Violation of Prior Agreements.** Merchant warrants that its execution and performance of this Merchant Agreement will not violate or conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Merchant is subject, including any agreement that prohibits the sale or pledge of Merchant's future receipts or the Purchased Amount.

**2.17 Opportunity for Counsel.** Merchant represents, warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Merchant Agreement, and that it has been represented by legal counsel or has had full opportunity to consult with its own legal counsel.

**2.18 Ongoing Obligations.** Merchant hereby covenants and agrees that even after it receives some or all of the Purchase Price from White Road, it will comply with White Road's ongoing requests for any documentation from Merchant for the purpose of business and identify verification and underwriting and verification (such as the merchant's driver's license, bank login, bank statements, or any other financial or business documentation). Merchant's failure to provide to White Road the requested documentation within twenty-four (24) hours shall be deemed a breach of this Agreement and White Road shall no longer be obligated to provide any further funding to Merchant. In addition, if after receipt of said documentation from Merchant, White Road discovers that Merchant made misrepresentations before receiving funding from White Road, White Road shall no longer be obligated to provide any further funding to Merchant and Merchant's misrepresentations shall be deemed a breach of this Agreement.

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Merchant; (d) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (e) Merchant shall transfer or sell all or substantially all of its assets, or issue any notice of intended bulk sale or transfer; (f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (g) Merchant shall use multiple depository accounts without the prior written consent of White Road (h) Merchant shall change its depositing account without the prior written consent of White Road; (i) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; (j) the Specified Percentage of its daily Receipts is not available for ACH by White Road on any three (3) business days within any twenty (20) business day period; (k) Merchant shall default under any of the terms, covenants and conditions of any other agreement with White Road; or (l) Merchant fails to deposit its Receipts into the Account.

**3.2 Personal Guaranty.** In the event of a Default under Sections 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13, and 2.14 hereof, should White Road determine that the Purchased Amount cannot be obtained from the Merchant's business, White Road will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to White Road for all of White Road's losses and damages, in additional to all costs, fees expenses and legal fees associated with such enforcement. White Road shall not be required before exercising and enforcing its rights under this Personal Guaranty first to resort to payment against Merchant or to any other person or to any collateral.

**3.3 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4.1 hereof, White Road may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Security Agreement or Guaranty, or pursuant to any other legal or equitable right or remedy. Upon Merchant's and/or Owner's/Guarantor's default hereunder, the balance of the Purchased Amount remaining due, plus any applicable fees, shall become immediately due and payable to White Road. In addition, upon an Event of Default, White Road may: i) enforce the provisions of the Security Agreement and Guaranty against each Merchant and Owner/Guarantor; ii) enforce its security interest in the Collateral and the ; iii) adjust debits of Merchant's Account to a daily debit; iv) debit Merchant's deposit accounts wherever situated by means of ACH debit or facsimile signature on a computer generated check drawn on Merchant's bank account for all or a portion of the balance of the Purchased Amount remaining due, or White Road may instruct the Processor to forward to White Road, without any prior notice to Merchant, all or a portion of the balance of the Purchased Amount remaining due, and v) without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of the appropriate court based upon the affidavit(s) of judgment by confession previously executed by Merchant(s) and Owner(s)/Guarantor(s). All rights, powers and remedies of White Road which may be exercised by White Road at any time after the occurrence of an Event of Default are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Costs.** Merchant shall pay to White Road all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(b) the enforcement of White Road 's remedies set forth in Section 3.3 above, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications.** Merchant is required to give White Road written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give White Road seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## IV. MISCELLANEOUS

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by White Road.

**4.2 Assignment.** This Agreement shall be binding upon and inure to the benefit of Merchant, Principal(s), White Road and their respective successors and assigns, except that Merchant and Principal(s) shall not have the right to assign or delegate any of their rights or obligations hereunder or any interest herein without prior written consent of White Road, which consent may be withheld in White Road's sole discretion. Any such assignment or delegation without White Road's prior written consent shall be void. White Road reserves the right to assign or delegate this Agreement or any of its rights or obligations hereunder with or without prior notice to Merchant. White Road may assign, transfer or sell its rights to receive the Purchased Amount and delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the merchant at the address set forth above in this agreement and to White Road at 2999 NE 191st Street, Unit 901, Miami, FL 33180 with a copy to 27-01 Queens Plaza North, Suite 802, Long Island City, NY 11101. Notices to White Road shall become effective only upon receipt by White Road. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of White Road to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, White Road and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of White Road which consent may be withheld in White Road's sole discretion. White Road reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, may, if White Road so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by White Road to

Merchant #1 Initials: _JLE_

DocuSign Envelope ID: ... WhiteRoad Capital LLC (DepositMatch.com)

transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provision in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and White Road and supersede all prior agreements and understandings relating to the subject matter hereof. Merchant and Principal(s) each acknowledge and agree that he, she or it is not relying on any representations not specifically embodied in this Agreement.

**4.10 JURY TRIAL WAIVER.**

THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.11 Facsimile Acceptance.** Merchant and Guarantor(s) hereby agree that facsimile and/or electronic signatures on this Merchant Agreement and Guaranty, or photocopies thereof, that shall be deemed acceptable and treated as originals for all purposes, and shall be admissible as evidence of the Merchant Agreement and Guaranty.

**4.12. Right of Access.** In order to ensure that Merchant is complying with the terms of this Merchant Agreement, Merchant agrees that White Road shall have the right to (i) enter, without notice, the premises of Merchant's business for the purpose of inspecting and checking Merchant's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Merchant's daily receipts to the Processor and to ensure that Merchant has not violated any other provision of this Agreement, and (ii) Merchant's shall provide access to its employees and records and all other items as requested by White Road, and (iii) have Merchant's provide information about its business operations, banking relationships, vendors, landlord and other information to allow White Road to interview any relevant parties. Furthermore, Merchant agrees to provide White Road, at all times with "Live Contemporaneous Access" to all of its bank accounts in order for White Road to evaluate Merchant's compliance with the Merchant Agreement, and for collections in the event of a default under the Merchant Agreement. "Live Contemporaneous Access" shall be defined as: Merchant, at all times and including but not limited to, providing White Road with accurate login information necessary to access all of Merchant's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens.

**4.13. Phone Recordings and Contact.** Merchant agrees that any call between White Road and Merchant, and their agents and employees may be recorded or monitored. Further, Merchant agrees that (i) it has an established business relationship with White Road, its employees and agents and that Merchant may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, emails address, or facsimile number given to White Road by the Merchant, its agents or employees, including cellular telephones.

**4.14. Monitoring, Recording, and Solicitations.**

a. Authorization to Contact Seller by Phone. Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

b. Authorization to Contact Seller by Other Means. Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

| Merchant's Legal Name: | JLK CONSTRUCTION, LLC. |
| D/B/A: | JLK CONSTRUCTION, LLC. |
| Federal EIN: | |
| Physical Address: | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 |

## SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant grants to White Road a security interest in and lien upon: (a) all accounts receivables, accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant, (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to White Road under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to White Road upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover White Road's entitlements under this Agreement, White Road is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of White Road's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, White Road or an affiliate of White Road. White Road is authorized to execute and file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by White Road without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, White Road has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, White Road will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from White Road written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant agrees that this is a contract of recoupment and White Road is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant agrees not to contest or object to any motion for relief from the automatic stay filed by White Road. Merchant agrees to execute and deliver to White Road such instruments and documents White Road may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. White Road is authorized to execute all such instruments and documents in Merchant's name.

In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to White Road for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due White Road under this Agreement. With respect to any such entity, White Road shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. White Road shall be held harmless by Merchant and each Owner/Guarantor and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. White Road shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of White Road's rights, including without limitation, White Road's right to collect all accounts, and to notify any payment card processor or creditor of such entity that White Road has such rights in such entity's assets. Merchant also agrees that, at the White Road's discretion, White Road may choose to amend any existing financing statement to include any such newly formed entity as debtor.

Merchant and Guarantor each acknowledge and agree that any security interest granted to White Road under any other agreement between Merchant or Guarantor and White Road (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as White Road deems necessary to perfect or maintain White Road's first priority security interest in the Collateral including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes White Road to file any financing statements deemed necessary by White Road to perfect or maintain White Road's security interest, which financing statement may contain notification that Merchant and/or Guarantor have granted a negative pledge to White Road with respect to the Collateral, and that any subsequent lien or may be tortuously interfering with White Road's rights. Merchant and Guarantor shall be liable for, and White Road may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by White Road in protecting, preserving and enforcing White Road's security interest and rights.

**Negative Pledge.** Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** White Road shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, White Road may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that White Road may enter into an agreement with Merchant's landlord giving White Road the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

Merchant #1 Initials: _____

DocuSign Envelope ID: ... ...LLC ...com)

**Remedies.** Upon any Event of Default, White Road may exercise any remedy available to it under (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to White Road, whether by acceleration or otherwise.

## GUARANTY

**Personal Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to White Road, Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the Merchant Agreement in Sections thereof 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13 and 2.14, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, White Road may seek recovery from Guarantors for all of White Road's losses and damages by enforcement of White Road's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral White Road may hold pursuant to this Agreement or any other guaranty.

White Road does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) White Road's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to White Road. In addition, White Road may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to White Road; (ii) release Merchant from its obligations to White Road; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to White Road under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting the Guarantor under this Agreement are joint and several.

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.**

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | *JESSE LEE KAGARICE* | | |

| OWNER / GUARANTOR (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | *JESSE LEE KAGARICE* | | |

Merchant #1 Initials:

# APPENDIX A SCHEDULE:

A. **Origination Fee** - 10.0% of Purchase Price to cover Underwriting and related expenses. This expense is charged at the time of funding.

B. **ACH Program Fee** - 0% of Purchase Price ACH's are labor intensive and are not an automated process, requiring us to charge this fee to cover costs. This expense is charged at the time of funding.

C. **Miscellaneous Service Fees** - Merchant shall pay certain fees for services related to the origination and maintenance of Accounts, which fees are set forth below. Each Merchant shall receive their funding electronically to their designated bank account, and the White Road may deduct some or all of the fees from the funded amount.

A. Rejected ACH/Blocked ACH - $5,000.00 when Merchant blocks Account from our Debit ACH, or when Merchant directs the bank to reject our debit ACH, which places them in default (per contract).

B. Pre-Authorized Bank Change Fee - $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

C. Wire Fee - $50.00 Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for either a Fed Wire fee or a bank ACH fee.

D. UCC Filing, Amendment or Termination Fee - $200.00.

E. Default Fee - $5,000.00 when Merchant defaults under the Agreement, including but not limited to diverting its Receivables from the bank account agreed upon in the "Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)" or changing its credit card processing thus terminating or diverting the agreed upon split.

F. Account Management Fees - $45.00 upon origination, and $45.00 per month thereafter until the Purchase Amount, together with any and all unpaid outstanding other fees have been paid in full. These Management Fees will not be applied towards the reduction of the Purchase Amount.

G. Stacking Fee - In the event that the Merchant enters into any cash advance or any loan agreement that relates to or involves the Receipts with any person or entity other than White Road during any portion of the term of this Agreement, then: i) Merchant shall pay to White Road a "Stacking" fee equal to $5,000.00 per occurrence, and ii) the specified daily remittances that Merchant is obligated to pay to White Road hereunder shall be doubled, and Merchant shall be deemed to have authorized White Road to double the amount of its ACH Debits from the Merchant's Account on a daily basis.

H. Third Party Collections Fee – In the event that Merchant defaults under any of the terms and conditions of this Agreement, Merchant shall pay to White Road, in addition to any other fees associated with Merchant's default, a third party collections fee equal to fifteen (15%) of the outstanding balance after all fees at the time of default.

I. NSF Fee (Standard) - $ 35.00 each until a default is declared.

J. Non-ACH Transaction Fee - When a Merchant makes a payment other than through ACH, the Merchant is responsible for the cost of that transaction.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | *JESSE LEE KAGARICE* | | |

DocuSign Envelope ID:

## Merchant Verification Form

| Merchant Name: JESSE LEE KAGARICE | |
|---|---|
| 1.  Do you currently or within the last 90 days have any intentions, plans or discussions regarding closing your Business? | No |
| 2.  Do you currently or within the least 90 days have any intentions, plans or discussions to change the name or legal structure of the business? | No |
| 3.  Are you currently in, or contemplating personal bankruptcy? | No |
| 4.  Are you currently in, or contemplating business bankruptcy? | No |
| 5.  Is your business currently for sale? | No |
| 6.  Do you have any existing merchant cash advance balances? | Yes |
| 7.  Are you involved in any litigation proceedings or are a party to a lawsuit? | No |
| 8.  Is your business currently in default of any agreement with a creditor? | No |
| 9.  Is your business currently in forbearance agreement with a creditor? | No |
| 10. Will selling the Future Receivables cause you to breach any agreement with a creditor? | No |

If you have answered YES to any of the above questions, please explain:

I hereby certify that the above statements are true and correct to the best of my knowledge; I authorize my landlord and credit card processor to discuss confidential account information for the purpose of satisfying the requirements of White Road Capital LLC, Series: 127009, D/B/A: GFE Holdings.

Completed and attested by:

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | JESSE LEE KAGARICE | | |

DocuSign Envelope ID: ... White Road Capital LLC (https://...com)

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT)
### AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep this important legal document for Merchant's records.

DISBURSEMENT OF ADVANCE PROCEEDS. By signing below, Merchant authorizes White Road to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Merchant later identifies and is acceptable to White Road) (hereinafter referred to as the "Designated Checking Account") This authorization is to remain in full force and effect until White Road has received written notification from Merchant of its termination in such time and in such manner as to afford White Road and Merchant's depository bank a reasonable opportunity to act on it.

BUSINESS PURPOSE ACCOUNT. By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

MISCELLANEOUS. White Road is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Merchant's account must comply with the provisions of U.S. law.

I, (We) JESSE LEE KAGARICE hereby Authorize, White Road Capital LLC, Series: 127009, D/B/A: GFE Holdings. (Hereinafter known as "White Road") to Electronically (ACH) debit the Bank Account Below, of which I am a signer:

| | | | |
|---|---|---|---|
| Bank Name: | NODAWAY VALLEY BANK | Tax ID: | |
| ABA: Routing: | | DDA: Account: | |
| For the amount of: | $590.45 | (Or) Percentage of each Banking Deposit: | 3% |
| On the Following Days: | MONDAY-FRIDAY | | |

This authorization is to remain in full force and effect until COMPANY has received written notification from me at least 5 banking days prior of its termination to afford COMPANY a reasonable opportunity to act on it.

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | *JESSE LEE KAGARICE* | | |

DocuSign Envelope ID:

Thank you for accepting an offer from White Road Capital LLC, Series: 127009, D/B/A: GFE Holdings ("White Road"). We look forward to being your funding partner for as long as you need.

Please note that the way your advance is set up with White Road, White Road requires viewing access to your bank account each business day, throughout the term of this Agreement, in order that White Road may calculate and verify the amount of your daily remittance. Please be assured that we will carefully safeguard your confidential information and only essential personnel will have access to it.

White Road Capital LLC, Series: 127009, D/B/A: GFE Holdings. will also require viewing access to your bank account, prior to funding, as part of the underwriting process.

Please be advised that for security purposes, White Road will request this information prior to funding. By signing below, you hereby agree that if you fail to provide the requested bank login information prior to funding, White Road shall have no obligation to provide funding. Please be further advised that if you change any of the bank login information during the term of this Agreement or at any time while you still have any outstanding obligations to White Road, you are required to immediately inform White Road of the changes made and provide White Road with the new bank login information. Please see below for the list of questions that will be by White Road as it relates to the banking information.

1. Bank Portal Website;
2. Bank Account Username;
3. Bank Account Password;
4. Security Question/Answer 1 of this Bank Account;
5. Security Question/Answer 2 of this Bank Account;
6. Security Question/Answer 3 of this Bank Account; and
7. Any other information necessary to access your Bank Account.

If you have any questions please feel free to contact our cash management department.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Signature** | JESSE LEE KAGARICE | | |

BANK ACCOUNT DISCLOSURE AFFIDAVIT

For the purpose of obtaining the Business Cash Advance evidence by the Merchant Agreement of this same date herewith (the "Business Cash Advance") from White Road Capital LLC, Series: 127009, D/B/A: GFE Holdings., the undersigned Seller/Merchant hereby makes the following statement under penalty of law:

## OPTION 1 – DISCLOSURE AND AUTHORIZATION FOR ADDITIONAL ACCOUNTS:

By selecting this option, the Seller/Merchant hereby declares that in addition to the designated for ACH debit, the Seller/Merchant also has the following additional account(s) which he authorizes us to use in the event we are unable to debit from the designated account. The Seller/Merchant declares and warrents that it currently maintains no other bank account at any financial institution other than those banks and accounts referenced below.

| Bank Name | |
|---|---|
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| Bank Name | |
|---|---|
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| Bank Name | |
|---|---|
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

**OPTION 2** - By selecting this option, the merchant swears, under penalty of law, that Merchant has no accounts in any lending institution in addition to the one provided for ACH debit

## PLEASE SELECT AN OPTION AND SIGN BELOW:

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | JESSE LEE KAGARICE | Social Security No: | |
| Title | Sole Member | Driver License No: | |
| Signature | JESSE LEE KAGARICE | | |

Merchant #1 Initials: [JLK]

DocuSign Envelope ID

## ADDENDUM TO MERCHANT AGREEMENT

This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law. Any litigation relating to this Agreement must be commenced and maintained in any court located in New York State (the "Acceptable Forums"), however any action or proceeding to enforce a judgment or arbitration award may also be commenced and maintained in any other court of competent jurisdiction. The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum.

**THE PARTIES AGREE TO WAIVE TRIAL BY JURY IN ANY DISPUTE BETWEEN THEM.**

In any litigation commenced by White Road, Merchant and Guarantor will not be permitted to interpose any counterclaim. Merchant and Guarantor agree that any claim that is not asserted against White Road within 1 year of its accrual will be time barred. If White Road prevails in any litigation with Merchant and/or Guarantor, then Merchant and Guarantor must pay White Road's reasonable attorney fees, which may include a contingency fee of up to 33% of the amount claimed, expert fees, costs of suit, and prejudgment interest at a rate of 16% per annum (or the maximum rate permitted by applicable law if lower). White Road, Merchant, and Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**Merchant and Guarantor consent to service of process and legal notices made by certified mail, return receipt requested delivered by the United States Postal Service and addressed to the Contact Address set forth immediately below or on Page 1 of this Agreement, any such service will be deemed complete 5 days after dispatch.**

I have read and agreed to the Terms and Conditions set forth above:

| MERCHANT (#1) | | Signature | JESSE LEE KAGARICE |
|---|---|---|---|
| **Full Name:** | JESSE LEE KAGARICE | **Social Security No:** | |
| **Title** | Sole Member | **Driver License No:** | |
| **Home Address:** | 18900 STATE ROUTE DD HIGHWAY, Saint Joseph, MO, 64505 | **Email:** | Jesse@jlkconstruction.com |

DocuSign Envelope ID

## TRADE REFERENCES

Please provide a list of 3-5 professional references

| TRADE REFERENCE #1: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #2: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #3: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #4: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #5: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

26570.25

## JLK Construction LLC BUSINESS BANKING – 6424559 ⌄

### Transactions

🎫 Scheduled    ⏱ Pending    ● Posted

| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
| Oct 07, 2022 | GFE Holdings.WR U | -590.45 | *1* |
| Oct 06, 2022 | GFE Holdings.WR U | -590.45 | *2* |
| Oct 05, 2022 | GFE Holdings.WR U | -590.45 | *3* |
| Oct 04, 2022 | GFE Holdings.WR U | -590.45 | *4* |
| Oct 03, 2022 | GFE Holdings.WR U | -590.45 | *5* |
| Sep 30, 2022 | GFE Holdings.WR U | -590.45 | *6* |
| Sep 29, 2022 | GFE Holdings.WR U | -590.45 | *7* |
| Sep 28, 2022 | GFE Holdings.WR U | -590.45 | *8* |
| Sep 27, 2022 | GFE Holdings.WR U | -590.45 | *9* |

| Date ▾ | Description ⇅ | Amount ⇅ | Balance |
|--------|---------------|----------|---------|
| Sep 26, 2022 | GFE Holdings.WR U | -590.45 | 10 |
| Sep 23, 2022 | GFE Holdings.WR U | -590.45 | 11 |
| Sep 22, 2022 | GFE Holdings.WR U | -590.45 | 12 |
| Sep 21, 2022 | GFE Holdings.WR U | -590.45 | 13 |
| Sep 20, 2022 | GFE Holdings.WR U | -590.45 | 14 |
| Sep 19, 2022 | GFE Holdings.WR U | -590.45 | 16 |
| Sep 16, 2022 | GFE Holdings.WR U | -590.45 | 17 |
| Sep 15, 2022 | GFE Holdings.WR U | -590.45 | 18 |
| Sep 14, 2022 | GFE Holdings.WR U | -590.45 | 19 |
| Sep 13, 2022 | GFE Holdings.WR U | -590.45 | 20 |
| Sep 12, 2022 | GFE Holdings.WR U | -590.45 | 21 |
| Sep 09, 2022 | GFE Holdings.WR U | -590.45 | 22 |
| Sep 08, 2022 | GFE Holdings.WR U | -590.45 | 23 |
| Sep 07, 2022 | GFE Holdings.WR U | -590.45 | 24 |
| Sep 06, 2022 | GFE Holdings.WR U | -590.45 | 25 |

| Date ▾ | Description ⇕ | Amount ⇕ | Balance |
|--------|---------------|----------|---------|
| Sep 06, 2022 | GFE Holdings.WR U | -590.45 | 26 |
| Sep 02, 2022 | GFE Holdings.WR U | -590.45 | 27 |
| Sep 01, 2022 | GFE Holdings.WR U | -590.45 | 28 |
| Aug 31, 2022 | GFE Holdings.WR U | -590.45 | 29 |
| Aug 30, 2022 | GFE Holdings.WR U | -590.45 | 30 |
| Aug 29, 2022 | GFE Holdings.WR U | -590.45 | 31 |
| Aug 26, 2022 | GFE Holdings.WR U | -590.45 | 32 |
| Aug 25, 2022 | GFE Holdings.WR U | -590.45 | 33 |
| Aug 24, 2022 | GFE Holdings.WR U | -590.45 | 34 |
| Aug 23, 2022 | GFE Holdings.WR U | -590.45 | 35 |
| Aug 22, 2022 | GFE Holdings.WR U | -590.45 | 36 |
| Aug 19, 2022 | GFE Holdings.WR U | -590.45 | 37 |
| Aug 18, 2022 | GFE Holdings.WR U | -590.45 | 38 |
| Aug 17, 2022 | GFE Holdings.WR U | -590.45 | 39 |
| Aug 16, 2022 | GFE Holdings.WR U | -590.45 | 40 |

| Date ▾ | Description ⇅ | Amount ⇅ | Balance |
|--------|---------------|----------|---------|
| Aug 15, 2022 | GFE Holdings.WR U | -590.45 | 41 |
| Aug 12, 2022 | GFE Holdings.WR U | -590.45 | 42 |
| Aug 11, 2022 | GFE Holdings.WR U | -590.45 | 43 |
| Aug 10, 2022 | GFE Holdings.WR U | -590.45 | 44 |
| Aug 09, 2022 | GFE Holdings.WR U | -590.45 | 45 |

Member FDIC. Equal Housing Lender. 　　　　　© 2015-2022 Fiserv, Inc. or its affiliates.

Exhibit "6"

JLK Construction LLC                                   Annual Interest Rate            250.3150%
Global Funding Experts 8-2-21                          Daily Interest Rate              0.6858%

| Date | Transaction | Payment | Interest | Principle | Balance |
|---|---|---|---|---|---|
| 8/2/2021 | Original Loan Amount | | | | 47,246.84 |
| | Loan fee deducted | | | | 8,750.00 |
| | Loan deposited | | | | 38,496.84 |
| 8/3/2021 | Payment | 1,300.00 | 264.01 | 1,035.99 | 37,460.85 |
| 8/4/2021 | Payment | 1,300.00 | 256.90 | 1,043.10 | 36,417.75 |
| 8/5/2021 | Payment | 1,300.00 | 249.75 | 1,050.25 | 35,367.50 |
| 8/6/2021 | Payment | 1,300.00 | 242.55 | 1,057.45 | 34,310.05 |
| 8/9/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 43,556.89 |
| 8/9/2021 | Payment | 1,300.00 | 298.71 | 1,001.29 | 42,555.60 |
| 8/10/2021 | Payment | 1,300.00 | 291.84 | 1,008.16 | 41,547.45 |
| 8/11/2021 | Payment | 1,300.00 | 284.93 | 1,015.07 | 40,532.38 |
| 8/12/2021 | Payment | 1,300.00 | 277.97 | 1,022.03 | 39,510.35 |
| 8/13/2021 | Payment | 1,300.00 | 270.96 | 1,029.04 | 38,481.31 |
| 8/16/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 47,728.15 |
| 8/16/2021 | Payment | 1,300.00 | 327.32 | 972.68 | 46,755.46 |
| 8/17/2021 | Payment | 1,300.00 | 320.65 | 979.35 | 45,776.11 |
| 8/18/2021 | Payment | 1,300.00 | 313.93 | 986.07 | 44,790.04 |
| 8/13/2021 | Payment | 1,300.00 | 307.17 | 992.83 | 43,797.21 |
| 8/20/2021 | Payment | 1,300.00 | 300.36 | 999.64 | 42,797.57 |
| 8/23/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 52,044.41 |
| 8/23/2021 | Payment | 1,300.00 | 356.92 | 943.08 | 51,101.32 |
| 8/24/2021 | Payment | 1,300.00 | 350.45 | 949.55 | 50,151.77 |
| 8/25/2021 | Payment | 1,300.00 | 343.94 | 956.06 | 49,195.71 |
| 8/26/2021 | Payment | 1,300.00 | 337.38 | 962.62 | 48,233.09 |
| 8/27/2021 | Payment | 1,300.00 | 330.78 | 969.22 | 47,263.87 |
| 8/30/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 56,510.71 |
| 8/30/2021 | Payment | 1,300.00 | 387.55 | 912.45 | 55,598.26 |
| 8/31/2021 | Payment | 1,300.00 | 381.29 | 918.71 | 54,679.55 |
| 9/1/2021 | Payment | 1,300.00 | 374.99 | 925.01 | 53,754.54 |
| 9/2/2021 | Payment | 1,300.00 | 368.65 | 931.35 | 52,823.19 |
| 9/3/2021 | Payment | 1,300.00 | 362.26 | 937.74 | 51,885.44 |
| 9/7/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 61,132.28 |
| 9/7/2021 | Payment | 1,300.00 | 419.24 | 880.76 | 60,251.53 |
| 9/7/2021 | Payment | 1,300.00 | 413.20 | 886.80 | 59,364.73 |
| 9/8/2021 | Payment | 1,300.00 | 407.12 | 892.88 | 58,471.85 |
| 9/9/2021 | Payment | 1,300.00 | 401.00 | 899.00 | 57,572.84 |
| 9/10/2021 | Payment | 1,300.00 | 394.83 | 905.17 | 56,667.68 |
| 9/13/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 65,914.52 |
| 9/13/2021 | Payment | 1,300.00 | 452.04 | 847.96 | 65,066.55 |
| 9/14/2021 | Payment | 1,300.00 | 446.22 | 853.78 | 64,212.78 |
| 9/15/2021 | Payment | 1,300.00 | 440.37 | 859.63 | 63,353.15 |
| 9/16/2021 | Payment | 1,300.00 | 434.47 | 865.53 | 62,487.62 |
| 9/17/2021 | Payment | 1,300.00 | 428.54 | 871.46 | 61,616.15 |
| 9/20/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 70,862.99 |
| 9/20/2021 | Payment | 1,300.00 | 485.97 | 814.03 | 70,048.97 |

| Date | Transaction | Payment | Interest | Principle | Balance |
|---|---|---|---|---|---|
| 9/21/2021 | Payment | 1,300.00 | 480.39 | 819.61 | 69,229.36 |
| 9/22/2021 | Payment | 1,300.00 | 474.77 | 825.23 | 68,404.13 |
| 9/23/2021 | Payment | 1,300.00 | 469.11 | 830.89 | 67,573.24 |
| 9/24/2021 | Payment | 1,300.00 | 463.41 | 836.59 | 66,736.66 |
| 9/27/2021 | Additional monies (see note) | (9,246.84) | 0.00 | (9,246.84) | 75,983.50 |
| 9/28/2021 | Payment | 1,300.00 | 521.09 | 778.91 | 75,204.59 |
| 9/29/2021 | Payment | 1,300.00 | 515.75 | 784.25 | 74,420.34 |
| 9/30/2021 | Payment | 1,300.00 | 510.37 | 789.63 | 73,630.71 |
| 10/1/2021 | Payment | 1,300.00 | 504.96 | 795.04 | 72,835.66 |
| 10/4/2021 | Payment | 1,300.00 | 499.50 | 800.50 | 72,035.17 |
| 10/4/2021 | Additional monies (see note) | (3,778.44) | 0.00 | (3,778.44) | 75,813.61 |
| 10/5/2021 | Payment | 1,300.00 | 519.93 | 780.07 | 75,033.53 |
| 10/6/2021 | Payment | 1,300.00 | 514.58 | 785.42 | 74,248.11 |
| 10/7/2021 | Payment | 1,300.00 | 509.19 | 790.81 | 73,457.30 |
| 10/8/2021 | Payment | 1,300.00 | 503.77 | 796.23 | 72,661.06 |
| 10/12/2021 | Payment | 1,300.00 | 498.31 | 801.69 | 71,859.37 |
| 10/12/2021 | Payment | 1,300.00 | 0.00 | 1,300.00 | 70,559.37 |
| 10/13/2021 | Payment | 1,300.00 | 483.89 | 816.11 | 69,743.26 |
| 10/14/2021 | Payment | 1,300.00 | 478.30 | 821.70 | 68,921.56 |
| 10/15/2021 | Payment | 1,300.00 | 472.66 | 827.34 | 68,094.22 |
| 10/18/2021 | Payment | 1,300.00 | 466.99 | 833.01 | 67,261.20 |
| 10/19/2021 | Payment | 1,300.00 | 0.00 | 1,300.00 | 65,961.20 |
| 10/20/2021 | Payment | 1,300.00 | 452.36 | 847.64 | 65,113.56 |
| 10/21/2021 | Payment | 1,300.00 | 446.55 | 853.45 | 64,260.11 |
| 10/22/2021 | Payment | 1,300.00 | 440.69 | 859.31 | 63,400.80 |
| 10/25/2021 | Payment | 1,300.00 | 434.80 | 865.20 | 62,535.60 |
| 10/26/2021 | Payment | 1,300.00 | 428.87 | 871.13 | 61,664.46 |
| 10/27/2021 | Payment | 1,300.00 | 422.89 | 877.11 | 60,787.35 |
| 10/28/2021 | Payment | 1,300.00 | 0.00 | 1,300.00 | 59,487.35 |
| 10/29/2021 | Payment | 1,300.00 | 407.96 | 892.04 | 58,595.32 |
| 11/1/2021 | Payment | 1,300.00 | 401.84 | 898.16 | 57,697.16 |
| 11/2/2021 | Payment | 1,300.00 | 395.68 | 904.32 | 56,792.84 |
| 11/3/2021 | Payment | 1,300.00 | 389.48 | 910.52 | 55,882.33 |
| 11/4/2021 | Payment | 1,300.00 | 383.24 | 916.76 | 54,965.56 |
| 11/5/2021 | Payment | 1,300.00 | 376.95 | 923.05 | 54,042.51 |
| 11/8/2021 | Payment | 1,300.00 | 370.62 | 929.38 | 53,113.13 |
| 11/9/2021 | Payment | 1,300.00 | 0.00 | 1,300.00 | 51,813.13 |
| 11/10/2021 | Payment | 1,300.00 | 355.33 | 944.67 | 50,868.47 |
| 11/12/2021 | Payment | 1,300.00 | 348.85 | 951.15 | 49,917.32 |
| 11/12/2021 | Payment | 1,300.00 | 342.33 | 957.67 | 48,959.65 |
| 11/15/2021 | Payment | 1,300.00 | 335.76 | 964.24 | 47,995.41 |
| 11/16/2021 | Payment | 1,300.00 | 329.15 | 970.85 | 47,024.56 |
| | Totals - Net of Additional monies | 97,500.00 | 11,510.96 | 229,726.28 | |

Exhibit "7"

JLK Construction LLC
Global Funding Experts 12-7-21

| | | | Annual Interest Rate | | 133.5360% |
| | | | Daily Interest Rate | | 0.3659% |

| Date | Transaction | Payment | Interest | Principle | Balance |
|---|---|---|---|---|---|
| 12/8/2021 | Original Loan Amount | | | | 106,090.50 |
| | Loan fee deducted | | | | 0.00 |
| | Loan deposited | | | | 106,090.50 |
| 12/9/2021 | Payment | 3,999.00 | 388.13 | 3,610.87 | 102,479.63 |
| 12/10/2021 | Payment | 3,999.00 | 374.92 | 3,624.08 | 98,855.56 |
| 12/13/2021 | Payment | 3,999.00 | 361.67 | 3,637.33 | 95,218.22 |
| 12/14/2021 | Payment | 3,999.00 | 348.36 | 3,650.64 | 91,567.58 |
| 12/15/2021 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 124,658.08 |
| 12/15/2021 | Payment | 3,999.00 | 456.06 | 3,542.94 | 121,115.15 |
| 12/16/2021 | Payment | 3,999.00 | 443.10 | 3,555.90 | 117,559.25 |
| 12/17/2021 | Payment | 3,999.00 | 430.09 | 3,568.91 | 113,990.34 |
| 12/20/2021 | Payment | 3,999.00 | 417.04 | 3,581.96 | 110,408.38 |
| 12/21/2021 | Payment | 3,999.00 | 403.93 | 3,595.07 | 106,813.31 |
| 12/22/2021 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 139,903.81 |
| 12/22/2021 | Payment | 3,999.00 | 511.84 | 3,487.16 | 136,416.65 |
| 12/23/2021 | Payment | 3,999.00 | 499.08 | 3,499.92 | 132,916.73 |
| 12/24/2021 | Payment | 3,999.00 | 486.28 | 3,512.72 | 129,404.01 |
| 12/27/2021 | Payment | 3,999.00 | 473.43 | 3,525.57 | 125,878.44 |
| 12/28/2021 | Payment | 3,999.00 | 460.53 | 3,538.47 | 122,339.97 |
| 12/29/2021 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 155,430.47 |
| 12/29/2021 | Payment | 3,999.00 | 568.65 | 3,430.35 | 152,000.11 |
| 12/30/2021 | Payment | 3,999.00 | 556.10 | 3,442.90 | 148,557.21 |
| 12/31/2021 | Payment | 3,999.00 | 543.50 | 3,455.50 | 145,101.71 |
| 1/3/2022 | Payment | 3,999.00 | 530.86 | 3,468.14 | 141,633.56 |
| 1/4/2022 | Payment | 3,999.00 | 518.17 | 3,480.83 | 138,152.73 |
| 1/5/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 171,243.23 |
| 1/5/2022 | Payment | 3,999.00 | 626.50 | 3,372.50 | 167,870.73 |
| 1/6/2022 | Payment | 3,999.00 | 614.16 | 3,384.84 | 164,485.89 |
| 1/7/2022 | Payment | 3,999.00 | 601.78 | 3,397.22 | 161,088.66 |
| 1/10/2022 | Payment | 3,999.00 | 589.35 | 3,409.65 | 157,679.01 |
| 1/11/2022 | Payment | 3,999.00 | 576.87 | 3,422.13 | 154,256.88 |
| 1/12/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 187,347.38 |
| 1/12/2022 | Payment | 3,999.00 | 685.41 | 3,313.59 | 184,033.80 |
| 1/13/2022 | Payment | 3,999.00 | 673.29 | 3,325.71 | 180,708.09 |
| 1/14/2022 | Payment | 3,999.00 | 661.12 | 3,337.88 | 177,370.21 |
| 1/18/2022 | Payment | 3,999.00 | 648.91 | 3,350.09 | 174,020.12 |
| 1/18/2022 | Payment | 3,999.00 | 636.66 | 3,362.34 | 170,657.78 |
| 1/19/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 203,748.28 |
| 1/19/2022 | Payment | 3,999.00 | 745.42 | 3,253.58 | 200,494.70 |
| 1/20/2022 | Payment | 3,999.00 | 733.51 | 3,265.49 | 197,229.21 |
| 1/21/2022 | Payment | 3,999.00 | 721.57 | 3,277.43 | 193,951.78 |
| 1/24/2022 | Payment | 3,999.00 | 709.58 | 3,289.42 | 190,662.36 |
| 1/25/2022 | Payment | 3,999.00 | 697.54 | 3,301.46 | 187,360.90 |
| 1/26/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 220,451.40 |
| 1/26/2022 | Payment | 3,999.00 | 806.53 | 3,192.47 | 217,258.92 |

| Date | Transaction | Payment | Interest | Principle | Balance |
|---|---|---|---|---|---|
| 1/27/2022 | Payment | 3,999.00 | 794.85 | 3,204.15 | 214,054.77 |
| 1/28/2022 | Payment | 3,999.00 | 783.12 | 3,215.88 | 210,838.89 |
| 1/31/2022 | Payment | 3,999.00 | 771.36 | 3,227.64 | 207,611.25 |
| 2/1/2022 | Payment | 3,999.00 | 759.55 | 3,239.45 | 204,371.80 |
| 2/2/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 237,462.30 |
| 2/2/2022 | Payment | 3,999.00 | 868.76 | 3,130.24 | 234,332.06 |
| 2/3/2022 | Payment | 3,999.00 | 857.31 | 3,141.69 | 231,190.37 |
| 2/4/2022 | Payment | 3,999.00 | 845.81 | 3,153.19 | 228,037.19 |
| 2/7/2022 | Payment | 3,999.00 | 834.28 | 3,164.72 | 224,872.47 |
| 2/8/2022 | Payment | 3,999.00 | 822.70 | 3,176.30 | 221,696.17 |
| 2/9/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 254,786.67 |
| 2/9/2022 | Payment | 3,999.00 | 932.14 | 3,066.86 | 251,719.81 |
| 2/10/2022 | Payment | 3,999.00 | 920.92 | 3,078.08 | 248,641.73 |
| 2/11/2022 | Payment | 3,999.00 | 909.66 | 3,089.34 | 245,552.39 |
| 2/14/2022 | Payment | 3,999.00 | 898.36 | 3,100.64 | 242,451.75 |
| 2/15/2022 | Payment | 3,999.00 | 887.01 | 3,111.99 | 239,339.76 |
| 2/16/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 272,430.26 |
| 2/16/2022 | Payment | 3,999.00 | 996.69 | 3,002.31 | 269,427.96 |
| 2/17/2022 | Payment | 3,999.00 | 985.71 | 3,013.29 | 266,414.66 |
| 2/18/2022 | Payment | 3,999.00 | 974.68 | 3,024.32 | 263,390.35 |
| 2/22/2022 | Payment | 3,999.00 | 963.62 | 3,035.38 | 260,354.97 |
| 2/22/2022 | Payment | 3,999.00 | 952.51 | 3,046.49 | 257,308.48 |
| 2/23/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 290,398.98 |
| 2/23/2022 | Payment | 3,999.00 | 1,062.43 | 2,936.57 | 287,462.41 |
| 2/24/2022 | Payment | 3,999.00 | 1,051.69 | 2,947.31 | 284,515.10 |
| 2/25/2022 | Payment | 3,999.00 | 1,040.90 | 2,958.10 | 281,557.00 |
| 2/28/2022 | Payment | 3,999.00 | 1,030.08 | 2,968.92 | 278,588.08 |
| 3/1/2022 | Payment | 3,999.00 | 1,019.22 | 2,979.78 | 275,608.30 |
| 3/2/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 308,698.80 |
| 3/2/2022 | Payment | 3,999.00 | 1,129.38 | 2,869.62 | 305,829.19 |
| 3/3/2022 | Payment | 3,999.00 | 1,118.88 | 2,880.12 | 302,949.07 |
| 3/4/2022 | Payment | 3,999.00 | 1,108.35 | 2,890.65 | 300,058.41 |
| 3/7/2022 | Payment | 3,999.00 | 1,097.77 | 2,901.23 | 297,157.18 |
| 3/8/2022 | Payment | 3,999.00 | 1,087.16 | 2,911.84 | 294,245.34 |
| 3/9/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 327,335.84 |
| 3/9/2022 | Payment | 3,999.00 | 1,197.56 | 2,801.44 | 324,534.40 |
| 3/10/2022 | Payment | 3,999.00 | 1,187.32 | 2,811.68 | 321,722.72 |
| 3/11/2022 | Payment | 3,999.00 | 1,177.03 | 2,821.97 | 318,900.75 |
| 3/14/2022 | Payment | 3,999.00 | 1,166.70 | 2,832.30 | 316,068.45 |
| 3/15/2022 | Payment | 3,999.00 | 1,156.34 | 2,842.66 | 313,225.80 |
| 3/16/2022 | Additional monies (see note) | (33,090.50) | 0.00 | (33,090.50) | 346,316.30 |
| 3/16/2022 | Payment | 3,999.00 | 1,267.01 | 2,731.99 | 343,584.30 |
| 3/17/2022 | Payment | 3,999.00 | 1,257.01 | 2,741.99 | 340,842.31 |
| 3/18/2022 | Payment | 3,999.00 | 1,246.98 | 2,752.02 | 338,090.29 |
| 3/21/2022 | Payment | 3,999.00 | 1,236.91 | 2,762.09 | 335,328.20 |
| 3/22/2022 | Payment | 3,999.00 | 1,226.81 | 2,772.19 | 332,556.01 |
| 3/23/2022 | Additional monies (see note) | (30,642.50) | 0.00 | (30,642.50) | 363,198.51 |

| Date | Transaction | Payment | Interest | Principle | Balance |
|---|---|---|---|---|---|
| 3/23/2022 | Payment | 3,999.00 | 1,328.77 | 2,670.23 | 360,528.28 |
| 3/24/2022 | Payment | 3,999.00 | 1,319.00 | 2,680.00 | 357,848.28 |
| 3/25/2022 | Payment | 3,999.00 | 1,309.20 | 2,689.80 | 355,158.47 |
| 3/28/2022 | Payment | 3,999.00 | 1,299.35 | 2,699.65 | 352,458.83 |
| 3/29/2022 | Payment | 3,999.00 | 1,289.48 | 2,709.52 | 349,749.30 |
| 3/30/2022 | Payment | 3,999.00 | 1,279.57 | 2,719.43 | 347,029.87 |
| 3/31/2022 | Payment | 566,076.00 | 1,269.62 | 564,806.38 | (217,776.52) |
| 3/31/2022 | Payment | 3,999.00 | 0.00 | 3,999.00 | (221,775.52) |
| 4/1/2022 | Payment | 3,999.00 | 0.00 | 3,999.00 | (225,774.52) |
| 4/11/2022 | Refund | (27,993.00) | 0.00 | (27,993.00) | (197,781.52) |
| | Totals - Net of Additional monies | 893,994.00 | 41,381.82 | 797,781.52 | |

Exhibit "8"

| | | | | | |
|---|---|---|---|---|---|
| JLK Construction LLC | | | Annual Interest Rate | | 169.3500% |
| Global Funding Experts - 7/13/22 | | | Daily Interest Rate | | 0.4640% |

| Date | Transaction | Payment | Interest | Principle | Balance |
|---|---|---|---|---|---|
| 7/14/2022 | Original Loan Amount | | | | 20,241.10 |
| | Loan fee deducted | | | | 0.00 |
| | Loan deposited | | | | 20,241.10 |
| 7/18/2022 | Payment | 2,499.00 | 375.65 | 2,123.35 | 18,117.75 |
| 7/19/2022 | Payment | 2,499.00 | 336.25 | 2,162.75 | 15,955.00 |
| 7/20/2022 | Payment | 2,499.00 | 296.11 | 2,202.89 | 13,752.11 |
| 7/21/2022 | Additional monies - see note | (19,546.10) | 0.00 | (19,546.10) | 33,298.21 |
| 7/21/2022 | Payment | 2,499.00 | 617.98 | 1,881.02 | 31,417.18 |
| 7/22/2022 | Payment | 2,499.00 | 583.07 | 1,915.93 | 29,501.25 |
| 7/25/2022 | Payment | 2,499.00 | 547.51 | 1,951.49 | 27,549.76 |
| 7/26/2022 | Payment | 2,499.00 | 511.29 | 1,987.71 | 25,562.06 |
| 7/27/2022 | Payment | 2,499.00 | 474.40 | 2,024.60 | 23,537.46 |
| 7/28/2022 | Additional monies - see note | (19,546.10) | 0.00 | (19,546.10) | 43,083.56 |
| 7/28/2022 | Payment | 2,499.00 | 799.58 | 1,699.42 | 41,384.14 |
| 7/28/2022 | Payment | 60,716.29 | 768.04 | 59,948.25 | (18,564.10) |
| 8/4/2022 | Additional monies - see note | (4,998.00) | (344.53) | (4,653.47) | (13,910.63) |
| | Totals - Net of Additional monies | 83,207.29 | 4,965.36 | 78,241.93 | |

Note: Additional Monies - The loan was broken into 18 amounts made on a weekly basis.  The lender only advances 4 of the 18 scheduled amounts for a total of $64,331.20.

On July 28, 2022, the lender withdrew the final payment of $60,716.29 to pay off the loan.
The lender then on August 4, 2022, sent additional funds in the amount of $4,998.00.
The amount withdrawn less the final additional funds provided resulted in the lender
receiving $13,910.63 in money in excess of the amounts loaned

Exhibit "9"

JLK Construction LLC                          Annual Interest Rate          263.1000%
Global Funding Experts - 8/5/22               Daily Interest Rate             0.7208%

| Date | Transaction | Payment | Interest | Principle | Balance |
|---|---|---|---|---|---|
| 8/9/2022 | Original Loan Amount | | | | 50,000.00 |
| | Loan fee deducted | | | | 5,000.00 |
| | Loan deposited | | | | 45,000.00 |
| 8/9/2022 | Payment | 590.45 | 324.37 | 266.08 | 44,733.92 |
| 8/10/2022 | Payment | 590.45 | 322.45 | 268.00 | 44,465.92 |
| 8/11/2022 | Payment | 590.45 | 320.52 | 269.93 | 44,195.99 |
| 8/12/2022 | Payment | 590.45 | 318.57 | 271.88 | 43,924.12 |
| 8/15/2022 | Payment | 590.45 | 316.61 | 273.84 | 43,650.28 |
| 8/16/2022 | Payment | 590.45 | 314.64 | 275.81 | 43,374.47 |
| 8/17/2022 | Payment | 590.45 | 312.65 | 277.80 | 43,096.67 |
| 8/18/2022 | Payment | 590.45 | 310.65 | 279.80 | 42,816.87 |
| 8/19/2022 | Payment | 590.45 | 308.63 | 281.82 | 42,535.06 |
| 8/22/2022 | Payment | 590.45 | 306.60 | 283.85 | 42,251.21 |
| 8/23/2022 | Payment | 590.45 | 304.56 | 285.89 | 41,965.32 |
| 8/24/2022 | Payment | 590.45 | 302.50 | 287.95 | 41,677.36 |
| 8/25/2022 | Payment | 590.45 | 300.42 | 290.03 | 41,387.33 |
| 8/26/2022 | Payment | 590.45 | 298.33 | 292.12 | 41,095.21 |
| 8/29/2022 | Payment | 590.45 | 296.22 | 294.23 | 40,800.98 |
| 8/30/2022 | Payment | 590.45 | 294.10 | 296.35 | 40,504.64 |
| 8/31/2022 | Payment | 590.45 | 291.97 | 298.48 | 40,206.15 |
| 9/1/2022 | Payment | 590.45 | 289.81 | 300.64 | 39,905.52 |
| 9/2/2022 | Payment | 590.45 | 287.65 | 302.80 | 39,602.71 |
| 9/6/2022 | Payment | 590.45 | 285.47 | 304.98 | 39,297.73 |
| 9/6/2022 | Payment | 590.45 | 283.27 | 307.18 | 38,990.55 |
| 9/7/2022 | Payment | 590.45 | 281.05 | 309.40 | 38,681.15 |
| 9/8/2022 | Payment | 590.45 | 278.82 | 311.63 | 38,369.52 |
| 9/9/2022 | Payment | 590.45 | 276.58 | 313.87 | 38,055.65 |
| 9/12/2022 | Payment | 590.45 | 274.31 | 316.14 | 37,739.51 |
| 9/13/2022 | Payment | 590.45 | 272.03 | 318.42 | 37,421.09 |
| 9/14/2022 | Payment | 590.45 | 269.74 | 320.71 | 37,100.38 |
| 9/15/2022 | Payment | 590.45 | 267.43 | 323.02 | 36,777.36 |
| 9/16/2022 | Payment | 590.45 | 265.10 | 325.35 | 36,452.01 |
| 9/19/2022 | Payment | 590.45 | 262.75 | 327.70 | 36,124.32 |
| 9/20/2022 | Payment | 590.45 | 260.39 | 330.06 | 35,794.26 |
| 9/21/2022 | Payment | 590.45 | 258.01 | 332.44 | 35,461.82 |
| 9/22/2022 | Payment | 590.45 | 255.62 | 334.83 | 35,126.99 |
| 9/23/2022 | Payment | 590.45 | 253.20 | 337.25 | 34,789.74 |
| 9/26/2022 | Payment | 590.45 | 250.77 | 339.68 | 34,450.06 |
| 9/27/2022 | Payment | 590.45 | 248.32 | 342.13 | 34,107.94 |
| 9/28/2022 | Payment | 590.45 | 245.86 | 344.59 | 33,763.34 |
| 9/29/2022 | Payment | 590.45 | 243.37 | 347.08 | 33,416.27 |
| 9/30/2022 | Payment | 590.45 | 240.87 | 349.58 | 33,066.69 |
| 10/3/2022 | Payment | 590.45 | 238.35 | 352.10 | 32,714.59 |
| 10/4/2022 | Payment | 590.45 | 235.81 | 354.64 | 32,359.95 |

| Date | Transaction | Payment | Interest | Principle | Balance |
|---|---|---|---|---|---|
| 10/5/2022 | Payment | 590.45 | 233.26 | 357.19 | 32,002.76 |
| 10/6/2022 | Payment | 590.45 | 230.68 | 359.77 | 31,642.99 |
| 10/7/2022 | Payment | 590.45 | 228.09 | 362.36 | 31,280.63 |
| 10/11/2022 | Payment | 590.45 | 225.48 | 364.97 | 30,915.66 |
| 10/11/2022 | Payment | 590.45 | 222.85 | 367.60 | 30,548.06 |
| 10/12/2022 | Payment | 590.45 | 220.20 | 370.25 | 30,177.81 |
| 10/13/2022 | Payment | 590.45 | 217.53 | 372.92 | 29,804.88 |
| 10/14/2022 | Payment | 590.45 | 214.84 | 375.61 | 29,429.27 |
| 10/17/2022 | Payment | 590.45 | 212.13 | 378.32 | 29,050.96 |
| 10/18/2022 | Payment | 590.45 | 209.41 | 381.04 | 28,669.91 |
| 10/19/2022 | Payment | 590.45 | 206.66 | 383.79 | 28,286.12 |
| 10/20/2022 | Payment | 590.45 | 203.89 | 386.56 | 27,899.56 |
| 10/21/2022 | Payment | 590.45 | 201.11 | 389.34 | 27,510.22 |
| 10/24/2022 | Payment | 590.45 | 198.30 | 392.15 | 27,118.07 |
| 10/25/2022 | Payment | 590.45 | 195.47 | 394.98 | 26,723.09 |
| 10/26/2022 | Payment | 590.45 | 192.63 | 397.82 | 26,325.27 |
| 10/27/2022 | Payment | 590.45 | 189.76 | 400.69 | 25,924.58 |
| 10/28/2022 | Payment | 590.45 | 186.87 | 403.58 | 25,521.00 |
| 10/31/2022 | Payment | 590.45 | 183.96 | 406.49 | 25,114.51 |
| 11/1/2022 | Payment | 590.45 | 181.03 | 409.42 | 24,705.09 |
| 11/2/2022 | Payment | 590.45 | 178.08 | 412.37 | 24,292.72 |
| 11/3/2022 | Payment | 590.45 | 175.11 | 415.34 | 23,877.38 |
| 11/4/2022 | Payment | 590.45 | 172.11 | 418.34 | 23,459.04 |
| 11/7/2022 | Payment | 590.45 | 169.10 | 421.35 | 23,037.69 |
| 11/8/2022 | Payment | 590.45 | 166.06 | 424.39 | 22,613.30 |
| 11/9/2022 | Payment | 590.45 | 163.00 | 427.45 | 22,185.85 |
| 11/10/2022 | Payment | 590.45 | 159.92 | 430.53 | 21,755.32 |
| 11/14/2022 | Payment | 590.45 | 156.82 | 433.63 | 21,321.69 |
| 11/14/2022 | Payment | 590.45 | 153.69 | 436.76 | 20,884.93 |
| 11/14/2022 | Payment | 26,090.30 | 0.00 | 26,090.30 | (5,205.37) |
| | Totals | 67,421.80 | 17,216.43 | 50,205.37 | |

Exhibit "10"

# JLK Construction, LLC
## Balance Sheet
### As of December 30, 2020

Tuesday, Mar 05, 2024 11:51:31 AM GMT-8 - Accrual Basis

|  |  | Total |
|---|---|---|
| **ASSETS** | | |
| **Current Assets** | | |
| **Bank Accounts** | | |
| Nodaway Valley Bank | | -18,349.27 |
| **Total Bank Accounts** | -$ | **18,349.27** |
| **Accounts Receivable** | | |
| Accounts Receivable | | 340,389.76 |
| **Total Accounts Receivable** | $ | **340,389.76** |
| **Other Current Assets** | | |
| Undeposited Funds | | 0.00 |
| **Total Other Current Assets** | $ | **0.00** |
| **Total Current Assets** | $ | **322,040.49** |
| **Fixed Assets** | | |
| Furniture and Equipment | | 282,361.44 |
| **Total Fixed Assets** | $ | **282,361.44** |
| **TOTAL ASSETS** | $ | **604,401.93** |
| **LIABILITIES AND EQUITY** | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| **Accounts Payable** | | |
| Post Petition Accounts Payable | | 0.00 |
| **Total Accounts Payable** | $ | **0.00** |
| **Other Current Liabilities** | | |
| Cindy Kagarice (deleted) | | 15,000.00 |
| john deere (deleted) | | 155,778.00 |
| Mary Lou Castle | | 12,500.00 |
| Nodaway - comm Loan#3180072 (deleted) | | 1,046.70 |
| Nodaway-Bank Loan #3180103 (deleted) | | 1,307.09 |
| Nodaway-Bank Loan #3190146 | | 237,846.20 |
| Payroll Liabilities | | 3,181.87 |
| SBA Payroll Protection Program (deleted) | | 9,403.51 |
| William Gerber | | 100,000.00 |
| **Total Other Current Liabilities** | $ | **536,063.37** |
| **Total Current Liabilities** | $ | **536,063.37** |
| **Long-Term Liabilities** | | |

# JLK Construction, LLC
## Balance Sheet

| | | |
|---|---|---|
| **SBA Small Business Loan Covid19** | | 149,900.00 |
| **Steve Roberts** | | 175,700.00 |
| **Total Long-Term Liabilities** | $ | 325,600.00 |
| **Total Liabilities** | $ | 861,663.37 |
| **Equity** | | |
| **Members Draw** | | -61,554.16 |
| **Retained Earnings** | | 64,475.98 |
| **Net Income** | | -260,183.26 |
| **Total Equity** | -$ | 257,261.44 |
| **TOTAL LIABILITIES AND EQUITY** | $ | 604,401.93 |

# JLK Construction, LLC
## Balance Sheet
### As of December 31, 2021

Tuesday, Mar 05, 2024 11:52:26 AM GMT-8 - Accrual Basis

|  | Total |
|---|---:|
| **ASSETS** | |
| **Current Assets** | |
| **Bank Accounts** | |
| **Nodaway Valley Bank** | 961,482.53 |
| **Total Bank Accounts** | $ 961,482.53 |
| **Accounts Receivable** | |
| **Accounts Receivable** | 109,552.89 |
| **Total Accounts Receivable** | $ 109,552.89 |
| **Other Current Assets** | |
| **Costs in Excess of Billings** | 337,298.00 |
| **Undeposited Funds** | 0.00 |
| **Total Other Current Assets** | $ 337,298.00 |
| **Total Current Assets** | $ 1,408,333.42 |
| **Fixed Assets** | |
| **Accumulated Depreciation** | -140,397.87 |
| **Ashland Scraper** | 40,936.25 |
| **Equipment - Tractor STE400** | 131,000.00 |
| **Equipment -Overseeder Single Seed Box** | 10,005.00 |
| **Equipment Purchased 12-2021** | 473,815.28 |
| **Equipment Trailer - Wagner Sales, Inc.** | 5,712.73 |
| **Ford F-250** | 96,230.00 |
| **Ford F250 2017** | 12,018.07 |
| **Furniture and Equipment** | 332,207.56 |
| **Hydraulic Excavator 306-07CR** | 93,640.83 |
| **Real Estate Purchased - Elwood** | 10,000.00 |
| **Subaru** | 81,013.00 |
| **Superintendent's Truck** | 58,700.00 |
| **Supervisor's Truck** | 58,700.00 |
| **Total Fixed Assets** | $ 1,263,580.85 |
| **TOTAL ASSETS** | $ 2,671,914.27 |
| **LIABILITIES AND EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| **Post Petition Accounts Payable** | 228,633.00 |
| **Total Accounts Payable** | $ 228,633.00 |
| **Credit Cards** | |

# JLK Construction, LLC
## Balance Sheet

| | | |
|---|---|---:|
| **Central Bank CC** | | |
|    **Cole Kagarice CC** | | 5,443.50 |
|    **Jesse Kagarice CC** | | 3,982.57 |
| **Total Central Bank CC** | $ | **9,426.07** |
| **Total Credit Cards** | $ | **9,426.07** |
| **Other Current Liabilities** | | |
|   **Direct Deposit Payable** | | 0.00 |
|   **GCM Capital LLC** | | 0.00 |
|   **Greenbox Capital** | | 4,396.60 |
|   **Jesse Kagarice** | | 0.00 |
|   **Mary Lou Castle** | | 0.00 |
|   **Nodaway-Bank Loan #3190146** | | 0.00 |
|   **Payroll Liabilities** | | 64.50 |
|    **101 Vacation- JLK** | | 0.00 |
|    **101-Union Dues** | | 143.40 |
|    **Child Support** | | 0.00 |
|    **Federal Taxes (941/944)** | | 0.00 |
|    **Federal Unemployment (940)** | | 692.75 |
|    **Federal _ Kansas** | | 0.00 |
|    **Kansas City-Tax JLk** | | 0.00 |
|    **Kansas-Kansas** | | 0.00 |
|    **KS Income Tax** | | 0.00 |
|    **KS Unemployment Tax** | | 0.00 |
|    **medicare-KS** | | 0.00 |
|    **Mkt Recovery Due** | | 0.00 |
|    **MO Income Tax** | | 0.00 |
|    **MO Unemployment Tax** | | 2,297.76 |
|    **Social Security-Kansas** | | 0.00 |
|    **Supp Dues 1290** | | 0.00 |
|    **Supp Dues 579** | | 0.00 |
|    **Vacation 101- Employee** | | 0.00 |
|    **Vacation 1290** | | 0.00 |
|    **Vacation-579** | | 0.00 |
|   **Total Payroll Liabilities** | $ | **3,198.41** |
|   **William Gerber** | | 0.00 |
| **Total Other Current Liabilities** | $ | **7,595.01** |
| **Total Current Liabilities** | $ | **245,654.08** |
| **Long-Term Liabilities** | | |
|   **2017 Ford F250 - Loan** | | 11,132.28 |
|   **Ally - Supervisor's Truck** | | 57,153.64 |

## JLK Construction, LLC
## Balance Sheet

| | | |
|---|---|---:|
| **CAT Financial - CAT Drum Roller** | | 101,277.87 |
| **CAT Financial - Hydraulic Excavator 306-07CR** | | 93,640.83 |
| **CNH Capital** | | 70,219.59 |
| **DLL Financial Solutions Partner** | | 34,810.53 |
| **Ein Cap Funding** | | 152,438.00 |
| **Ford Credit - superintendent's Truck** | | 56,821.40 |
| **Ford Finance King Ranch** | | 90,713.71 |
| **Global Funding Experts** | | 163,839.00 |
| **Legend Funding** | | 116,978.07 |
| **Montrose Savings Bank** | | 21,975.22 |
| **Nodaway - Commerical Loan 3210167** | | 167,733.14 |
| **People's United Equipment Finance CAT Motorgrader** | | 112,706.94 |
| **People's United Equipment Finance Corp Acct104944** | | 443,815.28 |
| **Peoples United Equipment - 2013 STE400** | | 87,184.97 |
| **Providence Capital Lease** | | 106,617.56 |
| **SBA Small Business Loan Covid19** | | 146,163.45 |
| **Steve Roberts** | | 141,300.00 |
| **Subaru Motors** | | 81,013.00 |
| **Total Long-Term Liabilities** | $ | **2,257,534.48** |
| **Total Liabilities** | $ | **2,503,188.56** |
| **Equity** | | |
| **Members Draw** | | -192,333.96 |
| **Retained Earnings** | | -291,823.52 |
| **Net Income** | | 652,883.19 |
| **Total Equity** | $ | **168,725.71** |
| **TOTAL LIABILITIES AND EQUITY** | $ | **2,671,914.27** |

# JLK Construction, LLC
## Balance Sheet
### As of December 31, 2022

Tuesday, Mar 05, 2024 11:53:13 AM GMT-8 - Accrual Basis

|  | Total |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Bank Accounts** | |
| Bison State Bank Checking (-096) | 100,002.07 |
| Central Bank of the Midwest (deleted) | 480.97 |
| Nodaway Valley Bank | 543.79 |
| **Total Bank Accounts** | $ 101,026.83 |
| **Accounts Receivable** | |
| Accounts Receivable | 369,403.55 |
| **Total Accounts Receivable** | $ 369,403.55 |
| **Other Current Assets** | |
| Costs in Excess of Billings | 0.00 |
| Prepaid Assets | 143,369.00 |
| Undeposited Funds | 0.00 |
| **Total Other Current Assets** | $ 143,369.00 |
| **Total Current Assets** | $ 613,799.38 |
| **Fixed Assets** | |
| 2007 KW | 67,920.00 |
| 2022 Polaris 3NSN4E001NF586725 | 2,000.00 |
| Accumulated Depreciation | -619,511.01 |
| Ashland Scraper | 0.00 |
| Equipment - 2007 Kenworth Road Tractor | 16,980.00 |
| Equipment - Tractor STE400 | 131,000.00 |
| Equipment -Overseeder Single Seed Box | 10,005.00 |
| Equipment 2022 Polaris Ranger Z22N4E99AN | 36,792.36 |
| Equipment Purchased 12-2021 | 473,815.28 |
| Equipment Trailer - Wagner Sales, Inc. | 5,712.73 |
| Ford F-250 | 96,230.00 |
| Ford F250 2017 | 12,903.86 |
| Furniture and Equipment | 292,207.56 |
| Hydraulic Excavator 306-07CR | 93,640.83 |
| Leasehold Improvements | 19,379.50 |
| Machinery & Equipment | 3,703,684.09 |
| Polaris Ranger | 13,620.16 |
| Real Estate Purchased - Elwood | 150,000.00 |
| Subaru | 81,013.00 |
| Superintendent's Truck | 58,700.00 |

### JLK Construction, LLC
### Balance Sheet

| | | |
|---|---|---:|
| **Supervisor's Truck** | | 58,700.00 |
| **Total Fixed Assets** | $ | **4,704,793.36** |
| **Other Assets** | | |
| **Intangible Assets** | | |
| **Accumulated Amortization** | | -16,192.89 |
| **SBA Loan Origination Fees** | | 647,715.00 |
| **Total Intangible Assets** | $ | **631,522.11** |
| **Total Other Assets** | $ | **631,522.11** |
| **TOTAL ASSETS** | $ | **5,950,114.85** |
| **LIABILITIES AND EQUITY** | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| **Accounts Payable** | | |
| **Post Petition Accounts Payable** | | 1,488,677.62 |
| **Total Accounts Payable** | $ | **1,488,677.62** |
| **Credit Cards** | | |
| **Central Bank CC** | | 254.39 |
| **Burkdoll CC** | | 7,661.08 |
| **Central bank CC main account** | | 3,000.00 |
| **Cindy CC** | | 11,282.80 |
| **Cole Kagarice CC** | | 40,195.00 |
| **Jason McManus** | | 11,103.95 |
| **Jesse Kagarice CC** | | 59,578.83 |
| **Roy Kagarice CC** | | 31,643.02 |
| **Service Truck 6793** | | 1,305.55 |
| **Truck service 7148** | | 18,322.65 |
| **Total Central Bank CC** | $ | **184,347.27** |
| **Total Credit Cards** | $ | **184,347.27** |
| **Other Current Liabilities** | | |
| **4K Hauling** | | 50,000.00 |
| **Advanced Solutions** | | 0.00 |
| **Alva Advance 1st** | | 119,336.00 |
| **Alva Advance 2nd** | | 71,514.00 |
| **Cindy Kagarice** | | 6,000.00 |
| **Direct Deposit Payable** | | 0.00 |
| **FFCG LLC** | | 0.00 |
| **GCM Capital LLC** | | 0.00 |
| **Greenbox Capital** | | 0.00 |
| **Jayme Kagarice Personal Account** | | 24,925.00 |
| **Jesse Kagarice** | | 0.00 |

# JLK Construction, LLC
## Balance Sheet

| | | |
|---|---|---:|
| Mary Lou Castle | | 0.00 |
| Nodaway-Bank Loan #3190146 | | 80,000.00 |
| Payroll Liabilities | | 0.00 |
| 101 Vacation- JLK | | 0.00 |
| 101-Union Dues | | 0.00 |
| Child Support | | 0.00 |
| Federal Taxes (941/944) | | 0.00 |
| Federal Unemployment (940) | | 0.00 |
| Federal _ Kansas | | 0.00 |
| Kansas City-Tax JLk | | 0.00 |
| Kansas-Kansas | | 0.00 |
| KS Income Tax | | 0.00 |
| KS Unemployment Tax | | 0.00 |
| medicare-KS | | 0.00 |
| Mkt Recovery Due | | 0.00 |
| MO Income Tax | | 0.00 |
| MO Unemployment Tax | | 0.00 |
| Social Security-Kansas | | 0.00 |
| Supp Dues 1290 | | 0.00 |
| Supp Dues 579 | | 0.00 |
| Vacation 101- Employee | | 0.00 |
| Vacation 1290 | | 0.00 |
| Vacation-579 | | 0.00 |
| Total Payroll Liabilities | $ | 0.00 |
| Premium Merchant Funding | | 0.00 |
| William Gerber | | 0.00 |
| Total Other Current Liabilities | $ | 351,775.00 |
| Total Current Liabilities | $ | 2,024,799.89 |
| Long-Term Liabilities | | |
| 2017 Ford F250 - Loan | | 0.00 |
| Ally - Supervisor's Truck | | 49,539.58 |
| Arnold William Gerber | | 145,000.00 |
| Bank of the Midwest 2009 Lowboy Loan | | 60,800.71 |
| CAT Financial - CAT Drum Roller | | 84,076.23 |
| CAT Financial - Hydraulic Excavator 306-07CR | | 78,015.41 |
| Central Bank of the Midwest - Commercial Loan 2085 | | 119,769.60 |
| CNH Capital | | 58,738.72 |
| DLL Financial Solutions Partner | | 0.00 |
| Ein Cap Funding | | 108,655.00 |

# JLK Construction, LLC
## Balance Sheet

| | | |
|---|---|---:|
| **Everest Funding** | | 53,407.77 |
| **Ford Credit - superintendent's Truck** | | 49,261.03 |
| **Ford Finance King Ranch** | | 78,363.34 |
| **Fundamental Capital** | | 481,624.18 |
| **Global Funding Experts** | | 0.00 |
| **Legend Funding** | | 0.00 |
| **Montrose Savings Bank** | | 0.00 |
| **Newtek SBA 7a loan** | | 4,911,745.13 |
| **Nodaway - Commerical Loan 3210167** | | 127,708.89 |
| **People's United Equipment Finance CAT Motorgrader** | | 83,011.11 |
| **People's United Equipment Finance Corp Acct104944** | | 2,714.06 |
| **Peoples United Equipment - 2013 STE400** | | 60,907.39 |
| **Providence Capital Lease** | | 88,558.46 |
| **Providence Capital Lease 2** | | 181,257.09 |
| **Rapid Finance** | | 54,819.94 |
| **SBA Small Business Loan Covid19** | | 487,357.29 |
| **Steve Roberts** | | 0.00 |
| **Subaru Motors** | | 70,379.81 |
| **Total Long-Term Liabilities** | $ | **7,435,710.74** |
| **Total Liabilities** | $ | **9,460,510.63** |
| **Equity** | | |
| **Members Draw** | | -105,212.35 |
| **Retained Earnings** | | -249,082.79 |
| **Net Income** | | -3,156,100.64 |
| **Total Equity** | -$ | **3,510,395.78** |
| **TOTAL LIABILITIES AND EQUITY** | $ | **5,950,114.85** |